UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MAKE THE ROAD NEW YORK, AFRICAN SERVICES
COMMITTEE, ASIAN AMERICAN FEDERATION,
CATHOLIC CHARITIES COMMUNITY SERVICES
(ARCHDIOCESE OF NEW YORK), and CATHOLIC
LEGAL IMMIGRATION NETWORK, INC.,

Plaintiffs,

- against -

KEN CUCCINELLI, in his official capacity as Acting
Director of United States Citizenship and Immigration
Services; UNITED STATES CITIZENSHIP &
IMMIGRATION SERVICES; KEVIN K. McALEENAN,
in his official capacity as Acting Secretary of Homeland
Security; and UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

Defendants.

**COMPLAINT**

---

Plaintiffs Make the Road New York ("MRNY"), African Services Committee

("ASC"), Asian American Federation ("AAF"), Catholic Charities Community Services

(Archdiocese of New York) ("CCCS-NY"), and Catholic Legal Immigration Network, Inc.

("CLINIC"), for their Complaint against defendants Ken Cuccinelli and Kevin K. McAleenan, in

their respective official capacities; the United States Citizenship and Immigration Services

("USCIS"); and the United States Department of Homeland Security ("DHS"), allege as follows:

## PRELIMINARY STATEMENT

1.      Defendants have promulgated a rule (the "Rule")[1] that seeks to deny

lawful permanent residence in the United States to millions of law-abiding aspiring immigrants

with low incomes and limited assets.  Most of them are the husbands and wives, parents and

---

[1]     *See* Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R.
pts. 103, 212, 213, 214, 245, 248).

children of U.S. citizens.  For the first time in history, the Rule would impose a wealth test on the primary doorway to U.S. citizenship for immigrants.

2.      The Rule purports to implement a narrow provision of the Immigration and Nationality Act (the "INA") that bars admission and lawful permanent residence ("LPR," or so-called "green card" status) to any noncitizen who immigration officials conclude is "likely to become a public charge."  For more than a century, courts and administrative agencies have recognized that this provision applies only to noncitizens who are destitute and unable to work, and who are thus likely to be predominantly reliant on government aid for subsistence.  In that time, Congress has repeatedly re-enacted the public charge provisions of the Act without material change.  And it has expressly rejected efforts to broaden its scope.

3.      Defendants now seek through the Rule to redefine "public charge" to dramatically expand the government's power to exclude noncitizens and deny them green cards.  Under the Rule, green card status—for the vast majority of immigrants, a necessary condition to achieving citizenship—would be denied to certain, predominantly nonwhite, noncitizens who USCIS loosely predicts are likely to receive even a small amount of specified government benefits at any time in the future.  Even the predicted receipt of noncash benefits (such as Medicaid and the Supplemental Nutrition Assistance Program ("SNAP," the former food stamp program)) that are widely used by working families to supplement their earnings— and that, under existing law, are expressly excluded from public charge consideration—would render applicants ineligible for a green card.  The Rule would fundamentally transform American immigration law—and, indeed, foundational principles of American democracy—by conditioning lawful permanent residence on high incomes and a perceived ability to

accumulate enough wealth to fully absorb the prospective impacts of health problems or wage losses.

4.      The Rule, entitled "Inadmissibility on Public Charge Grounds" and set to become effective on October 15, 2019, threatens grave, imminent harm to immigrants, their families, and their communities, and to immigrant assistance organizations such as plaintiffs here.  The nonpartisan Migration Policy Institute has estimated that more than half of all family-based green card applicants could not meet the factor the Rule weights most heavily in favor of an immigrant's adjustment of status, an income of 250 percent of the Federal Poverty Guidelines ("FPG").[2]  The Migration Policy Institute has also estimated that 69 percent of recent green card recipients had one or more factors that the Rule weights negatively, and 43 percent had two or more negative factors.[3]  As defendants intend, the impact of the Rule would be felt disproportionately by immigrants from countries with predominantly nonwhite populations, including those from Mexico, Central America, the Caribbean, China, the Philippines, and Africa.

5.      The harm the Rule will cause is not limited to future denials of green card status.  Far from it.  As defendants concede—and intend—the Rule will also likely cause hundreds of thousands of immigrants annually not to access benefits to which they are lawfully entitled.  Since press reports surfaced in January 2017 of a draft Executive Order directing DHS to adopt a broadened definition of "public charge," large numbers of noncitizens have

---

[2]     Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public-Charge" Rule*, Migration Policy Institute (Aug. 2018), https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule. This study was referenced in numerous public comments, including, *e.g.*, those submitted by the National Hispanic Leadership Agenda, and the Service Employees International Union.

[3]     Randy Capps et al., *Gauging the Impact of DHS' Proposed Public-Charge Rule on U.S. Immigration*, Migration Policy Institute (Nov. 2018), https://www.migrationpolicy.org/research/impact-dhs-public-charge-rule-immigration. This study was referenced in numerous public comments, including, *e.g.*, those submitted by the National Center for Law and Economic Justice, and the Massachusetts Attorney General.

already chosen not to participate in public benefit programs for fear of damaging their

immigration status.  DHS has also acknowledged that the losses of benefits resulting from the

Rule could lead to "[w]orse health outcomes," "[i]ncreased use of emergency rooms and urgent

care as a method of primary health care due to delayed treatment"; "[i]ncreased prevalence of

communicable diseases"; "[i]ncreased rates of poverty and housing instability"; and "[r]educed

productivity and educational attainment," among other dire harms.[4]  In fact, numerous studies

cited in public comments on the proposed Rule have shown that DHS's estimates drastically

understate the harm the Rule will cause.[5]

> 6.     Nothing in the INA justifies or authorizes the Rule.  On the contrary, the

Rule is inconsistent with the language of the Act and with more than a century of judicial

precedent and administrative practice.  As DHS has admitted, "[a] series of administrative

decisions after passage of the [INA] clarified . . . that receipt of welfare would not, alone, lead

to a finding of likelihood of becoming a public charge."  83 Fed. Reg. at 51,125.  Consistent

with these decisions and the settled meaning of "public charge," USCIS's predecessor agency,

the Immigration and Naturalization Service ("INS"), determined in 1999 that "mere receipt of

public assistance, by itself, will not lead to a public charge finding."[6]  INS's 1999 published

field guidance (the "Field Guidance"), which has been in effect for more than 20 years,

expressly excluded from public charge consideration receipt of such supplemental noncash

benefits as Medicaid and SNAP, thus permitting intending immigrants who were not primarily

---

[4]   Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,270 (proposed Oct. 10, 2018) (to be
      codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248).
[5]   *E.g.*, California Immigrant Policy Center, Comment, at 3 (Dec. 10, 2018).  Throughout this Complaint, public
      comments on the proposed Rule will be cited by referring to the name of the organization or individual that
      submitted them.
[6]   Inadmissibility and Deportability on Public Charge Grounds, 64 Fed. Reg. 28,676, 28,677 (proposed May 26,
      1999) (to be codified at 8 C.F.R. pts. 212, 237).

dependent on cash assistance to obtain crucial health or other services for themselves and their families without losing eligibility for green cards.[7]

    7. The Rule overturns this historical understanding.  It seeks to label as "public charges" a far larger group of intending immigrants, including noncitizens who receive any amount of cash or noncash public benefits for even a short duration.  Thus, a noncitizen could be branded likely to be a public charge for receiving benefits such as Medicaid, SNAP, and public housing subsidies that are widely used by low-wage workers and are available to beneficiaries with earned income well above the poverty line.  Receipt of such benefits would not have been considered in any public charge determination under existing law, including the Field Guidance.  And, because determining whether someone is "likely to become a public charge" is inherently predictive, the Rule would bar green card status to any noncitizen whom USCIS agents predict is likely to receive even a minimal amount of such benefits at any time in the future.  Under the Rule, green card status could also be denied on the ground that an applicant has limited assets and works at a job that is low-wage or does not provide health insurance.  The Rule would also predicate a "public charge" finding on a wide variety of other factors that have never previously been considered relevant, including such vague and standardless (and non-statutory) factors as English fluency and credit score.

    8. The Rule thus attempts to rewrite the INA without action by Congress, and it does so in a way that Congress has expressly and repeatedly rejected.  Between 1996 and 2013, Congress rejected multiple efforts to define "public charge" to include the receipt of

---

[7] *See* Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999).

noncash supplemental benefits.  On the contrary, Congress has repeatedly reenacted the public charge provisions of the INA without material change.

9.     Defendants fully understand and intend the dramatic change the Rule will make to U.S. immigration law.  Stephen Miller, the President's senior advisor on immigration and a principal architect of the Rule, has said that the Rule will be "transformative," and defendant Ken Cuccinelli, in announcing the publication of the Rule, stated that it would "reshape" the system of obtaining lawful permanent residence.  They are right.  But under the Constitution, it is up to Congress, not the Department of Homeland Security, to "transform[]" or "reshape" U.S. law.

10.     The Rule also is "transformative" in that it undermines the goal of family unity, which has been a cornerstone of U.S. immigration policy for nearly a century. Beginning in 1921, Congress expanded the categories of family members of citizens and green card holders able to seek admission or status adjustment through their relatives to further the "well-established policy of maintaining family unity."  Revision of Immigration and Nationality Laws, S. Rep. No. 1137, at 16 (1952).  The Immigration Act of 1965, also called the Hart-Celler Act, Pub. L. No. 89-236, 79 Stat. 911, adopted an immigration policy designed to "first reunite families," H.R. Rep. No. 89-745, at 12 (1965).[8]  Congress has never retreated from that policy.  The Rule will predominantly affect family-based aspiring immigrants, and thus will undermine decades of immigration law promoting and protecting family stability, unity, and well-being through the process of granting lawful permanent residence.

---

[8]     *See* Albertina Antognini, *Family Unity Revisited: Divorce, Separation, and Death in Immigration Law*, 66 S.C. L. Rev. 1, 4 (2014).

11.   The Rule seeks to achieve by fiat what the Trump Administration has failed to achieve through legislation.  The Trump Administration explicitly sought to reduce family-based immigration and convert U.S. immigration policy to a "merit"-based system.  But its efforts to achieve that goal through legislation have failed. The Rule now seeks to circumvent Congress in furtherance of that goal.

12.   The Rule accordingly violates the Administrative Procedure Act ("APA") because it is not in accordance with law, and is arbitrary, capricious, and an abuse of discretion.

13.   Even more fundamentally, under the plain language of the INA, DHS issued the Rule without statutory authority.  The INA expressly grants the authority to regulate public charge determinations for noncitizens seeking adjustment of status not to DHS, but to the Attorney General.  Accordingly, the promulgation of the Rule was enacted "in excess of statutory jurisdiction, authority, or limitations," in further violation of the APA.  5 U.S.C. § 706(2)(C).

14.   The Rule violates the APA for additional reasons.  Defendants fail to address substantive objections raised in the more than 266,000 public comments—the vast majority of them opposing the proposed rule—from state and local governments, health care providers, educators, religious organizations, members of Congress, business organizations, independent policy analysts, and others.  Defendants fail to establish the premise of the Rule that certain arbitrary and in some cases undefined circumstances, such as the minimal receipt of temporary benefits or lack of English proficiency, are reliable predictors of becoming a public charge.  This premise is disconnected from the reality of the immigrant experience in the United States.  Defendants fail to justify DHS's dramatic departure from prior agency

7

interpretation of the INA, including the Field Guidance. And, while purporting to apply only to green card applications submitted after its effective date, the Rule is impermissibly retroactive, as well as so confusing, broad, and vague, and internally inconsistent that it fails to give applicants notice of conduct to avoid and invites arbitrary decision-making by government officials.

15.     The Rule also discriminates against people with disabilities contrary to Section 504 of the Rehabilitation Act of 1973. 29 U.S.C. § 794.

16.     Finally, the Rule violates the Constitution because its adoption was driven by unconstitutional animus against nonwhite immigrants. The Rule—which originated in a nativist think tank, and subsequently in a draft Executive Order—reflects the President's and his advisors' longstanding hostility to nonwhite immigrants from what he has referred to as "shithole countries," and whom he has characterized as "animals" who are "infesting" the United States. He has repeatedly referred to immigration from the southern border as an "invasion." Defendant Cuccinelli, the acting USCIS Director and the primary public face of the Administration's defense of the Rule, has for many years similarly referred to entry of undocumented immigrants from Mexico as an "invasion." In a recent televised interview, when asked whether the Rule was consistent with the ethos of the Statue of Liberty's welcoming words to "your tired, your poor, your huddled masses yearning to breathe free," Cuccinelli responded that those words were addressed to "people coming from Europe." Multiple courts, including at least two district courts in this Circuit, have already found it "plausible" that other anti-immigrant actions by the current Administration—including actions undertaken by DHS—were motivated by just such unconstitutional animus.

17.    Plaintiffs are national and community-based non-profit organizations that advise, assist, advocate for, and serve hundreds of thousands of low-income noncitizens and their families in New York City and nationwide.  The Rule will impede their core missions, and they will be forced to allocate substantial time and resources to respond to the impact the Rule will have on noncitizen families in New York and elsewhere. Accordingly, they bring this action under the APA and the Fifth Amendment to the United States Constitution to enjoin the Rule, declare it unlawful, and set it aside.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the United States Constitution, the APA, 5 U.S.C. § 551 *et seq*., and the INA, 8 U.S.C. § 1101 *et seq*.

19.    The publication of the final Rule in the Federal Register, on August 14, 2019, constitutes final agency action within the meaning of 5 U.S.C. § 704.

20.    Venue is proper in this district pursuant to 28 U.S.C. § 1391, because the adjudication of family-based adjustment of status applications occurs at the USCIS New York Field Office located at 26 Federal Plaza, New York, New York 10278, which is in this district, and is where MRNY's members, and ASC's and CCCS's clients, would have their adjustment of status applications adjudicated.  Venue in this district is also proper because Plaintiffs MRNY, ASC, AAF, and CCCS have offices in this district.

## PARTIES

### I.    Plaintiffs

21.    Plaintiff Make the Road New York ("MRNY") is a nonprofit, membership-based community organization with more than 23,000 members residing in New

York City, Long Island and Westchester.  Its mission is to build the power of immigrant and working-class communities to achieve dignity and justice.  Its work involves four core strategies: Legal and Survival Services, Transformative Education, Community Organizing and Policy Innovation. MRNY regularly creates and disseminates educational and outreach materials and conducts workshops for its members and the public on issues affecting working-class and immigrant communities. MRNY also mobilizes community members to engage in organizing and public-policy advocacy efforts around the organization's priorities.

22.     Through its legal, health and education teams, MRNY provides direct services to thousands of immigrant New Yorkers.  Among other matters, MRNY's legal team represents thousands of immigrants in removal proceedings or filing affirmative applications for immigration benefits, including individuals seeking adjustment of status. Its health team assists immigrants in accessing health services and navigating the health system as well as advocating for improved access to healthcare for immigrants.  And its adult education team focuses on English as a second language, civics, basic adult education, and citizenship classes for immigrant New Yorkers.  In 2018 alone, across its five community centers, MRNY provided direct services to over 10,000 individuals (not including their family members who benefited from its services).

23.     During the public notice-and-comment period, MRNY submitted to USCIS a detailed comment documenting numerous harms the Rule would inflict on its members and immigrant communities.  MRNY's comment demonstrated the Rule's substantial chilling effect on families and individuals entitled to nutritional and health assistance; the risks to public health and children should the Rule take effect; and the economic losses and increased suffering of immigrant communities.  MRNY's comment also criticized the Rule's

10

racist intent and disproportionate impact on Latinx communities; the irrationality of the

English-language proficiency requirement; and the incoherence and unlawfulness of the Rule's

alteration of the test to determine whether an immigrant is or may become a public charge.

24.    MRNY also assisted approximately 300 of its members in submitting

comments.

25.    The Rule is causing substantial harm to MRNY.  MRNY's mission of

advocating for the rights of low-income immigrant communities is inseparable from the

interests of its members in not being denied admission or adjustment of their immigration

status, in receiving vital public benefits, and in maintaining family integrity and unity.

Defendants' actions also harm MRNY, and threaten it with ongoing and future harm, by

causing the organization to divert resources in response to defendants' actions, including by

assisting immigrants who may receive or need to receive public benefits on behalf of

themselves and their families in navigating this new, more onerous regulatory framework.

MRNY's members and clients who are preparing to file for adjustment of status face the

prospect of denial and ultimately removal from the U.S. should the Rule take effect.  Since the

Rule was proposed, MRNY has held dozens of workshops to address questions and concerns

among its members and devoted significant organizational resources to educating, screening

and assisting members and other members of the public in responding to the Rule. MRNY's

legal team has to divert resources to provide consultations and advice to immigrant New

Yorkers who may be impacted under this Rule.  In the event that adjustment applications are

denied on public charge grounds, MRNY will have to devote resources to representing its

members and clients in removal proceedings. Defendants' actions also increase the already

significant fears and needs of New York's immigrant community, impeding MRNY's goals of mobilizing and empowering its constituency.

26.    Plaintiff African Services Committee ("ASC") is a non-profit multi-service human rights agency based in the Manhattan neighborhood of Harlem, and dedicated to mobilizing and empowering  immigrants, refugees, and asylees from across the African Diaspora, filling gaps in the pathway to achievement of economic self-sufficiency.  ASC's departments provide, among other things, housing placement, rental assistance, health screening access to care, and mental health services for hundreds of immigrants, especially those living with and at risk for HIV/AIDS and viral hepatitis; legal representation in immigration proceedings, including those for adjustment of status, providing increasing levels of assistance with legal application fees and emergency financial support to fill one-time needs, from private sources of funding; English language classes for immigrants; food pantry and nutrition services; and development of leadership skills of immigrants through community education and organizing. In seeking to educate and organize the communities it serves, ASC also publishes fact sheets, newsletters, and policy notes, which include updates and information on immigration policies with the potential to impact its clients.

27.    During the public notice-and-comment period, ASC submitted to USCIS a detailed comment documenting numerous harms the Rule would inflict on its clients and immigrant communities generally, with a particular focus on the risks to health care access for those with HIV/AIDS.

28.    Defendants' actions threaten substantial harm to ASC's ability to accomplish its mission.  ASC's clients who are preparing to file for adjustment face the prospect of denial and ultimately removal from the U.S. should the Rule take effect.  ASC's

clients are at particular risk because many live with chronic health conditions currently

protected under the Americans with Disability Act ("ADA") and lack private health insurance.

The Rule reinforces the concept of disability being a public burden, and will adversely affect

immigrants with disabilities like many of ASC's clients, who are more likely than non-disabled

immigrants to be living on or below the poverty line and utilizing public benefits for survival.

For example, people with disabilities often need help with daily activities that are covered by

Medicaid, but typically are not covered by private insurance. As another, children whose

immigrant parents have disabilities will suffer due to being denied access to programs that

provide them shelter and food, even if they were born in the U.S. In the worst-case scenario,

children may be forcibly separated from their parents and placed into foster care.

   29. The Rule is also affecting ASC's ability to connect clients with the

benefits and services they need due to the warranted fear that receiving benefits today will be

held against them in the future when they pursue their goals of seeking adjustment of status.

   30. Because of the Rule's impact on ASC clients and constituents, among the

many legal needs presented by clients, the organization has no choice but to devote significant

resources to responding to the Rule. ASC has had to prioritize assisting applicants for

adjustment who can file before the Rule's October 15, 2019, effective date, and at the same

time counsel staff, community partners, and clients with urgent questions about whether

receiving the benefits and services that keep them healthy and secure will undermine their

ability to remain permanently in their communities surrounded by their networks of support.

The consequences of choosing to forego benefits, especially healthcare and housing assistance,

would be detrimental for ASC clients living with chronic health conditions and would derail

their efforts to work, pursue education and training, and achieve their goals of success. In the

13

event that adjustment applications are denied on public charge grounds, ASC will have to devote resources to representing its clients in removal proceedings.

31.    Plaintiff Asian American Federation ("AAF") is a non-profit umbrella leadership and organizational development network based in lower Manhattan and Flushing, Queens, with a mission of building the influence and well-being of the pan-Asian American community.  AAF represents over 70 community services agencies throughout the northeast who work in health and human services, education, economic development, civic participation, and social justice, and are focused on serving low-income Asian immigrants and their families. In serving these members, AAF provides information and advocacy tools aimed at the low-income constituents of their members and for use by member staff; initiates research and data analysis to assess community needs, improve service delivery, and make policy recommendations; develops research on critical policy issues; raises awareness of problems by engaging with government stakeholders and the media; and provides training and capacity-building support to AAF member agencies.

32.    During the public notice-and-comment period, AAF submitted to USCIS a detailed comment documenting numerous harms the Rule would inflict on its clients and immigrant communities generally, with a particular focus on the Rule making it harder for Asian immigrants to adjust and the chilling effect caused by the Rule.

33.    Defendants' actions harm AAF in numerous ways.  For low-income Asian immigrants, just like others, the Rule represents an emergency that requires immediate, critical decisions be made about pursuing plans to adjust, seeking to preserve the ability to adjust by foregoing public benefits, and dealing with the fallout from foregoing such benefits: immediate, adverse impacts on health, increased hunger, and housing instability.  To fulfill its

14

mission of building the influence and well-being of its constituent communities, AAF has been required to expend resources providing the information, services, and expertise its members need to address this unfolding emergency, and at the same time represent member interests by engaging with government actors, Asian-language media, and the public to help get the word out about the Rule and its impacts, especially in the low-immigrant Asian neighborhoods and communities.

34.    Plaintiff Catholic Charities Community Services (Archdiocese of New York) ("CCCS-NY") is a nonprofit organization within the Archdiocese of New York, with program sites and affiliates located throughout New York City and the Lower Hudson Valley. CCCS-NY's mission is to provide high quality human services to New Yorkers of all religions who are in need, especially the most vulnerable: the newcomer, the family in danger of becoming homeless, the hungry child, persons struggling with their mental health and developing youth.  CCCS-NY's mission is grounded in the belief in dignity of each person and the building of a just and compassionate society.

35.    CCCS-NY has been pursuing this mission since 1949 through a network of programs and services that enable participants to access eviction/homelessness prevention; tenant education and financial literacy training; case management services to help people resolve financial, emotional and family issues; long-term disaster case management services to help hurricane survivors rebuild their homes and lives; emergency food and access to benefits and other resources; immigration legal services; refugee resettlement; English as a second language services; specialized assistance for the blind; after-school and recreational programs for children and youth; dropout prevention and youth employment programs; and supportive housing programs for adults with severe mental illness.

15

36.     CCCS-NY includes a 150-employee Immigrant and Refugee Services Division, which provides legal counsel, deportation defense, and application assistance— including litigation, family unity, asylum support, naturalization, and more—to immigrants; conducts large scale legal services initiatives throughout the Lower Hudson Valley; provides legal orientation, know your rights, and legal defense to unaccompanied children; offers resettlement and orientation support to refugees; provides English as a second language and cultural instruction; and operates three information hotline services, which respond to over 64,000 calls annually.  Two of those hotlines are fundamental to the provision of legal services and legal information by New York City and New York State.  These are the "ActionNYC Hotline" and the "New Americans Hotline," which answer over 43,000 calls in 18 languages annually and make referrals to social service providers throughout New York State each year. During 2018, the Immigrant and Refugee Services programming directly assisted over 20,000 individuals—children, families, workers—in New York.

37.     During the public notice-and-comment period, CCCS-NY submitted to USCIS a comment documenting the harms the Rule would inflict on immigrant communities, including increased suffering for families and children due to immigrants' foregoing food and health care assistance for fear of losing access to immigration status.  CCCS-NY's comment also criticized the Rule's unlawful and confusing alteration of the test to determine whether an immigrant is or may become a public charge; the likelihood of arbitrary and discriminatory application of the new standards; and the arbitrary, costly, and inequitable increase in the Rule's public bond requirements.

38.     Defendants' actions directly harm CCCS-NY in multiple ways.  The Rule threatens CCCS-NY's ability to achieve its core mission of helping to assist vulnerable

immigrants—families, children, long-time residents, workers—establish their footing in the communities they serve, whether through obtaining LPR status to preserve and protect family unity or ensuring that clients who are eligible continue to access critical government services and benefits that support vulnerable families.   The Rule also requires CCCS-NY to devote substantial resources to assist its clients in understanding and addressing its impact. Further, CCCS-NY's clients who are preparing to file for adjustment of status face the prospect of denial and ultimately removal from the U.S. should the Rule take effect. In the event that adjustment applications are denied on public charge grounds, CCCS-NY will have to devote resources to representing its clients in removal proceedings.

39.    Given the critical role the CCCS-NY hotlines play in the State and City response to public charge, CCCS-NY is on the front line of responding to the impact of the Rule—on New Yorkers who want to adjust to LPR status and their families, and on New Yorkers who are considering giving up SNAP, housing assistance, and essential health care because they do not understand if the Rule applies to them.

40.    Plaintiff Catholic Legal Immigration Network, Inc. ("CLINIC") is a national, non-profit training and resource network focused on equipping immigration organizations with the tools necessary to provide comprehensive immigration representation. CLINIC's network includes approximately 370 affiliate immigration programs, which operate over 400 offices in 49 states and the District of Columbia.  Its network employs more than 2,300 attorneys and accredited representatives who, in turn, serve hundreds of thousands of low-income immigrants each year, including aid with applications for adjustment of status.  In seeking to further its mission to embrace the Gospel value of welcoming strangers, CLINIC supports its network by hosting in-person trainings on immigration-related matters; conducting

17

e-learning courses and webinars; publishing newsletters, Practice Advisories, and articles on developments in the immigration landscape; and, in some instances, providing funding for affiliates working directly with immigrant communities.

41.    CLINIC affiliates employ not only attorneys but also Department of Justice ("DOJ")-accredited representatives. Accredited representatives are non-attorney staff or volunteers who are approved by DOJ to represent noncitizens in immigration court or before the Board of Immigration Appeals or USCIS. An accredited representative must work for a non-profit or social service organization that provides low- or no-cost immigration legal services.  Many CLINIC affiliates rely on accredited representatives for the day-to-day work of their organization.  In turn, those accredited representatives rely on CLINIC's resources for training and guidance.

42.    CLINIC also provides training to its affiliates and other providers of services to immigrants.  Trainings take the form of webinars, online courses with multiple classes, online self-directed courses, and workshops during its annual affiliate convening. CLINIC also provides technical support to its affiliates through the "Ask-the-Experts" portal on its website.

43.    During the public notice-and-comment period, CLINIC submitted to USCIS a detailed comment documenting the enormous harms and burdens the Rule would inflict on immigrant communities and legal representatives and pointing out significant legal and practical flaws in the Rule's scheme.  These flaws included, among others, the Rule's failure to justify changes to longstanding practice; its bypassing of the legislative process; and its inconsistency with congressional intent and the plain meaning of "public charge."

44.     Defendants' actions threaten to impede CLINIC's mission, and have directly harmed and threaten ongoing and future harm to CLINIC, including by expending substantial resources to address the Rule and its impacts.  Attorneys and accredited representatives from affiliates submit inquiries regarding individual immigration matters that are particularly complex, and CLINIC staff provide an expert consultation.  Prior to the Rule being published on August 14, 2019, CLINIC attorneys provided an average of ten consultations a week on public charge related issues.  Since the Rule was released, CLINIC has experienced a tripling in volume of technical support questions related to public charge and has had to prioritize updating its legal reference materials, conducting webinars, and modifying its training curricula. CLINIC anticipates that demand for consultations will be that much greater when the Rule becomes effective on October 15, 2019.  Consultations regarding removal defense for individuals whose adjustment of status applications have been denied will be particularly complex.

45.     CLINIC has no choice to apply its resources to addressing the emergencies precipitated by the Rule, both advising on individual cases brought to them by affiliates, and getting accurate information out to their immense network.

46.     Were the Rule enjoined and set aside, plaintiffs could proceed with furthering their missions of affirmatively helping immigrants in meeting their goals instead of being forced into the defensive posture of protecting them from adverse actions, dealing with emergencies, and filling in the gaps created by a disenrollment from government benefits and services.  Accordingly, the injuries to plaintiffs would be redressed by a favorable decision from this Court.  Such a decision would, among other things, allow the organizational plaintiffs to redirect their resources from this issue to their other core objectives.

19

## II.    Defendants

47.    Defendant Ken Cuccinelli is the Acting Director of United States

Citizenship & Immigration Services, the component of DHS that oversees most adjustments

and that is responsible for promulgating the Rule.  President Trump appointed him to this role

in June 2019 without seeking Senate confirmation, after the abrupt forced resignation of his

predecessor, Lee Francis Cissna.  Defendant Cuccinelli is sued in his official capacity.

48.    Defendant Kevin K. McAleenan (the "Acting Secretary") is the Acting

Secretary of Homeland Security and Commissioner of U.S. Customs and Border Protection.

He inherited the role of Acting Secretary in April 2019 after the forced resignation of his

predecessor, Kirstjen Nielsen.  He is sued in his official capacity.

49.    Defendant DHS is a cabinet department of the United States federal

government.  DHS has statutory responsibility for, among other things, administration and

enforcement of certain portions of the INA (although, as discussed below, not the provisions

by which the Rule is purportedly authorized).

50.    Defendant USCIS is the agency with DHS responsible for the

administration of applications within the United States for immigrant and non-immigrant

benefits, including adjudication of applications for legal permanent residence.

### FACTUAL ALLEGATIONS

51.    The factual allegations in this Complaint are set forth in nine Sections.

Section I describes lawful permanent residence (green card or "LPR") status, the basis for

family-based adjustment, and the process an applicant for adjustment follows to obtain status

under current law, including the public charge provisions of the INA.  Section II discusses the

historical interpretation of "public charge" in our immigration laws, including Congress's

repeated rejections of efforts to expand the definition of "public charge" in a manner substantially similar to that reflected in the Rule.  Section III describes the Rule.  Section IV describes the supplemental, noncash public benefits whose receipt would render a person a public charge under the Rule.  Section V describes the ways the Rule violates the Administrative Procedure Act, including that the Rule is unlawfully retroactive, arbitrary and capricious, and discriminatory against individuals with disabilities.  Section VI explains DHS's lack of statutory authority to promulgate the Rule.  Section VII details defendants' failure to follow the APA's procedural requirements in promulgating the Rule, including their failure to meaningfully respond to substantive comments.  Section VIII details the extensive evidence of anti-immigrant animus displayed by the defendants and the Trump Administration, under whose instructions DHS crafted and promulgated the Rule.  Finally, Section IX discusses the immediate and irreparable harm that the Rule will cause.

**I.      LPR Status, the Adjustment Process, and the Public Charge Provision of the INA**

52.    The INA defines "lawfully admitted for permanent residence" to mean "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws . . . ."  8 U.S.C. § 1101(a)(20).  An LPR, or green card holder, has permission to live and work in the U.S. permanently as long as they abide by the law, and the right to petition for certain family members to join them in the U.S. as LPRs.  LPR status is also a precondition for most immigrants to be eligible for obtaining U.S. citizenship through naturalization.  The INA refers to the process whereby a noncitizen already residing in the United States obtains legal permanent residence as adjustment of status.

53.     There are various paths by which an intending immigrant can obtain LPR status.  Family-based immigration is the predominant path, accounting for 66 percent of all adjustments to LPR status.[9]  Other paths to LPR status include (among others) humanitarian entry provided to refugees, asylees, and certain crime victims; employer sponsorship; and the diversity visa lottery.

54.     Obtaining LPR status through a family member involves a number of preconditions and steps.  As an initial matter, a person must have a qualifying relationship with certain U.S. citizens or LPRs.  One category of qualifying relationships is "immediate relative," meaning a spouse of a U.S. citizen; an unmarried child under the age of 21 of a U.S. citizen; or the parent of a U.S. citizen who is at least 21 years old.  8 U.S.C. §§ 1151(b)(2)(A)(i), 1151(f).  The INA places annual numerical limits on the number of immigrant visas available to relatives of U.S. citizens and LPRs in certain categories, but there are no such limits on the number of persons seeking to obtain LPR status through an immediate relative.  *Id*. § 1151(b).  Other relatives of a U.S. citizen or LPR may qualify under "family-based preference" categories.  *Id.* § 1153(a).  These include unmarried adult children of citizens; spouses and unmarried children of LPRs; married children of citizens; and brothers and sisters of citizens, but there are annual numerical limits placed on the immigrant visas available in each of these family-based preference categories.  *Id.* § 1151(a)(1).  Fiancés of a U.S. citizen and a fiancé's child, as well as a widow or widower of a U.S. citizen, may also be eligible to adjust their status to LPR.  Most family-based applicants for LPR status are required

---

[9]     *See* Dep't of Homeland Security, *Annual Flow Report: Lawful Permanent Residents*, at 5 (2018), https://www.dhs.gov/sites/default/files/publications/Lawful_Permanent_Residents_2017.pdf.

to have a financial sponsor who can support them at or above 125 percent of the FPG. *See id.* at § 1183a.

55. Section 212 of the INA lists many of the bases for denying applications for admission and adjustment. *Id.* § 1182(a)(1)–(10) (including, *e.g.*, grounds related to health, criminal convictions, national security, and public charge). If the applicant is found to be eligible and there is no basis for denial, the application for status adjustment is approved and the applicant is issued a lawful permanent resident card, known as a green card.

56. In the context of admissibility and status adjustment, public charge determinations are governed by section 212(a)(4) of the INA, which states that a noncitizen who "in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A).

57. The INA identifies five factors that a consular officer or the Attorney General must consider when making a prospective public charge determination in the admissibility context: (1) age, (2) health, (3) family status, (4) assets, resources, and financial status, and (5) education and skills. *Id.* § 1182(a)(4)(B)(i). The statute does not ascribe particular weight to any one factor. The INA also permits a consular officer or the Attorney General to "consider any affidavit of support" from a financial sponsor. 8 U.S.C. § 1182(a)(4)(B)(ii).

58. A separate provision of the INA, not directly at issue here, provides that a public charge determination may result in a noncitizen being deported. Section 237(a)(5) of the INA provides that "[a]ny alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable."

*Id.* § 1227(a)(5). Although the Rule at issue in this litigation purports to apply only to Section 212(a)(4), relating to admission and status adjustment, recent reports indicate that the Department of Justice is developing a public charge deportation rule "based on" the DHS Rule at issue here,[10] and DHS confirms as much in the final Rule.[11]

## II. The Public Charge Provisions Have Historically Been Interpreted to Apply Only to Noncitizens Primarily Dependent on The Government For Subsistence

59. Since the "public charge" inadmissibility provision first became part of federal immigration law in 1882, courts and administrative agencies have interpreted the term "public charge" to refer to noncitizens who rely primarily on the government for subsistence, and Congress has repeatedly considered and rejected efforts to expand the definition of public charge in a manner similar to the definition in the Rule. The historical interpretation of "public charge," from its origins in federal immigration law to the present, is described chronologically below.

### A. 1880s–1930s: The Original Meaning of "Public Charge" Referred to A Narrow Class of Persons Wholly Unable to Care for Themselves

60. The term "public charge" first appeared in federal immigration law in the Immigration Act of 1882, 47th Cong. ch. 376, 22 Stat. 214, § 2, which provided that "any person unable to take care of himself or herself without becoming a public charge" could be denied admission to the United States. Later bills changed the wording of the clause to "likely to become a public charge," and that language has been retained in the statute to the present.[12]

---

[10] *See* Yaganeh Torbati, *Exclusive: Trump Administration Proposal Would Make It Easier to Deport Immigrants Who Use Public Benefits*, Reuters (May 3, 2019), https://www.reuters.com/article/us-usa-immigration-benefits-exclusive/exclusive-trump-administration-proposal-would-make-it-easier-to-deport-immigrants-who-use-public-benefits-idUSKCN1S91UR.

[11] *E.g.*, 84 Fed. Reg. at 41,324.

[12] *E.g.*, 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 § 1; Immigration Act of 1903, 57th Cong. ch. 1012, 32 Stat. 1213, 1214 § 2 (excluding from the United States "persons likely to become a public charge," among others); Immigration Act of 1917, 64th Cong. Ch. 29, 39 Stat. 874, 876 (same); Immigration and

61.    In the Immigration Act of 1891, Congress provided additionally that newly arrived immigrants were subject to "removal," or deportation, if they became public charges within one year after entry resulting from circumstances that did not predate arrival (a period later extended to five years). 26 Stat. 1084, 1086 § 11. Like the public charge inadmissibility provision, the public charge removal provision has remained largely unchanged since it was first adopted.[13]

62.    While the 1882 Act and its successors did not define the term "public charge," Congress considered the phrase to refer to those who were likely to become long-term residents of "poor-houses and alms-houses"—*i.e.*, persons who were institutionalized and wholly dependent on the government for subsistence. 13 Cong. Rec. 5109 (June 19, 1882). In the House debate on the bill that became the 1882 Act, one supporter argued that the bill was needed to address alleged efforts by foreign nations "to get these paupers into the United States and make their support a burden upon the United States. . . . Here they become at once a public charge. They get into our poor-houses." 13 Cong. Rec. 5107, 5109 (1882) (statement of Mr. Van Voorhis). The same Representative favorably quoted a writer who stated that "America has come to be regarded by European economists as a cheaper poor-house and jail than any to be found at home." *Id.* at 5108–09.

63.    This interpretation of "public charge" is consistent with earlier and contemporaneous usage. Contemporary dictionaries defined "charge" as one "committed to another's custody, care, concern, or management." *Century Dictionary of the English*

---

Nationality Act of 1952, 82nd Cong. ch. 477, 66 Stat. 163, 183 (1952) (excluding noncitizens "who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges").

[13]    *See* Immigration Act of 1903, 32 Stat. 1213, 1218 § 20; Immigration Act of 1990, Pub. L. 101-649 § 602, 104 Stat. 4978 ("Any alien who, within five years after the date of entry, has become a public charge from causes not affirmatively shown to have arisen since entry is deportable.").

*Language* (1889–91).  Consistent with this definition (as one group of immigration historians stated in a comment on the Rule), "under the colonial, state, and early federal immigration laws, deportation based on the public charge clause applied only to people accommodated at public charitable institutions or who were substantially dependent on public relief for the basic maintenance of their lives."[14]  The 1882 Act itself derived from earlier state statutes regulating admission of immigrants, particularly in New York and Massachusetts, which similarly used the term "public charge" to refer to residents of public institutions for the destitute, such as almshouses and workhouses.[15]

64.    Early judicial interpretations of the original public charge provisions confirmed that Congress did not intend the public charge exclusion to apply broadly to noncitizens who relied on any outside assistance, however minimal.  On the contrary, the courts recognized early that Congress intended the term public charge to require a substantial level of lengthy or permanent dependence on the public for subsistence.  As the Second Circuit held in 1917, "We are convinced that Congress meant [by public charge] to exclude persons who were likely to become occupants of almshouses for want of means to support themselves in the future."  *Howe* v. *United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917); *see also Gegiow* v. *Uhl*, 239 U.S. 3, 9-10 (1915) (holding that the list of excludable immigrants in the Immigration Act of 1907, including those likely to become a public charge, meant to exclude immigrants "on the ground of ***permanent*** personal objections accompanying them," (emphasis added), and stating that a group of immigrants could not be excluded on public charge grounds based on "the amount of money possessed and ignorance of our language").

---

[14]    Torrie Hester et al., Comment, at 3 (Oct. 5, 2018) [hereinafter "Historians' Comment"].
[15]    *See* Hidetaka Hirota, *Expelling the Poor* 180–204 (2017).

65.    Consistent with this narrow understanding of public charge, federal immigration officials in the early 20th century excluded only a minuscule percentage of arriving immigrants on public charge grounds.  According to DHS's own data, of the approximately 21.8 million immigrants admitted to the United States as lawful permanent residents between 1892 and 1930, approximately 205,000—less than one percent—were deemed inadmissible as likely to become public charges.  The same has been true in subsequent years: between 1931 and 1980 (the last year for which DHS publishes such data), only 13,798 immigrants were excluded on public charge grounds out of more than 11 million immigrants admitted as legal permanent residents—an exclusion rate of approximately one-tenth of one percent.[16]

66.    The narrow scope of the term "public charge" as interpreted by these courts and administrative agencies in applying the public charge exclusion provision of the INA is consistent with contemporaneous use of the term by courts in other contexts. Contemporaneous state court decisions expressly distinguished between receipt of "temporary relief" and becoming a public charge.  *See*, *e.g.*, *Davies v. State ex rel. Boyles*, 27 Ohio C.C. 593, 595–96, 1905 WL 629, at *2 (Ohio Cir. Ct. July 8, 1905) ("[P]ublic interests are subserved by the aiding of persons who might become a public charge, if left to their own resources, to such an extent that, by combining the small fund given them by the state with what they may be able to earn . . . they might be able to maintain themselves and avoid

---

[16]    *See* Dep't of Homeland Security, *Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016*,  (Dec. 18, 2017), https://www.dhs.gov/immigration-statistics/yearbook/2016/table1; Immigration and Naturalization Service, *2001 Statistical Yearbook of the Immigration and Naturalization Service* 258 (2003), https://www.dhs.gov/sites/default/files/publications/Yearbook_Immigration_Statistics_2001.pdf; *see also* Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* 18 (2004).  Similarly, during the Great Depression, the Immigration and Naturalization Service ("INS") (the predecessor agency to USCIS) did not consider immigrants who were "victims of the general economic depression" deportable simply because they received public relief.  *Id.* at 72.

becoming a charge."); *Yeatman v. King*, 51 N.W. 721, 723 (1892) (emphasizing the "obligation" on the public "to keep a portion of the population destitute of means and credit from becoming a public charge by affording them temporary relief").

**B.     1940s–1980s: Administrative Decisions Affirm the Original Understanding of Public Charge**

67.     The original interpretation of "public charge" by Congress and the courts persisted in the mid-twentieth century, largely through decisions of the Board of Immigration Appeals (the "BIA") and the Attorney General, which narrowly limited the circumstances in which an immigrant could be deported or denied admissibility or adjustment of status on public charge grounds.

68.     In the leading case of *Matter of B-*, 3 I. & N. Dec. 323, 324 (B.I.A. 1948), the BIA held that "acceptance by an alien of services provided by a State . . . to its residents, services for which no specific charge is made, does not in and of itself make the alien a public charge." Rather, the Board held, a noncitizen was removable as a public charge *only* if (1) the noncitizen was "charged" for receipt of a public benefit under the law, (2) a demand for payment was made, and (3) the noncitizen or a family member failed to pay. *Id.* at 326. *Matter of B-* has remained the law for more than seventy years.

69.     In 1952, four years after *Matter of B-* was decided, Congress reenacted the public charge provision in the Immigration and Nationality Act of 1952 (the "1952 Act," also known as the McCarran-Walter Act). The Senate report accompanying the bill that became the 1952 Act carefully traced the administrative and court decisions interpreting the public charge provisions of the Act, and proposed retaining the existing provisions without defining the term "public charge." S. Rep. No. 1515, at 348–49 (1950). Consistent with that recommendation,

the 1952 Act did not define the term or purport to change existing administrative

interpretations.  *See* 1952 Act, 66 Stat. 163, 183.

       70.    The holding in *Matter of B-* that mere receipt of public benefits does not

render a person a public charge has been applied in the context of admissibility as well as

removal.  In *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409 (B.I.A. 1962; A.G. 1964),

Attorney General Robert F. Kennedy set forth in detail the history of the public charge

inadmissibility rule—including its "extensive judicial interpretation"—and explained that, in

order to exclude a noncitizen as likely to become a public charge, "the [INA] requires more

than a showing of a possibility that the alien will require public support."  *Id.* at 421–22.

Instead, the Attorney General explained:

> [s]ome specific circumstance, such as mental or physical disability,
> advanced age, or other fact reasonably tending to show that the burden of
> supporting the alien is likely to be cast on the public, must be present.  A
> healthy person in the prime of life cannot ordinarily be considered likely
> to become a public charge, especially where he has friends or relatives in
> the United States who have indicated their ability and willingness to come
> to his assistance in case of emergency.

*Id.* at 422 (collecting cases); *see also Matter of Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974)

("The fact that an alien has been on welfare does not, by itself, establish that he or she is likely to

become a public charge."); *Matter of Harutunian*, 14 I. & N. Dec. 583, 590 (1974) (finding that a

70-year old noncitizen who was reliant on state old age assistance was inadmissible on public

charge grounds where she "lacks means of supporting herself, . . . has no one responsible for her

support and . . . expects to be dependent for support on old age assistance. . . .").

       71.    These administrative decisions continue to reflect a narrow definition of

"public charge" despite the increasingly broad array of public benefits that became available

for low-income people since the 1882 Immigration Act was enacted, including the Aid to

Dependent Children program (1935), public housing (1937), food stamps (1964), Medicaid

(1965), Supplemental Security Income (1972), and Section 8 housing vouchers (1974).

Indeed, even prior to the New Deal—throughout the nineteenth and early twentieth centuries—

states, counties, and municipalities routinely provided temporary assistance to needy

residents.[17]  And prior to enactment of the Personal Responsibility and Work Opportunity

Reconciliation Act of 1996, discussed further below, many lawfully residing noncitizens were

eligible for most federal public benefits without restriction.  Plaintiffs are not aware of any

judicial or administrative decision holding that the receipt of benefits under any of these

programs rendered the recipient a public charge for immigration purposes, and defendants have

cited none.

### C.   1990s: PRWORA and IIRIRA Confirm Noncitizen Eligibility for Public Benefits and Leave Existing Law Regarding Public Charge Determinations Unchanged

72.   Congress in the 1990s twice reenacted the public charge provisions of the

INA without material change.  First, the Immigration Act of 1990 reenacted the public charge

provision virtually unchanged from the 1952 Act.  The legislative history to the 1990 Act

recognized that something more than mere receipt of benefits was required to label an

immigrant as a public charge.  A 1988 House Report explained that courts associated the

likelihood of becoming a public charge with "destitution coupled with an inability to work,"

and noted the Supreme Court's finding in 1915 that a person deemed likely to become a public

charge "is one whose anticipated dependence on public aid is primarily due to poverty and to

---

[17]   *See* Michael B. Katz, *In the Shadow of the Poorhouse: A Social History of Welfare in America* 37–59 (10th ed. 1996).

physical or mental afflictions."[18]  In the debate leading to enactment of the 1990 Act, one

Congressman characterized someone who "would become a public charge" as a person "who

gets here who is helpless."[19]  The 1990 Act also amended the INA to remove some of its

archaic provisions related to the disabled, such as exclusions based on "mental retard[ation],"

"insanity," "psychopathic personality," "sexual deviation," or "mental defect."[20]

73.    In 1996, Congress enacted two major pieces of legislation focused on the

eligibility of noncitizen immigrants for certain public benefits and on public charge

determinations: the Personal Responsibility and Work Opportunity Reconciliation Act

("PRWORA," colloquially called the "Welfare Reform Act") and the Illegal Immigration

Reform and Immigrant Responsibility Act ("IIRIRA").  Neither statute purported to redefine

"public charge," or to alter the settled rule that the mere receipt of means-tested benefits is not

a basis for branding someone a public charge.

74.    PRWORA restricted certain noncitizens' eligibility for certain federal

benefits.  Pub. L. 104-193, § 403, 110 Stat. 2105, 2265–67 (1996).  Some noncitizens were

completely excluded from eligibility.  But following the passage of PRWORA and subsequent

legislation, certain classes of immigrants remained eligible to receive federally-funded

government benefits, including Medicaid, Food Stamps (now SNAP), Supplemental Security

Income ("SSI") and Temporary Assistance for Needy Families ("TANF," a form of cash

assistance), the Children's Health Insurance Program ("CHIP"), and the Special Supplemental

Nutrition Program for Women, Infants, and Children ("WIC").  *See generally* 8 U.S.C.

---

[18]    Staff of the H. Comm. on the Judiciary, 100th Cong., Grounds for Exclusion of Aliens Under the Immigration and Nationality Act:  Historical Background and Analysis 121 (Comm. Print 1988) (citing *Gegiow v. Uhl*, 239 U.S. 3 (1915)).

[19]    135 Cong. Rec. S14,291 (July 12, 1989) (statement of Mr. Simpson).

[20]    Immigration Act of 1990, Pub. L. No. 101-649, §§ 601-603, 104 Stat. 4978, 5067–85 (1990).

§§ 1612–1613. PRWORA also authorized states to choose to cover a broader group of

noncitizens for eligibility in state public benefits programs. *Id.* § 1621(d).[21]

75.   Contrary to DHS's suggestion, nothing in PRWORA supports the Rule's

unprecedented definition of public charge as someone who receives a minimal amount of

public benefits. While PRWORA's statement of purpose expressed the policy that resident

noncitizens "not depend on public resources to meet their needs," 84 Fed. Reg. at 41,294,

Congress plainly concluded that that policy was consistent with affirming the eligibility of

certain noncitizens for federal public benefits, and authorizing states to provide benefits to a

broader group of noncitizens not eligible for federal benefits.[22]

76.   Nothing in PRWORA purported to change the meaning of "public charge"

or to overturn its longstanding administrative application. Nor was this accidental. On the

contrary, PRWORA specifically amended *another* provision of the INA relevant to public

charge determinations. Section 423 of PRWORA amended the INA to provide detail about the

requirements for executing an affidavit of support, a document executed by sponsors of certain

immigrants establishing that the immigrant will not become a public charge. Pub. L. No. 104-

193, § 423, 110 Stat. 2105, 2271–74. If Congress had wanted to change the settled

---

[21]   In legislation following enactment of PRW0RA, Congress expanded the availability of certain benefits, particularly SNAP, to so-called "qualified aliens." *See* Agricultural Research, Education and Extension Act of 1998 ("AREERA"), Pub. L. No. 105-185, 112 Stat. 523 (restoring eligibility for certain elderly, disabled and child immigrants who resided in the United States when PRWORA was enacted); The Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, 116 Stat. 134 (restoring eligibility for food stamps (now SNAP) to qualified aliens who have been in the United States at least five years and immigrants receiving certain disability payments and for children, regardless of how long they have been in the country).

[22]   DHS concedes that PRWORA's policy statements about self-sufficiency were not codified in the INA, including in the public charge inadmissibility provision, which makes no mention of "self-sufficiency." *See* 84 Fed. Reg. at 41,355–56 ("although the INA does not mention self-sufficiency in the context of section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), DHS believes that there is a strong connection between the self-sufficiency policy statements [in PRWORA] (even if not codified in the INA itself) at 8 U.S.C. 1601 and the public charge inadmissibility language in section 212(a)(4) of the Act, 8 U.S.C. 1182(a)(4), which were enacted within a month of each other.").

interpretation of public charge to include receipt of minimal amounts of noncash benefits, it would have been eminently logical for it to do so as part of PRWORA, a law that specifically concerned both the availability of public benefits to noncitizens and the public charge inadmissibility provision of the INA. Congress declined to make that change.

77. IIRIRA—which was passed the month after PRWORA—codified the existing standard for determining whether a noncitizen was inadmissible as a public charge. Pub. L. No. 104-208 § 531, 110 Stat. 3009 (1996) (amending 8 U.S.C. § 1182). IIRIRA re-enacted the existing INA public charge provision relating to admission and status adjustment, and once again chose to leave the term "public charge" undefined. *See* 8 U.S.C. § 1182(a)(4). Instead, the statute provided that, consistent with prior case law, a public charge determination should take account of the "totality of the circumstances," and specified that any public charge determination consider the applicant's age; health; family status; assets, resources, and financial status; and education and skills. *Id.* § 1182(a)(4)(B)(i).

78. IIRIRA also confirmed that immigration officers could consider a binding affidavit of support from an applicant's sponsor in making a public charge determination. *Id.* § 1182(a)(4)(B)(ii); *see id.* § 1183a. In practice, since the enactment of PRWORA and IIRIRA, noncitizens seeking admission or adjustment have routinely been able to overcome a potential public charge determination by filing a binding affidavit of support from a sponsor.[23]

79. Nothing in IIRIRA purported to expand the definition of public charge, or reflected an intent by Congress to use the public charge provision to refuse admission or status adjustment based upon past or likely future receipt of supplemental or noncash public benefits.

---

[23]   *See* Center on Budget and Policy Priorities, Comment, at 30 (Dec. 7, 2018) [hereinafter "CBPP Comment"].

D.    **1995–2013: Congress Repeatedly Rejects Efforts to Expand the Meaning of "Public Charge"**

80.    Congress's decision to maintain the definition of "public charge" was no oversight.  On the contrary, Congress has repeatedly considered and rejected proposals to amend the INA public charge provisions to apply to persons receiving (or considered likely to receive) means-tested public benefits—the result that DHS now seeks to achieve through the Rule.

81.    In the debate leading up to the enactment of IIRIRA, Congress considered and rejected a proposal to label as a public charge anyone who received certain means-tested public benefits.  An early version of the bill that became IIRIRA would have defined the term "public charge" for purposes of removal to include any noncitizen who received certain public benefits enumerated in the bill, including Aid to Families with Dependent Children, Medicaid, food stamps, SSI, and other programs "for which eligibility for benefits is based on need." Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996).  The express purpose of this provision was to overturn the settled understanding of "public charge" found in the case law.  When the bill was considered by the Senate, Senator Alan Simpson (a proponent of the provision) explained during debate that the purpose of the new public charge definition was to override "a 1948 decision by an administrative law judge"—*Matter of B-*, discussed in ¶¶ 68–70 above—which he argued had rendered the public charge provision "virtually unenforced and unenforceable."  *See* 142 Cong. Rec. S4401, S4408–09 (1996).

82.    The effort to overturn *Matter of B-* and change the settled definition of public charge was met with criticism.  For example, Senator Patrick Leahy expressed concern

34

that the bill "is too quick to label people as public charges for utilizing the same public

assistance that many Americans need to get on their feet." S. Rep. No. 104-249, at 63 (1996).

Senator Leahy was "disturbed that the definition of public charge goes too far in including a

vast array of programs none of us think of as welfare," including medical services and

supplemental nutritional programs and urged that the bill "will yield harsh and idiosyncratic

results that no one should intend." *Id*. at 64.

        83. The effort to redefine the public charge in IIRIRA failed. Although a

version of the bill including the expansive definition of public charge cleared one chamber of

Congress, the bill could not be passed until the provision was removed. In a statement on the

Senate floor the day IIRIRA was enacted, Senator Jon Kyl, a floor manager of the bill and

proponent of the provision, explained:

> [I]n order to ensure passage of this historic immigration measure,
> important provisions of title 5 have been deleted. . . . [One] provision that
> was removed from title 5 would have clarified the definition of "public
> charge." Under the House-passed conference report, an immigrant could
> be deported—but would not necessarily be deported—if he or she received
> Federal public benefits for an aggregate of 12 months over a period of 7
> years. That provision was dropped during Saturday's negotiations.

142 Cong. Rec. S11872, S11882 (1996) (statement of Sen. Kyl).

        84. In 2013, Congress again turned back efforts to redefine public charge to

include anyone receiving means-tested public benefits when the Senate debated the proposed

Border Security, Economic Opportunity, and Immigration Modernization Act, a bill that

sought to create a path to citizenship for noncitizens who could show they were not "likely to

become a public charge." S. 744, 113th Cong. § 2101 (2013). During committee

deliberations, Senator Jefferson B. Sessions, later to serve as Attorney General during a period

of time when the Rule was under consideration and development, sought to amend the

definition of public charge to include receipt of "noncash employment supports such as Medicaid, the SNAP program, or the Children's Health Insurance Program." S. Rep. No. 113-40, at 42 (2013). Senator Sessions' proposed amendment was rejected by voice vote. *Id.*

85. In short, Congress has repeatedly rejected efforts to expand the definition of public charge along the lines now proposed by DHS. In so doing, it has demonstrated its clear intent to continue to apply the historical definition of public charge that has endured for over 100 years. Nowhere in the INA does Congress delegate to DHS, USCIS, or any other executive agency the authority to add new bases of inadmissibility or removability without the consent of Congress.

## E. 1999: Administrative Field Guidance Reaffirms the Settled Interpretation of Public Charge

86. In 1999, approximately three years after the passage of PRWORA and IIRIRA (and in the administration of the President Clinton, who signed both bills), the Immigration and Naturalization Service ("INS," the predecessor agency to USCIS) issued its *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"), 64 Fed. Reg. 28,689 (May 26, 1999), and a parallel proposed regulation, 64 Fed. Reg. 28,676 (May 26, 1999). INS issued the Field Guidance and proposed regulation "[a]fter extensive consultation with benefit-granting agencies," 64 Fed. Reg. at 28,692, in response to "growing public confusion" about the definition of public charge in the wake of PRWORA and IIRIRA, *id.* at 28,676, and "to ensure the accurate and uniform application of law and policy in this area," *id.* at. 28,689. INS explained that the Field Guidance "summarize[d] longstanding law with respect to public charge," and provided "new guidance on public charge determinations" in light of the recent legislation. *Id.*

36

87. The Field Guidance defined "public charge" as a noncitizen "who is likely to become (for admission/adjustment purposes) 'primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense.'" *Id.* The Field Guidance expressly excluded from public charge determinations consideration of noncash benefits programs, such as Medicare, Medicaid, SNAP, and housing assistance. *Id.* INS explained that "[i]t has never been [INS] policy that any receipt of services or benefits paid for in whole or in part from public funds renders an alien a public charge, or indicates that the alien is likely to become a public charge." *Id.* at 28,692.

88. INS explained that the definition of public charge adopted in the Field Guidance and proposed regulation comported with the plain meaning of "charge," as evidenced by dictionary definitions of the term as one "committed or entrusted to the care, custody, management, or support of another."[24] It reasoned that this definition "suggests a complete, or nearly complete, dependence on the Government rather than the mere receipt of some lesser level of financial support," and that this standard of primary dependence on public assistance "was the backdrop against which the 'public charge' concept in immigration law developed in the late 1800s." 64 Fed. Reg. at 28,677.

89. INS further concluded that noncash benefit programs should not be considered in public charge determinations because benefits under such programs "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to

---

[24] 64 Fed. Reg. at 28,677 (quoting Webster's Third New International Dictionary of the English Language 377 (1986) (defining "charge" as "a person or thing committed or entrusted to the care, custody, management, or support of another," and providing as an example: "He entered the poorhouse, becoming a county charge.") and citing 3 Oxford English Dictionary 36 (2d ed. 1989) (defining "charge" as "[t]he duty or responsibility of taking care of (a person or thing); care, custody, superintendence")).

support an individual or family." *Id.* at 28,692.  It explained that such benefits "are

increasingly being made available to families with incomes far above the poverty level,

reflecting broad public policy decisions about improving general health and nutrition,

promoting education, and assisting working-poor families in the process of becoming self-

sufficient." *Id.*  INS also emphasized that it did not expect this definition "to substantially

change the number of aliens who will be found deportable or inadmissible as public charges."

*Id*.  Likewise, USCIS publishes on its website a "public charge fact sheet" that, as of the filing

of this Complaint, makes clear that noncash benefits are not subject to public charge

consideration.[25]

90.    In identifying only primary dependence on means-tested cash assistance as

a trigger for the public charge determination, the Field Guidance made expectations clear both

to applicants for adjustment and admission and to USCIS officers tasked with implementing it.

In the 20 years since the Field Guidance was adopted, the number of noncitizens excluded or

denied adjustment as likely to become a public charge has remained small.  By the same token,

according to statistics from the State Department, between 2000 and 2016, approximately

36,000 noncitizens were denied visas on public charge grounds, less than two-tenths of one

percent of the more than 17 million immigrants admitted as lawful permanent residents.[26]

F.    **Background of The Rule**

91.    The Rule originated in a wide-ranging policy proposal published in April

2016 by the Center for Immigration Studies ("CIS"), a far-right group founded by white

---

[25]   *See* Public Charge Fact Sheet, https://www.uscis.gov/news/fact-sheets/public-charge-fact-sheet (last visited Aug. 24, 2019).
[26]   *See* Report of the Visa Office, 2000–2018, https://travel.state.gov/content/travel/en/legal/visa-law0/visa-statistics.html.

38

supremacist John Tanton and dedicated to immigration restrictionism.[27]  Tanton was a

supporter of "passive eugenics"[28] intended to preserve America's white majority, which he

feared was under threat due to the "greater reproductive powers" of Hispanic immigrants.[29]  He

has been quoted as saying, "I have come to the point of view that for European-American

society and culture to persist, it requires a European-American majority and a clear one at

that."[30]

        92.    The CIS publication that led to the Rule, "A Pen and a Phone: 79

immigration actions the next president can take," lists numerous proposals for limiting

immigration of low-income people and asylum seekers from non-European countries.  Action

#60 urges the next president to "make use of the public charge doctrine to reduce the number

of welfare-dependent foreigners living in the United States." [31]  The publication also

misleadingly states that "[h]alf of households headed by immigrants use at least one welfare

program."[32] This assertion fails to differentiate long-term lawful permanent residents and

naturalized citizens from intending immigrants; ignores that most intending immigrants are not

eligible for any non-emergency public assistance at all; and misleadingly includes benefits paid

to U.S. citizen members of noncitizen-headed households.[33]

---

[27] *See* Southern Poverty Law Center listing of Center for Immigration Studies as an "anti-immigrant hate group," Southern Poverty Law Center, https://www.splcenter.org/fighting-hate/extremist-files/group/center-immigration-studies (last visited Aug. 24, 2019).

[28] *See* Anti-Defamation League, *Ties Between Anti-Immigrant Movement and Eugenics*, (Feb. 22, 2013), https://www.adl.org/news/article/ties-between-anti-immigrant-movement-and-eugenics.

[29] *See* Matt Schudel, *John Tanton, architect of anti-immigration and English-only efforts, dies at 85*, Wash. Post (July 21, 2019), https://www.washingtonpost.com/local/obituaries/john-tanton-architect-of-anti-immigration-and-english-only-efforts-dies-at-85/2019/07/21/2301f728-aa3f-11e9-86dd-d7f0e60391e9_story.html.

[30] *Id.*

[31] Center for Immigration Studies, *A Pen and A Phone* 8 (Apr. 6, 2016), https://cis.org/sites/cis.org/files/79-actions_1.pdf.

[32] *Id.*

[33] *See* Alex Nowrasteh, *Center on Immigration Studies Overstates Immigrant, Non-Citizen, and Native Welfare Use*, Cato Institute (Dec. 6, 2018), https://www.cato.org/blog/center-immigration-studies-overstates-immigrant-

93.     Within a week of President Trump's inauguration, a draft of an Executive

Order targeting immigrant-headed families that had used any means-tested public benefit,

including health insurance for U.S. citizen children, was leaked to the public, initiating a

pattern across the country of fear and withdrawal from public services and benefits.  The draft

Executive Order, among other things, directed DHS to issue new rules defining "public

charge" to include any person receiving means-tested public benefits.[34]

94.     The draft Executive Order was never signed.  But DHS embarked on

drafting changes to the public charge criteria through notice-and-comment rulemaking.  Early

drafts of the proposed rule were leaked to the press in February and March 2018.[35]  And on

October 10, 2018, DHS published a Notice of Proposed Rulemaking (the "NPRM") entitled

"Inadmissibility on Public Charge Grounds" and opened the proposed rule for public notice

and comment.  Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (proposed Oct.

10, 2018) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248).

95.     More than 266,000 think tanks, scholars, advocacy groups, legal services

organizations, children's aid groups and other non-profits, states, municipalities, and

individuals submitted comments, the "vast majority" of which "opposed the Rule," according

to DHS.  84 Fed. Reg. at 41,304.

96.     On August 14, 2019, USCIS published the final Rule.

_____

non-citizen-native-welfare-use (criticizing CIS's "unsound methodological choice[s]" that are made to
"inflat[e]" the apparent use of public benefits programs by noncitizens so as to justify expanding public charge).

[34]  *See* Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote
Accountability and Responsibility (Jan. 23, 2017), https://cdn3.vox-
cdn.com/uploads/chorus_asset/file/7872571/Protecting_Taxpayer_Resources_by_Ensuring_Our_Immigration_
Laws_Promote_Accountability_and_Responsibility.0.pdf.

[35]  Nick Miroff, *Trump Proposal Would Penalize Immigrants Who Use Tax Credits and Other Benefits*, Wash. Post
(Mar. 28, 2018), https://www.washingtonpost.com/world/national-security/trump-proposal-would-penalize-
immigrants-who-use-tax-credits-and-other-benefits/2018/03/28/4c6392e0-2924-11e8-bc72-
077aa4dab9ef_story.html.

### III. Summary of The Rule

97. The Rule seeks to implement the CIS wish list and the draft Executive Order. The Rule brands as a "public charge" anyone who receives any amount of specified means-tested public benefits in any twelve months over a thirty-six month period; it defines the statutory phrase "likely to become a public charge" to include anyone deemed likely to receive such benefits "at any time in the future"; and it provides that receipt of such benefits during the three years preceding the application is a "heavily weighted negative factor" in determining whether an applicant is likely to become a public charge. Other factors, including low income, limited assets, and having a health condition coupled with an absences of private health insurance, also weigh against applicants. The Rule also calls for consideration of such nonstatutory factors as English language proficiency and credit score, and counts both youth and old age against an intending immigrant. The Rule precludes any noncitizen immigrant subject to public charge scrutiny who is deemed likely to receive such benefits at any time in the future—including large numbers of low-income and nonwhite applicants who have never received such benefits—from obtaining legal permanent residence.

98. More specifically, the Rule works as follows.

99. *First*, the Rule defines "public charge" to mean a person "who receives one or more [specified] public benefits . . . for more than 12 months in the aggregate within any 36-month period (such that, for instance, receipt of two benefits in one month counts as two months)." 84 Fed. Reg. at 41,501 (proposed 8 C.F.R. § 212.21(a)).

100. *Second*, the Rule defines "public benefit" to mean *any* amount of benefits from any of the programs enumerated in the Rule. 84 Fed. Reg. at 41,501 (proposed 8 C.F.R. § 212.21(b)). The Rule defines "public benefits" to include a wide range of cash and noncash

41

benefits that offer short-term or supplemental support to eligible recipients. These benefits include cash benefits such as SSI, 42 U.S.C. § 1381 *et seq.*; TANF, 42 U.S.C. § 601 *et seq.*; and "Federal, state or local cash benefit programs for income maintenance"; and noncash supplemental benefits such as SNAP, 7 U.S.C. §§ 2011–2036c; Section 8 Housing Assistance under the Housing Choice Voucher Program, 24 CFR part 984; 42 U.S.C. §§ 1437f and 1437u; Section 8 Project-Based Rental Assistance, 24 C.F.R. parts 5, 402, 880–884, 886; federal Medicaid, 42 U.S.C. §§ 1396 *et seq.* (with certain narrow exclusions)[36]; and Public Housing under section 9 of the U.S. Housing Act of 1937, 42 U.S.C. § 1437 *et seq.*  84 Fed. Reg. 41,501 (proposed 8 C.F.R. § 212.21(b)).[37]  In contrast, as noted, the Field Guidance considers only primary dependence on cash assistance and long-term institutionalization in making a public charge determination, and specifically excludes from consideration noncash benefits.

101.   The definition of "public benefit" in the Rule also radically changes the amount as well as the type of benefits that can trigger a public charge finding.  While under the Field Guidance, as noted, only a person who was considered "primarily dependent" on the government for subsistence was deemed a public charge, under the Rule, the receipt of any amount of the listed benefits renders the immigrant an excludable public charge if they are received for the established duration: 12 months "in the aggregate" in the 36-month period prior to filing an application for adjustment.  Under this "aggregate" calculus, receipt of two

---

[36]   Medicaid benefits excluded from the public charge analysis include benefits paid for an emergency medical condition, services or benefits provided under the Individuals with Disabilities Education Act, school-based benefits provided to children at or below the eligible age for secondary education, and benefits received by children under 21 years of age, or woman during pregnancy and 60 days post-partum.  84 Fed Reg. at 41,501 (proposed 8 C.F.R. § 212.21(b)(5)).

[37]   The definition of "public benefits" excludes benefits received by (i) individuals enlisted in the armed forces as well as their spouses and children, (ii) individuals during a period in which they are exempt from the public charge inadmissibility ground, and (iii) children of U.S. citizens whose admission for lawful permanent residence will automatically result in their acquisition of citizenship.  84 Fed. Reg. at 41,501.

benefits in one month would count as two months.  *See* 84 Fed. Reg. at 41,501 (proposed 8 C.F.R. § 212.21(a)).

102.  DHS offers no cogent explanation for this twelve-month trigger.  Indeed, although DHS received numerous comments that opposed taking into account the receipt of minimal or supplemental benefits in making a public charge determination, the final Rule actually lowers the threshold from what was proposed in the NPRM.  The proposed rule in the NPRM would have labeled someone a public charge only if they received any of the listed benefits, such as SNAP, in an amount in excess of fifteen percent of the FPG for a household of one within twelve months—which currently would amount to $1,821 a year.  But it did not penalize applicants for receipt of benefits below this already-low threshold.  DHS nowhere explains why it considers the appropriate threshold to be 12 months rather than 6, 24, or any other number.  Moreover, under the final Rule, USCIS will "consider and give appropriate weight to past receipt of benefits" even below the already low twelve-month threshold.  84 Fed. Reg. at 41,297.

103.  The Rule's sweeping definitions of "public charge" and "public benefits" would drastically increase the number of persons potentially deemed a public charge.  As an illustration, by one estimate, in any one year, 30 percent of U.S.-born citizens receive one of the benefits included in the proposed definition (compared to approximately 5 percent of U.S.-born citizens who meet the current benefit-related criteria in the public charge determination under the Field Guidance).  Similarly, in any given year, 16 percent of U.S. workers receive one of those benefits, compared to one percent who meet the current benefit-related criteria.  As set forth in its submission through the public notice-and-comment process, the Center on Budget and Policy Priorities estimates that 40 percent of U.S.-born individuals covered by a

2015 survey participated in one of those programs between 1998 and 2014—a figure that, after adjusting for underreporting, is likely approximately 50 percent.[38]  A more recent report by the same organization explains that, "[i]f one considers benefit receipt of the U.S.-born citizens over the 1997-2017 period, some 43 to 52 percent received one of the benefits included in the proposed public charge rule," and that more than 50 percent of the U.S.-born citizen population would receive such benefits over their lifetimes.[39]  While U.S. citizens are not subject to the public charge rule, these figures illustrate the extraordinarily broad potential impact of the Rule.

104.  DHS does not dispute the accuracy of these estimates.  Instead, it dismisses any comparisons to U.S. citizens' benefit use as "immaterial."  *See* 84 Fed. Reg. at 41,353 ("it is immaterial whether the definition of 'public charge' in the rule would affect one in twenty U.S. citizens or one in three").  But DHS offers no support for the suggestion that Congress would ever have approved a definition of "public charge" so sweeping that it could be applied to nearly half of U.S. citizens.

105.  *Third*, the Rule defines the statutory phrase "likely at any time to become a public charge" to mean "more likely than not at any time in the future to become a public charge, . . . based on the totality of the alien's circumstances."  84 Fed. Reg. at 41,501, (proposed 8 C.F.R. § 212.21(c)).  Thus, the Rule expressly disclaims any limit on how far into

---

[38]   *See* CBPP Comment at 2, 7–8, 10; *see also* Center for American Progress, Comment, at 15 (Dec. 10, 2018) ("[T]he proposed redefinition would mean that most native-born, working-class Americans are or have been public charges").

[39]   *See* Center on Budget and Policy Priorities, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means a Chance to Come to or Stay in the U.S.* (May 30, 2019), https://www.cbpp.org/research/poverty-and-inequality/trump-administrations-overbroad-public-charge-definition-could-deny.

the future the consideration is to extend or what "totality" of circumstances a government officer is permitted to balance.

106. *Fourth*, the Rule creates a complex and confusing scheme of positive and negative "factors," including certain "heavily weighted" factors, that will be used in determining whether a noncitizen is likely to become a public charge. 84 Fed. Reg. at 41,502–03 (proposed 8 C.F.R. § 212.22)*.*

107. The factors focus overwhelmingly on the noncitizen's income and financial resources. Thus, one of the "heavily weighted negative factors" under the Rule is past or current receipt of public benefits. 84 Fed. Reg. at 41,504 (proposed 8 C.F.R. § 212.22(c)). Another "heavily weighted negative factor" is an applicant's diagnosis with a medical condition that is "likely to require extensive medical treatment" and corresponding lack of private health insurance or financial resources to pay for anticipated medical costs. *Id.*

108. Likewise, every "heavily weighted positive factor" under the Rule similarly focuses on the immigrant's assets and financial resources, such as (1) having income, assets, or resources, and support of at least 250 percent of the FPG, (2) being authorized to work and currently employed with an annual income of at least 250 percent of the FPG, or (3) possessing private health insurance. *Id.* The Rule expressly excludes from consideration as private health insurance any insurance purchased using tax credits for premium support under the Affordable Care Act. *Id.*

109. The factors under the Rule that are not "heavily weighted" also focus predominantly on assets and financial resources. For example, the Rule provides that DHS will consider whether the applicant's household's annual gross income is at least 125 percent of the most recent FPG based on household size. *See* 84 Fed. Reg. at 41502–03 (proposed 8

C.F.R. § 212.22(b)(4)).  If the applicant's household's annual gross income is below that level, DHS will consider this a negative factor, unless the total value of the applicant's household assets and resources is at least *five times* the underage.  *See id.*[40]

110.  Other factors likewise focus on financial resources.  DHS states that it will consider whether the applicant has sufficient assets and resources to cover reasonably foreseeable medical costs related to a condition that could require extensive care or interfere with work.  Lack of private health insurance or an undefined amount of cash reserves that could cover medical expenses would be a negative factor.  84 Fed. Reg. at 41,503 (proposed 8 C.F.R.§ 212.22(b)(4)(C)); *see also* 83 Fed. Reg. at 51,189.

111.  The Rule also penalizes applicants who are under the age of 18—merely because of their age, even though they have their whole working lives ahead of them—as well as those aged 62 and over.  *See* 84 Fed. Reg. at 41,502 (proposed 8 C.F.R. § 212.22(b)(1)). Although DHS acknowledges that many commenters pointed out that it is not possible for young people to work to support themselves, the Rule fails to address this point, and instead responds that DHS may not "exempt" such children from the regulation.  But choosing not to categorize youth as a negative factor is not the same as providing an "exempt[ion]," and DHS does nothing to address those many comments.

112.  The Rule provides further that DHS will consider additional vague and unprecedented factors for which there appears to be no specific standard.  For example, for the first time, DHS will evaluate an intending immigrant's English language proficiency, without articulating any standard or level of proficiency an applicant is required to attain or how such

---

[40]   This amount is reduced to three times the underage for an immigrant who is the spouse or child of a U.S. Citizen, and one times the underage for an immigrant who is an orphan who will be adopted in the United States after acquiring permanent residence.  *See id.*

proficiency is to be measured.  84 Fed. Reg. at 41,504 (proposed 8 C.F.R.

§ 212.22(b)(5)(ii)(C)).  In contrast, when determining a naturalization applicant's English

language proficiency, USCIS's regulation sets out clear standards for ability to read, write, and

speak "words in ordinary usage" and directs applicants to test study materials and testing

procedures on the USCIS website.  *See* 8 C.F.R. § 312.1.

113.  Further, the Rule will take into account a noncitizen's U.S. credit score, as

assessed by private credit agencies, counting below-average credit scores as a negative factor.

84 Fed. Reg. at 41,503 (proposed 8 C.F.R. § 212.22(b)(4)(ii)(G)).  There is no other

immigration benefit for which DHS uses credit score—an error-prone measurement, as DHS

concedes, *see* 84 Fed. Reg. at 41,427 ("DHS recognizes that the credit reports and scores may

be unavailable or inaccurate.")—to determine whether an applicant is entitled to relief.

114.  DHS states that it will consider submission of an affidavit of support, but

the approach outlined in the Rule departs from past practices by decreasing the impact of a

sufficient affidavit of support on a public charge determination.  Under the Rule, an affidavit of

support will no longer be sufficient to rebut a public charge finding.  Rather, it will simply be

one positive factor—and not even a heavily weighted one—in the totality of the circumstances

test.  *See* 84 Fed. Reg. at 41,439.  Moreover, DHS will no longer consider an enforceable

affidavit of support at face value.  Instead, the Rule requires an immigration office to evaluate

"the likelihood that the sponsor would actually provide the statutorily-required amount of

financial support to the [noncitizen]," by evaluating such non-statutory factors as the sponsor's

income and assets, the sponsor's relationship to the applicant, and whether the sponsor has

submitted affidavits of support for other individuals.  84 Fed. Reg. at 41,504 (proposed 8

C.F.R. § 212.22(b)(7)).

115.  The impact of these factors is to multiply the number of grounds for deeming noncitizens inadmissible as public charges and barred from legal permanent residence.  By focusing virtually all the factors DHS chooses to identify—including the majority of "heavily weighted factors"—on an immigrant's assets and resources, the Rule provides immigration officers with an abundance of options to deny green cards to low-income immigrants, whether they have accessed public benefits or not.  The income and resources-focused factors are not targeted to determining who is currently or predicted to be primarily dependent on the government for subsistence.  Rather, they are geared toward capturing a much broader group of low- and middle-income noncitizens in the public charge dragnet. As discussed above, this approach represents a sharp departure from the consistent historical understanding and application of the public charge inadmissibility rule.

## IV.    The Public Benefits Targeted by the Rule Provide Temporary and/or Supplemental Support to Individuals Who Work

116.  As noted, the Rule defines "public charge" to mean a person who receives certain enumerated public benefits for more than 12 months in any 36-month period.  The "public benefits" at the root of the public charge inquiry include, for the first time, noncash benefits, including SNAP, Medicaid, and public housing assistance.  As INS recognized in issuing the Field Guidance, these benefits "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family."  64 Fed. Reg. at 28,692.  Contrary to DHS's repeated assertion that an individual who makes use of these benefits "is not self-sufficient," *e.g.*, 84 Fed. Reg. at 41,349, these programs are widely used by working families to supplement their other income.  And they are, by design, available to people with incomes well above the poverty line and, in some cases, with significant assets.

A.    **SNAP**

117.   Congress created the food stamp program (now known as the

Supplemental Nutrition Assistance Program, or "SNAP") in 1964, in order to "safeguard the

health and well-being of the Nation's population by raising levels of nutrition among low-

income households."[41]  SNAP benefits may be used to buy nutritional staples, like bread, fruits

and vegetables, meat, and dairy products.[42]  The current maximum monthly allotment of SNAP

benefits an individual is eligible for is $192 for an individual, or $504 for a family of three,[43]

which amounts to less than $6 per person daily.  The average actual allotment for a family of

three in 2019 is estimated to be approximately $378 per month, or little more than $4 per

person daily.[44]

118.   The supplemental nature of SNAP is evident not only from its name, but

from the significant number of SNAP recipients who work.  Over one-third of non-disabled

adults work in *every* month they participate in SNAP.[45]  And "[j]ust over 80 percent of SNAP

households with a non-disabled adult, and 87 percent of households with children and a non-

disabled adult, included at least one member who worked either in a typical month while

receiving SNAP or within a year of that month."[46]  Many SNAP recipients must meet strict

---

[41]   Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (codified at 7 U.S.C. § 2011); *accord* 7 C.F.R. § 271.1 (reiterating same purpose).

[42]   *See* N.Y. Office of Temporary & Disability Assistance *Supplemental Nutrition Assistance Program (SNAP)*: *Frequently Asked Questions*, http://otda.ny.gov/programs/snap/qanda.asp#purchase.

[43]   U.S. Dep't of Agriculture Food & Nutrition Serv., *SNAP Eligibility*, https://www.fns.usda.gov/snap/recipient/eligibility#How much could I receive in SNAP benefits? (providing monthly SNAP benefits by household size, for the period October 1, 2018 through September 30, 2019).

[44]   *See* Center on Budget and Policy Priorities, *A Quick Guide to SNAP Eligibility and Benefits* at Table 1 (Oct. 16, 2018), https://www.cbpp.org/research/food-assistance/a-quick-guide-to-snap-eligibility-and-benefits, (estimating 2019 averages based on FY 2017 SNAP Quality Control Household Characteristics Data, the "most recent data with this information"); *accord* CBPP Comment at 44 ("SNAP benefits average only about $1.40 per meal, or about $126 per month per person.").

[45]   CBPP Comment at 44.

[46]   *Id*. at 43.

work requirements to maintain eligibility.[47]  Receipt of SNAP benefits can improve birth

outcomes and long-term health, and reduce future reliance on the very public benefits

programs whose use DHS claims it seeks to discourage.[48]

119.  Although most SNAP recipients are subject to income and resource

eligibility requirements, many recipients have significant assets and income above the poverty

line.  Households with earned income can maintain SNAP eligibility up to 150 percent of the

FPG, and households with childcare expenses up to 200 percent.  Many significant assets are

excluded from SNAP eligibility determinations, including homes of residence, the full or

partial value of certain vehicles, and most retirement and pension plans. 7 U.S.C. § 2014(g); 7

C.F.R. § 273.8(e).  Certain households are exempt from the resource cap altogether.

120.  In some cases, an intending immigrant undergoing adjustment would be

eligible for SNAP before his or her green card application is approved.  More commonly, the

applicant undergoing the public charge determination only would be eligible for SNAP five

years after he or she adjusts.  But an adjusted LPR may be eligible for SNAP sooner if he or

she is under age 18, in receipt of a disability-based benefit, can be credited with 40 qualifying

quarters of work, or was lawfully residing in the U.S. and 65 or older when PRWORA was

signed into law on August 22, 1996.

B.    Medicaid

121.  Congress created the federal Medicaid program in 1965 to assist states in

furnishing medical assistance to individuals and families.[49]  As described by the federal

---

[47]   For example, Able Bodied Adults without Children, or "ABAWDs" are required to work or participate in a
      work program for at least 20 hours per week in order to receive SNAP benefits for more than three months in a
      36-month period. *See* 7 C.F.R. § 273.24.
[48]   CBPP Comment at 45–47.
[49]   Social Security Amendments of 1965, Pub. L. No 89-97, 79 Stat. 286.

Centers for Medicare and Medicaid Services, which works in partnership with state governments to administer Medicaid, "Medicaid provides health coverage to millions of individuals, including eligible low-income adults, children, pregnant women, elderly adults and people with disabilities."[50]  The income and resource eligibility criteria for federal Medicaid depend on, among other criteria, the recipient's age and income, and whether the person is blind or disabled.[51]

122.  Many recipients of Medicaid work.  Nearly 80 percent of non-elderly, non-disabled adult Medicaid beneficiaries are in working families.[52]  Among Medicaid enrollees who work, over half work full-time for the entire year in which they participate in the program.[53]  Research shows that access to affordable health insurance and care, like Medicaid, "promotes individuals' ability to obtain and maintain employment."[54]

123.  In the 37 states (including the District of Columbia) that have adopted Medicaid expansion under the Affordable Care Act, the program is available to workers with no resources cap and with earnings above the poverty level.[55]  For example, parents with dependent children, and adults aged 19–64, can qualify for federal Medicaid if their income

---

[50]   Centers for Medicare & Medicaid Services, *Medicaid*, https://www.medicaid.gov/medicaid/index.html (last visited Aug. 24, 2019).

[51]   *See* Centers for Medicare & Medicaid Services, *Eligibility*, https://www.medicaid.gov/medicaid/eligibility/index.html (last visited Aug. 24, 2019).

[52]   CBPP Comment at 39.

[53]   Rachel Garfield et al., *Understanding the Intersection of Medicaid and Work: What Does the Data Say?*, Kaiser Family Foundation, at 4 (Aug. 2019), http://files.kff.org/attachment/Issue-Brief-Understanding-the-Intersection-of-Medicaid-and-Work-What-Does-the-Data-Say.

[54]   CBPP Comment at 40–41 (quoting Larisa Antonisse and Rachel Garfield, *The Relationship Between Work and Health: Findings from a Literature Review*, Kaiser Family Foundation (Aug. 2018), https://www.kff.org/medicaid/issue-brief/the-relationship-between-work-and-health-findings-from-a-literature-review/).

[55]   Kaiser Family Foundation, *Status of State Medicaid Expansion Decisions: Interactive Map*, (Aug. 1, 2019), https://www.kff.org/medicaid/issue-brief/status-of-state-medicaid-expansion-decisions-interactive-map/.

does not exceed 133 percent of the FPG.[56] Medicaid expansion was a key component of the Affordable Care Act and appeared in the first public draft of the legislation.[57]

124. A person adjusting to LPR status through a family member who is subject to public charge would become eligible for federal Medicaid after he or she adjusts and has been a so-called "qualified alien" for five years.[58]

125. Through New York State of Health, New York's state-run Health Exchange, New Yorkers are screened for and enrolled in Medicaid as well as other types of government-funded health insurance, government-subsidized private health insurance, and non-subsidized private health insurance. Government-funded insurance provided by New York includes medical assistance that is available to persons not eligible for federal Medicaid. *See* N.Y. Soc. Serv. Law §§ 366(1)(g), 369-gg. Immigrants who are eligible for this form of state-funded health insurance include qualified aliens subject to the five-year limit and persons considered permanently residing under color of law, including persons who have applied for deferred action for childhood arrivals ("DACA") or other deferred action, and applicants for asylum.

126. Some New Yorkers are eligible for New York's Basic Health Plan, called the "Essential Plan." N.Y. Soc. Serv. Law §§ 366(1)(g), 369-gg. The Essential Plan provides coverage to certain immigrants who are ineligible for federal Medicaid, as well as for New Yorkers with income from 139 percent to 200 percent of the FPG who must pay a low monthly

---

[56]   42 U.S.C. § 1396a(a)(10).

[57]   John Cannan, *A Legislative History of the Affordable Care Act: How Legislative Procedure Shapes Legislative History*, 105 Law Libr. J. 131, 137 (2013).

[58]   *See* 8 U.S.C. § 1641(b).

premium for coverage.[59]  As required by Congress, immigrants must be "lawfully present" to be eligible for private qualified health plans pursuant to the Affordable Care Act, including the Essential Plan.

127.  Although such non-federal Medicaid forms of health insurance do not count as "public benefits" under the Rule's public charge test, many noncitizens fear that enrollment in state-funded programs and even private coverage (which often have the same name as the state's Medicaid program) will carry adverse immigration consequences.  Almost all recipients of New York Medicaid are required to enroll in private Medicaid managed care plans.  N.Y. Soc. Serv. Law § 364-j.  Since many of the same health insurance companies offer commercial, Medicaid, Medicare, Essential Plan, and/or Children's Health Insurance Program coverage, many New Yorkers do not understand which program they are in, especially if their eligibility shifts year to year.

## C.    Federal Rental Assistance Benefits

128.  The Rule includes three types of federal rental assistance in its definition of "public benefit": (i) public housing, (ii) Section 8 vouchers; and (iii) project-based Section 8.  Most tenants of public housing pay 30 percent of their income (after certain deductions) for rent and utilities.  Federal subsidies, issued by the Department of Housing and Urban Development to the local public housing authority that owns and manages the public housing, are intended to cover the gap between tenant rents and operating costs.  Section 8 housing choice vouchers provide a rental subsidy to the participant household that can be used to rent a privately owned housing unit.  42 U.S.C. §§ 1437f, 1437u.  Households receiving project-

---

[59]  *See* N.Y. State of Health, *Essential Plan at a Glance* (June 2019), https://info.nystateofhealth.ny.gov/sites/default/files/Essential%20Plan%20At%20A%20Glance%20Card%20-%20English.pdf.

based Section 8 benefit from a subsidy that is attached to the residence where they reside. 42 U.S.C. § 1437f; 24 C.F.R. parts 5, 402, 880–884, 886. Each of these federal rental assistance programs has an income eligibility requirement measured by the local Area Median Income ("AMI") for the size of the family receiving the benefit.

129. Federal rental assistance programs support work by enabling low-income households to live in stables homes. Of the non-elderly, non-disabled households receiving federal rental assistance, approximately two-thirds are headed by working adults.[60] That number is even higher for households containing non-citizens, where approximately three-quarters of non-elderly, non-disabled households report earning wages.[61]

130. As with SNAP and Medicaid, recipients of federal rental assistance may have incomes above the poverty threshold and assets or other resources. Under these three rental assistance programs, while there are requirements for targeting assistance to lower-income households (below 30 percent of AMI), a household can qualify for assistance with income up to 80 percent of the AMI, which for a family of four in New York City is $85,360 per year,[62] more than three times above the FPG of $25,750 for a family that size.[63]

## V.   The Rule Violates the Administrative Procedure Act in Numerous Ways

131. The Rule violates the APA in several respects, including that it is "arbitrary, capricious, an abuse of discretion, [and] otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right," *id.* § 706(2)(B), and "in excess of statutory jurisdiction, authority, or limitations," *id.* § 706(2)(C). This section discusses several

---

[60]   CBPP Comment at 48.

[61]   *Id.*

[62]   N.Y.C. Dep't of Housing Preservation & Development, *Area Median Income (AMI)*, https://www1.nyc.gov/site/hpd/renters/area-median-income.page (last visited Aug. 24, 2019).

[63]   *See* U.S. Dep't of Health & Human Services, *U.S. Federal Poverty Guidelines Used to Determine Financial Eligibility for Certain Federal Programs*, https://aspe.hhs.gov/poverty-guidelines (last visited Aug. 24, 2019).

ways in which the Rule violates the APA, including that (1) the Rule's definition of "public charge" is contrary to the INA; (2) the Rule is unlawfully retroactive and penalizes past conduct that was not part of the public charge analysis at the time it occurred; (3) the Rule is so confusing, vague, and broad that it fails to give notice of conduct to avoid and invites arbitrary and inconsistent enforcement; (4) the Rule unlawfully discriminates against individuals with disabilities; (5) the Rule's changes to the public charge bond provision impermissibly renders such bonds inaccessible; and (6) the Rule is arbitrary and capricious in other ways.

### A.     The Rule's Definition of "Public Charge" is Contrary to the INA

132.   As discussed above, *see supra* ¶¶ 59–90, the Rule's definition of "public charge" as an individual who receives a minimal amount of noncash public benefits is contrary to the interpretation of "public charge" that has endured for 130 years:  an individual primarily dependent on the government for subsistence.  The statutory meaning of the term "public charge" is evident from, among other things, (i) the plain meaning of the phrase, (ii) the judicial and administrative interpretation of the term since it first became part of federal immigration law; (iii) Congress's approval of that interpretation in repeatedly reenacting the statute; and (iv) Congress's rejection of efforts to expand that interpretation in the manner the Rule now seeks to accomplish.

133.   Accordingly, the Rule is not in accordance with the law and is in excess of DHS's statutory jurisdiction.  5 U.S.C. §§ 706(2)(A), 706(2)(C).

### B.     The Rule Retroactively Penalizes Noncitizens for Past Conduct that Has Never Been Relevant to Public Charge Determinations

134.   Apparently recognizing that retroactive application of the Rule would be unfair and unlawful, the Rule purports not to consider receipt of public benefits other than cash

assistance and long-term institutionalized care (which were considered in public charge

determinations under the Field Guidance) obtained prior to the Rule's effective date.  84 Fed.

Reg. at 41,504.  But both the Rule itself and the proposed bureaucratic form that accompanies

the Rule make clear that DHS *does* intend to consider past receipt of public benefits when

determining whether a noncitizen is inadmissible on public charge grounds.  Such retroactive

application is unlawful, because it is arbitrary and capricious and because DHS lacks the

statutory authority to promulgate retroactive rules concerning public charge determinations.

*See* 8 U.S.C. § 1182.

135.  The Rule applies retroactively in several ways.  It (1) explicitly penalizes

*any* past receipt of, rather than primary dependence on, cash benefits; (2) requires applicants to

document receipt of all past *noncash* benefits on a newly-created Form I-944; (3) evaluates, for

the first time, credit scores based on years of past financial activity; (4) assesses English

language proficiency that would require years of preparation; and (5) ends the ability of

applicants to rely on sponsor affidavits to overcome the heavily weighted "negative" factors

that were never before considered.  The Rule thus greatly increases the likelihood of a public

charge determination based on numerous past activities that were never evaluated or even seen

as relevant under the Field Guidance.

136.  *First*, the rule retroactively penalizes any past receipt of cash assistance,

including amounts that would not give rise to a public charge finding under the Field

Guidance.  Under the Field Guidance, a noncitizen may be found to be inadmissible as a public

charge if she is likely to become "primarily dependent on the government for subsistence, as

demonstrated by . . . the receipt of public cash assistance for income maintenance."  64 Fed.

Reg. at 28,689.  The Field Guidance further provides that "[t]he longer ago an alien received

such cash benefits . . . the less weight [this] factor[] will have as a predictor of future receipt," and "the length of time an applicant has received public cash assistance is a significant factor" as well. *Id.* at 28,690. The Field Guidance explains that receipt of cash assistance is just one factor in the totality of the circumstances test and that, for example, a noncitizen who received cash public benefits but also has an affidavit of support or full-time employment "should be found admissible." *Id.* The Field Guidance has been relied upon by noncitizens, lawyers, and advocates for twenty years.

137. The Rule completely changes this calculus. The Rule states that "DHS will consider, as a negative factor . . . ***any amount of cash assistance*** . . . received, or certified for receipt, before" the effective date of the Rule. 84 Fed. Reg. at 41,504 (proposed 8 C.F.R. § 212.22(d)) (emphasis added). Thus, while the Field Guidance considered receipt of means-tested cash assistance only to the extent it tended to show likely "primary dependence on the government for subsistence," *see* 64 Fed. Reg. at 28,693, the new Rule could predicate a public charge finding on past receipt at any time of "any amount of cash assistance" (even, apparently, cash assistance below the threshold of 12 months within a 36-month period). The proposed Rule, therefore, penalizes past receipt of cash assistance that, at the time it was received, would not have resulted in a public charge determination.

138. *Second*, the Rule requires applicants to submit evidence of past receipt of noncash benefits. While the Rule purports to direct DHS personnel not to consider past receipt of public benefits other than cash assistance or institutionalization, DHS's actions say the opposite. In connection with issuing the Rule, DHS prepared a form (Form I-944)[64] for

---

[64] USCIS, Form I-944, Declaration of Self Sufficiency, https://www.regulations.gov/document?D=USCIS-2010-0012-63772; USCIS, Form I-944, Instructions for Declaration of Self Sufficiency, https://www.regulations.gov/document?D=USCIS-2010-0012-63771.

submission by those applying for immigration benefits with USCIS, such as adjustment of

status or extension or stay or change in status, "to demonstrate that the applicant is not likely to

become a public charge under section 212(a)(4) of the Act," 83 Fed. Reg. at 51,254; *see also*

84 Fed. Reg. at 41,295. And the form requests precisely the information DHS says it will not

consider. Form I-944 requires immigrants seeking admission or adjustment of status to

disclose whether they have "***ever*** applied for" or received the public benefits enumerated in the

Rule (emphasis added). Applicants are required to respond to detailed questions about all such

benefits they have received at any time. Neither Form I-944 nor its Instructions say that

benefits applied for or received before the Rule's effective date—benefits that were not

considered in public charge determinations when they were applied for or received—will not

be considered.

139. DHS's requirement that such benefits be disclosed to the personnel

making public charge determinations is also so onerous as to render it effectively unworkable.

As legal services providers have made clear during the public comment period, the complexity

of the modern public benefits landscape, the administrative hurdles to recipients of and

applicants for benefits, and the likelihood of errors in calculating exact amounts of public

benefits, including noncash benefits, received make it "virtually impossible for applicants to

accurately self-report."[65]

140. Further, this disclosure requirement clearly indicates that application for or

receipt of such benefits could be considered in assessing whether the applicant is likely to

become a public charge. At a minimum, DHS personnel reviewing an applicant's Form I-944

will see information about pre-Rule receipt of benefits and have that information in mind when

---

[65]    New York Legal Assistance Group, Comment, at 7 (Dec. 10, 2018).

evaluating whether the applicant is inadmissible.  It is both unfair and unlawful to punish a noncitizen under a new Rule for conduct that did not violate any rule at the time it occurred.

141.  *Third*, the Rule directs adjustment officers, for the first time, to evaluate applicants' "credit scores," an inherently backward-looking criterion, that subjects applicants to evaluations of reasonable past financial conduct that was never before considered.  *See* 84 Fed. Reg. at 51,188.  There is no immigration benefit for which eligibility has ever taken into account the credit scores compiled by private credit rating companies. Applicants who have made reasonable financial decisions, such as taking on debt that would assist them in becoming financially stable—for example, a loan for a car that will allow them to work, or schooling that will increase their skills—will be penalized by such past decisions.

142.  *Fourth*, the Rule includes an evaluation of English language proficiency that, in addition to lacking any measurable standard, penalizes applicants for decisions to forego English language instruction in reliance on the fact that no immigration benefit other than naturalization is premised on English language proficiency.  *See* 84 Fed. Reg. at 51,195. Because achieving proficiency is a time-consuming process that can take years of preparation and substantial monetary commitment, this factor impermissibly penalizes applicants for past decisions made in reliance on then-current rules.

143.  *Fifth*, the Rule now penalizes applicants who expected to be able to overcome a public charge determination by having their sponsors submit affidavits of support pursuant to 8 U.S.C. § 1183a(a)(1).  *See* 84 Fed. Reg. at 51,117.  Under IIRIRA, noncitizens seeking admission through family-sponsored immigration and some forms of employment-sponsored immigration are required to have their sponsor submit such an affidavit as part of their application for admission to the United States.  *See* 8 U.S.C. §§ 1183, 1183a.  In practice,

affidavits of support have provided sufficient assurance that an individual will not become a public charge, and properly executed affidavits have been deemed sufficient to satisfy a public charge analysis.[66] Intending immigrants who received benefits, including cash assistance (whose receipt prior to the effective date is a negative factor), did so in reliance on the practice that a sponsor affidavit—an enforceable agreement with the U.S. government that the sponsor would support them—would overcome a potential public charge determination.

144. The Rule thus penalizes noncitizens for decisions made in reliance on existing law. For twenty years, noncitizens have made decisions relying on the express terms in the Field Guidance. The Field Guidance made clear that neither mere receipt of cash benefits nor acceptance of supplemental noncash benefits would subject an applicant to a public charge finding, particularly for those filing with the support of sponsor affidavits, nor was credit score or English language proficiency even mentioned as a consideration. The Rule penalizes reliance on these clear rules. In applying this new standard retroactively, the Rule increases every noncitizen's liability for activity that at the time had no negative consequences.

145. DHS identifies no authority that would permit it to promulgate retroactive rules. Without express authorization from Congress, DHS lacks the power to issue this Rule.

### C. The Rule is So Confusing, Vague, and Broad that it Fails to Give Applicants Notice of Conduct to Avoid and Invites Arbitrary, Subjective, and Inconsistent Enforcement

146. The Rule is complex and confusing. It transforms the process for determining public charge through a series of changes both to the benefits considered relevant to the public charge determination, and to the assessment and "weighting" of other qualities.

---

[66] *See* CBPP Comment at 30; Center for Law and Social Policy, Comment, at 106 (Dec. 7, 2018) (citing 9 FAM § 302.8-2(B)(3)) [hereinafter "CLASP Comment"].

The Rule and the many internal inconsistencies within it fail to give applicants notice of conduct to avoid, and fail to provide adjudicators with clear guidelines to apply.

147.   These vague, broad, and standardless factors make it impossible for DHS officers to administer the Rule in an objective and consistent manner, or for applicants to predict how it will be applied.   Likewise, an officer administering the Rule would have no way to reconcile inconsistencies between the Rule itself and the preamble purporting to explain the Rule.

148.   Many of the retroactive elements of the Rule pose challenges to administering the Rule objectively and consistently.   For example, Form I-944 requires immigration officers to obtain information about *any* past receipt of noncash public benefits— even benefits received prior to the Rule's effective date—even though those same officers are being instructed in the Rule ***not*** to consider such benefits.

149.   The negative factor relating to credit scores is subject to arbitrary application because the Rule fails to consider many scenarios that could affect an applicant's credit score.   For example, although the Rule specifically states that "bankruptcies" should form part of the credit score analysis, it provides no guidance about how to treat an applicant who took advantage of bankruptcy laws to discharge and restructure debts.   An immigration officer has no way to know whether to treat such a bankruptcy as a positive factor (reflecting sophistication or financial prudence) or a negative factor (reflecting excessive debt and poor financial management).   And the Rule is silent about whether "bankruptcies" (or "arrests, collections, actions, [and] outstanding debts") that occurred before its effective date may be considered.   *See* 84 Fed. Reg. at 41,425–26.

150.   Many other vague factors also invite arbitrary enforcement of the Rule. For example, the English proficiency factor—which comes with no standard for "proficiency" to guide either applicant or immigration officer—may be applied by each officer in a different way depending on the officer's own language comprehension skills or the officer's ability to understand a non-U.S. accent.  While the I-944 Form suggests that applicants provide "certifications" of English language courses, the Rule offers no guidance as to how to evaluate these certifications.

151.   Beyond that, there are inconsistencies between the Rule and the preamble's description of how the Rule is supposed to work that invite arbitrary enforcement. For example, the preamble to the Rule states that "active duty service members, including those in the Ready Reserve, and their spouses and children" are exempt from their use of public benefits being counted against them.  84 Fed. Reg. at 41,372.  But, although the Rule does exclude benefits used by individuals who are family members of active-duty service members who are noncitizens, it inexplicably does not exclude benefits used by noncitizen family members of active-duty service members who are U.S. citizens.  This inconsistency leaves immigration officers without clear law to apply to applicants who are spouses or children of active-duty U.S. citizen service members.

152.   As another example, the preamble to the Rule states that having non-private health insurance, even if it is not Medicaid, will be given heavily negative weight if the applicant has a qualifying health condition.  84 Fed. Reg. at 41,445 (stating that DHS considers it a "heavily weighted negative factor" if an applicant lacks "financial means to pay for reasonably foreseeable medical costs if the [non-citizen] does not have private health insurance").   But nothing in the Rule itself suggests that having non-private health insurance

other than Medicaid counts as a negative factor.  To the contrary, the Rule specifically states

that, if an applicant has a medical condition that is likely to require extensive treatment, an

immigration officer should consider whether the applicant can pay for reasonably foreseeable

medical costs through health insurance "not designated as a public benefit . . . ."  84 Fed. Reg.

at 41,503 (proposed 8 C.F.R. § 212.22(b)(4)(2)(H)).  Furthermore, to the extent this provision

expresses a bias in favor of employer-provided health insurance, it is in conflict with the fact

that many noncitizens work in industries where employers are less likely to provide health

insurance.

        153.  The distinction in the Rule between Medicaid and other forms of medical

insurance poses additional challenges to consistent enforcement of the Rule (as well as to green

card applicants and their advisors).  As discussed above, *supra* ¶¶ 125–27, in states like New

York where there are numerous forms of health insurance offered by the same managed care

plans, a USCIS officer (as well as applicants and their advisors) will have difficulty

distinguishing between health benefits that trigger the public charge, namely federal Medicaid,

and other forms of health insurance maintained by the same companies whose receipt is not a

negative factor under public charge.

    **D.**    **The Rule Unlawfully Discriminates Against Individuals with Disabilities**

        154.  The Rule discriminates against individuals with disabilities in violation of

the Rehabilitation Act of 1973 ("Rehabilitation Act"), Pub L. No. 93-112, 87 Stat. 355.  It does

so by expressly treating disability as a negative factor—indeed, as multiple, duplicative

negative factors—in making public charge determinations.   The Rule thus conflicts with

Section 504 of the Rehabilitation Act, which provides that "[n]o otherwise qualified individual

with a disability in the United States . . . shall, solely by reason of her or his disability, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination . . .
under any program or activity conducted by an Executive agency." 29 U.S.C. § 794(a).

155. Starting in 1973, Congress began to pass a series of historic civil rights
laws prohibiting discrimination on the basis of disability in public and private life: barring
disability discrimination in federally funded programs by the federal government itself, in
private and public employment, in state and local programs and services, and in public
accommodations. These laws were designed to promote the goal of enabling individuals with
disabilities to achieve equality of opportunity, full inclusion, and integration in society. The
Rule ignores these laws and attempts to roll back the clock to a time when disabled individuals
were not permitted to fully participate in society.

156. The first major federal civil rights statute extending protections to the
disabled was the Rehabilitation Act, which authorized vocational rehabilitation grants and
prohibited disability discrimination in federally funded programs. 29 U.S.C. § 784. In 1978,
Congress extended the Rehabilitation Act protections to prohibit discrimination by the Federal
government itself. *See* Rehabilitation, Comprehensive Services, and Developmental
Disabilities Amendments of 1978, Pub. L. No. 95-602, 95 Stat. 2955.

157. In 1990, Congress passed the Americans with Disabilities Act ("ADA"),
Pub. L. No. 101-336, 104 Stat. 327, to prohibit discrimination against individuals with
disabilities in employment, local and state government programs and services, and public
accommodations. In passing the ADA, Congress found that "historically, society has tended to
isolate and segregate individuals with disabilities, and, despite some improvements, such forms
of discrimination against individuals with disabilities continue to be a serious and pervasive
social problem." 42 U.S.C. § 12101(a)(2).

64

158.   In 2008, following a series of Supreme Court cases that had narrowly construed the definition of disability under the ADA, Congress acted to reinforce the intent of these civil rights statutes by passing the ADA Amendments Act, which amended the ADA and the Rehabilitation Act to clarify that the definition of disability in each statute was to be "construed in favor of broad coverage of individuals" to ensure "maximum" coverage.[67]

159.   As a program or activity conducted by DHS, public charge determinations are subject to the Rehabilitation Act.[68]

160.   DHS regulations implementing the Rehabilitation Act prohibit the agency from denying a benefit or service "on the basis of disability."  6 C.F.R. § 15.30(b)(1).  These provisions provide further that the agency may not "utilize criteria or methods of administration" that would: "(i) Subject qualified individuals with a disability to discrimination on the basis of disability; or (ii) Defeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with a disability."  *Id.* § 15.30(b)(4).

161.   The Rule violates the Rehabilitation Act and the implementing regulations by creating a new discriminatory scheme that is triggered by disability.

162.   *First*, the Rule imposes a negative "health" factor based on disability alone, providing that "diagnos[is] with a medical condition that is likely to require extensive medical treatment," with nothing more, is treated as a negative factor.  *See* 84 Fed. Reg. at 41,502 (proposed 8 C.F.R. § 212.22(b)(2)).

---

[67]   *See* The Americans with Disabilities Amendments Act ("ADAA") Pub. L. No. 110-325, 122 Stat. 3553, codified at 42 U.S.C. § 12102 et seq., and codified at 29 U.S.C. § 705(9) (B) (Rehabilitation Act provisions incorporating these ADA definitions.); *see also* Amendment of Americans With Disabilities Act Title II and Title III Regulations To Implement ADA Amendments Act of 2008, 81 Fed. Reg. 53,204 (explaining that the ADA Amendments Act was intended to: "effectuate Congress's intent to restore the broad scope of the ADA by making it easier for an individual to establish that he or she has a disability").

[68]   *See* Dawn E. Johnsen, Department of Justice Office of Legal Counsel, *Letter Opinion for the General Counsel Immigration and Naturalization Service* (Apr. 18, 1997); Robert B. Shanks, *Memorandum Re: Section 504 of the Rehabilitation Act of 1973* (Feb. 2, 1983).

163.  *Second*, the Rule imposes an additional heavily weighted negative factor for applicants who (a) have a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with their ability to provide for himself or herself, attend school, or work; and (b) are uninsured and have neither the prospect of obtaining private health insurance, nor the financial resources to pay for reasonably foreseeable medical costs related to such medical condition.  *See* 84 Fed. Reg. at 41,504 (proposed 8 C.F.R. § 212.22(c)(1)(iii)).

164.  *Third*, the Rule imposes a separate negative factor for an applicant who lacks "sufficient household assets and resources (including, for instance, health insurance not designated as a public benefit under 8 C.F.R. § 212.21(b)) to pay for reasonably foreseeable medical costs, such as costs related to a medical condition that is likely to require extensive medical treatment or institutionalization or that will interfere with the alien's ability to provide care for himself or herself, to attend school, or to work."  *See* 84 Fed. Reg. at 41,503 (proposed 8 C.F.R. § 212.22(b)(4)(H)).

165.  The Rule thus takes a single characteristic common to individuals with disabilities—a chronic health condition—and counts it as a negative factor ***three*** different times in the totality of the circumstances analysis: once as a negative factor relating to "health," once as a negative factor relating to "assets, resources, and financial status," and once as an independent "heavily weighted negative factor" related, again, to health and financial resources.  DHS provides no explanation to justify this triple-counting, which results in disproportionally punishing individuals with disabilities.  Indeed, the agency "acknowledges that multiple factors may coincide or relate to each other," and it makes no effort to explain or justify its conclusory

denial that it is "impermissibly counting factors twice," let alone three times.  84 Fed. Reg. at 41,406.

166.  The Rule also utilizes a complex and confusing web of discriminatory principles to evaluate health insurance coverage—providing positive and negative weights to health insurance coverage depending on whether it is "private," or "publicly funded or subsidized," or, as in the case of federal Medicaid, a "public benefit."  Having "private health insurance" is a heavily weighted positive factor under the Rule, but DHS has arbitrarily determined that applicants cannot receive this heavily weighted credit if they receive Affordable Care Act tax credits for their insurance premiums, despite tax credits only being available to individuals up to 400 percent of the FPG.  This disqualification of coverage under the Affordable Care Act is not disqualifying if the coverage was received through the "marketplace," 84 Fed. Reg. at 41,388, a distinction that was not set forth in the NPRM.

167.  Many individuals with disabilities must rely on federal Medicaid to meet their needs because it covers services and medical equipment that are often not available under private insurance.  Despite this, under the Rule, federal Medicaid is defined as a "public benefit," and past receipt of federal Medicaid is considered a heavily weighted negative factor.

168.  Even though the Rule purports to designate only federal Medicaid as a "public benefit," it nonetheless punishes individuals, including individuals with disabilities, for using other non-private forms of health insurance.  For example, health insurance provided by New York State's Essential Plan is not a federal Medicaid benefit and does not count as a "public benefit" under the Rule.  However, individuals with disabilities who have Essential Plan coverage will nonetheless be assessed a heavily weighted negative factor under the Rule's provision that punishes individuals who have chronic medical conditions and do not have "the

67

prospect of obtaining *private* health insurance." *See* 84 Fed. Reg. at 41,504 (proposed 8 C.F.R. § 212.22(c)(1)(iii)) (emphasis added); 84 Fed. Reg. at 41,445. In addition, because Essential Plan is not private health insurance, an applicant receiving Essential Plan benefits cannot be credited with the heavily-weighted positive factor of having "private health insurance" under proposed 8 C.F.R. § 212(c)(2)(ii). To the contrary, the Essential Plan is considered to be "publicly-funded or subsidized health insurance." 84 Fed. Reg. at 41,428.

169. DHS received numerous comments explaining that the Rule would negatively and disproportionately affect people with disabilities, those with chronic health conditions, and other vulnerable individuals. DHS did not deny this outcome and instead merely responded, without explanation, that the agency "does not intend to disproportionately affect such groups." 84 Fed. Reg. at 41,429.

170. DHS is unapologetic about this discriminatory scheme, which represents a clear departure from the mandates of the Rehabilitation Act and its conforming regulations. In fact, as justification for such harsh treatment of individuals with disabilities, DHS relies on the very archaic views of disability that Congress sought to eradicate in the Rehabilitation Act and the ADA, falling back on the excuse that consideration of health "has been part of public charge determinations historically." 84 Fed. Reg. at 41,368. In support of this point, DHS relies upon a judicial opinion from 1911 in which one individual was excluded on the basis of public charge because "he had a 'rudimentary' right hand affecting his ability to earn a living," another individual had "poor appearance and 'stammering,'" and a third individual "was very small for his age." 84 Fed. Reg. at 41,368 n.407 (citing *Barlin* v. *Rodgers*, 191 F. 970, 974–977 (3d Cir. 1911)).

171. The Rule is thus arbitrary and capricious because it discriminates against people with disabilities and fails to address the conflict between the Rule and Section 504 of the Rehabilitation Act.

**E.    The Rule's Changes to the Public Charge Bond Provision Render Such Bonds Effectively Inaccessible**

172. Since 1907, the federal immigration laws have provided a procedure by which a noncitizen excludable on public charge grounds could be admitted "upon the giving of a suitable and proper bond."   Immigration Act of 1907, 59 Cong. Ch. 1134 § 2, 34 Stat. 898 § 26.  A public charge bond is a contract between the United States and a counterparty who pledges a sum of money (secured by cash or property or underwritten by a certified surety company) to guarantee that the noncitizen will not become a public charge during a certain time frame.  *See* 8 U.S.C. § 1183; 8 C.F.R. § 103.6(c)(1); 8 C.F.R. § 213.1.  Currently, the minimum threshold for posting a public charge bond is $1,000.  *See* 8 C.F.R. § 213.1.

173. As discussed above, in 1996, Congress created for the first time an alternative to a public charge bond: an enforceable affidavit of support.  *See* 8 U.S.C. §§ 1182(a)(4)(B)(ii), 1183a; *supra* ¶ 78.  The advent of an enforceable affidavit of support largely obviated the need for public charge bonds, which have been required only "rarely" since the IIRIRA was enacted.  *See* 83 Fed. Reg. at 51,219 n.602.

174. The Rule dramatically alters this practice.  As described above, under the Rule, an affidavit of support is no longer sufficient for admissibility.  Rather, it is only one positive factor—and not a heavily weighted one—in the totality of the circumstances analysis. Accordingly, under the Rule, the posting of a public charge bond is once again the only way to overcome a determination that a noncitizen is inadmissible as likely to become a public charge.

But the Rule takes extreme steps to make the statutorily-authorized public charge bond inaccessible and unworkable.

175. *First*, the Rule provides that a noncitizen can post a public charge bond only with DHS's permission, and DHS is directed to exercise that discretion in favor of permitting a bond only if the applicant possesses no heavily weighted negative factors, the same factors that lead to a finding of inadmissibility in the first place. *See* 84 Fed. Reg. at 41,506 (proposed 8 C.F.R. § 213.1(b)) ("If an alien has one or more heavily weighted negative factors, . . . DHS generally will not favorably exercise discretion to allow submission of a public charge bond."). Thus, contrary to the statute and longstanding practice, the Rule creates a Catch-22 by making bonds available only to applicants who do not need them.

176. *Second*, the Rule would raise the minimum amount of such bonds from $1,000 to $8,100, annually adjusted for inflation. 84 Fed. Reg. at 41,506 (proposed 8 C.F.R. § 213.1(c)(2)). The amount of the bond required is not appealable. *Id.* A noncitizen whose income and assets render her inadmissible on public charge grounds under the proposed Rule is exceedingly unlikely to have $8,100 or more in cash or cash equivalents to secure such a bond. This minimum bond amount effectively regulates away the statutorily mandated availability of public charge bonds to overcome inadmissibility determinations.

177. *Finally*, the Rule also imposes draconian forfeiture procedures on the very few immigrants who might be offered the opportunity to post a public charge bond, and who might have assets to post such a bond. Existing federal regulations (which the Rule purports to incorporate) require a "substantial violation" in order to determine that a public charge bond has been breached. 8 C.F.R. § 103.6(e); *see* 84 Fed. Reg. at 41,455. The Rule, however, requires forfeiture of ***the entire bond*** for any violation of its terms, no matter how minor. In

other words, an immigrant who posts a $8,100 public charge bond and later receives 12 months of a "public benefit" within any 36-month period before the bond is formally cancelled—for example, an immigrant who receives $50 per month of cash benefits for a year after losing a job—would be required to forfeit the entire $8,100 bond. *See* 84 Fed. Reg. at 41,507 (proposed 8 C.F.R. § 213.1(h)(6)) ("The bond must be considered breached in the full amount of the bond.").

###### F.    The Rule Is Arbitrary and Capricious in Other Ways

178.    The Rule is arbitrary and capricious in other ways that violate the APA.  It uses an arbitrary and capricious durational standard as a threshold for receipt of government benefits.  The Rule's durational threshold—receipt of *any* amount of enumerated benefits for 12 cumulative months in any 36-month period—has no sound basis and is at odds with the Congressional intent that the public charge exclusion apply only to those who primarily depend on the government for subsistence.  As another example, the Rule employs an arbitrary and capricious system of weighted factors to govern public charge determinations.  Many of the factors themselves, like English language proficiency and credit scores, are supported by insufficient evidence and have no value for predicting who is likely to be a public charge.  And the Rule provides no guidance, beyond designating factors as "negative," "positive," and "heavily weighted," for determining how different factors should be weighed against each other or considered in assessing the totality of the applicant's circumstances.

### VI.    The Rule Was Promulgated Without Authority

179.    DHS lacks statutory authority to promulgate the Rule.

180.    DHS cites as its principal legal authority for promulgating the Rule, and for making "public charge inadmissibility determinations and related decisions," section 102 of

the Homeland Security Act (the "HSA"), codified at 6 U.S.C. § 112, and section 103 of the

INA, codified at 8 U.S.C. § 1103.  84  Fed. Reg. at 41,295.  Neither provision authorizes DHS

to promulgate this Rule as it relates to public charge determinations for noncitizens seeking to

adjust their status to lawful permanent resident.  Rather, that authority belongs exclusively to

the Attorney General of the United States.

181.  Section 102 of the HSA created the position of Secretary of Homeland

Security, and broadly defined the Secretary's "functions."  *See* 6 U.S.C. § 112.  Nothing in that

section provides the Secretary with rulemaking authority over public charge determinations.

182.  Section 103 of the INA describes the "powers and duties" of the Secretary

of Homeland Security, the Under Secretary, and the Attorney General, as it relates to

immigration laws.  *See* 8 U.S.C. § 1103.  That section provides: "The Secretary of Homeland

Security shall be charged with the administration and enforcement of this chapter and all other

laws relating to the immigration and naturalization of aliens, ***except insofar as this chapter or***

***such laws relate to the powers, functions, and duties conferred upon the*** President, ***Attorney***

***General***, the Secretary of State, the officers of the Department of State, or diplomatic or

consular officers."  8 U.S.C. § 1103(a)(1) (emphases added).  Section 103 further provides that

the Secretary of Homeland Security "shall establish such regulations . . . as he deems necessary

for ***carrying out his authority*** under the provisions of this chapter."  *Id.* § 1103(a)(3) (emphasis

added).  Accordingly, DHS has the authority to administer and enforce the INA, including

through rulemaking, except with respect to provisions of the INA that relate to the powers of

the Attorney General (among others).

183.  The public charge provision of the INA that is the subject of the proposed

Rule specifically relates to the "powers, functions, and duties conferred upon the . . . Attorney

General." Specifically, the public charge provision—section 214(a)(4) of the INA—provides that a noncitizen "who, in the opinion of the consular officer at the time of application for a visa, or *in the opinion of the Attorney General at the time of application for admission or adjustment of status*, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A) (emphasis added). The provision goes on to enumerate the factors that "the Attorney General shall at a minimum consider" when "determining whether an alien is inadmissible under this paragraph." *Id.* § 1182(a)(4)(B). Accordingly, it is the Attorney General, not DHS or the Secretary of Homeland Security, who is responsible for making public charge inadmissibility determinations for noncitizens seeking admission or adjustment of status.[69] The Rule was promulgated by an agency acting beyond its jurisdiction, and is *ultra vires* and void as a matter of law.

## VII. The Process for Promulgating the Rule Violates the Law

184. The Rule violates the APA because it was promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). This section describes how DHS's process for promulgating the Rule was deficient because (1) DHS failed to respond to significant comments, and (2) DHS failed to provide a reasoned explanation for changing policy direction from the Field Guidance.

### A. DHS's Process for Promulgating the Rule was Procedurally Deficient

185. DHS published the NPRM on October 10, 2018. *See* 83 Fed. Reg. 51,114. DHS invited public comment on the proposed rule. The comment period closed on December

---

[69] Although the public charge provision of the INA provides that inadmissibility determinations for visa applicants are to be made by "consular officer[s]," 8 U.S.C. § 1182(a)(4), the HSA specifically transferred rulemaking authority concerning visa applications to the Secretary of Homeland Security. *See, e.g.*, 6 U.S.C. § 202(3); 6 U.S.C. § 236(b). Notably, the HSA did not specifically transfer rulemaking authority concerning adjustment of status applications to DHS.

10, 2018; over 266,000 public comments were filed.  Although the vast majority of these comments criticized and opposed the Rule, DHS ignored or did not respond to numerous significant complaints.

186.   We cite below just a few examples called to DHS's attention in comments on the proposed rule:

(i)    The Rule is so vague, inconsistent, and lacking in measurable standards that it invites arbitrary and discriminatory application;

(ii)   The requirement on the Form I-944 that applicants for adjustment disclose past receipt of benefits that were not counted in the public charge determination in the Field Guidance renders the Rule retroactive;

(iii)  The Rule provides no standard for measuring English language proficiency, and learning English requires long-term preparation and expense which many applicants postpone until naturalization;

(iv)   Advances in treating such illnesses as HIV, cancer, and diabetes enable many people to work, and these chronic conditions should not render an applicant a public charge;

(v)    The dramatic increase in the public bond requirement—from $1,000 to $10,000 in the proposed Rule ($8,100 in the final Rule)—is arbitrary and unfair;

(vi)   The harms to millions of immigrant families—including increased hunger, illness, and housing instability—cannot be justified.

187.   DHS fails to respond meaningfully to significant comments about these issues, instead pushing forward with almost all of the provisions of the proposed rule in the NPRM intact, or with only minor changes that make no meaningful difference.

188.   In addition to the non-exhaustive list of examples above, nowhere in the NPRM was there any reference to insurance premiums under the Affordable Care Act.  The NPRM failed to give notice to the public that while the Rule would consider private health

insurance as a positive factor, it would not count insurance through the Affordable Care Act
markets if the applicant obtained any tax subsidies.  Thus, USCIS deprived the public of the
opportunity to comment on this provision at all.

189.  Numerous procedural anomalies characterized the promulgation and
publication of the Rule.  In addition to the purges of high-level DHS and USCIS officials, *see
infra* ¶¶ 218, 223–24, 232, the Trump Administration has cut short the period of public and
Congressional feedback that typically follows the closing of the notice-and-comment period.

190.  Shortly before the publication of the final Rule, in a process required by a
longstanding Executive Order, the Office of Interagency Affairs ("OIRA"), a component of the
Office of Management and Budget, scheduled a series of meetings with stakeholders regarding
the impacts of the Rule.  *See* Executive Order 12,866 (1993).  Although representatives from
numerous state and local governments, as well as nationally known advocacy groups,
scheduled meetings with OIRA to present their points of view on the Rule and its
implementation, OIRA cut short the public feedback process, taking just a few meetings and
cancelling the rest.

**B.     DHS Fails to Justify its Departure from the 1999 Field Guidance**

191.  DHS fails to provide a reasoned explanation for changing policy direction
from the Field Guidance and promulgating the Rule for several reasons.

192.  *First*, DHS fails to identify any problems with enforcement of the Field
Guidance, which has been in continuous effect for over 20 years.  DHS does not suggest that
the Field Guidance has been ineffective or difficult to administer, or identify any adverse
consequences from the Field Guidance.  DHS contends that the Field Guidance is "overly
permissi[ve]," 84 Fed. Reg. at 41,319, but does not identify a single adverse result flowing

from the Field Guidance's allegedly permissive standard that the Rule is meant to address.
Rather, DHS simply states that it has "determined that it is permissible and reasonable to
propose a different approach," 83 Fed. Reg. at 51,164, and that the public charge standard set
forth in the Rule "furthers congressional intent" that noncitizens "be self-sufficient," *e.g.*, 84
Fed. Reg. at 41,319.  But the agency provides no examples of how the goal of self-sufficiency
has not been served by the Field Guidance.

193.  *Second*, DHS fails to explain why its new definition of "public charge"
better reflects Congressional intent than the definition established in the Field Guidance.  DHS
repeatedly states that the Rule reflects Congress's intent in PRWORA—which was enacted in
1996—that noncitizens "be self-sufficient and not reliant on public resources."  *E.g.*, 84 Fed.
Reg. at 41,319.  But DHS fails to acknowledge that the Field Guidance—which was issued less
than three years after PWRORA, under the administration of the same President who signed
that bill into law—is far better evidence of the statute's meaning and congressional intent than
the contrary interpretation included in the Rule 23 years later.  DHS offers no evidence
suggesting that INS mistook Congress's intent when it issued the Field Guidance in 1999, or
that Congress viewed the Field Guidance as inconsistent with its intent.

194.  *Third*, DHS offers no reasoned explanation for why it is necessary or
appropriate to redefine "public charge" to mean the receipt of even a minimal amount
supplemental benefits available to working families.  DHS provides no evidence that mere
receipt of such benefits has ever triggered a public charge finding, either before or after the
Field Guidance was promulgated.  DHS identifies no authority suggesting that receipt of
noncash benefits has ever factored into a public charge determination, that receipt of public

benefits alone has been sufficient to render someone a public charge, or that receipt of public benefits has ever rendered a working individual a public charge.

195.  DHS also offers no reasoned explanation for rejecting the expert views of agencies that administer the relevant public benefits that are reflected in the Field Guidance.  In issuing the Field Guidance, INS explained that its definition of public charge—and decision to exclude noncash benefits from consideration—reflected evidence and input it received after "extensive consultation with" the agencies that administer such benefits.  64 Fed. Reg. at 28,692.  DHS acknowledges that the Field Guidance reflects these consultations, but simply states that they do not foreclose a different interpretation.  84 Fed. Reg. at 41,351.

196.  Indeed, emails between the White House and federal agencies while the Rule was being drafted demonstrate that those agencies were expressly discouraged from providing substantive input on whether to expand the definition of "public charge."  In circulating drafts of the proposed rule within the Executive Branch, a White House official stressed that "*the decision of whether to propose expanding the definition of public charge, broadly, has been made at a very high level and will not be changing*" (emphasis in original).[70]

197.  *Fourth*, the Rule does not explain the contradiction between the concern about the public health impacts of discouraging use of public benefits as described in the Field Guidance, and DHS's disregard of those impacts.  DHS recognizes that the Field Guidance was issued in response to "confusion" about public charge that had resulted in immigrants foregoing benefits and consequent risks to public health.  *See* 83 Fed. Reg. at 51,133 (citing 64

---

[70]  *See* Yeganeh Torbati et al., *"No Comment": Emails Show the VA Took No Action to Spare Veterans from a Harsh Trump Immigration Policy*, ProPublica (Aug. 19, 2019), https://www.propublica.org/article/emails-show-the-va-took-no-action-to-spare-veterans-from-a-harsh-trump-immigration-policy.

Fed. Reg. at 28,676–77).  DHS also acknowledges that the Rule will have a wide-spread chilling effect and a corresponding negative impact on public health.  But it offers no reasoned explanation for its decision to disregard INS's concerns.  Instead, DHS simply reiterates that its primary purpose is furthering "self-sufficiency," and that the Rule's chilling effect is an acceptable tradeoff in pursuing that asserted purpose.  *See* 84 Fed. Reg. at 41,311–13.

198.  *Fifth*, DHS fails to justify its abandonment of the "primary dependence" standard in the Field Guidance in favor of the durational standard in the rule: receipt of any enumerated benefits for 12 cumulative months in a 36-month period.  As explained above, the "primary dependence" standard was based on more than a century of case law and Congress's recent intent in enacting PRWORA and IIRIRA.  *See supra* ¶¶ 86–89.  The new durational standard, by contrast, is based on DHS's conclusory assertion "that it is permissible and reasonable to propose a different approach."  83 Fed Reg. at 51,164.  DHS acknowledges that its durational standard—which does not account for the *amount* of benefits received—will result in "potential incongruities," *i.e.*, arbitrary results.  84 Fed. Reg. at 41,361.  DHS attempts to justify the durational standard based on inapposite data, such as data that measures the duration of time that individuals receive means-tested assistance, but fails to distinguish between use by citizens and noncitizens or otherwise explain how this data justifies its approach.  *See* 84 Fed. Reg. at 41,360.

199.  *Sixth*, DHS fails to address the legitimate reliance interests engendered by the Field Guidance.  The Field Guidance, and the long history of public charge on which it is based, has permitted generations of immigrant families to build lives in the U.S. without fearing that their choices, including whether to seek public benefits, may have a negative impact on their immigration status (other than the choice to receive cash assistance or long-

78

term institutional care).  U.S. immigration lawyers and advocates have likewise relied upon the simplicity and clarity of the Field Guidance to aid clients in making decisions about their lives and the consequences of using public benefits.  The Rule fails to consider adequately the existence of these reliance interests and how they might affect implementation of the Rule.

200.  For example, previous receipt of "any" cash assistance is now scored as a negative factor, even if the applicant was never primarily dependent on the benefit.  Other choices made by applicants in the past similarly cannot be undone, such as having another child, choosing to work instead of improving English language skills, or defaulting on a loan from one creditor in favor of paying the rent.  None of these decisions can be renegotiated. This policy effectively punishes individuals who legitimately relied on decades of agency interpretation to make important decisions in their lives.  DHS provides no reasoned explanation for doing so.

## VIII.   The Rule Is Motivated by Impermissible Animus Against Immigrants of Color

201.  The Rule is motivated by animus against immigrants from predominantly nonwhite countries, and, as designed, will disproportionately affect those nonwhite individuals.

202.  The Rule, which originated in a "wish list" created by an anti-immigrant think tank associated with white supremacists, *see supra* ¶¶ 91–94, continues the pattern of hostility to immigrants that has characterized the Trump Administration's rhetoric and policies. The stated rationale for the Rule—to ensure that immigrants are self-sufficient—is, at best, a pretext for discrimination against immigrants, and in particular nonwhite immigrants, even those who are complying with the country's long-standing rules for obtaining lawful residence.

A. **The President Has Repeatedly Expressed Hostility Toward Nonwhite Immigrants**

203. President Trump has a long and well-documented history of disparaging and demeaning immigrants, particularly those from Latin American, African, and Arab nations—or, as he has put it while considering changes to immigration rules, immigrants from "shithole countries."[71] Through his words and deeds, he has repeatedly portrayed immigrants—and particularly nonwhite immigrants—as dangerous criminals who are "invading" or "infesting" this country and draining its resources.[72]

204. In announcing his presidential campaign, then-candidate Trump compared Mexican immigrants to rapists. He said: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."[73]

205. Throughout his primary campaign, candidate Trump derided the ethnic backgrounds of his political foes. For instance, he retweeted a post stating that fellow-candidate Jeb Bush must like "Mexican illegals because of his wife," who is Mexican,[74] and insinuated that Senator Ted Cruz was untrustworthy because of his Cuban heritage.[75] In May 2016, candidate Trump called into question the integrity and impartiality of U.S. District Judge

---

[71] BBC, *Donald Trump's 'racist slur' provokes outrage* (Jan. 12 2018), https://www.bbc.com/news/world-us-canada-42664173.

[72] Donald J. Trump (@realDonaldTrump), Twitter (June 19, 2018, 9:52 AM), https://twitter.com/realDonaldTrump/status/1009071403918864385.

[73] Washington Post, *Transcript of Donald Trump's Presidential Bid Announcement* (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/.

[74] Jacob Koffler, *Donald Trump Tweets Racially Charged Jab at Jeb Bush's Wife*, Time (July 6, 2015), https://time.com/3946544/donald-trump-mexican-jeb-bush-twitter/.

[75] *See* Rebecca Sinderbrand, *In Iowa, Trump Makes a Play for Cruz's Evangelical Base*, Wash. Post (Dec. 29, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/12/29/in-iowa-trump-makes-a-play-for-cruzs-evangelical-base/.

Gonzalo Curiel—an Indiana native who was presiding over a lawsuit against Trump University—because of Judge Curiel's ethnic heritage: "He's a Mexican. We're building a wall between here and Mexico. The answer is, he is giving us very unfair rulings—rulings that people can't even believe."[76]

206. Among President Trump's first actions as president—at the same time that the draft Executive Order from which the Rule derives was being developed—was to sign another executive order on January 26, 2017, banning all immigration from six Muslim majority countries. President Trump repeatedly made clear that his decision was driven by anti-Muslim sentiment, including by expressly "calling for a total and complete shutdown on Muslims entering the United States"[77]; justifying that by citing the internment of Japanese Americans during World War II[78]; and calling for the surveillance of mosques in the United States.[79]

207. In a June 2017 Oval Office meeting, the President is said to have berated administration officials about the number of immigrants who had received visas to enter the country that year, complaining that 2,500 Afghanis should not have gained entry because the country was "a terrorist haven," that 15,000 Haitians "all have AIDS," and that 40,000

---

[76] Sean Sullivan & Jenna Johnson, *Trump Calls American-Born Judge 'a Mexican,' Points out 'My African American' at a Rally*, Wash. Post (June 3, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/06/03/trump-calls-american-born-judge-a-mexican-points-out-my-african-american-at-a-rally/.

[77] Jenna Johnson, *Trump Calls for 'Total and Complete Shutdown of Muslims Entering the United States,'* Wash. Post (Dec. 7, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/12/07/donald-trump-calls-for-total-and-complete-shutdown-of-muslims-entering-the-united-states/.

[78] Meghan Keneally, *Donald Trump Cites These FDR Policies to Defend Muslim Ban*, ABC News (Dec. 8, 2015), https://abcnews.go.com/Politics/donald-trump-cites-fdr-policies-defend-muslim-ban/story?id=35648128.

[79] Jeremy Diamond, *Trump Doubles Down on Calls for Mosque Surveillance*, CNN (June 15, 2016), https://www.cnn.com/2016/06/15/politics/donald-trump-muslims-mosque-surveillance/index.html.

Nigerians would never "go back to their huts" after seeing the United States.[80]  Shortly

thereafter, the Department of Homeland Security announced that it would be withdrawing

Temporary Protected Status ("TPS") from immigrants from Haiti, El Salvador, and the Sudan.

208.  The President's attacks on immigrants have only escalated since 2017.

When discussing how to prosecute immigrants in sanctuary cities, Trump equated immigrants

with "animals," stating "[y]ou wouldn't believe how bad these people are.  These aren't

people. These are animals."[81]  He has repeatedly characterized immigration at the southern

border, including a caravan of Central American asylum-seekers passing through Mexico as an

"invasion."[82]  He asserted falsely that the caravan consisted of both Middle Eastern terrorists

and members of the Central American gang MS-13, thereby conflating the ethnicities of two

minority groups that he reviles.[83]  More recently, the President endorsed a proposal to transport

and "release" migrants detained at the border into sanctuary cities, in the hopes that doing so

would stoke racial and anti-immigrant tensions, thereby putting pressure on his political

enemies.[84]

209.  Most recently, as widely reported, the President told four members of

Congress, all women of color, to "go back . . . [to] the totally broken and crime infested places

---

[80]  Michael Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.

[81]  Héctor Tobar, *Trump's Ongoing Disinformation Campaign Against Latino Immigrants*, The New Yorker (Dec. 12, 2018), https://www.newyorker.com/news/daily-comment/trumps-ongoing-disinformation-campaign-against-latino-immigrants.

[82]  *Id.*

[83]  *See id.*

[84]  *See* Rachael Bade & Nick Miroff, *White House Proposed Releasing Immigrant Detainess in Sanctuary Cities, Targeting Political Foes*, Wash. Post (Apr. 11, 2019), https://www.washingtonpost.com/immigration/white-house-proposed-releasing-immigrant-detainees-in-sanctuary-cities-targeting-political-foes/2019/04/11/72839bc8-5c68-11e9-9625-01d48d50ef75_story.html?utm_term=.bfdb455e37c4; Eileen Sullivan, *Trump Says He Is Considering Releasing Migrants in "Sanctuary Cities,"* N.Y. Times (Apr. 12, 2019), https://www.nytimes.com/2019/04/12/us/politics/trump-sanctuary-cities.html?action=click&module=Top%20Stories&pgtype=Homepage.

from which they came."[85]  And, in reference to Representative Ilhan Omar, a former refugee

from Somalia who arrived in the United States as a child and became a citizen in 2000, smiled

as supporters at a campaign rally chanted "send her back."[86]

210.  In contrast to these expressions of hostility to nonwhite immigrants, the

President has repeatedly expressed support for immigration of whites and Europeans.  In

March 2013, for instance, President Trump warned that Republicans are on a "suicide mission"

if they support immigration reform, before calling for more immigration from Europe:

> Now I say to myself, why aren't we letting people in from Europe? . . .
> Nobody wants to say it, but I have many friends from Europe, they want to
> come in. . . . Tremendous people, hard-working people. . . . I know people
> whose sons went to Harvard, top of their class, went to the Wharton
> School of finance, great, great students. They happen to be a citizen of a
> foreign country. They learn, they take all of our knowledge, and they can't
> work in this country. We throw them out. We educate them, we make
> them really good, they go home—they can't stay here—so they work from
> their country and they work very effectively against this.  How stupid is
> that?[87]

211.  Likewise, in a January 2018 meeting, Trump reportedly expressed dismay

that we do not "have more people from places like Norway, contrasting such immigrants with

those from "shitholes countries" such as Haiti and countries in Africa."[88]  According to sworn

---

[85]   Katie Rogers & Nicholas Fandos, *Trump Tells Congresswomen to 'Go Back' to the Countries They Came From*, N.Y. Times (July 14, 2019), https://www.nytimes.com/2019/07/14/us/politics/trump-twitter-squad-congress.html.

[86]   *See* Meagan Flynn, *'Malignant, dangerous, violent': Trump rally's 'Send her back!' chant raises new concerns of intolerance*, Wash. Post (July 8, 2019), https://www.washingtonpost.com/nation/2019/07/18/malignant-dangerous-violent-trump-rallys-send-her-back-chant-raises-new-concerns-intolerance/?noredirect=on.

[87]   Pema Levy, *Trump: Let In More (White) Immigrants*, Talking Points Memo (Mar. 15, 2013), https://talkingpointsmemo.com/dc/trump-let-in-more-white-immigrants.

[88]   Jen Kirby, *Trump Wants Fewer Immigrants from "Shithole Countries" and More from Places Like Norway*, Vox (Jan. 11, 2018 5:55 PM), https://www.vox.com/2018/1/11/16880750/trump-immigrants-shithole-countries-norway.

Congressional testimony by Trump's former lawyer Michael Cohen, Trump once asked Cohen

whether he could "name a country run by a black person that wasn't a shithole."[89]

## B. President Trump Has Repeatedly Expressed Hostility Toward Immigrants Who Receive Public Benefits

212. President Trump has directed particular hostility toward the precise group

at issue in this case: immigrants who receive public benefits.

213. In November 2018, President Trump advocated for the complete

elimination of public benefits for immigrants who are already U.S. lawful permanent residents.

Although undocumented immigrants are eligible for virtually no federal assistance, much less

cash benefits, President Trump retweeted a post falsely claiming that "[i]llegals can get up to

$3,874 a month under Federal Assistance program. Our social security checks are on average

$1200 a month. RT [retweet] if you agree: If you weren't born in the United States, you should

receive $0 assistance."[90] In an interview with Breitbart News published on March 11, 2019,

President Trump was quoted as saying "I don't want to have anyone coming in that's on

welfare."[91]

214. Similarly, during the presidential campaign, candidate Trump wrote a

Facebook post falsely asserting: "When illegal immigrant households receive far more in

federal welfare benefits—than []native American households—there is something CLEARLY

---

[89] Miles Parks, *GOP Attacks After Opening Focused on Trump: Highlights from Cohen's Testimony*, NPR (Feb. 27, 2019), https://www.npr.org/2019/02/27/698631746/gop-attacks-after-opening-focused-on-trump-highlights-from-cohens-testimony.

[90] Héctor Tobar, *Trump's Ongoing Disinformation Campaign Against Latino Immigrants*, The New Yorker (Dec. 12, 2018), https://www.newyorker.com/news/daily-comment/trumps-ongoing-disinformation-campaign-against-latino-immigrants.

[91] Alexander Marlow, et al., *Exclusive—President Donald Trump on Immigration: "I Don't Want to Have Anyone Coming in That's on Welfare"* (Mar. 11, 2019), https://www.breitbart.com/politics/2019/03/11/exclusive-president-donald-trump-on-immigration-i-dont-want-to-have-anyone-coming-in-thats-on-welfare/.

WRONG with the system!"[92]  And in the first Republican presidential debate, he falsely

complained that the Mexican government was sending immigrants to the United States

"because they don't want to pay for them.  They don't want to take care of them."[93]

**C.     Other Senior Trump Advisors Have Expressed the Same Animus Toward
Immigrants Who Receive Public Benefits**

215.  President Trump's senior advisors on immigration, including those with

significant responsibility for promulgating the Rule, have made similar statements.  Several of

President Trump's appointees and associates involved in his Administration's immigration

policy, including former Attorney General Jefferson Sessions, Campaign Manager and

Counselor to the President Kellyanne Conway, Senior Advisor to U.S. Immigration and

Customs Enforcement Jon Feere, current USCIS official and former member of the White

House's Domestic Policy Council John Zadrozny, former Kansas Secretary of State and

member of President Trump's transition team Kris Kobach, Senior Policy Advisor Stephen

Miller, and Policy Advisor for the "Trump for President" campaign and Ombudsman of USCIS

Julie Kirchner, also have past and present ties to anti-immigrant organizations founded by John

Tanton and designated as hate groups by the Southern Poverty Law Center, including CIS and

the Federation for American Immigration Reform ("FAIR").[94]

216.  President Trump's principal advisor on immigration policy, Senior Policy

Advisor Stephen Miller, has asserted that the United States' current immigration system

"cost[s] taxpayers enormously because roughly half of immigrant head[s] of households in the

---

[92]   *Trump: I'll Fix Welfare System that Helps Illegal Immigrants More than Americans*, Fox News Insider (May 11, 2016), http://insider.foxnews.com/2016/05/11/trump-rips-welfaresystem-gives-illegal-immigrants-more-americans

[93]   Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News, (Aug. 6, 2015), https://www.foxnews.com/politics/at-gop-debate-trump-says-stupid-u-s-leaders-are-being-duped-by-mexico.

[94]   Southern Poverty Law Center, *Federation for American Immigration Reform* (2019), https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform.

United States receive some type of welfare benefit," and that "a recent study said that as much as $300 billion a year may be lost as a result of our current immigration system in terms of folks drawing more public benefits than they're paying in."[95] These statements are apparently based on misleading assertions by CIS, which do not distinguish between immigrants exempt from public charge determinations, other non-LPRs, LPRs, U.S. citizen children of noncitizens, and naturalized citizens.

217. Miller has taken an active role in agency processes focused on furthering the Trump Administration's anti-immigrant policies, including the Rule. For example, when he discovered that an agency had drafted a report describing the benefits of refugees to the economy, he "swiftly intervened," and the report was "shelved in favor of a three-page list of all the federal assistance programs that refugees used."[96] He has baselessly blamed immigrants who enter from the southern border for "thousands" of American deaths annually.[97]

218. Miller has specifically focused on expanding the definition of public charge, even directing federal agencies to "prioritize" this matter over their "other efforts."[98] Miller's drive to push the Rule and other anti-immigration policies ahead despite opposition from officials who questioned their legality, practicability, or reasonability, was reported to be one of the primary reasons why former Secretary Nielsen was forced to resign, along with

---

[95] The White House, *Press Briefing by Press Secretary Sarah Sanders and Senior Policy Advisor Stephen Miller* (Aug. 2, 2017), https://www.whitehouse.gov/briefings-statements/pressbriefing-press-secretary-sarah-sanders-senior-policy-advisor-stephen-miller-080217/.

[96] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html?_r=0.

[97] *See* Glenn Kessler, *Stephen Miller's claim that 'thousands of Americans die year after year' from illegal immigration*, Wash. Post (Feb. 21, 2019), https://www.washingtonpost.com/politics/2019/02/21/stephen-millers-claim-that-thousand-americans-die-year-after-year-illegal-immigration/?utm_term=.299854358dbc.

[98] Tal Kopan, *Sources: Stephen Miller Pushing Policy to Make It Harder for Immigrants Who Received Benefits to Earn Citizenship*, CNN (Aug. 7, 2018), https://www.cnn.com/2018/08/07/politics/stephen-miller-immigrants-penalizebenefits/index.html.

other officials at DHS.[99]  Miller reportedly exerted pressure to force the resignation of USCIS

Director Cissna because of the perceived lack of urgency in finalizing the Rule, which Miller

predicted would be "transformative."[100]  During a meeting with administration officials in

March 2019, Miller reportedly became furious that the public charge rule was not yet finished,

shouting: "You ought to be working on this regulation all day every day . . .  It should be the

first thought you have when you wake up.  And it should be the last thought you have before

you go to bed.  And sometimes you shouldn't go to bed."[101]  Emails obtained through a FOIA

request show Miller berating Cissna in June 2018 over the perceived delay in publishing the

proposed public charge rule, with Miller writing "I don't care what you need to do to finish it

on time."[102]

219.  Other senior officials have similarly expressed animus against nonwhite

immigrants.  Former Chief of Staff and Secretary of Homeland Security John Kelly has called

Haitians "welfare recipients," and, during the weeks leading up to the withdrawal of TPS to

Haitians, solicited data regarding the TPS beneficiaries' use of public and private assistance.[103]

Kelly also took a leadership role in formulating and promoting the family separation policy

formally implemented by DHS in 2018, at several points denying that taking mostly Central

---

[99]   *See* Eileen Sullivan & Michael D. Shear, *Trump Sees an Obstacle to Getting His Way on Immigration: His Own Officials*, N.Y. Times (Apr. 14, 2019), https://www.nytimes.com/2019/04/14/us/politics/trump-immigration-stephen-miller.html?action=click&module=Top%20Stories&pgtype=Homepage.

[100]  *See id.*

[101]  *Id.*

[102]  Ted Hesson, *Emails show Stephen Miller pressed hard to limit green cards*, Politico (Aug. 2, 2019), https://www.politico.com/story/2019/08/02/stephen-miller-green-card-immigration-1630406.

[103]  Patricia Hurtado, *As the Wall Consumes Washington, Another Immigrant Drama Unfolds in Brooklyn*, Bloomberg (Jan. 11, 2019), https://www.bloomberg.com/news/articles/2019-01-11/as-wall-consumes-washington-another-immigrant-drama-in-brooklyn.

American children from their parents at the border was "cruel" and casually adding that separated children would be placed in "foster care or whatever."[104]

**D.    President Trump and Other White House Officials Have Expressed Hostility Toward Family-Based Immigration, Which is Primarily Utilized by Immigrants from Predominantly Nonwhite Countries**

220.   President Trump has also repeatedly spoken about his disdain for family-based immigration preferences.  The primary beneficiaries of family-based immigration preferences are individuals from predominantly nonwhite countries, with the most applicants originating in Mexico, China, Cuba, India and the Dominican Republic.[105]

221.   President Trump has referred to family-based immigration with the derogatory term "chain migration," repeatedly calling it a "disaster" and falsely claiming that it allows citizens to bring in relatives who are "15 times removed."[106]  He has associated family-based immigration preferences with terrorism, using discrete events to launch into attacks on what he calls the "sick, demented" statutory scheme that has been in place for decades.  He has called immigrants who arrive pursuant to family preferences "the opposite of [origin countries'] finest,"  "truly EVIL," and "not the people that we want."[107]

222.   President Trump strongly supported the RAISE Act, a bill introduced in the Senate which seeks to reduce the number of green cards issued by more than 50 percent.

---

[104]  Matthew Yglesias, *Cruelty is the Defining Characteristic of Donald Trump's Politics and Policy*, Vox (May 14, 2018), https://www.vox.com/policy-and-politics/2018/5/14/17346904/john-kelly-foster-care-cruelty-judith-shklar.

[105]  Jie Zong et al., *Frequently Requested Statistics on Immigrants and Immigration in the United States*, Migration Policy Institute, https://www.migrationpolicy.org/article/frequently-requested-statistics-immigrants-and-immigration-united-states (last updated July 10, 2019).

[106]  Meghan Keneally, *8 Times Trump Slammed "Chain Migration" Before It Apparently Helped His Wife's Parents Become Citizens*, ABC News (Aug. 10, 2018), https://abcnews.go.com/US/times-trump-slammed-chain-migration-apparently-helped-wifes/story?id=57132429.

[107]  Jessica Kwong, *Donald Trump Says 'Chain Migration' Immigrants 'Are Not the People That We Want'—That Includes Melania's Parents*, Newsweek (Jan. 14, 2019), https://www.newsweek.com/donald-trump-chain-migration-immigrants-melania-1291210.

The bill would create a so-called "merit-based" immigration system that would reduce admissions based on family ties to current citizens or LPRs,[108] The bill obtained only two sponsors in the Senate.

E.     **Anti-Immigrant Animus of Defendants Cuccinelli and McAleenan and Other Top Officials at DHS and USCIS**

223.   This hostility towards nonwhite immigrants was and is shared by high-level officials at DHS and USCIS, including defendant Cuccinelli; former USCIS Director Cissna, who promulgated the proposed rule and oversaw much of the public comment and review before he was abruptly forced out of office in June 2019; defendant McAleenan; and former DHS Secretary Kirstjen Nielsen, who oversaw the Department when it first proposed this Rule.

224.   Acting USCIS Director Cuccinelli assumed his position in July 2019, after the White House forced the resignation of USCIS Director Cissna because it viewed him as too slow in promulgating the Rule.[109] John Zadrozny, a member of the White House Domestic Policy Council previously employed by FAIR, was installed as Cuccinelli's deputy chief of staff.[110]

---

[108]   David Nakamura, *Trump, GOP Senators Introduce Bill to Slash Legal Immigration Levels*, Wash. Post (Aug. 3, 2017), https://www.washingtonpost.com/news/post-politics/wp/2017/08/02/trump-gop-senators-to-introduce-bill-to-slash-legal-immigration-levels/.

[109]   Molly O'Toole et al., *Trump Aide Stephen Miller 'Going to Clean House' as Immigration Policy Hardens*, Los Angeles Times (April 8, 2019), https://www.latimes.com/politics/la-na-pol-trump-nielsen-tougher-border-immigration-whats-next-20190408-story.html. The unusual process for appointing Cuccinelli circumvented the Federal Vacancies Reform Act, which requires the Director of USCIS officials to be drawn from the deputy ranks within the federal agency. Instead, after firing Cissna, President Trump ordered the creation a new deputy position for Cuccinelli, and then promoted him to Acting Director of USCIS, a position for which he was reported to be unlikely to win Senate confirmation. *See* Louise Radnofsky, *High Turnover Roils Trump's Immigration Policy Ranks*, The Wall Street Journal (June 12, 2019), https://www.wsj.com/articles/high-turnover-roils-trumps-immigration-policy-ranks-11560355978.

[110]   Rebecca Rainey, *More Moves at USCIS*, Politico (June 14, 2019), https://www.politico.com/newsletters/morning-shift/2019/06/14/more-moves-at-uscis-655114.

225.  Cuccinelli is an immigration restrictionist who has advocated for the end of birthright citizenship for children of immigrants, compared immigrants to "rats" and "pests," and who founded State Legislators for Legal Immigration, a nativist group formed to advocate for immigration and public benefits restrictions.[111]  Since at least 2007, Cucinnelli (echoing the President's rhetoric) has repeatedly described the United States as being "invaded" by immigrants along the Southern border.[112]

226.  In 2008, when Cuccinelli was a state senator in Virginia, he introduced legislation that would have allowed employers to fire those who did not speak English in the workplace.  Under his plan, those fired would have subsequently been ineligible for unemployment benefits.  One of Cuccinelli's colleagues in the Virginia Senate called it "the most mean-spirited piece of legislation I have seen in my 30 years."[113]

227.  Cuccinelli announced the finalization of the Rule in a press briefing on August 12, 2019, stating that the rule would "reshape" the system of obtaining lawful permanent residence.[114]  Asked on television the next day whether the poem inscribed on the Statue of Liberty—"give us your tired, your poor, your huddled masses yearning to breathe

---

[111]  Jessica Cobain, *The Anti-Immigrant Extremists in Charge of the U.S. Immigration System*, Center for American Progress (June 24, 2019), https://www.americanprogress.org/issues/immigration/news/2019/06/24/471398/anti-immigrant-extremists-charge-u-s-immigration-system/

[112]  Andrew Kaczynski, *Trump Official Has Talked About Undocumented Immigrants as 'Invaders' Since at Least 2007*, CNN (Aug. 17, 2019 9:00 AM), https://www.cnn.com/2019/08/17/politics/kfile-ken-cuccinelli-immigration-invasion-rhetoric/index.html.

[113]  Elaina Plott, *The New Stephen Miller*, The Atlantic (Aug. 14, 2019), https://www.theatlantic.com/politics/archive/2019/08/who-is-ken-cuccinelli/596083/?utm_source=feed.

[114]  Kadia Tubmanm *The Trump Administration Ties Green Cards and Citizenship to Public Assistance*, Yahoo News (Aug. 12, 2019), https://news.yahoo.com/trump-administration-ties-green-cards-and-citizenship-to-public-assistance-202741361.html.

free"—represented "what America stands for," Cuccinelli responded that the poem was addressed to "people coming from Europe."[115]

228.   Former Director Cissna was similarly consistent about his hostility to immigrants.  During his oversight of the development and promulgation of the Rule, he repeatedly condemned the family preferences system.  Like Trump, Cissna referred to family-based immigration to it with the derogatory phrase "chain migration," and associated incidents of crime or terrorism with the INA's mandate to unify families.  For example, in a press conference at the White House, Cissna used a pipe bomb attack by a Bangladeshi immigrant to make a speech criticizing family-based preferences as "not the way that we should be running our immigration system" and claiming to be unaware of data demonstrating that immigrants have a lower rate of crime than U.S.-born citizens.[116]  Cissna oversaw the decision to close all 23 of USCIS's international offices—which handle, among other things, citizenship applications, family visa applications, international adoptions, and refugee processing.[117]

229.   Under Cissna, Ian M. Smith, a policy analyst with ties to neo-Nazi groups, helped draft the Rule.  Smith resigned in August 2018, just two months before the publication of the NPRM, when these neo-Nazi ties became publicly exposed.[118]

---

[115]   Baragona, *Ken Cucinelli: Statue of Liberty Poem Was About 'People Coming From Europe'*, Daily Beast (Aug. 13, 2019), https://www.thedailybeast.com/ken-cuccinelli-statue-of-liberty-poem-was-about-people-coming-from-europe.

[116]   White House, *Press Briefing by Press Secretary Sarah Sanders* (Dec. 12, 2017), https://www.whitehouse.gov/briefings-statements/press-briefing-press-secretary-sarah-sanders-121217/.

[117]   Hamed Aleaziz, *The Trump Administration Has Set Projected Dates For Closing Foreign Immigration Offices*, Buzzfeed News (Apr. 19, 2019), https://www.buzzfeednews.com/article/hamedaleaziz/trump-administration-overseas-immigration-offices; *Tracking USCIS International Field Office Closures*, American Immigration Lawyers Association (Aug. 15, 2019), https://www.aila.org/infonet/uscis-to-close-all-international-offices-by-2020.

[118]   Nick Miroff, *Homeland Security Staffer with White Nationalist Ties Attended White House Policy Meetings*, The Washington Post (Aug.30, 2018), https://www.washingtonpost.com/world/national-security/homeland-security-staffer-with-white-nationalist-ties-attended-white-house-policy-meetings/2018/08/30/7fcb0212-abab-11e8-8a0c-70b618c98d3c_story.html?utm_term=.a461d9bc633b.

230.  Both Acting Secretary McAleenan in his role as Commissioner for U.S. Customs and Border Protection and Former Secretary Nielsen shared President Trump's animus towards immigrants and sought to implement his anti-immigrant policies, including the public charge rule.  Both have defended the Trump Administration's policy of separating immigrant children at the border, largely Central Americans and Mexicans, from their families, a widely excoriated policy that resulted in the separation of as many as 6,000 children from their parents.[119]  McAleenan was one of three officials to support the family separation policy, which continues today despite class action litigation and official claims that it has ceased.

231.  In McAleenan's role at CBP, he oversaw an agency accused of rampant abuses of nonwhite immigrants, where numerous agents have assaulted or killed immigrants at the border.  CBP agents have stated in court filings that the use of ethnic and racial slurs and the articulation in writing of violent urges toward migrants is "part of agency culture."[120] McAleenan led CBP during a period of years when up to 10,000 agents participated in a Facebook group rife with deeply offensive racist, sexist, and homophobic commentary.[121] McAleenen and other high officials at CBP were aware of the nature of the group, but did not shut it down.[122]  On McAleenan's watch, five Guatemalan children have died in CBP custody in the past six months, Central American migrants at the border have been tear-gassed, and families have been forced to sleep outside in the dirt because of CBP refusals to process their

---

[119]  Miriam Jordan & Caitlin Dickerson, *U.S. Continues to Separate Families Despite Rollback of Policy*, N.Y. Times (Mar. 9, 2019), https://www.nytimes.com/2019/03/09/us/migrant-family-separations-border.html.

[120]  Tim Elfrak, *Mindless Murderous Savages: Border Agent Used Slurs Before Hitting Migrant With His Truck*, Wash. Post (May 20, 2019), https://www.washingtonpost.com/nation/2019/05/20/mindless-murdering-savages-border-agent-used-slurs-before-allegedly-hitting-migrant-with-his-truck/.

[121]  A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019), https://www.propublica.org/article/secret-border-patrol-facebook-group-agents-joke-about-migrant-deaths-post-sexist-memes.

[122]  Ted Hesson & Cristiano Lima, *Border Agency Knew About Secret Facebook Group for Years*, Politico (July 3, 2019), https://www.politico.com/story/2019/07/03/border-agency-secret-facebook-group-1569572.

requests for asylum. McAleenan also oversaw CBP during the implementation of the first and second "Muslim bans," which were struck down by appellate courts across the country for violation of the equal protection clause. (A revised third ban eventually survived Supreme Court review.)

232. The unusual sudden purges of high-level officials at DHS in the spring of 2019 reflect President Trump's desire to move immigration policy in a "tougher direction."[123] These firings sent unmistakable signals to current officials that speedy action, regardless of potential legal vulnerabilities, was encouraged and even required.

233. Multiple courts adjudicating claims over the Trump Administration's immigration policies have concluded that "even if the DHS Secretary or Acting Secretary did not 'personally harbor animus . . . , their actions may violate the equal protection guarantee if President Trump's alleged animus influenced or manipulated their decisionmaking process.'"[124] Another court adjudicated the specific question of whether "statements by Trump . . . [can] be imputed to [DHS Deputy Secretary] Duke or Nielsen." It ruled in the affirmative, finding that statements from "people plausibly alleged to be involved in the

---

[123] John Fritze & Alan Gomez, *Trump to Name Ken Cuccinelli to Immigration Job as White House Seeks 'Tougher Direction'*, USA Today (May 21, 2019), https://www.usatoday.com/story/news/politics/2019/05/21/donald-trump-ken-cuccinelli-take-job-homeland-security/3750660002/.

[124] *Ramos* v. *Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018); *see also CASA de Maryland, Inc.* v. *Trump*, 355 F. Supp. 3d 307, 326 (D. Md. 2018) ("Defendants contend that the Secretary was the decision-maker, not the President, and that the Secretary's decision did not involve classification of a group of foreign nationals on the basis of their individual characteristics, but rather the classification of a foreign state. As to the first of these contentions, there can be no doubt that if, as alleged, the President influenced the decision to terminate El Salvador's TPS, the discriminatory motivation cannot be laundered through the Secretary."); *Centro Presente* v. *U.S. Dep't of Homeland Security*, 332 F. Supp. 3d 393, 414–15 (D. Mass. 2018) ("Defendants argue that the allegations regarding statements by Trump are irrelevant because animus held by the President cannot be imputed to Duke or Nielsen, the two officials who terminated the TPS designations at issue, notwithstanding allegations that the White House was closely monitoring decisions regarding TPS designations. . . . [B]ecause the exact time that the new policy regarding the criteria for TPS designations was made and the exact participants involved in that decision are unclear, it would be premature to conclude that President Trump had nothing to do with that decision such that his statements would be irrelevant.").

decision-making process, and an allegedly unreasoned shift in policy [are] sufficient to allege plausibly that a discriminatory purpose was a motivating factor in a decision."[125]

234.   Courts have looked at facts such as these and found that the Trump Administration's actions can plausibly be traced to the President's personal anti-immigrant animus.  For example, Judge Furman of this Court recently held that statements and actions by the President render "plausible" plaintiffs' allegation that Administration action in adding citizenship questions to the upcoming census was motivated by unconstitutional animus.[126] Likewise, Judge Garaufis of the Eastern District of New York recently held that President Trump's statements about immigrants were "racially charged, recurring, and troubling" enough to raise "a plausible inference that the DACA rescission was substantially motivated by unlawful discriminatory purpose."[127]  The Ninth Circuit affirmed a district court's similar finding, considering not only Trump's "pre-presidential" and "post-presidential" statements, but also the "unusual history" of that agency action and the evidence of the disparate impact it would have on "Latinos and persons of Mexican heritage."[128]  And in litigation over President Trump's travel ban, the Fourth Circuit found that the relevant executive order "sp[oke] in vague words of national security," but still facially "drip[ped] with religious intolerance, animus, and discrimination."[129]

[125]   *Centro Presente*, 332 F. Supp. 3d at 415.
[126]   *State of New York* v. *United States Dep't of Commerce, et al.*, 315 F. Supp. 3d 766, 780 (S.D.N.Y. 2018) (Furman, J.).
[127]   *Batalla Vidal* v. *Nielsen*, 291 F. Supp. 3d 260, 277 (E.D.N.Y. 2018).
[128]   *Regents of the Univ. of Cal.* v. *U.S. Dep't of Homeland Security*, 908 F.3d 476, 518–20 (9th Cir. 2018).
[129]   *Int'l Refugee Assistance Project* v. *Trump*, 857 F.3d 554, 572 (4th Cir. 2017) (en banc), *vacated as moot without expressing a view on the merits*, 138 S. Ct. 353 (2017); *see also Int'l Refugee Assistance Project* v. *Trump*, 241 F. Supp. 3d 539, 558–59 (D. Md. 2017) (finding the same at the district court: "[D]irect statements of President Trump's animus towards Muslims and intention to impose a ban on Muslims entering the United States, present a convincing case that the First Executive Order was issued to accomplish, as nearly as possible, President Trump's promised Muslim ban."); *Hawai'i* v. *Trump*, 245 F. Supp. 3d 1227, 1236 (D. Haw. 2017) ("[H]ere the historical context and the specific sequence of events leading up to the adoption of the challenged

F.  **As Intended, the Rule Disproportionately Affects Immigrants from Nonwhite Countries**

235.  The Rule will also have a disproportionate effect on nonwhite immigrants. Evidence submitted to DHS as part of its notice-and-comment process showed that the Rule's most heavily weighted positive factor, an income of at least 250 percent of the FPG, is unlikely to be met by 71 percent of applicants from Mexico and Central America, 69 percent from Africa, 75 percent from the Philippines, and 63 percent from China; by comparison, only 36 percent of applicants from Europe, Canada, and Oceania who will be unlikely to meet this threshold.[130]

236.  Another comment on the proposed rule estimated, for every country in the world, the percentage of the population that would be assigned a "negative factor" under the Rule due to having a family income below 125 percent of the FPG.[131]  The results confirm that the "125 percent test will disproportionately affect immigrants from poor countries and have a racially disparate impact on who is allowed into the U.S."[132]  For example, 99.2 percent of the population of South Asia, 98.5 percent of the population of Sub-Saharan Africa, and 79.1 percent of the population of Latin America and the Caribbean would fall below the 125 percent

---

Executive Order are as full of religious animus, invective, and obvious pretext as is the record here, it is no wonder that the Government urges the Court to altogether ignore that history and context." (internal quotation marks omitted)).

[130]  Jeanne Batalova et al., *Through the Back Door: Remaking the Immigration System via the Expected "Public-Charge" Rule*, Migration Policy Institute (Aug. 2018), https://www.migrationpolicy.org/news/through-back-door-remaking-immigration-system-expected-public-charge-rule.  This study was referenced in numerous public comments, including, *e.g.*, those submitted by the National Hispanic Leadership Agenda, and the Service Employees International Union.  *See also* Legal Aid Justice Center, Comment, at 8 (Dec. 10, 2018) (citing Boundless Immigration Inc., *Looming Immigration Directive Could Separate Nearly 200,000 Married Couples Each Year* (Sept. 24, 2018), https://www.boundless.com/blog/looming-immigration-directive-separate-nearly-200000-married-couples/ (citing the same figures)).

[131]  CBPP Comment at 11–17 & Table 2.

[132]  *Id.* at 12.

threshold.  By contrast, less than 10 percent of the populations of countries like Norway, Germany, and France fall below the threshold.[133]

237.  The Rule's standardless requirement that applicants obtain "English language proficiency" will similarly have a disproportionate impact on immigrants from Latin American countries.

238.  The Rule is arbitrary and capricious because it arbitrarily discriminates against immigrants of color.

239.  The Rule is also arbitrary and capricious because it is pretextual.  The Rule purports to identify immigrants who will become public charges, but the factors that it adopts as part of the Rule bear no reasonable relationship to the public charge inquiry.  This demonstrates that defendants were seeking to reduce immigration by immigrants of color.

## IX.    The Rule Will Cause Irreparable Harm to Immigrant Families, the Public, and Plaintiffs

240.  The Rule will cause irreparable harm to hundreds of thousands or millions of immigrants by penalizing them for past or anticipated future use of benefits to which they are legally entitled.  Individuals receive these benefits during the most vulnerable times in their lives.  Effectively forcing individuals to forego benefits so as to protect their immigration statuses will have broad negative repercussions on the health and safety of noncitizens, and will impede their integration into American society.  The Rule itself acknowledges massive impacts on society at large, including public health, the economy, and workforce.  The Rule will also impede the fundamental missions of plaintiffs, and will force them to divert resources to support their clients, members, and the public in dealing with the fallout from the Rule.

---

[133]  *See id.* at 12–13.

A.      **Harms to Immigrant Families**

241.  As DHS concedes, the Rule will cause a flight of immigrants away from

benefits to which they are lawfully entitled and that are not currently part of the public charge

analysis, including benefits for healthcare, nutrition, and housing.  Some of this will occur

because immigrants will correctly conclude that the benefits will harm their ability to achieve

LPR status.  In other cases, it will occur because of understandable and predictable fear and

confusion, abetted by the complexity of the Rule and the Administration's consistently

expressed hostility to immigration and immigrants, as discussed above.  In all such cases, the

loss of such benefits will cause irreparable harm to immigrant households across the country.

242.  DHS concedes the existence of these chilling effects, but grossly

understates their severity.  While acknowledging that it is "difficult to predict" the Rule's

chilling effect on noncitizens, 84 Fed. Reg. at 41,313, DHS estimates that about 2.5 percent of

public benefits recipients who are members of households including foreign-born

noncitizens—or approximately 232,288 individuals—will forego benefits to which they are

legally entitled every year.[134]  DHS further estimates that, as a result, these individuals will

lose nearly $1.5 billion in federal benefits payments, and more than $1 billion in state benefits

payments, ever year.[135]  DHS estimates that these numbers could be higher in the first year the

Rule is in effect, causing as many as 725,760 individuals to disenroll from benefits programs,

and denying them access to as much as $4.37 billion in federal benefits that year alone.[136]

---

[134]  *See* DHS, Economic Analysis Supplemental Information for Analysis of Public Benefits Programs, at 7 & Table 5, https://www.regulations.gov/document?D=USCIS-2010-0012-63742.

[135]  *See id.*; Regulatory Impact Analysis, Inadmissibility on Public Charge Grounds, at 10–11 & Table 1, https://www.regulations.gov/document?D=USCIS-2010-0012-63741 [hereinafter "Regulatory Impact Analysis"].

[136]  *See* Regulatory Impact Analysis, at 98–99 & Table 18.

243.  These DHS estimates are not based on any data of actual disenrollment. Instead, they are based on DHS's estimate of the average percentage of immigrants (out of the total population of foreign-born noncitizens in the United States who receive any of the specified benefits) who adjust status every year.  *See* 83 Fed. Reg. at 51,266.  DHS thus rests its conclusion on the unsupported assumption that only immigrants who intend to apply for status adjustment will forego public benefits as a result of the Rule, and that they will do so only in the year in which they intend to make such an application.

244.  DHS's assumptions are unwarranted, and its conclusions grossly understate the Rule's chilling effects, as evidenced by comments provided to DHS on the proposed rule.  A study conducted by the Migration Policy Institute, based upon data showing the effects of reducing noncitizen access to public benefit programs under PRWORA, has estimated that, as a result of the rule in the form proposed in the NPRM, "5.4 million to 16.2 million of the total 27 million immigrants and their U.S.- and foreign-born children in benefits-receiving families could be expected to disenroll from programs."[137]  The nonpartisan Fiscal Policy Institute estimated that "the chilling effect [of the proposed rule] would extend to 24 million people in the United States, including 9 million children under 18 years old."[138] Similarly, Manatt Health estimated that "[n]ationwide, 22.2 million noncitizens and a total of

---

[137]  Jeanne Batalova et al., *Chilling Effects: The Expected Public Charge Rule and Its Impact on Legal Immigrant Families' Public Benefits Use*, Migration Policy Institute, at 4 (June 2018), https://www.migrationpolicy.org/research/chilling-effects-expected-public-charge-rule-impact-legal-immigrant-families.  This study was referenced in numerous public comments, including, *e.g.*, those of the Southern Poverty Law Center, the Alabama Coalition for Immigrant Justice, the Coalition of Florida Farmworker Organizations, the Farmworker Association of Florida, the Florida Immigrant Coalition, the Hispanic Interest Coalition of Alabama, the MQVN Community Development Corporation, and the Southeast Immigrant Rights Network, and the Center for Law and Social Policy.

[138]  Fiscal Policy Institute, *FPI Estimates Human & Economic Impacts of Public Charge Rule: 24 Million Would Experience Chilling Effects*,  (Oct. 10, 2018), http://fiscalpolicy.org/public-charge.  This study was referenced in public comments, including, *e.g.*, those of Advancement Project California, and the Community Legal Center.

41.1 million noncitizens and their family members currently living in the United States (12.7% of the total U.S. population) could potentially be impacted as a result of the proposed changes in public charge policy."[139]   More recently, a study published by the Journal of the American Medical Association estimated that the proposed Rule "is likely to cause parents to disenroll between 0.8 million and 1.9 million children with specific medical needs from health and nutrition benefits."[140]   Certain of these estimates are more than 50 times greater than DHS's estimates.  DHS does not contend (and certainly offers no reason to believe) that the modest changes made in the final Rule will ameliorate this harm.

245.   The chilling effects of the Rule are already well documented and have been observed by the organizational plaintiffs among their clients and constituencies—and, again, were called to DHS's attention in comments on the proposed rule.  Following the leak of President Trump's draft Executive Order in January 2017 and early drafts of the Rule in February and March 2018, many immigrants and their families chose to forego participation in federal, state, and local benefits to avoid being labeled public charges.  For example, just months after the first leaks of the executive order, a Los Angeles-based health care provider serving a largely Latino community reported a 20 percent drop in SNAP enrollment and a 54 percent drop in Medicaid enrollment among children, as well as an overall 40 percent decline in program re-enrollments.[141]   In late 2017, benefits administrators continued to see declining

---

[139]   Manatt Health, *Public Charge Proposed Rule: Potentially Chilled Population Data Dashboard* (Oct. 11, 2018), https://www.manatt.com/Insights/Articles/2018/Public-Charge-Rule-Potentially-Chilled-Population.  This study was referenced in public comments, including, *e.g.*, those of the American Civil Liberties Union, and Loyola University Chicago's Center for the Human Rights of Children.

[140]   Leah Zallman et al., *Implications of Changing Public Charge Immigration Rules for Children Who Need Medical Care*, JAMA Pediatrics (July 1, 2019), https://jamanetwork.com/journals/jamapediatrics/article-abstract/2737098.

[141]   CBPP Comment at 59 (citing Annie Lowrey, *Trump's Anti-Immigrant Policies Are Scaring Eligible Families Away from the Safety Net*, The Atlantic (Mar. 24, 2017), https://www.theatlantic.com/business/archive/2017/03/trump-safety-net-latino-families/520779/).

program participation over the prior year, including an 8.1 percent decrease in New Jersey

SNAP programs, a 9.6 percent decrease in Florida WIC participation, and a 7.4 percent

decrease in Texas WIC participation.[142]  By September 2018, WIC agencies in at least 18 states

reported drops of up to 20 percent in enrollment, a change they attributed "to fears about the

[public charge] immigration policy."[143]  A study released in November 2018 found that

participation in SNAP "dropped by nearly 10 percentage points in the first half of 2018 for

immigrant households that are eligible for the program and have been in the United States less

than five years."[144]  For the period from January 2018 through January 2019, New York City

found a 10.9 percent drop in non-citizens leaving the SNAP caseload or deciding not to enroll,

compared to a 2.8 percent drop among citizens.[145]  Even more recently, a survey by the Urban

Institute found that in 2018—before the NPRM was published, but after extensive reporting

that it was under consideration—***one in seven adults*** in immigrant families reported that they

or a family member had disenrolled from or chosen not to apply for a noncash benefit program

"for fear of risking green card status."[146]  Another study published by the Urban Institute in

---

[142]  CBPP Comment at 60 (citing Emily Bumgaertner, *Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services*, N.Y. Times (Mar. 6, 2018), https://www.nytimes.com/2018/03/06/us/politics/trump-immigrants-public-nutrition-services.html).

[143]  CBPP Comment at 60 (citing Helena Bottemiller Evich, *Immigrants, Fearing Trump Crackdown, Drop out of Nutrition Programs*, Politico (Sept. 4, 2018), https://www.politico.com/story/2018/09/03/immigrants-nutrition-food-trump-crackdown-806292).

[144]  Helena Bottemiller Evich, *Immigrant Families Appear to Be Dropping out of Food Stamps*, Politico (Nov. 14, 2018), https://www.politico.com/story/2018/11/14/immigrant-families-dropping-out-food-stamps-966256.  This article was cited by several commenters, including, *e.g.*, the City of Chicago, and 111 Members of Congress led by Reps. Jerrold Nadler, Zoe Lofgren, and Adriano Espaillat.  *See also* Allison Bovell-Ammon, et al., *Trends in Food Insecurity and SNAP Participation Among Immigrant Families of U.S.-Born Young Children*, Children's Healthwatch, at 1 (Apr. 4, 2019) (finding that "SNAP participation decreased in all immigrant families in 2018, but most markedly in more recent immigrants, while employment rates were unchanged").

[145]  N.Y.C. Dep't of Social Servs., *Fact Sheet: SNAP Enrollment Trends in New York City* (June 2019), https://www1.nyc.gov/assets/immigrants/downloads/pdf/Fact-Sheet-June-2019.pdf.

[146]  Hamutal Bernstein et al., *One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018*, Urban Institute, at 2 (May 22, 2019), https://www.urban.org/sites/default/files/publication/100270/one_in_seven_adults_in_immigrant_families_reported_avoiding_publi_7.pdf.

August 2019 showed that numerous adults in immigrant families have avoided participating in SNAP, Medicaid, and housing benefits due to fear and confusion about the public charge rule.[147]  This effect will only become more pronounced with the publication of the final Rule.

246.  DHS acknowledges, but does not quantify, other dire harms to immigrants, their families, and their communities that will result when noncitizens forego benefits to avoid harming their immigration status.  These include:

- "Worse health outcomes, including increased prevalence of obesity and malnutrition, especially for pregnant or breastfeeding women, infants, or children, and reduced prescription adherence;
- Increased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment;
- Increased prevalence of communicable diseases, including among members of the U.S. citizen population who are not vaccinated;
- Increases in uncompensated care in which a treatment or service is not paid for by an insurer or patient; and
- Increased rates of poverty and housing instability; and
- Reduced productivity and educational attainment."

83 Fed. Reg. at 51,270.  DHS further acknowledges the possibility that **not** adopting the Rule might "alleviate food and housing insecurity, improve public health, decrease costs to states and localities, [and] better guarantee health care provider reimbursements."  84 Fed. Reg. at 41,314. But it apparently views these consequences as an acceptable cost of its stated goal of furthering immigrant "self-sufficiency."

247.  Here, too, DHS understates the severe harms in the form of food insecurity, worse health, and homelessness that have been, are being, and will be suffered by immigrants, their children (including U.S. citizen children), and other family members—harms that, once again, many commenters to the NPRM called to DHS's attention.

---

[147]  Hamutal Bernstein et al., *Safety Net Access in the Context of the Public Charge Rule: Voices of Immigrant Families*, Urban Institute (Aug. 7, 2019), https://www.urban.org/sites/default/files/publication/100754/safety_net_access_in_the_context_of_the_public_charge_rule_1.pdf.

248.  Going without SNAP will increase food insecurity, which leads to adverse health impacts and increased spending on medical care.[148]  Studies show that participation in SNAP for six months reduced the percentage of SNAP households that were food insecure by 6–17 percent, reducing obesity, improving dietary intake, and contributing to more positive overall health outcomes.[149]  According to one estimate, SNAP decreases annual healthcare expenditures by an average of $1,409 per participant as compared to non-participants.[150]

249.  Similarly, declines in Medicaid participation will restrict access to medical care and increase the rates of uninsured persons, negatively impacting the health of already strained communities.[151]  Medicaid significantly increases access to health care, leading to better composite health scores, lower incidences of high blood pressure, fewer emergency room visits, and reduced hospitalizations.[152]  The positive effects of Medicaid go beyond just health.  For example, Medicaid (including CHIP) has been shown to reduce childhood poverty rates by 5.3 percentage points.[153]

---

[148]   *See* CLASP Comment at 32; CBPP Comment at 61–62.

[149]   Institute for Policy Integrity at New York University School of Law, Comment, at 10 (Dec. 10, 2018) (citing Food Research & Action Center, *The Role of the Supplemental Nutrition Assistance Program in Improving Health and Well-Being*, at 5 (Dec. 2007), https://frac.org/wp-content/uploads/hunger-health-role-snap-improving-health-well-being.pdf).

[150]   Food Research & Action Center, *The Role of the Supplemental Nutrition Assistance Program in Improving Health and Well-Being*, at 7 (Dec. 2017), https://frac.org/wp-content/uploads/hunger-health-role-snap-improving-health-well-being.pdf (cited in Institute for Policy Integrity at New York University School of Law, Comment, at 10 (Dec. 10, 2018)).

[151]   *See* CLASP Comment at 33; CBPP Comment at 62–64.

[152]   CLASP Comment at 33 (citing Alisa Chester & Joan Alker, *Medicaid at 50: A Look at the Long-Term Benefits of Childhood Medicaid,* Georgetown Univ. Health Policy Inst. Ctr. for Children and Families (2015), https://ccf.georgetown.edu/wpcontent/uploads/2015/08/Medicaid-at-50_final.pdf; Sarah Miller & Laura R. Wherry, *The Long-Term Effects of Early Life Medicaid Coverage,* SSRN Working Paper (2014), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2466691).

[153]   Loyola University Chicago's Center for the Human Rights of Children, Comment, at 5 (citing Dahlia Remler, et al., *Estimating the Effects of Health Insurance and Other Social Programs on Poverty Under the Affordable Care Act*, Health Affairs (Oct. 2017), https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2017.0331).

250.  Going without rental assistance will increase homelessness and housing instability,[154] which lead to a host of individual and societal harms including increased hospital visits, loss of employment, and mental health problems.[155]  Current housing assistance lifts about a million children out of poverty each year,[156] leads to significantly higher college attendance rates and higher annual incomes,[157] and improves long-term economic mobility.[158]

251.  Children in particular—including U.S.-citizen children of noncitizen parents—will lose access to programs that support healthy development.  Numerous studies have found that children who lack these basic needs will feel repercussions throughout their lives, as they perform worse in school and suffer adverse health consequences.  For example, housing instability negatively impacts a child's cognitive development, decreases student retention rates, and limits student opportunity.[159]  The Robin Hood Foundation found that the proposed rule could increase the number of poor New York City residents by as much as 5 percent.[160]  DHS "recognizes that many of the public benefits programs aim to better future

[154]  Gregory Mills et al., *Effects of Housing Vouchers on Welfare Families*, U.S. Dep't of Housing and Urban Development, at 139 (2006), https://www.huduser.gov/publications/pdf/hsgvouchers_1_2011.pdf (finding that between 1999 and 2004, housing vouchers reduced the percentage of homeless families living in the streets or in shelters from 7 percent to 5 percent, and the percentage of homeless families living with friends or relatives from 18 percent to 12 percent).  This study was referenced in public comments, including, *e.g.*, those submitted by the Institute for Policy Integrity at New York University School of Law, and Loyola University Chicago's Center for the Human Rights of Children.
[155]  National Housing Law Project, Comment, at 4 (Dec. 10, 2018) (citing Will Fischer, *Research Shows Housing Vouchers Reduce Hardship and Provide Platform for Long-Term Gains Among Children*, Center on Budget & Policy Priorities (Oct. 7, 2015), https://www.cbpp.org/research/researchshows-housing-vouchers-reduce-hardship-and-provide-platform-for-lon gterm-gains); CBPP Comment at 64–65.
[156]  Trudi Renwick & Liana Fox, *The Supplemental Poverty Measure: 2016*, U.S. Census Bureau (Sept. 2017).  This study was referenced in numerous public comments, including, *e.g.*, those submitted by Michigan Immigrant Rights Center, the Massachusetts Law Reform Institute, the Disability Law Center, and the National Housing Law Project.
[157]  CLASP Comment at 34 (citing Raj Chetty et al., *The Effects of Exposure to Better Neighborhoods on Children: new Evidence from the Moving to Opportunity Experiment*, Am. Econ. Rev. 855 (2016)).
[158]  National Housing Law Project, Comment, at 8 (Dec. 10, 2018).
[159]  *Id.* at 9.
[160]  Christopher Wimer et al., *Public Charge: How a New Policy Could Affect Poverty in New York City*, Robin Hood (Dec. 2018), https://robinhoodorg-

economic and health outcomes" for children, *see* 84 Fed. Reg. at 41,371, but makes no effort to

address the impact that the loss of benefits will have on the well-being of children both now

and in the future.

252.  DHS similarly acknowledges the severe harm from the Rule to vulnerable

populations, but, again, does nothing to ameliorate these harms.  Women, persons with

disabilities, persons with HIV/AIDS, and elderly individuals all use benefits programs at

higher than average rates.[161]  These categories of people, then, particularly stand to suffer if

they are unable to access benefits due to operation of the Rule, as several commenters pointed

out.[162]

253.  Finally, the Rule will harm immigrants and their families by depriving

them of the ability to remain in this country and keep their families together.  DHS is aware of

this harm, too, but makes no effort to address it.  On the contrary, Rule is designed to affect

primarily family-based immigrants.

254.  DHS acknowledges a chilling effect on "people who erroneously believe

themselves to be affected" and therefore forego public benefits due to fear or confusion about

the Rule's scope, but blandly responds that it "will not alter this rule to account for [the]

---

production.s3.amazonaws.com/uploads/2018/12/Public_Charge_Report_FINAL-4.pdf.  This study was cited in
several public comments, including, *e.g.*, those submitted by Legal Services NYC, and the New York City
Comptroller.

[161]  *See, e.g.,* American Civil Liberties Union, Comment (Dec. 10, 2018).

[162]  *E.g.*, 84 Fed. Reg. at 41,310–11 ("Some commenters stated that including SNAP in the public charge
determination would worsen food insecurity primarily among families with older adults, children, and people
with disabilities. . . . Several commenters stated that the sanctions associated with the use of Medicaid and
Medicare Part D benefits would result in reduced access to medical care and medications for vulnerable
populations, including pregnant women, children, people with disabilities, and the elderly. . . . Many
commenters said that reduced enrollment in federal assistance programs would most negatively affect
vulnerable populations, including people with disabilities, the elderly, children, survivors of sexual and
domestic abuse, and pregnant women. . . . Several commenters said the proposed rule would adversely affect
immigrant women, because they will be more likely to forego healthcare and suffer worsening health
outcomes.")

unwarranted choices" of these individuals.  84 Fed. Reg. at 41,313.  DHS does not and cannot

contend, however, that all noncitizens who forego benefits in order not to be penalized by the

Rule are misinformed and confused.  On the contrary, it concedes that discouraging benefits

use by noncitizens is precisely one of the Rule's goals.  Moreover, in light of the repeated

expressions of hostility by members of the Trump Administration to immigrants and

immigrants' purported heavy use of public benefits, including not least of all those by

President Trump himself, it is difficult to avoid concluding that such confusion was intended.

More fundamentally, DHS cannot credibly disclaim responsibility for the damage the Rule will

predictably cause by attributing that damage to supposed confusion about the Rule.  At the

least, the enormously complex nature of the Rule, as discussed above, and the Rule's heavy

reliance on subjective assessments by USCIS officers of the "totality of the circumstances,"

make such confusion inevitable.

### B.     Harms to the General Public

255.  Large numbers of immigrant families foregoing public benefits to which

they are entitled will have significant adverse impacts on the national and local economies,

state and local governments, and the public generally.

256.  DHS acknowledges the significant negative impact the Rule will have "on

the economy, innovation, and growth."  84 Fed. Reg. at 41,472.  As multiple commenters

pointed out, these harms are very large.  For example, assuming a 35 percent disenrollment

rate—a rate derived from studies of the chilling effect on immigrants of other major policy

changes, such as the enactment of PRWORA in 1996—the Fiscal Policy Institute estimates

that former public benefits recipients will forego $17.5 billion in public benefits, the lost

spending of which would result in the potential loss of 230,000 jobs and $33.8 billion in

potential economic ripple effects.[163]  Another study estimated an even more severe economic

impact of the rule, explaining: "The total annual income of workers who would be affected by

the public charge rule is more than $96.4 billion.  Should they leave the United States, our

economy would suffer negative indirect economic effects of more than $68 billion dollars.  The

total cost to the U.S. economy could therefore amount to *$164.4 billion*" (emphasis added).[164]

257.  Health care systems will be particularly affected.  Medicaid supports

hospitals, health centers, and other community care providers that provide needed medical

access to low-income people throughout the United States, not just immigrants.  By reducing

Medicaid enrollment and effectively limiting immigrants' access to health care, these providers

will be negatively impacted and may have to limit their services to all persons.  Studies cited in

public comments estimated that nearly $17 billion in Medicaid and CHIP hospital payments

could be at risk as a result of the chilling effect of the Rule,[165] and that community health

centers stood to lose $624 million in Medicaid revenue, resulting in 538,000 fewer patients and

a loss of 6,100 medical staff jobs.[166]

258.  Similar examples abound.  Businesses that accept SNAP benefits, such as

grocery stores, will be harmed: they will have to cut back on the foods that they offer to the

---

[163] CLASP Comment at 38 (citing Fiscal Policy Institute, *Only Wealthy Immigrants Need Apply: How a Trump Rule's Chilling Effect Will Harm the U.S.*, at 5 (Oct. 10, 2018), http://fiscalpolicy.org/wp-content/uploads/2018/10/US-Impact-of-Public-Charge.pdf).

[164] *See* New American Economy, *How the "Public Charge" Rule Change Could Impact Immigrants and U.S. Economy* (Oct. 31, 2018), https://research.newamericaneconomy.org/report/economic-impact-of-proposed-rule-change-inadmissibility-on-public-charge-grounds/.  This study was referenced in public comments, including, *e.g.*, those submitted by the Institute for Policy Integrity at New York University School of Law, and the New American Economy.

[165] *E.g.*, CLASP Comment at 38 (citing Cindy Mann et al., *Medicaid Payments at Risk for Hospitals Under Public Charge*, Manatt Health (Nov. 16 2018), https://www.manatt.com/Insights/White-Papers/2018/Medicaid-Payments-at-Risk-for-Hospitals-Under-Publ).

[166] *E.g.*, CLASP Comment at 38 (citing Leighton Ku et al., *How Could the Public Charge Proposed Rule Affect Community Health Centers?*, RCHN Community Health Foundation Research Collaborative (Nov. 2018), https://publichealth.gwu.edu/sites/default/files/downloads/GGRCHN/Public%20Charge%20Brief.pdf).

entire community, not just immigrants. Moreover, SNAP benefits have a high multiplier effect as they circulate through the economy. Studies have found that every dollar of SNAP translates to roughly $1.79 in local economic activity.[167] Decreasing the use of SNAP benefits deprives entire communities of this multiplier effect.

259. Even utilizing the final rule's inadequate and vastly underestimated 2.5 percent rate of disenrollment or foregone enrollment, DHS estimates that SNAP disenrollment alone will result in $197.8 million in foregone benefit payments, leading to a $354 million decrease in total economic activity, a $51.4 million decrease in retail food expenditures, a $146.3 million decrease in expenditures on nonfood goods and services, and a loss of more than 1,900 jobs.[168] Assuming a far more justifiable higher rate of disenrollment or foregone enrollment, the fallout from SNAP disenrollment will be even more consequential.

## C.    Harms to Plaintiffs

260. The effects described in the previous sections are already being felt, and will only become more pronounced when the Rule goes into effect on October 15, 2019, unless it is enjoined. Since even before the Rule was published on August 14, 2019, noncitizens increasingly have been forced to grapple with the potential effects of the Rule on their immigration statuses, and have increasingly turned to advocacy organizations for help. As discussed above, *supra* ¶¶ 21–46, plaintiffs are the front-lines for dealing with this well-

---

[167] *See* Kenneth Hanson, *The Food Assistance National Input-Output Multiplier (FANIOM) Model and Stimulus Effects of SNAP*, U.S. Dep't of Agriculture, at iv (Oct. 2010), https://www.ers.usda.gov/webdocs/publications/44748/7996_err103_1_.pdf ("The FANIOM analysis of SNAP expenditures is estimated to increase economic activity (GDP) by $1.79 billion."); *accord* Nune Phillips, *SNAP Contributes to a Strong Economy*, Center for Law and Social Policy (Aug. 2017) ("[E]ach $1 increase in SNAP payments generates $1.73 of economic activity, a fiscal impact greater than any other public benefit program or tax cuts."). Hanson's study for the U.S. Department of Agriculture was referenced in several public comments, including, *e.g.*, those submitted by the Harvard Law School Food Law and Policy Clinic, the National Immigration Law Center, USCIS-2010-0012-39659 and the City and County of San Francisco.
[168] Regulatory Impact Analysis at 104–06.

founded panic, which will continue unless and until the Rule is enjoined.  The Rule threatens the mission of each of the plaintiffs, and requires them to devote substantial resources—in money, time, and personnel—that cannot otherwise be devoted to serving their constituents.

261.  Plaintiff CCCS-NY operates the New York state and New York City hotlines that answer questions and, where needed, makes emergency referrals for people who may be trying to adjust before October 15, 2019, or may be deciding whether to close their cases or apply for benefits they need, or who may require emergency assistance to deal with the loss of benefits. CCCS-NY's legal team is required to answer urgent questions from noncitizens about the Rule and its implications, and to assist eligible clients in seeking adjustment before the deadline.  By prioritizing these cases, CCCS-NY is unable to serve other clients with other serious issues.

262.  Plaintiff MRNY is holding emergency meetings and answering questions from clients and members concerned about whether the Rule applies to them.  MRNY's staff help its members and other noncitizens navigate the processes of applying for health insurance and SNAP benefits.  Since the Rule was announced, these staff have had to spend significant time learning about the new rule; engaging in community education trainings and workshops; and conducting screenings and intakes and answering questions from MRNY's members and the public.  In the short time since the Rule was issued on August 14, 2019, MRNY has held eight workshops on public charge, in addition to the approximately 29 workshops held in October and November 2018 after the NPRM was first published.  These workshops are in demand and serve hundreds of members, clients, and the public.  MRNY will continue to conduct such workshops after October 15, 2019 if the Rule is not enjoined

108

263.   Like CCCS-NY, the legal teams at MRNY and ASC must, by necessity, prioritize adjustments that can be filed before October 15, 2019, so as to protect their clients from being subject to the Rule.   Also like CCCS-NY, the MRNY and ASC legal teams are unable to deal with other issues facing their clients due to this need to prioritize muting the effects of the Rule.

264.   Plaintiffs CLINIC and AAF are likewise on the receiving end of urgent questions from members and affiliates brought through their clients and constituents. CLINIC's consultation service is already at maximum capacity, unable to address other emergency needs of its affiliates.

265.   These harms will be greatly amplified if the Rule is allowed to go into effect on October 15, 2019.   Plaintiffs will have to address questions from clients, members of their organizations, and the public who are planning adjustment about how the Rule affects them, and those same clients will require extra assistance when they go forward with an adjustment application.   Not only will clients need assistance filling out the burdensome Form I-944, they will need extra counseling to understand fully their options, including not going forward with an application at all.   Plaintiffs will also have to assist clients and members with questions about continuing to receive or applying for benefits.   Because the consequences of applying for or receiving benefits will be far more dire, tasks that used to be relatively routine will now require plaintiffs' staff to conduct a grueling analysis to attempt to determine whether the application could render the client a public charge.

266.   Plaintiffs will need to devote substantial resources to educating their members, constituents, and immigrant communities generally regarding the Rule.   For instance, AAF held a special press briefing after the Rule was issued featuring information

109

provided in seven Asian languages for the benefit both of those present and for consumers of

Asian ethnic media generally.  MRNY has held eight workshops on public charge since the

final rule was announced, bringing the total number of its workshops on public charge since

the rule was proposed to over three dozen.  Preparing such educational sessions requires

plaintiffs to devote time, personnel, and resources that cannot then be spent on addressing other

consequential issues facing those same constituencies.

267.  Plaintiffs like CCCS-NY and AAF that have access to charity funds also

will face extra demands on those resources.  Because noncitizens will be unable to access

public benefits, they will instead turn to these organizations to help fill the gaps and make ends

meet.  The plaintiffs will be unable to use these funds for other programs or to address the

needs of their other constituents.

268.  The Rule goes to the heart of the core mission of each of the plaintiffs.

Where plaintiffs seek a world where immigrants have choices and are treated with dignity and

respect as they make their way towards permanent residence and greater economic success, the

Rule has the opposite effect.  In application, the Rule will prevent low-income immigrants of

color from applying to adjust, and will limit their choices about accessing benefits that get

them through hard times.  To address this harm and fulfill their missions, plaintiffs will be

forced to devote time, money, personnel, and other resources to this issue.

269.  In October 2018, USCIS began a policy of issuing Notices to Appear in

immigration court for removal hearings to immigrants whose adjustment of status the agency

had denied.  Intending immigrants are thus facing not only a higher likelihood of denial of

adjustment once the Rule goes into effect, but also, for many, an accompanying risk that such

denial will lead to placement in removal proceedings.  Implementation of the Rule will thus

force many adjustment applicants and their families to leave the lives they have built and cherished over years in the United States. For Plaintiffs MRNY, ASC, and AAF, these effects will in turn hinder the organizations' ability to mobilize community members and impede their ability to fulfill their mission of strengthening the political voice and well-being of immigrant communities. For all plaintiffs, these effects will cause a substantial increase in resources dedicated to mitigating the harms of the Rule, educating clients about the dangers of adjustment, and evaluating the risks of accessing important health care, nutritional, and housing assistance. And, where the Rule results in denials of adjustment of status, plaintiffs will be forced to spend additional resources counseling individuals through subsequent removal proceedings.

270. The Rule will potentially result in denial of status adjustment to hundreds of thousands of applicants, including the thousands of adjustment applicants who receive representation, counseling, and other immigration-related services from plaintiffs. The Department of State, which processes applicants immigrant visas from abroad, has seen a significant increase in immigrant visa denials on public charge grounds in the year since it implemented a policy change similar to the Rule. That pattern will repeat itself as to applications for adjustment of status if the Rule goes into effect. Implementation of the Rule will lead to immigrants losing their opportunity to adjust, and will threaten families with instability far into the future.

# CAUSES OF ACTION

## COUNT ONE

### (Violation of Administrative Procedure Act – Substantively Arbitrary and Capricious, Abuse of Discretion, Contrary to Constitution or Statute)

271.  Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

272.  The APA, 5 U.S.C. § 706(2), prohibits federal agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."

273.  DHS and USCIS are each an "agency" under the APA.  5 U.S.C. § 551(A).

274.  In implementing the Rule, defendants took unconstitutional and unlawful action, in violation of the APA, by, among other things, as set forth herein: (a) expanding the definition of "public charge" in a manner contrary to the statutory meaning of the term; (b) seeking to establish a framework for making public charge determinations that will deny status adjustment to large numbers of intending immigrants who would be approved for status adjustment under an approach consistent with the Act; (c) identifying "negative factors" and "heavily weighted negative factors" for public charge determinations that are contrary to law; (d) establishing a Rule that is so confusing, vague, and broad that it fails to give applicants notice of the conduct to avoid and inviting arbitrary, subjective, and inconsistent enforcement; (e) seeking to establish a framework for public charge determinations that undermines the Congressional goal of promoting family unity; (f) promulgating a rule that discriminates

112

against individuals with disabilities in violation of the Rehabilitation Act of 1973;

(g) promulgating a Rule that, in purpose and effect, is improperly retroactive; and

(h) promulgating a rule that is motivated by animus against nonwhite immigrants.

275.   Defendants acted arbitrarily and capriciously, otherwise not in accordance with law, and contrary to constitutional right, and abused their discretion, in violation of the APA.

276.   Defendants' violations have caused and will continue to cause ongoing harm to plaintiffs and the general public.

## COUNT TWO

### (Violation of Administrative Procedure Act – Procedurally Arbitrary and Capricious, Notice and Comment)

277.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

278.   The APA, 5 U.S.C. §§ 553 and 702(2)(D), prohibits federal agency action that affects substantive rights "without observance of procedure required by law."

279.   DHS and USCIS are each an "agency" under the APA.  5 U.S.C. § 551(A).

280.   In implementing the Rule, defendants will change the substantive criteria regarding evaluating whether an individual is a public charge.

281.   The Rule must comply with the APA process for notice-and-comment rulemaking.  5 U.S.C. § 553.

282.   Under the APA, agencies engaged in notice-and-comment rulemaking must, among other things, (a) provide reasonable basis for departing from prior agency actions;

(b) support their actions with appropriate data and evidence; and (c) provide a reasoned response to significant public comments.

283. Defendants have failed to comply with these obligations.

284. These violations will cause ongoing harm to plaintiffs.

## COUNT THREE

### (Violation of the Administrative Procedure Act – In Excess of Statutory Jurisdiction, Authority, or Limitations)

285. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

286. The APA, 5 U.S.C. § 706(2)(C), prohibits federal agency action that is made "in excess of statutory jurisdiction, authority, or limitations."

287. DHS and USCIS lack rulemaking authority to promulgate the Rule.

288. Section 103 of the INA denies DHS authority over the "powers, functions, and duties conferred upon the . . . Attorney General." 8 U.S.C. § 1103(a)(1).

289. The INA confers upon the Attorney General, not DHS, the authority to regulate adjustment of status applications, 8 U.S.C. § 1255(a), and to make public charge inadmissibility determinations for noncitizens seeking admission or adjustment of status, 8 U.S.C. § 1182(a)(4)(A).

290. The promulgation of the Rule by DHS and USCIS is in excess of the agencies' statutory jurisdiction, authority, or limitations.

291. This violation will cause ongoing harm to Plaintiffs.

## COUNT FOUR

### (Violation of the Fifth Amendment – Equal Protection and Due Process)

292. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

293. The Due Process Clause of the Fifth Amendment prohibits the federal government from denying persons due process of law and the equal protection of the laws.

294. The Rule targets individuals for discriminatory treatment based on their race, ethnicity, and/or national origin, without lawful justification.

295. The Rule was motivated, in whole or in part, by a discriminatory motive and/or a desire to harm a particular group, nonwhite immigrants.

296. Nonwhite immigrants will be disproportionately harmed by the Rule.

297. By issuing the Rule, defendants violated the equal protection and due process guarantees of the Fifth Amendment.

298. This violation will cause ongoing harm to plaintiffs.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that the Court:

a.  Issue a declaratory judgment stating that the Rule is unauthorized by law and contrary to the Constitution and laws of the United States;

b.  Vacate and set aside the Rule;

c.  Preliminarily and permanently enjoin defendants from implementing the Rule or taking any actions to enforce or apply it;

d.  Award plaintiffs attorneys' fees; and

e.  Grant such additional relief as the Court considers just.

Dated:   New York, New York
         August 27, 2019

By:  */s/ Jonathan H. Hurwitz*

**PAUL, WEISS, RIFKIND, WHARTON &**
**GARRISON LLP**
Andrew J. Ehrlich
Jonathan H. Hurwitz
Robert J. O'Loughlin
Daniel S. Sinnreich
Amy K. Bowles (*admission pending*)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
roloughlin@paulweiss.com
dsinnreich@paulweiss.com
abowles@paulweiss.com

**CENTER FOR CONSTITUTIONAL RIGHTS**
Ghita Schwarz
Brittany Thomas
Baher Azmy

666 Broadway
7th Floor
New York, New York  10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

116

**THE LEGAL AID SOCIETY**
Susan E. Welber, Staff Attorney, Law Reform Unit

Janet Sabel, Attorney-in-Chief
Adriene Holder, Attorney-in-Charge, Civil Practice
Judith Goldiner, Attorney-in-Charge, Law Reform Unit
Susan Cameron, Supervising Attorney, Law Reform Unit
Kathleen Kelleher, Staff Attorney, Law Reform Unit
Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit
Margaret Garrett, Staff Attorney, Immigration Law Unit
Rebecca Novick, Director, Health Law Unit
Lillian Ringel, Staff Attorney, Health Law Unit (*pro hac vice application forthcoming*)
Esperanza Colón, Staff Attorney, Brooklyn Neighborhood Office

199 Water Street, 3rd Floor
New York, New York 10038
(212) 577-3320
Sewelber@legal-aid.org
Jsabel@legal-aid.org
Aholder@legal-aid.org
Jgoldiner@legal-aid.org
Scameron@legal-aid.org
Kkelleher@legal-aid.org
Hhshafiqullah@legal-aid.org
Mgarrett@legal-aid.org
Ranovick@legal-aid.org
Lringel@legal-aid.org
Emcolon@legal-aid.org

*Attorneys for Plaintiffs Make the Road New York, African Services Committee, Asian American Federation, Catholic Charities Community Services (Archdiocese of New York), and Catholic Legal Immigration Network, Inc.*