UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAKE THE ROAD NEW YORK, AFRICAN SERVICES
COMMITTEE, ASIAN AMERICAN FEDERATION,
CATHOLIC CHARITIES COMMUNITY SERVICES,
and CATHOLIC LEGAL IMMIGRATION NETWORK,
INC.,

Plaintiffs,

- against -

KEN CUCCINELLI, in his official capacity as Acting
Director of United States Citizenship and Immigration
Services; UNITED STATES CITIZENSHIP &
IMMIGRATION SERVICES; KEVIN K. McALEENAN,
in his official capacity as Acting Secretary of Homeland
Security; and UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

Defendants.

1:19-cv-07993 (GBD)

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

THE FACTS ......................................................................................... 5

I.   The History of the Term "Public Charge" in the INA ........................... 5

    A.   The Original Meaning of "Public Charge" Referred to a Narrow Class of Persons Wholly Unable to Care for Themselves ...................................... 6

    B.   Administrative Decisions for Nearly a Century Affirm That Mere Receipt of Public Benefits Does Not Render The Recipient a Public Charge ......... 7

    C.   Congress Has Approved Administrative Interpretations by Reenacting the Public Charge Provisions of the INA Without Material Change .............. 9

    D.   Congress Has Expressly Rejected Proposals to Deem Anyone Receiving Means-Tested Public Benefits a Public Charge ..................................... 10

    E.   Administrative Field Guidance from 1999 Confirmed the Settled Interpretation of Public Charge .................................................. 11

II.  DHS's Public Charge Rule .......................................................... 12

ARGUMENT ....................................................................................... 16

I.   Plaintiffs Are Likely to Succeed on Their Claims ............................. 16

    A.   The Rule Is Contrary to the INA ................................................. 17

    B.   The Rule Violates the Rehabilitation Act ....................................... 21

    C.   DHS Lacks Authority to Promulgate the Rule .................................. 22

    D.   The Rule Is Arbitrary and Capricious ........................................... 24

        1.   DHS's Explanation That the Rule Will Promote "Self-Sufficiency" Runs Counter to the Evidence before the Agency ......................... 25

        2.   The Rule Is Vague, Lacking in Objective Standards, and Internally Inconsistent, Thereby Inviting Arbitrary Enforcement ................. 25

        3.   DHS Failed to Respond to Significant Public Comments ............. 26

        4.   DHS Failed to Justify Departing from the Field Guidance ........... 28

E.      The Rule Is Impermissibly Retroactive Because It Penalizes Individuals for Past Conduct Undertaken in Reliance on the Existing Field Guidance ...................................................................................................... 30

F.      The Rule Violates the Equal Protection Guarantee of the U.S. Constitution ...................................................................................................... 31

    1.      The Rule Will Have a Disparate Impact on Persons of Color ...... 32

    2.      Statements by the Officials Who Drove and Drafted the Rule Demonstrate Unconstitutional, Discriminatory Animus............... 33

II.     Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction........... 34

A.      Irreparable Harm Is Presumed When a Rule Violates Federal Law ......... 35

B.      Plaintiffs Have and Will Continue to Divert Resources to Address the Impact of the Rule and Suffer Harms to Their Organizational Missions . 35

III.    The Balance of Equities and Public Interest Support a Preliminary Injunction ... 38

A.      There Is No Public Interest in an Unlawful Rule ...................................... 38

B.      The Public Has a Strong Interest in Preventing the Enormous Harm That the Rule Will Cause ................................................................................. 38

IV.     Any Injunction or Postponement Should Apply Nationwide ............................... 40

CONCLUSION.................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Matter of A-,*
    19 I. & N. Dec. 867 (B.I.A. 1988) ...................................................................8

*Adams Fruit Co., Inc.* v. *Barrett,*
    494 U.S. 638 (1990) .........................................................................................23

*Airbnb, Inc. v. City of New York,*
    373 F. Supp. 3d 467 (S.D.N.Y. 2019) ............................................................39

*Albemarle Paper Co.* v. *Moody,*
    422 U.S. 405 (1975) .........................................................................................20

*Alexander* v. *Choate,*
    469 U.S. 287 (1985) .........................................................................................21

*Ass'n of Private Sector Colls. and Univs.* v. *Duncan,*
    681 F.3d 427 (D.C. Cir. 2012) ........................................................................28

*Matter of B-,*
    3 I. & N. Dec. 323 (B.I.A. 1948) .....................................................................7

*Batalla Vidal* v. *Nielsen,*
    279 F. Supp. 3d 401 (E.D.N.Y. 2018) ..............................................24, 26, 34

*Michigan* v. *Bay Mills Indian Cmty.,*
    572 U.S. 782 (2014) .........................................................................................20

*United States v. Bd. of Comm'rs,*
    435 U.S. 110 (1978) .........................................................................................20

*Bob Jones University* v. *United States,*
    461 U.S. 574 (1983) .........................................................................................20

*Bowen* v. *Georgetown Univ. Hosp.,*
    488 U.S. 204 (1988) ...................................................................................22, 30

*Brewer v. West Irondequoit Cent. Sch. Dist.,*
    212 F.3d 738 (2d Cir. 2000) ............................................................................35

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000) .........................................................................................17

*CASA de Maryland* v. *Trump*,
   355 F. Supp. 3d 307 (D. Md. 2018) ......................................................................34

*Centro de la Comunidad Hispana de Locust Valley* v. *Town of Oyster Bay*,
   868 F.3d 104 (2d Cir. 2017)................................................................................36

*Chevron U.S.A. Inc.* v. *Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)............................................................................................17

*City of Cleburne* v. *Cleburne Living Ctr.*,
   473 U.S. 432 (1985)............................................................................................31

*City of Arlington* v. *FCC*,
   569 U.S. 290 (2013)............................................................................................23

*City of Portland* v. *EPA*,
   507 F.3d 706 (D.C. Cir. 2007)............................................................................26

*United States* v. *City of Yonkers*,
   837 F.2d 1181 (2d Cir. 1987)..............................................................................31

*Conn. Dep't of Envtl. Prot.* v. *OSHA*,
   356 F.3d 226 (2d Cir. 2004)................................................................................35

*Davies* v. *State ex rel. Boyles*,
   17 Ohio Cir. Dec. 593, 1905 WL 629 (Ohio Cir. Ct. 1905) ................................6

*Washington* v. *Davis*,
   426 U.S. 229 (1976)............................................................................................31

*New York* v. *Dep't of Commerce*,
   351 F. Supp. 3d 502 (S.D.N.Y. 2019)..................................................................29

*New York* v. *Dep't of Justice*,
   343 F. Supp. 3d 213 (S.D.N.Y. 2018)........................................................27, 28, 29

*E. Bay Sanctuary Covenant* v. *Barr*,
   No. 19-cv-4073, slip op. (N.D. Cal. Sept. 9, 2019) ............................................40

*E. Bay Sanctuary Covenant v. Trump*,
   354 F. Supp. 3d 1094 (N.D. Cal. 2018) ......................................................36, 37, 40

*Encino Motorcars, LLC* v. *Navarro*,
   136 S. Ct. 2117 (2016)..................................................................................28, 30

*Michigan* v. *EPA*,
   268 F.3d 1075 (D.C. Cir. 2001)..........................................................................24

*Faiveley Transp. Malmo AB* v. *Wabtec Corp.*,
    559 F.3d 110 (2d Cir. 2009)...........................................................................35

*FBME Bank Ltd.* v. *Lew*,
    209 F. Supp. 3d 299 (D.D.C. 2016) .............................................................27

*Food Mktg. Inst.* v. *Argus Leader Media*,
    139 S. Ct. 2356 (2019).................................................................................18

*Forest Grove Sch. Dist.* v. *T.A.*,
    557 U.S. 230 (2009).....................................................................................19

*FCC* v. *Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).....................................................................................29

*Gegiow v. Uhl*,
    239 U.S. 3 (1915)...........................................................................................7

*Good Samaritan Hosp.* v. *Shalala*,
    508 U.S. 402 (1993).....................................................................................19

*Grand River Enter. Six Nations, Ltd.* v. *Pryor*,
    481 F.3d 60 (2d Cir. 2007)...........................................................................35

*Matter of Harutunian*,
    14 I. & N. Dec. 583 (1974) ............................................................................8

*Heublein v. FTC*,
    539 F. Supp. 123 (D. Conn. 1982) ...............................................................35

*Howe v. United States ex rel. Savitsky*,
    247 F. 292 (2d Cir. 1917)...............................................................................7

*Innovation Law Lab* v. *Nielsen*,
    366 F. Supp. 3d 1110 (N.D. Cal. 2019) .......................................................16

*Int'l Union, United Mine Workers of Am.* v. *Mine Safety & Health Admin.*,
    626 F.3d 84 (D.C. Cir. 2010)........................................................................27

*Isaacs* v. *Bowen*,
    865 F.2d 468 (2d Cir. 1989).........................................................................19

*King* v. *Burwell*,
    135 S. Ct. 2480 (2015).................................................................................17

*League of Women Voters of U.S.* v. *Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ....................................................................36, 38

*Leary* v. *United States*,
   395 U.S. 6 (1969) ........................................................................................18

*Lilliputian Sys., Inc.* v. *Pipeline & Hazardous Materials Safety Admin.*,
   741 F.3d 1309 (D.C. Cir. 2014) ..................................................................26

*United States* v. *Mango*,
   199 F.3d 85 (2d Cir. 1999) ..........................................................................19

*Matter of Martinez-Lopez*,
   10 I. & N. Dec. 409 (B.I.A. 1962; A.G. 1964) ............................................8

*MCI Telecomm. Corp.* v. *Am. Tel. & Tel. Co.*,
   512 U.S. 218 (1994) ....................................................................................18

*United States* v. *Mead Corp.*,
   533 U.S. 218 (2001) ....................................................................................32

*Dep't of Agriculture* v. *Moreno*,
   413 U.S. 528 (1973) ....................................................................................31

*Motor Vehicle Mfrs. Ass'n of the U.S.* v. *State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................................24

*Nat'l Fuel Gas Supply Corp.* v. *N.Y. State Dep't of Envtl. Conservation*,
   761 F. App'x 68 (2d Cir. 2019) ..................................................................28

*Nat'l Min. Ass'n* v. *U.S. Army Corps of Eng'rs*,
   145 F.3d 1399 (D.C. Cir. 1998) ..................................................................40

*Nat. Res. Def. Council* v. *Dep't of Energy*,
   362 F. Supp. 3d 126 (S.D.N.Y. 2019) ........................................................27

*Nat'l Mining Ass'n* v. *Dep't of Interior*,
   177 F.3d 1 (D.C. Cir. 1999) ........................................................................30

*In re O'Sullivan*,
   31 F. 447 (C.C.S.D.N.Y. 1887) ....................................................................7

*Otoe-Missouria Tribe of Indians* v. *N.Y. State Dep't of Fin. Servs.*,
   769 F.3d 105 (2d Cir. 2015) ........................................................................16

*Matter of Perez*,
   15 I. & N. Dec. 136 (B.I.A. 1974) ................................................................8

*Perez* v. *Mortg. Bankers Ass'n*,
   135 S. Ct. 1199 (2015) ................................................................................26

*Pennsylvania* v. *President U.S.*,
    930 F.3d 543 (3d Cir. 2019)........................................................................36

*R.F.M.* v. *Nielsen*,
    365 F. Supp. 3d 350 (S.D.N.Y. 2019).......................................................29

*Ramos* v. *Nielsen*,
    336 F. Supp. 3d 1075 (N.D. Cal. 2018) .....................................................3

*Washington* v. *Reno*,
    35 F.3d 1093 (6th Cir. 1994) ....................................................................38

*Rock of Ages Corp.* v. *Sec'y of Labor*,
    170 F.3d 148 (2d Cir. 1999).......................................................................30

*United States* v. *Rowland*,
    826 F.3d 100 (2d Cir. 2016).......................................................................18

*Saget* v. *Trump*,
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ............................................ *passim*

*Sarango* v. *Attorney General*,
    651 F.3d 380 (3d Cir. 2011)......................................................................24

*CFTC* v. *Schor*,
    478 U.S. 833 (1986)..................................................................................19

*Solid Waste Agency of N. Cook Cty.* v. *U.S. Army Corps of Eng'rs*,
    531 U.S. 159 (2001)..................................................................................18

*Sunward Elecs., Inc.* v. *McDonald*,
    362 F.3d 17 (2d Cir. 2004).........................................................................16

*Matter of T-*,
    3 I. & N. Dec. 641 (B.I.A. 1949) ................................................................7

*United Airlines* v. *Brien*,
    588 F.3d 158 (2d Cir. 2009)......................................................................18

*Texas* v. *United States*,
    809 F.3d 134 (5th Cir. 2015) ....................................................................17

*Texas* v. *United States*,
    95 F. Supp. 3d 965 (N.D. Tex. 2015) .......................................................16

*V.W. by and through Williams* v. *Conway*,
    236 F. Supp. 3d 554 (N.D.N.Y. 2017)......................................................38

*Valle del Sol Inc.* v. *Whiting,*
   732 F.3d 1006 (9th Cir. 2013) ...............................................................................35

*Vill. of Arlington Heights* v. *Metro. Hous. Dev. Corp.,*
   429 U.S. 252 (1977) ..............................................................................................32

*Winter* v. *Nat. Res. Def. Counsel,*
   555 U.S. 7 (2008) ..................................................................................................16

*Yeatman* v. *King,*
   51 N.W. 721 (N.D. 1892) .......................................................................................6

## STATUTES

5 U.S.C. § 702 ...............................................................................................30, 36

5 U.S.C. § 705 .......................................................................................................16

5 U.S.C. § 706(2) ..................................................................................17, 22, 32, 40

6 U.S.C. § 112(e) ..................................................................................................24

8 U.S.C. § 1103(a)(1) ............................................................................................23

8 U.S.C. § 1182(a)(4) .................................................................................6, 10, 23

8 U.S.C. § 1183a ...................................................................................................31

8 U.S.C. § 1601(2) ................................................................................................21

8 U.S.C. § 1612 .......................................................................................................9

8 U.S.C. § 1613 .......................................................................................................9

29 U.S.C. § 794(a) ................................................................................................21

1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ....................................6

Homeland Security Technical Corrections Act of 2003, H.R. 1416, 108th Cong.
   (2003) ....................................................................................................................24

Illegal Immigration Reform and Immigrant Responsibility Act, Pub. L. 104-208,
   110 Stat. 3009 (1996) ...........................................................................................10

Immigration Act of 1882, 47th Cong. ch. 376, 22 Stat. 214 ..................................6

Immigration and Nationality Act of 1952, 82nd Cong. ch. 477, 66 Stat. 163 ....6, 9

Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. (1996) ......................................................................................................11

Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. 104-193, 110 Stat. 2105 (1996) ........................................................................9, 10

Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq. .............................................2, 21


## OTHER AUTHORITIES

6 C.F.R. § 15.30(b)(1) ..........................................................................................22

8 C.F.R. § 212.21(a) ..............................................................................12, 13, 26

8 C.F.R. § 212.22 .........................................................................13, 22, 26, 31

8 C.F.R. § 312.1(a) ...............................................................................................28

64 Fed. Reg. 28,676 .......................................................................................25, 29

64 Fed. Reg. 28,689 ...............................................................................11, 13, 30

83 Fed. Reg. 51,114 ...........................................................................................4, 8, 15

84 Fed. Reg. 41,292 ....................................................................................... *passim*

Border Security, Economic Opportunity, and Immigration Modernization Act, S. Rep. No. 113-40 (2013) ...............................................................................11

Fed. R. Civ. P. 65 ................................................................................................15

Report of the Committee on the Judiciary, S. Rep. No. 1515 (1950) .............................9

Report of the Committee of the Judiciary, S. Rep. No. 104-249 (1996) ......................11

Senate Debate of Immigration Control & Financial Responsibility Act, 142 Cong. Rec. S4401 (1996) .........................................................................................11

Senate Debate of Immigration Act of 1882, 13 Cong. Rec. 5109 (June 19, 1882) ......................6

Senate Debate of Omnibus Consolidated Appropriations Act, 1997, 142 Cong. Rec. S11872 (1996) ......................................................................................11

Staff of the H. Comm. on the Judiciary, 100th Cong., Grounds for Exclusion of Aliens Under the Immigration and Nationality Act:  Historical Background and Analysis (Comm. Print 1988) .............................................................................9

## PRELIMINARY STATEMENT

Defendants have promulgated a rule (the "Rule"),[1] set to become effective on October 15, 2019, that would allow the government to deny lawful permanent residence to noncitizens with low incomes and limited assets on the ground that they are "likely to become a public charge." The Rule will—as defendants intend—primarily affect poor and working-class immigrants seeking lawful permanent residence (*i.e.*, a green card) so they can remain in this country with family members living here. As defendants also intend, it will disproportionately affect immigrants of color. Under the familiar preliminary injunction standard (likelihood of success, irreparable injury, balance of equities, and public interest), the Rule should be preliminarily enjoined, and its effective date should be postponed pursuant to 5 U.S.C. § 705.

***Plaintiffs are likely to prevail on the merits***. The Rule violates the Administrative Procedure Act ("APA") and the Fifth Amendment. *First*, the Rule overturns more than a century of judicial and administrative interpretation of the statutory term "public charge." Under current law, consistent with that longstanding historical interpretation, the public charge exclusion applies narrowly to noncitizens who are destitute and unable to work, and thus are likely to rely primarily for subsistence on government aid in the form of cash or long-term institutionalization, and not to those who merely received supplemental or shot-term assistance.

The Rule seeks to overturn this longstanding law, and by doing so to (in the Trump Administration's words) "transform[]" and "reshape" American immigration. Under the Rule, noncitizens would be denied lawful permanent residence if the government predicts that they are

---

[1]   Inadmissibility on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pts. 103, 212, 213, 214, 245, 248), Ex. 1.  Citations to "Ex. __" are to exhibits to the attached Declaration of Robert J. O'Loughlin.  Other declarations supporting this motion are cited according to the last name of the declarant (*e.g.*, "Nichols Decl. ¶ __"). Citations to the Rule's additions to the Code of Federal Regulations, 84 Fed. Reg. at 41,500–08, are cited according to the proposed provision (*e.g.*, "Proposed 8 C.F.R. § ___").

likely at any time *in the future* to receive any minimal amount of benefits from specified benefit programs—even if they have never received such benefits in the past. These programs include noncash benefits such as Medicaid, SNAP (food stamps), and public housing subsidies that are not considered under current law. But use of these benefits does not connote destitution—the historical public charge standard—or, as the defendants allege, a lack of "self-sufficiency." Millions of low-income citizens and noncitizens—even, as defendants acknowledge, active-duty service members—rely on those programs to supplement their incomes and enable themselves and their families to be self-sufficient.

The Rule violates Congress's clearly expressed intent. Congress has repeatedly approved the narrow historical interpretation of the "public charge" inadmissibility provision by reenacting it without material change. At least twice it has expressly rejected proposals to define "public charge" to include the receipt of noncash benefits. The Administration is not entitled to circumvent Congress and unilaterally rewrite the law.

*Second*, the Rule is also contrary to law because it violates the Rehabilitation Act of 1973, which prohibits "discrimination . . . by an Executive Agency" based on disability. But the Rule expressly treats disability as a negative factor in public charge determinations—indeed, by double- and triple-counting disabilities as multiple negative factors.

*Third*, the Rule violates the APA because the Department of Homeland Security ("DHS") issued it without statutory authority. The Immigration and Nationality Act ("INA") grants the Attorney General, not DHS, sole authority to regulate public charge determinations for noncitizens seeking lawful permanent residence.

*Fourth*, the Rule is arbitrary and capricious for numerous reasons.

*Fifth*, the Rule exceeds DHS's rulemaking authority because it is retroactive.

*Sixth*, the Rule violates the Fifth Amendment because its adoption was driven by unconstitutional animus against immigrants of color. The Rule—which originated with a proposal by a nativist think tank, and was subsequently adopted in a draft Executive Order—furthers the Trump Administration's longstanding hostility to nonwhite immigrants, whom he has characterized as "animals" who are "invading" or "infesting" the United States. Defendants have consistently echoed this hateful rhetoric and sought to put it into practice: defendant Cuccinelli justified the Rule by arguing that the Statue of Liberty's welcome message is directed only to "people coming from Europe"; compared immigrants to "rats"; was a founding member of a state legislative group that described undocumented immigrants as "foreign invaders"; and, in October 2018, advocated treating asylum applicants from Mexico with "no due process" by "just point[ing] them back across the river and let[ting] them swim for it."[2] At least two courts have preliminarily enjoined other anti-immigrant actions by DHS as motivated by such unconstitutional animus.[3] Consistent with defendants' purpose, the impact of the Rule will be felt disproportionately by nonwhite immigrants, including most dramatically on Latinos and immigrants from Mexico and Central America.

**The Rule will cause irreparable harm**. The Rule will deny millions the right to continue living in this country with their families. As defendants concede, it will also cause hundreds of thousands of individuals and households to forego public benefits to which they are entitled[4]—

---

[2]  *See* Jacey Fortin, *'Huddled Masses' in Statue of Liberty Poem are European, Trump Official Says*, N.Y. Times (Aug. 14, 2019), Ex. 2; Marc Fisher, *Cuccinelli, a Righteous, Faith-Driven Warrior Who Delights in Provocation, Will Join Trump Administration*, Wash. Post (May 22, 2019), Ex. 3; Andrew Kaczynski, *Trump Official Has Talked About Undocumented Immigrants as 'Invaders' Since at Least 2007*, CNN Politics (Aug. 17, 2019), Ex. 4.

[3]  *Saget* v. *Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019) (describing animus against "non-white immigrants"); *Ramos* v. *Nielsen*, 336 F. Supp. 3d 1075, 1104 (N.D. Cal. 2018) describing animus against "non-white, non-European immigrants"), *on appeal*, No. 18-16981 (9th Cir.).

[4]  Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114, 51,269 & Table 53 (proposed Oct. 10, 2018), Ex. 5.

estimates that, as independent analysts have shown, are greatly understated. As the accompanying declarations of Professors Leighton Ku and Diane Schanzenbach explain, the Rule will lead between one and three million members of immigrant families to forego Medicaid coverage each year, resulting in 1,300 to 4,000 excess premature deaths annually, and households including over 1.7 million individuals to forego food assistance under the SNAP program. Reports about the Trump Administration's plans to broaden the definition of "public charge" have *already* led to large numbers of noncitizens foregoing benefits for fear of risking their immigration status. Those results will only get worse if the Rule becomes effective.

The Rule will also irreparably harm plaintiffs. Plaintiffs are non-profit organizations that advise, assist, advocate for, and serve hundreds of thousands of low-income noncitizens and their families in New York and nationwide. The Rule attacks plaintiffs' core missions of empowering and serving their constituents. Plaintiffs' resources to provide legal and other community services to clients and members affected by the Rule are finite, and the Rule will require them to divert substantial time and money to deal with the Rule's fallout (and has already done so). Those resources are not then available to further their missions in other ways.

***The balance of hardships and public interest tips decidedly in favor of enjoining the Rule***. The Rule will also cause enormous public harm even beyond the direct harm to plaintiffs and their immigrant clients. The Rule itself acknowledges it will lead to: "[w]orse health outcomes"; "[i]ncreased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment"; "[i]ncreased prevalence of communicable diseases, including among members of the U.S. citizen population who are not vaccinated"; "[i]ncreases in uncompensated care in which a treatment or service is not paid for by an insurer or patient"; "[i]ncreased rates of poverty and housing instability"; "[r]educed productivity and educational

4

attainment," and other "unanticipated consequences and indirect costs." 83 Fed. Reg. at 51,270. The Rule further acknowledges "downstream and upstream impacts on state and local economies, large and small businesses, and individuals." *Id*. at 51,268.

In contrast, no significant harm will be caused by requiring defendants to continue addressing applications for lawful permanent residence as they have historically done, including under existing agency guidance that has been in effect for more than 20 years. And, under well-settled law, there is no public interest in allowing agencies to act unlawfully.

* * *

The Rule announces that law-abiding poor and working-class noncitizens who wish to continue living in this country with their families are not welcome here.  That is not the law Congress enacted. Defendants' indefensible effort to make it so will cause great harm to plaintiffs and enormous suffering in immigrant communities.  Plaintiffs' motion to enjoin or postpone the Rule should be granted.

## THE FACTS

I.    **The History of the Term "Public Charge" in the INA**

The long history of the statutory term "public charge" demonstrates that the Rule is contrary to Congress's intent. In the more than 130 years since the term "public charge" first became part of U.S. immigration law as part of the Immigration Act of 1882, it has been interpreted and applied narrowly to refer only to persons who are institutionalized or are otherwise primarily dependent on the government for subsistence, and Congress has repeatedly approved that interpretation.

### A.  The Original Meaning of "Public Charge" Referred to a Narrow Class of Persons Wholly Unable to Care for Themselves

The term "public charge" first appeared in federal immigration law in the Immigration Act of 1882, 47th Cong. ch. 376, 22 Stat. 214, § 2, Ex. 6, which provided that "any person unable to take care of himself or herself without becoming a public charge" could be denied admission to the United States. Later statutes changed the wording of the clause to "likely to become a public charge"—the language of the current statute—and added provisions creating a public charge basis for removal as well as inadmissibility.[5] While the statute has not defined the term "public charge," the legislative history of the 1882 Act shows that Congress intended the term to refer to those likely to become long-term residents of "poor-houses and alms-houses"— *i.e.*, persons who were institutionalized and wholly dependent on the government for subsistence. 13 Cong. Rec. 5109 (June 19, 1882) (statement of Rep. Davis), Ex. 9.[6]

Early court decisions likewise found the public charge provision to apply to "persons who were likely to become occupants of almshouses for want of means with which to support themselves in the future." *Howe v. United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917);

---

[5]  *E.g.*, 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 § 1, Ex. 7; Immigration and Nationality Act of 1952, 82nd Cong. ch. 477, 66 Stat. 163, 183, Ex. 8. Under current law, as the Rule notes, 84 Fed. Reg. at 41,294, the public charge inadmissibility provision also applies to resident noncitizens seeking to obtain legal permanent residence status (referred to as "adjustment of status"). *See* 8 U.S.C. § 1182(a)(4)(A) (public charge inadmissibility is to be determined "at the time of application for admission or adjustment of status"); *id.* § 1255(a) ("The status of an alien who was inspected and admitted or paroled into the United States . . . may be adjusted by the Attorney General . . . if . . . the alien is eligible to receive an immigrant visa and is admissible to the United States for permanent residence . . . .").

[6]  *Accord* Torrie Hester et al., Comment, at 3 (Oct. 25, 2018), Ex. 10 ("[U]nder the colonial, state, and early federal immigration laws, deportation based on the public charge clause applied only to people accommodated at public charitable institutions or who were substantially dependent on public relief for the basic maintenance of their lives."). The narrow scope of the term "public charge" in immigration law is also consistent with contemporaneous use of the term by numerous state courts outside of the immigration context. Indeed, courts emphasized the "obligation" of the public "to keep a portion of the population destitute of means and credit from becoming a public charge by affording them temporary relief." *Yeatman* v. *King*, 51 N.W. 721, 723 (N.D. 1892). *See also, e.g.*, *Davies* v. *State ex rel. Boyles*, 17 Ohio Cir. Dec. 593, 595–96, 1905 WL 629 (Ohio Cir. Ct. 1905) ("It seems to the court, however, that public interests are subserved by the aiding of persons who might become a public charge, if left to their own resources, to such an extent that, by combining the small fund given them by the state with what they may be able to earn . . . they might be able to maintain themselves and avoid becoming a charge.").

*accord In re O'Sullivan*, 31 F. 447, 449 (C.C.S.D.N.Y. 1887) (holding "the ultimate fact [at issue in determining public charge status is] whether these immigrants were 'unable to take care of themselves'"). The courts emphasized that the provision was intended to exclude immigrants "on the ground of permanent personal objections accompanying them," rather than those needing temporary assistance. *Gegiow v. Uhl*, 239 U.S. 3, 10 (1915).

Consistent with the narrow scope of the public charge provision, federal immigration officials have historically excluded only a minuscule percentage of arriving immigrants on public charge grounds. According to DHS data, of the 21.8 million immigrants admitted to the United States as lawful permanent residents between 1892 and 1930, less than one percent were deemed inadmissible on public charge grounds. The same has been true in subsequent years: between 1931 and 1980 (the last year for which DHS publishes such data), only 13,798 immigrants were excluded on public charge grounds out of more than 11 million admitted as lawful permanent residents—an exclusion rate of about one-tenth of one percent.[7]

> **B.    Administrative Decisions for Nearly a Century Affirm That Mere Receipt of Public Benefits Does Not Render The Recipient a Public Charge**

The original meaning of "public charge" remained undisturbed in the mid-twentieth century. In the leading case of *Matter of B-*, 3 I. & N. Dec. 323, 324 (B.I.A. 1948), the Board of Immigration Appeals ("BIA") held that "acceptance by an alien of services provided by a State . . . to its residents, services for which no specific charge is made, does not in and of itself make the alien a public charge [for removal purposes]." *Accord Matter of T-*, 3 I. & N. Dec. 641, 644 (B.I.A. 1949); *Matter of A-*, 19 I. & N. Dec. 867, 867 (B.I.A. 1988).

---

[7]    *See* Dep't of Homeland Security, *Table 1. Persons Obtaining Lawful Permanent Resident Status: Fiscal Years 1820 to 2016*, (Dec. 18, 2017), Ex. 11; Immigration and Naturalization Service, *2001 Statistical Yearbook of the Immigration and Naturalization Service* 258 (2003), Ex. 12; *see also* Mae Ngai, Impossible Subjects: Illegal Aliens and the Making of Modern America 18 (2004), Ex. 13.

The holding in *Matter of B-* has been the law for more than 70 years, and has been applied to admissibility as well as removal. In *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409, 421 (B.I.A. 1962; A.G. 1964), Attorney General Kennedy explained that, to exclude a noncitizen as likely to become a public charge, "the [INA] requires more than a showing of a possibility that the alien will require public support." *Accord Matter of Perez*, 15 I. & N. Dec. 136, 137 (B.I.A. 1974) ("The fact that an alien has been on welfare does not, by itself, establish that he or she is likely to become a public charge."); *Matter of Harutunian*, 14 I. & N. Dec. 583, 590 (1974) (finding a 70-year old noncitizen inadmissible on public charge grounds where she "lacks means of supporting herself, . . . has no one responsible for her support and . . . expects to be dependent for support on old age assistance."). Defendants acknowledge that these and other administrative decisions "clarified that . . . receipt of welfare would not, alone, lead to a finding of likelihood of becoming a public charge." 83 Fed. Reg. at 51,125.

These administrative decisions have continued to reflect a narrow definition of "public charge" despite the increasingly broad array of public benefits that became available for low-income people over the course of the twentieth century—including, for many years, otherwise eligible noncitizens.[8] Plaintiffs are not aware of any judicial or administrative decision holding that the receipt of benefits under any of these programs rendered the recipient a public charge for immigration purposes, and defendants have cited none.

---

[8]   Medha D. Makhlouf, *The Public Charge Rule as Public Health Policy*, 16 Ind. Health L. Rev. 177, 185–89 (2019) ("Throughout most of the twentieth century, noncitizens were generally eligible for public aid."), Ex. 14; Cybelle Fox, *Unauthorized Welfare: The Origins of Immigrant Status Restrictions in American Social Policy*, J. Am. Hist. 1051, 1058 (2016), Ex. 15 ("Between 1935 and 1971 no federal laws barred noncitizens, even unauthorized immigrants, from social security benefits, unemployment insurance, [Old Age Assistance], or ADC . . . .  With the enactment of additional public assistance legislation—creating the food stamp program or Medicaid, for example—the same rules applied.").

### C.      Congress Has Approved Administrative Interpretations by Reenacting the Public Charge Provisions of the INA Without Material Change

Congress has approved these judicial and administrative interpretations of "public charge" by repeatedly reenacting the public charge provisions of the INA without material change. In 1952, four years after *Matter of B-* was decided, Congress reenacted the public charge provision in the Immigration and Nationality Act of 1952 without defining the term or purporting to change its interpretation. *See* 66 Stat. 163, 183, Ex. 8. The accompanying Senate report shows that Congress was aware of these administrative and judicial decisions, and consciously decided not to disturb them. *See* S. Rep. No. 1515, at 348–49 (1950), Ex. 16. Almost 40 years later, the Immigration Act of 1990 once again reenacted the public charge provision without material change. The legislative history to the 1990 Act noted that courts had associated likelihood of becoming a public charge with "destitution coupled with an inability to work."[9]

In 1996, in two major pieces of legislation focused on the eligibility of noncitizen immigrants for certain public benefits and on public charge determinations, Congress again chose not to redefine "public charge" or to alter its settled interpretation.  In the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Congress restricted certain noncitizens' eligibility for certain federal benefits. Pub. L. 104-193, § 403, 110 Stat. 2105, 2265–67 (1996), Ex. 18. But, following the passage of PRWORA and subsequent legislation, many noncitizens remained eligible for federal benefits, including Medicaid and Food Stamps (now SNAP), and states were authorized to provide benefits to many others. *See generally* 8 U.S.C. §§ 1612–13. While defendants seek to justify the Rule by citing language in PRWORA's statement of purpose that resident noncitizens "not depend on public resources to

---

[9]      Staff of the H. Comm. on the Judiciary, 100th Cong., Grounds for Exclusion of Aliens Under the Immigration and Nationality Act:  Historical Background and Analysis 121 (Comm. Print 1988), Ex. 17.

meet their needs," 84 Fed. Reg. at 41,294, Congress plainly concluded that allowing noncitizens to receive these benefits was consistent with that purpose.[10]

The Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), also enacted in 1996, likewise did not overturn the settled interpretation of the INA's public charge provisions. Pub. L. 104-208, div. C, § 531, 110 Stat. 3009, 3674 (1996) (amending 8 U.S.C. § 1182), Ex. 19. Instead, Congress affirmatively re-enacted the existing INA public charge provision relating to admission and status adjustment, leaving the term undefined. The statute amended the public charge admissibility provision only to codify the existing standard that a public charge determination should consider the "totality of the circumstances" and should take account of the applicant's age; health; family status; assets, resources, and financial status; and education and skills. *Id.* § 1182(a)(4)(B)(i).[11]

### D. Congress Has Expressly Rejected Proposals to Deem Anyone Receiving Means-Tested Public Benefits a Public Charge

Congress has also repeatedly rejected proposals to define the term "public charge"—as the Rule seeks to do—to apply to persons receiving (or considered likely to receive) means-tested public benefits. In the 1996 debate on IIRIRA, Congress considered and declined to adopt a proposal to overturn *Matter of B-* and label as a public charge anyone who received such

---

[10]  Congress's decision not to alter the settled administrative definition of "public charge" was not an oversight. On the contrary, PRWORA specifically amended *another* provision of the INA relevant to public charge determinations. Section 423 of PRWORA amended the INA to provide detail about the requirements for executing an affidavit of support, a document executed by sponsors of certain immigrants establishing that the immigrant will not become a public charge. Pub. L. No. 104-193, § 423, 110 Stat. 2105, 2271–74, Ex. 18.

[11]  IIRIRA also expressly provided that public charge determinations may "consider any affidavit of support." 8 U.S.C. § 1182(a)(4)(b)(ii). In practice, since the enactment of IIRIRA, a noncitizen seeking admission or adjustment has been able to overcome a potential public charge finding by obtaining an affidavit of support from a sponsor. *See* Center on Budget and Policy Priorities, Comment, at 30 (Dec. 7, 2018) (hereinafter "CBPP Comment"), Ex. 20.

benefits. Although the provision was included in a version of the bill passed by the House, it was removed to allow the bill to pass the Senate.[12]

In 2013, Congress again turned back efforts to redefine public charge to include anyone receiving any means-tested public benefits. During deliberations on the proposed Border Security, Economic Opportunity, and Immigration Modernization Act, a bill that sought to create a path to citizenship for noncitizens who could show they were "not likely to become a 'public charge,'" Senator Jefferson B. Sessions, later Attorney General while the Rule was under development, sought to amend the definition of public charge to include receipt of "non-cash employment supports such as Medicaid, the SNAP program, or the Children's Health Insurance Program." S. Rep. No. 113-40, at 38, 42, 62 (2013), Ex. 25. Senator Sessions's proposed amendment was rejected by voice vote. *Id.*

### E.     Administrative Field Guidance from 1999 Confirmed the Settled Interpretation of Public Charge

On May 26, 1999, three years after the passage of PRWORA and IIRIRA, the Immigration and Naturalization Service ("INS," the predecessor agency to defendant U.S. Citizenship and Immigration Services ("USCIS")) issued its *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds* ("Field Guidance"), 64 Fed. Reg. 28,689, Ex. 26 and a parallel proposed regulation, 64 Fed. Reg. 28,676, Ex. 27. INS explained that the Field Guidance "summarize[d] longstanding law with respect to public charge," and provided "new guidance on public charge determinations" in light of the recent legislation. 64 Fed. Reg. at 28,689; *see also id.* at 28,692 ("The proposed standards take into account the law and public

---

[12]     *See* Immigration Control & Financial Responsibility Act of 1996, H.R. 2202, 104th Cong. § 202 (1996), Ex. 21; 142 Cong. Rec. S4401, S4408–10 (1996) (statement of Sen. Simpson), Ex. 22; S. Rep. No. 104-249, at 63–64 (1996) (statement of Sen. Leahy), Ex. 23; 142 Cong. Rec. S11872, S11882 (1996) (statement of Sen. Kyl), Ex. 24.  (*See generally* Compl. ¶¶ 81–83.)

policy decisions concerning alien eligibility for public benefits and public health considerations, as well as past practice by the Service and the Department of State."). The Field Guidance has been in effect for more than 20 years, and defendants have cited no contemporaneous evidence (and we know of none) questioning INS's interpretation of PRWORA or IIRIRA.

The Field Guidance reaffirmed the agency's longstanding approach by defining "public charge" as a noncitizen "who is likely to become (for admission/adjustment purposes) 'primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense.'" *Id.* at 28,689. The Field Guidance excluded from consideration in public charge determinations past or expected future receipt of noncash benefits such as Medicaid, SNAP, and housing assistance, because they "are by their nature supplemental and do not, alone or in combination, provide sufficient resources to support an individual or family." *Id.* at 28,692.

## II.    DHS's Public Charge Rule

The Rule contravenes Congress's intent by greatly expanding the circumstances in which noncitizens can be denied lawful permanent residence on public charge grounds. Neither past receipt of benefits nor inability to work or unemployment is necessary under the Rule to find that an applicant is likely to become a public charge. On the contrary, applicants who have never sought or received public benefits and are employed full-time at low-wage jobs could well be denied lawful permanent residence on the ground that they are likely at some point in the future to receive any of the specified benefits.

The Rule defines "public charge" to mean any person who receives one or more specified "public benefits" in any amount for more than 12 months in any 36-month period (and specifying that, for instance, receipt of two benefits in one month counts as two months). Proposed 8 C.F.R. § 212.21(a). It defines "public benefit" to mean cash benefits or benefits from

12

specified noncash programs that offer short-term or supplemental support to eligible recipients. Proposed 8 C.F.R. § 212.21(b). These supplemental noncash benefits include SNAP, federal Medicaid (with certain exclusions), Section 8 Housing Assistance, Section 8 Project-Based Rental Assistance, and Public Housing under section 9 of the U.S. Housing Act of 1937. *Id.* These benefits are widely used by working families and are available to many individuals and families with incomes above the poverty level. (Schanzenbach Decl. ¶¶ 6–19 & Tables 1–3; Allen Decl. ¶¶ 10–22; Ku Decl. ¶¶ 16–22, 79–81; *see also* Compl. ¶¶ 116–30.) (Indeed, defendants acknowledge in the Rule that many active-duty service members receive benefits from SNAP or Medicaid. 84 Fed. Reg. at 41,355, 41,371.) As the Field Guidance explained in concluding that such benefits should be excluded from public charge considerations, those benefits "are increasingly being made available to families with incomes far above the poverty level, reflecting broad public policy decisions about improving general health and nutrition, promoting education, and assisting working-poor families in the process of becoming self-sufficient." 64 Fed. Reg. at 28,692.

The Rule creates a complex and confusing scheme of positive and negative "factors," including "heavily weighted" factors, for USCIS personnel to use in determining whether someone is likely to become a public charge. Proposed 8 C.F.R. § 212.22. These factors focus overwhelmingly on the applicant's income and financial resources. Thus, the Rule treats as separate negative factors: income less than 125 percent of the federal poverty guidelines; a low credit score; past or current receipt of public benefits (a "heavily weighted" negative factor); and a medical condition requiring extensive medical treatment and lack of private health insurance (another "heavily weighted" negative factor). The strong correlation between these factors leads

to a snowball effect in which a single characteristic—low income or assets—triggers multiple negative factors, making a public charge finding virtually inevitable.  (*See* Compl. ¶¶ 107–15.)

The Rule would drastically increase the number of persons potentially deemed a public charge. According to the Kaiser Family Foundation, 94 percent of noncitizens who originally entered the United States without LPR status have at least one characteristic that could be weighed negatively in a public charge determination, and 42 percent have characteristics that could be treated as heavily weighted negative factors.[13] The Center on Budget and Policy Priorities estimates that 40 percent of U.S.-born individuals covered by a 2015 survey participated in one of the listed benefit programs between 1998 and 2014—a figure that, after adjusting for underreporting, is likely approximately 50 percent.[14] DHS asserts that "[i]t is immaterial whether the definition of 'public charge' in the rule would affect one in twenty U.S. citizens or one in three," and that "[t]he relevant question is whether the rule's definition of public charge is consistent with the statute." 84 Fed. Reg. at 41,353. But it makes no effort to justify its apparent view that "public charge" should be defined so broadly as to apply to people who, in the relevant ways, are in the same position as half or more of U.S. citizens.

Making low-income immigrants unwelcome is exactly what defendants intend. The Rule originated in a wide-ranging policy proposal published in April 2016 by the Center for Immigration Studies ("CIS"), a far-right group founded by white nationalist John Tanton and

---

[13]    Samantha Artiga et al., *Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid* (Oct. 2018), Ex. 28. The CBPP Comment cited this study by name and specifically stated that it "should be consulted and discussed, rather than ignored" by DHS. CBPP Comment at 93, Ex. 20.

[14]    *See* CBPP Comment at 2, 7–8, 10, Ex. 20; *see also* Center for American Progress, Comment, at 15 (Dec. 10, 2018) ("[T]he proposed redefinition would mean that most native-born, working-class Americans are or have been public charges"), Ex. 29.   A more recent CBPP study explains that more than 50 percent of the U.S.-born citizen population would receive a covered public benefit in their lifetimes. *See* Danilo Trisi, *Trump Administration's Overbroad Public Charge Definition Could Deny Those Without Substantial Means a Chance to Come to or Stay in the U.S.*, Center on Budget and Policy Priorities (May 30, 2019), Ex. 30.

dedicated to restricting immigration.[15] It urged using the public charge doctrine "to reduce the number of welfare-dependent foreigners living in the United States."[16] Within a week of President Trump's inauguration, a draft of an Executive Order was leaked to the press that, among other things, sought to implement the CIS proposal by directing DHS to issue new rules defining "public charge" to include any person receiving any means-tested public benefits.[17]

Although the draft Executive Order was never signed, DHS and USCIS, in a process driven by the White House, began drafting the Rule to implement the same policy. The White House directed agency officials that "**the decision of whether to propose expanding the definition of public charge, broadly, has been made at a very high level and will not be changing**" (emphasis in original).[18] Senior Advisor Stephen Miller, President Trump's principal advisor on immigration policy, exerted pressure on DHS to promulgate the public charge rule quickly and according to the President's design.[19] (*See* Compl. ¶ 218 & nn.98–102.)

On October 10, 2018, defendants issued a notice of proposed rulemaking, 83 Fed. Reg. 51,114. More than 266,000 think tanks, scholars, advocacy groups, legal services organizations, children's aid groups and other non-profits, states, municipalities, and individuals submitted comments, the "vast majority" of which, as DHS concedes, opposed the Rule. 84 Fed. Reg. at 41,304. The Final Rule, largely disregarding these comments, was published in the Federal Register on August 14, 2019, and is set to become effective October 15, 2019.

---

[15]   *See* Carly Goodman, *John Tanton Has Died. He Made America Less Open to Immigrants and More Open to Trump*, Washington Post (July 18, 2019), Ex. 31.

[16]   Center for Immigration Studies, *A Pen and A Phone* 8 (Apr. 6, 2016), Ex. 32.

[17]   *See* Andrew Bremberg, Memorandum for the President: Executive Order on Protecting Taxpayer Resources by Ensuring Our Immigration Laws Promote Accountability and Responsibility (Jan. 23, 2017), Ex. 33.

[18]   Emails between OMB Office of Information & Regulatory Affairs and other agencies (dated Mar. 29, 2018, Apr. 5, 2018, July 16, 2018, July 19, 2018, Sept. 4, 2018, Sept. 6, 2018), Ex. 34.

[19]   *See* Emails between S. Miller, C. Symans, and F. Cissna (June 8, 2018), Ex. 35 (Miller told then-USCIS Director Francis Cissna that the timeline on the regulation was "unacceptable" and an "embarrassment," and that "I don't care what you need to do to finish it on time").

## ARGUMENT

Federal Rule of Civil Procedure Rule 65 authorizes a court to issue a preliminary injunction where the plaintiffs establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter* v. *Nat. Res. Def. Counsel*, 555 U.S. 7, 20 (2008); *see also Otoe-Missouria Tribe of Indians* v. *N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2015) (in the Second Circuit, a plaintiff challenging governmental action must "demonstrate irreparable harm" and "a likelihood of success on the merits").[20]  The Court applies the same test to determine whether, under 5 U.S.C. § 705, it should "postpone the effective date of an agency action," such as a regulation issued pursuant to notice-and-comment rulemaking. *See Texas* v. *United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015). Under these standards, the Rule should be preliminarily enjoined or its effective date postponed, and it should be done nationwide.

## I.    Plaintiffs Are Likely to Succeed on Their Claims

Plaintiffs are likely to succeed on the merits of their APA claims, because (i) the Rule is inconsistent with the statutory meaning of "public charge" in the INA, (ii) the Rule discriminates against individuals with disabilities in violation of the Rehabilitation Act, (iii) DHS and USCIS lack authority to promulgate the Rule, (iv) the Rule is arbitrary and capricious, and (v) the Rule is impermissibly retroactive. The Rule also violates the Equal Protection guarantee of the United States Constitution because it was motivated by animus against nonwhite immigrants.

---

[20]    While the Second Circuit has held that plaintiffs seeking to alter the status quo must demonstrate a "substantial" likelihood of success on the merits, *Sunward Elecs., Inc.* v. *McDonald*, 362 F.3d 17, 24 (2d Cir. 2004), that standard does not apply here, because plaintiffs seek simply to keep in place the standards that have been the law for decades.  Similarly, the Court may issue an injunction after the Rule's October 15, 2019, effective date because doing so would merely "temporarily restore the law to what it had been for many years prior." *Innovation Law Lab* v. *Nielsen*, 366 F. Supp. 3d 1110, 1129 (N.D. Cal. 2019) (alteration omitted).

### A.    The Rule Is Contrary to the INA

A rule is "unlawful" and "shall [be] . . . set aside" under the APA if it is "not in accordance with the law." 5 U.S.C. §§ 706(2)(A), 706(2)(C).

Defendants' interpretation of the INA is not entitled to *Chevron* deference. *See Chevron U.S.A. Inc.* v. *Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The *Chevron* doctrine does not apply to regulations, such as the Rule, that involve questions "of deep economic and political significance," including those that involve "billions of dollars in spending" and affect healthcare "for millions of people." *See King* v. *Burwell*, 135 S. Ct. 2480, 2489 (2015); *see also Texas* v. *United States*, 809 F.3d 134, 181–82 (5th Cir. 2015) (DHS regulation concerning non-enforcement policy for immigrant parents of citizen and LPR children not afforded *Chevron* deference because it "undoubtedly implicates questions of deep economic and political significance"), *aff'd*, 136 S. Ct. 2271. The Rule—which, among other things, affects billions of dollars of spending on public benefits programs for millions of people—qualifies as such a "major question" as to which *Chevron* deference does not apply.

The Rule also fails under *Chevron*. "[A] reviewing 'court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125–26 (2000) (quoting *Chevron*, 467 U.S. at 842–43). To determine whether Congress has spoken on the precise issue, courts look to (among other things) the "range of plausible meanings" that the term could have had at the time it was enacted, and the "subsequent acts [that] shape or focus those meanings." *Id.* at 143. Agency action that is "inconsistent with the administrative structure that Congress enacted into law" should be set aside. *Id.* at 125 (quoting *ETSI Pipeline Project* v. *Missouri*, 484 U.S. 497, 517 (1988)). Even where Congress's intent is ambiguous, courts will look to dictionary definitions and "contextual indications" of the term's meaning, and will reject an agency's interpretation "when it goes

beyond the meaning the statute can bear." *MCI Telecomm. Corp.* v. *Am. Tel. & Tel. Co.*, 512 U.S. 218, 226, 229 (1994).

Here, defendants' proffered interpretation of the statutory term "public charge" is inconsistent with the plain meaning of the term "public charge" as it has been understood for over 100 years, and with Congress's demonstrable intent to affirm that understanding. ***First***, the Rule is inconsistent with the plain language of the INA. As discussed above (pp. 6–7), at the time it was introduced in federal immigration law, the term "public charge" referred to a narrow category of persons who are institutionalized or otherwise completely dependent on public assistance, and this interpretation was confirmed in case law from the early twentieth century. *See Food Mktg. Inst.* v. *Argus Leader Media*, 139 S. Ct. 2356, 2363–64 (2019) (courts look to "common usage," such as "dictionary definitions" and "early case law," to "shed light on [a] statute's ordinary meaning"); *United States* v. *Rowland*, 826 F.3d 100, 108 (2d Cir. 2016).

***Second***, the meaning of "public charge" as primarily dependent on the government for subsistence is shown by its consistent administrative interpretation. (*See supra* pp. 7–8). "[A] long-standing, contemporaneous construction of a statute by the administering agencies is entitled to great weight, and will be shown great deference." *Leary* v. *United States*, 395 U.S. 6, 25 (1969); *see United Airlines* v. *Brien*, 588 F.3d 158, 172 (2d Cir. 2009).

The Supreme Court has emphasized that an agency's interpretation of a statute soon after its enactment is better evidence of the statute's meaning and Congress's intent than a later, inconsistent interpretation. *See Solid Waste Agency of N. Cook Cty.* v. *U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) (looking to Army Corps of Engineers' "original interpretation" of the Clean Water Act, "promulgated two years after its enactment," as well as the absence of any "persuasive evidence that the Corps mistook Congress' intent" when it originally interpreted the

Act, to determine that a later inconsistent interpretation was against clear congressional intent); *Good Samaritan Hosp.* v. *Shalala*, 508 U.S. 402, 414 (1993).

Under these cases, the relevant agencies' application of public charge in the years after the provision was originally enacted is the best evidence of the statute's meaning. Likewise, the definition of "public charge" in the Field Guidance—issued less than three years after PRWORA and IIRIRA were passed, and in the administration of the President who signed both bills—is the best reflection of Congress's intent, particularly absent any "persuasive evidence that [INS] mistook Congress' intent" (indeed, absent any such evidence at all).

*Third*, Congress's repeated reenactment of the public charge provision without material change demonstrates its approval of the agency interpretation. "It is well established that when Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *CFTC* v. *Schor*, 478 U.S. 833, 846 (1986); *see Forest Grove Sch. Dist.* v. *T.A.*, 557 U.S. 230, 239–40 (2009) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change."); *United States* v. *Mango*, 199 F.3d 85, 92 (2d Cir. 1999) (agency's longstanding interpretation reflects congressional intent because "Congress has not acted to correct it"); *Isaacs* v. *Bowen*, 865 F.2d 468, 475 (2d Cir. 1989) ("[t]he passage of time" itself "has evidentiary significance for discerning Congress's appreciation of [an] agency's actions"). Here, Congress repeatedly re-enacted the public charge provisions of the INA without material change. Nor is there need to rest on the presumption that Congress was aware of the agency and judicial interpretations, because the legislative history unequivocally demonstrates that awareness. (*See supra* pp. 9–11.)

*Fourth*, Congressional intent to preserve an agency's interpretation of a statute is especially clear where, as here, Congress has rejected legislation specifically intended to overturn that interpretation. In *Bob Jones University* v. *United States*, the Court considered the IRS's decade-old determination that private schools practicing racial discrimination were not entitled to tax-exempt status. 461 U.S. 574, 579 (1983). In upholding the agency's interpretation of the relevant provision of the tax code, the Court found that Congress's repeated consideration and rejection of bills intended to overturn the IRS's interpretation was "significant" evidence of "Congressional approval of the [IRS] policy." *Id.* at 600–01; *see also Michigan* v. *Bay Mills Indian Cmty.*, 572 U.S. 782 , 801–02 (2014) (Congressional intent to approve longstanding judicial interpretation of scope of tribal immunity clear when Congress considered, but failed to enact, two bills that expressly sought to abrogate that interpretation); *United States* v. *Bd. of Comm'rs*, 435 U.S. 110, 134–35 (1978) (Congress's intent to endorse an agency's interpretation is particularly clear where Congress reenacts a statute and "manifest[s] its view" on an existing interpretation). The Supreme Court has placed particular weight on Congress's decision to enact a bill without specific language overturning existing law that passed one chamber of Congress but was removed during conference. *See Albemarle Paper Co.* v. *Moody*, 422 U.S. 405, 408, 414 n.8 (1975) (finding that "Congress plainly ratified" prior judicial interpretation when conference committee "specifically rejected" language overturning that interpretation, and the bill passed both chambers without such language).

Here, Congress's repeated rejection of legislation seeking to define "public charge" to include receipt of noncash benefits is "significant" evidence of "Congressional approval" of the existing interpretation. *Bob Jones*, 461 U.S. at 600–01. As in *Bay Mills*, a Congressperson expressed his desire to overturn *Matter of B-* through the failed provision proposed in 1996. (*See*

*supra* pp. 10–11 & n.12.) And as in *Albermarle*, Congress's intent is particularly clear in view of the fact that the 1996 proposal passed the House and was removed in conference. (*See id*.)

**Fifth**, defendants' almost exclusive reliance on the statement of policy in PRWORA that "aliens within the Nation's borders not depend on public resources to meet their needs," and that "the availability of public benefits not constitute an incentive for immigration to the United States," 8 U.S.C. § 1601(2), is misplaced. *E.g.*, 84 Fed. Reg. at 41,295, 41,301. As discussed above (pp. 9–10), nothing in PRWORA or the INA indicates that the statement of purpose was intended to alter the longstanding definition of "public charge," or that a prediction about self-sufficiency should be the sole or even primary criterion for making public charge determinations. And, by retaining immigrant eligibility for certain benefits in PRWORA and later legislation, Congress plainly concluded that receipt of such benefits was consistent with self-sufficiency, and that allowing noncitizens to access those benefits was consistent with its stated policy.

Accordingly, the Rule and defendants' primary stated rationale are incompatible with congressional intent and the long-understood statutory meaning of "public charge."

### B.      The Rule Violates the Rehabilitation Act

The Rule is "contrary to law" under the APA for the additional reason that it explicitly discriminates against individuals with disabilities in violation of Section 504 of the Rehabilitation Act.  Section 504 prohibits "any program or activity conducted by any Executive agency" from discriminating against persons with disabilities. 29 U.S.C. § 794(a); *Alexander* v. *Choate*, 469 U.S. 287, 294–97 (1985) (explaining that section 504 prohibits all government action that discriminates against individuals with disabilities, not only actions "fueled by a discriminatory intent"). DHS's implementing regulations prohibit it from denying a benefit or service "on the basis of disability," 6 C.F.R. § 15.30(b)(1), or "utiliz[ing] criteria or methods of administration" that would: "(i) [s]ubject qualified individuals with a disability to discrimination on the basis of

21

disability; or (ii) [d]efeat or substantially impair accomplishment of the objectives of a program or activity with respect to individuals with a disability." *Id.* § 15.30(b)(4); *see also id.* § 15.49.

Contrary to the Rehabilitation Act and DHS's own regulations, the Rule expressly and in multiple ways discriminates based on disability. Indeed, the Rule requires officials to count disability status as a negative factor where an applicant has a "diagnos[is] with a medical condition that is likely to require extensive medical treatment." Proposed 8 C.F.R. § 212.22(b)(2); *see* 84 Fed. Reg. at 41,407–08 (officials will consider "an applicant's disability diagnosis"). The Rule also considers a disability to be a negative factor relating to a noncitizen's "assets, resources, and financial status," and, separately, a "heavily weighted negative factor," if the noncitizen lacks private health insurance or sufficient assets to cover reasonably foreseeable medical costs related to the disability. *See* proposed 8 C.F.R. § 212.22(c)(1)(iii), proposed 8 C.F.R. § 212.22(b)(4)(H). Other negative factors may also flow from a person's disability status, such as receipt of federal Medicaid. As a result, as DHS concedes, the Rule will have a "potentially outsized impact . . . on individuals with disabilities." 84 Fed. Reg. at 41,368. The Rule thus violates Section 504, and is contrary to law under the APA.

## C.   DHS Lacks Authority to Promulgate the Rule

The APA also directs the courts to declare unlawful and "set aside" agency actions that are "in excess of statutory jurisdiction." 5 U.S.C. §§ 706(2)(A), 706(2)(C). "It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress." *Bowen* v. *Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Because an agency's "power to act" is "authoritatively prescribed by Congress," when agencies "act beyond their jurisdiction, what they do is ultra vires." *City of Arlington* v. *FCC*, 569 U.S. 290, 297 (2013); *Adams Fruit Co., Inc.* v. *Barrett*, 494 U.S. 638, 650 (1990) (rejecting agency action

relating to enforcement provision of statute because the statute provided the agency with "no [rulemaking] . . . delegation regarding [the] enforcement provision").

DHS cites Sections 103 and 212(a)(4) of the INA and Section 102 of the Homeland Security Act of 2002 (the "HSA"), as its source of authority to issue the Rule. 84 Fed. Reg. at 41,295–96. But its reliance on those provisions is misplaced, because they unambiguously delegate rulemaking authority over public charge inadmissibility to the Attorney General, not DHS. INA Section 103 excludes from the powers of the Secretary of Homeland Security (the "Secretary") the administration or enforcement of laws that "relate to the power, functions, and duties conferred upon the . . . Attorney General." 8 U.S.C. § 1103(a)(1). And it empowers the Secretary only to "establish such regulations . . . as he deems necessary for carrying out *his authority* under the provisions of this chapter." *Id.* § 1103(a)(3) (emphasis added).

The other statutory provision on which DHS relies, Section 212(a)(4) of the INA, is just such a provision for which rulemaking authority is granted to the Attorney General, not DHS. It provides that a noncitizen "who, in the opinion of the consular officer at the time of application for a visa, or *in the opinion of the Attorney General at the time of application for admission or adjustment of status*, is likely at any time to become a public charge is inadmissible." 8 U.S.C. § 1182(a)(4)(A) (emphasis added). The plain language of that section empowers the Attorney General—not DHS or the Secretary—to make public charge determinations for noncitizens seeking adjustment of status.

Although the HSA transferred certain INS functions to DHS, it did not transfer rulemaking power over adjustment of status, including public charge determinations. Section 102 of the HSA, which DHS cites, enumerates the "functions" of the Secretary and states that "the issuance of regulations by the Secretary shall be governed by chapter 5 of [the APA]." 6 U.S.C.

23

§ 112(e). But it does not grant the Secretary rulemaking authority. As the courts have recognized, "Attorney General" in section 212 of the INA means "Attorney General" unless and until Congress amends it. *See Sarango* v. *Attorney General*, 651 F.3d 380, 385 (3d Cir. 2011) (holding that a 2006 statute replacing "Attorney General" with "Secretary of Homeland Security" in 8 U.S.C. § 1182(a)(9)(C)(ii), indicated Congress's intent to transfer relevant authority to DHS in that provision).[21] Because no statute confers rulemaking authority over public charge determinations on DHS, DHS has no such authority. *See Michigan* v. *EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) ("If there is no statute conferring authority, a federal agency has none.").

### D.      The Rule Is Arbitrary and Capricious

A rule is arbitrary and capricious if the promulgating agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency," *Motor Vehicle Mfrs. Ass'n of the U.S.* v. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or when it is "internally inconsistent," *see Batalla Vidal* v. *Nielsen*, 279 F. Supp. 3d 401, 428 (E.D.N.Y. 2018).

Here, the Rule is arbitrary and capricious because: (i) defendants' assertion that the Rule will promote "self-sufficiency" is counter to the evidence before them; (ii) the Rule is vague, lacks objective standards, and is internally inconsistent, and thus invites arbitrary and discriminatory enforcement; (iii) defendants fail to consider and respond to significant comments on the Rule; and (iv) defendants do not justify departing from the Field Guidance.

---

[21]   Congress's decision not to amend Section 212(a)(4) was intentional. In 2003, Congress considered and rejected a bill to fix "mistakes and omissions" in the HSA by, among other things, replacing certain references to "Attorney General" with "Secretary of Homeland Security" in the INA. Homeland Security Technical Corrections Act, H.R. 1416, 108th Cong. § 7, Ex. 36. The proposed revisions, however, would *not* have changed references to the Attorney General in section 212, including in the public charge provision.

### 1.   *DHS's Explanation That the Rule Will Promote "Self-Sufficiency" Runs Counter to the Evidence before the Agency*

DHS asserts that the purpose of the Rule is to "better ensure that [noncitizens] subject to the public charge inadmissibility ground are self-sufficient." *E.g.*, 84 Fed. Reg. at 41,295, 41,301. As discussed above, there is no basis in the INA for defining "public charge" by reference to presumed "self-sufficiency." (*See supra* p. 21.) DHS's assertion is also counter to the evidence before it that supplemental benefits promote rather than impede self-sufficiency.[22] The evidence further shows that participation in such programs does not show a lack of self-sufficiency, and that they are widely used by working families to supplement their incomes, including, in many cases, incomes well above the poverty line.  (Schanzenbach Decl. ¶¶ 6–19 & Tables 1–3; Allen Decl. ¶¶ 10–22; Ku Decl. ¶¶ 16–22, 79–81; *see also* Compl. ¶¶ 116–30.) *Accord* 64 Fed. Reg. at 28,677 (noting that noncash benefits are "available to families with incomes far above the poverty level"). As INS emphasized, these benefits are meant to "assist[] working-poor families in the process of becoming self-sufficient." *Id.*

### 2.   *The Rule Is Vague, Lacking in Objective Standards, and Internally Inconsistent, Thereby Inviting Arbitrary Enforcement*

The Rule is complex and confusing. It replaces the clear standards in the Field Guidance—which DHS does not contend have been difficult to administer—with a new series of factors, evidence, and "weights," but provides no guidance on how to assess them against each other, beyond substance-free references to the "totality of the circumstances." On top of this, several of the factors in the Rule are vague, broad, and standardless. The Rule is also filled with internal contradictions. The Rule thus invites inconsistent and discriminatory application, and fails to give noncitizens notice of conduct to avoid. Among other things, the Rule:

---

[22]   *E.g.*, Center for Law and Social Policy, Comment, at 16, 18–22, 31–36, 48 (Dec. 7, 2018) (hereinafter "CLASP Comment"), Ex. 37; CBPP Comment at 49–52, Ex. 20.

- Requires evaluating "[w]hether the [noncitizen] is proficient in English," without providing any standard or level of proficiency an applicant is required to attain, proposed 8 C.F.R. § 212.22(b)(5)(ii)(D);

- Requires applicants to complete a Form I-944 that requires listing any benefits "**EVER**" received,[23] although the Rule purports not to consider past receipt of noncash benefits prior to the effective date, proposed 8 C.F.R. § 212.22(d);

- Inconsistently states that possession of non-private health insurance (other than federal Medicaid) should be considered *positively* if the applicant has a chronic medical condition, proposed 8 C.F.R. § 212.22(b)(4)(2)(H), but elsewhere states that the same medical condition should be considered a heavily weighted *negative* factor if an applicant "does not have private health insurance," 84 Fed. Reg. at 41,445; and

- Distinguishes between federal Medicaid—receipt of which renders someone a public charge, proposed 8 C.F.R. § 212.21(b)(5)—and other forms of medical insurance, although DHS officers will frequently have difficulty distinguishing between nearly identical forms of health benefits. (*See* Ku Decl. ¶ 22.)

(See also Compl. ¶¶ 146–53.) These inconsistencies and lack of objective standards render the Rule unlawfully arbitrary and capricious. *See Batalla Vidal*, 279 F. Supp. 3d at 408.

### 3. *DHS Failed to Respond to Significant Public Comments*

The notice-and-comment process requires agencies to "respond to significant comments received during the period for public comment." *Perez* v. *Mortg. Bankers Ass'n.*, 135 S. Ct. 1199, 1203 (2015). The agency must respond to comments which "raise points relevant to the agency's decision and which, if adopted, would require a change in the agency's proposed rule." *City of Portland* v. *EPA*, 507 F.3d 706, 715 (D.C. Cir. 2007). An agency has not adequately responded to significant comments if it has failed to provide a "reasoned explanation and substantial evidence" for its decisions, *see Lilliputian Sys., Inc.* v. *Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1313 (D.C. Cir. 2014), or "defies the expert record evidence," fails "to address these comments," or "at best . . . attempt[s] to address them in a conclusory manner," *Int'l Union, United Mine Workers of Am.* v. *Mine Safety & Health Admin.*,

---

[23]   U.S. Citizenship and Immigration Service, *Declaration of Self-Sufficiency, Form I-944*, Ex. 38.

626 F.3d 84, 93–94 (D.C. Cir. 2010), or does not address significant criticism of data forming the basis of the rule, *FBME Bank Ltd.* v. *Lew*, 209 F. Supp. 3d 299, 313 (D.D.C. 2016).

Defendants offer no serious response to the large number of comments objecting to the harm caused by the Rule's chilling effects, including that people who are not covered by the Rule would nevertheless forego benefits to which they were entitled. (*E.g.*, Russell Decl. Ex. A at 4; Oshiro Decl. Ex. A at 9.) DHS's perfunctory statement that it "finds it difficult to predict the rule's disenrollment impacts with respect to people who are not regulated by this rule," 84 Fed Reg. at 41,313, disregards detailed analysis of just that issue presented in comments.  (*E.g.*, CLASP Comment, Ex. 37, at 4–6, 25–40; CBPP Comment, Ex. 20, at 59–68; *see also* Ku Decl. ¶¶ 25–62 & Table 1; Schanzenbach Decl. ¶¶ 31–48 & Tables 4–8; Allen Decl. ¶¶ 45–63.) And DHS's bland assertion that it need not alter the Rule "to account for such unwarranted choices" by people not covered by the Rule, *id.* at 41,313, abdicates defendants' responsibility to consider the Rule's effects. *New York* v. *Dep't of Justice*, 343 F. Supp. 3d 213, 240–41 (S.D.N.Y. 2018) (agency action held arbitrary and capricious where agency failed to consider whether perceived benefits of action outweighed negative consequences, including "unintended" impact); *Nat. Res. Def. Council* v. *Dep't of Energy*, 362 F. Supp. 3d 126, 148 (S.D.N.Y. 2019) (same).

The Rule also acknowledges other potential costs, including "[p]otential lost productivity, [a]dverse health effects, [and] [a]dditional medical expenses due to delayed health care," but makes no effort to quantify them. *See* 84 Fed. Reg. at 41,489. When an agency "entirely fail[s] to consider any important aspect of the problem before it," its action is arbitrary and capricious. *See Nat'l Fuel Gas Supply Corp.* v. *N.Y. State Dep't of Envtl. Conservation*, 761 F. App'x 68, 71 (2d Cir. 2019) (quotation marks omitted); *New York* v. *Dep't of Justice*, 343 F. Supp. 3d at 240–41.

DHS also failed to respond meaningfully to comments expressing concern about many of the vague, confusing, and inconsistent aspects of the Rule described above (pp. 25–26), such as the English language proficiency factor, (*e.g.*, Wheeler Decl. Ex. A at 27), noting that they would invite arbitrary and discriminatory enforcement. (*See also, e.g.*, Russell Decl. Ex. A at 7–10; Oshiro Decl. Ex. A at 8–9.) While defendants purport to address comments on the English language proficiency factor, *see* 84 Fed. Reg. at 41,448, nowhere do they respond to core concerns regarding the lack of standards to guide applicants or adjudicators.[24]

Finally, an agency violates the rulemaking process when it does not give notice of important provisions of the final rule, and thus deprives the public of the chance to provide comments at all. *See Ass'n of Private Sector Colls. and Univs.* v. *Duncan*, 681 F.3d 427, 462–63 (D.C. Cir. 2012). The Rule includes a "heavily weighted positive factor for private health insurance," but expressly excludes plans for which the noncitizen receives subsidies in the form of premium tax credits under the Affordable Care Act. 84 Fed. Reg. at 41,388. None of this was in the rule as initially proposed. Failure to provide notice of this provision renders it invalid.

### 4.  *DHS Failed to Justify Departing from the Field Guidance*

An agency seeking to change an existing policy must "display awareness that it is changing position and show that there are good reasons for the new policy." *Encino Motorcars, LLC* v. *Navarro*, 136 S. Ct. 2117, 2126 (2016). An agency is required to provide a more detailed justification when "its new policy rests upon factual findings that contradict those which underlay its prior policy." *FCC* v. *Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An "agency's lack of a reasoned explanation for a policy that requires a departure from years of agency practice results in a rule that cannot carry the force of law." *R.F.M.* v. *Nielsen*, 365 F.

---

[24]   In contrast, the regulation regarding English language requirements for naturalization provides that applicants "read, write, and speak words in ordinary usage in the English language" 8 C.F.R. § 312.1(a); *see id.* § 312.1(c).

Supp. 3d 350, 379 (S.D.N.Y. 2019). Several courts have found that other anti-immigration actions of the Trump Administration were arbitrary and capricious for failing to justify departures from prior policies. *See, e.g.*, *id.* at 378–80; *Saget* v. *Trump*, 375 F. Supp. 3d 280, 354–59 (E.D.N.Y. 2019); *New York* v. *Dep't of Justice*, 343 F. Supp. 3d at 239–41; *New York* v. *Dep't of Commerce*, 351 F. Supp. 3d 502, 654–60 (S.D.N.Y. 2019), *aff'd in part* 139 S. Ct. 2551.

Defendants acknowledge that the Rule varies from the Field Guidance, *e.g.*, 84 Fed. Reg. at 41,308, but fail to provide a reasoned explanation for the change. *First*, defendants nowhere explain the contradictions between the factual findings underlying the Field Guidance and those underlying the Rule. INS found that individuals and families disenrolling from benefits programs due to confusion over who would be considered a public charge would cause harm to immigrant communities and the general public, 64 Fed. Reg. at 28,676–77, but DHS offers no reasoned explanation for disregarding these concerns. *Second*, defendants characterize the Field Guidance as "overly permissi[ve]," 84 Fed. Reg. at 41,319, but cite no adverse results flowing from the Field Guidance's allegedly permissive standard, or explain how the Field Guidance disserved the goal of furthering immigrant self-sufficiency. *Third*, defendants fail to explain why their new definition of "public charge" better reflects Congressional intent in PWRORA than the definition established in the Field Guidance, which was issued less than three years after PWRORA.

The Rule also fails to account for the significant reliance interests engendered by the existing policy. In *Encino Motorcars*, the Supreme Court declined to give deference to the Department of Labor's changed rule on overtime because the department offered "barely any explanation" as to why it had changed policy and the "significant reliance interests involved." 136 S. Ct. at 2126 (quoting *Nat'l Cable & Telecomms Assn.* v. *Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). The Field Guidance, and the longstanding interpretations of "public charge" on

which it is based, has permitted generations of immigrant families to build lives in the U.S. without fearing that their choices may have a negative impact on their immigration status. The Rule fails to give adequate consideration to these reliance interests, and accordingly was promulgated "without observance of procedure required by law." 5 U.S.C. § 702(2)(D).

### E. The Rule Is Impermissibly Retroactive Because It Penalizes Individuals for Past Conduct Undertaken in Reliance on the Existing Field Guidance

Absent "express terms," "a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules." *Bowen*, 488 U.S. at 209. An administrative rule operates retroactively if it "attaches a new disability in respect to transactions or considerations already past." *Nat'l Mining Ass'n* v. *Dep't of Interior,* 177 F.3d 1, 8 (D.C. Cir. 1999).

DHS appears to recognize that applying the Rule retroactively would be improper. *See* 84 Fed. Reg. at 41,321. But, contrary to DHS's assertions, the Rule penalizes noncitizens for decisions made in reliance on existing law, and therefore exceeds DHS's rulemaking authority. *See Rock of Ages Corp.* v. *Sec'y of Labor*, 170 F.3d 148, 158–59 (2d Cir. 1999).

The Rule retroactively penalizes past receipt of cash assistance that would not have resulted in a public charge determination when it was received. Under the Field Guidance, noncitizens may be found inadmissible as a public charge only if they are likely to receive sufficient cash benefits to make them "primarily dependent on the government for subsistence." 64 Fed. Reg. at 28,689. Under the Rule, however, DHS "will consider, as a negative factor . . . *any amount of cash assistance*" previously received or certified for receipt. Proposed 8 C.F.R. § 212.22(d) (emphasis added). Similarly, although the Rule purports not to consider receipt of non-cash benefits prior to the effective date, the I-944 form created by the Rule (Ex. 38) requires applicants to disclose whether they have "**EVER** received" benefits covered by the Rule.

The Rule is improperly retroactive in other respects as well. It directs USCIS, for the first time, to evaluate an applicant's "credit score," subjecting applicants to evaluations of past financial conduct never before considered. Proposed 8 C.F.R. § 212.22(b)(4)(ii)(G). And the Rule penalizes applicants who expected to be able to overcome a public charge determination by having their sponsors submit affidvits of support pursuant to 8 U.S.C. § 1183a(a)(1). For over 20 years such affidvits have been deemed sufficient to satisfy a public charge analysis (*see supra* n.11), but under the Rule affidavits of support are only a single (not heavily weighted) positive factor. 84 Fed. Reg. at 41,439; proposed 8 C.F.R. § 212.22(b)(7).

### F.       The Rule Violates the Equal Protection Guarantee of the U.S. Constitution

The Rule is motivated by animus against nonwhite immigrants, and thus violates the Fifth Amendment's Equal Protection principles.  *See, e.g.*, *City of Cleburne* v. *Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985); *Dep't of Agriculture* v. *Moreno*, 413 U.S. 528, 538 (1973); *United States* v. *City of Yonkers*, 837 F.2d 1181, 1223–24 (2d Cir. 1987). To demonstrate an Equal Protection violation, plaintiffs need not show either express discrimination or that animus is the sole motivating factor. *Washington* v. *Davis*, 426 U.S. 229, 241 (1976); *City of Yonkers*, 837 F.2d at 1223–24 (racial animus need only be "a significant factor" motivating government action). Instead, they may demonstrate discriminatory purpose with a range of evidence, including but not limited to (1) "the impact of the official action, whether it 'bears more heavily on one race than another'"; (2) the historical background of a policy decision, "if it reveals a series of official actions taken for invidious purposes" as well as "administrative history . . . especially where there are contemporary statements by members of the decisionmaking body"; and (3) "[t]he specific sequence of events leading up to the challenged decision." *Vill. of*

31

*Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267–68 (1977) (citations omitted). These factors demonstrate that the Rule was motivated by discriminatory animus.[25]

### 1.     *The Rule Will Have a Disparate Impact on Persons of Color*

As set forth in comments on the Rule and the accompanying declaration of Professor Jennifer van Hook, the Rule will have a significantly disparate negative impact on nonwhite immigrants. Under the Rule, Latino, Black, and Asian immigrants are more likely to be at risk of being deemed inadmissible than non-Hispanic whites. (Van Hook Decl. ¶¶ 46–68, 95, 96 & Tables 1, 2, 7, 8 & Figures 1a, 2a, 7a.) Mexicans/Central Americans are far more likely to be at high risk of being deemed inadmissible than those of European origin, as are those from the Caribbean, South America, the Middle East or Central Asia, sub-Saharan Africa, and South and East Asia. (*Id.*) The Rule's disproportionate impact on immigrants of color persists even after adjusting for levels at which they use public benefits. Especially for Latinos and immigrants from Mexico and Central America, the chances of being denied adjustment under the Rule are higher than for immigrants from European-origin countries even if they have not received public benefits. (*Id.*) The English-language proficiency factor in particular renders Latinos at high risk. (*Id.* ¶ 51.) Indeed, after the State Department made similar changes to its public charge guidelines for immigrant visa applicants outside the United States, denials on public charge grounds increased by about twelve times, with particularly high rates of denial to Mexican applicants. (Ku Decl. ¶ 29.) Denials of immigrant visas to applicants from India, Pakistan, Bangladesh, Haiti, and the Dominican Republic also saw dramatic increases.[26]

---

[25]   If the Court determines that the Rule is unconstitutional, it should also be set aside under the APA. *See United States* v. *Mead Corp.*, 533 U.S. 218, 227 n.6 (2001); 5 U.S.C. § 706(2)(B).

[26]   Ted Hesson, *Visa denials to poor Mexicans skyrocket under Trump's State Department*, Politico (Aug. 6, 2019), Ex. 39.

Similarly, the Rule's "chilling effects" fall almost exclusively on immigrants of color. Up to 3.1 million members of immigrant families, including many U.S. citizens, are likely to forego Medicaid benefits each year as a result of the Rule, and "[t]hose harmed are disproportionally low-income members of racial and ethnic minority groups, especially Latino and Asian families." (Ku Decl. ¶ 9.) An Urban Institute study conducted after the release of the notice of proposed rulemaking showed that 13.7% of adults in immigrant families reported avoiding non-cash benefits out of fear for their or their family members' immigration status, and that concerns among Hispanics were more than double those of non-Hispanic whites. (Ku Decl. ¶ 28.)

### 2.    *Statements by the Officials Who Drove and Drafted the Rule Demonstrate Unconstitutional, Discriminatory Animus*

The Rule reflects repeated expressions of racial and ethnic animus from President Trump, his senior advisors, and DHS and USCIS officials (*see* Compl. ¶¶ 203–34), and stems directly from proposals long urged by racist, anti-immigrant groups. For decades, these anti-immigrant activists have pushed to restrict family-based immigration and have published studies that inflate immigrants' benefit use. As noted above (*supra* pp. 14–15), nativist think tank CIS urged changes to the public charge rule to reduce immigration by "welfare-dependent foreigners." Consistent with this proposal, within weeks of President Trump's inauguration, a draft of an Executive Order directing DHS to expand the definition of "public charge" leaked to the press.[27]

Courts have found an intention by the Trump Administration, including DHS, to "decrease the presence of non-white immigrants in the United States." *Saget*, 375 F. Supp. 3d at 369. As one court concluded:

> One could hardly find more direct evidence of discriminatory intent towards Latino immigrants. [President Trump] has broadly painted Latino immigrants as drug-users, criminals, and rapists. He spoke publicly about the need to protect 'the

---

[27]   *See* Dara Lind, *A Leaked Trump Order Suggests He's Planning to Deport More Legal Immigrants for Using Social Services*, Vox (Jan. 31, 2017), Ex. 40.

> West' and 'civilization; from forces from 'the South or the East' . . . [a]nd . . . allegedly called El Salvador and Haiti . . . a 'shithole' country and expressed a preference for immigrants from overwhelmingly white countries like Norway.[28]

The statements and motives of President Trump and his advisors are particularly relevant here because of the pressure the White House exerted on DHS and USCIS officials to restrict immigration, including by dictating the content of the Rule. (*See supra* pp. 14–15.) Courts recognize that "liability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action." *Batalla Vidal*, 291 F. Supp. 3d at 279.

In any case, there is ample evidence of animus against nonwhite immigrants from the DHS officials responsible for the Rule. Former USCIS Director Cissna, who led USCIS during the public comment process on the Rule, stated that accepting immigrants based on family connections "takes us away from where we want to go as a country,"[29] and linked such immigrants with terrorism and criminality.[30] Cissna was replaced in June 2019 by Acting USCIS Director Ken Cuccinelli, who, in a recent televised interview, interpreted the Statue of Liberty's welcoming words as addressed to "people coming from Europe." (*See supra* p. 3.)

## II.   Plaintiffs Will Suffer Irreparable Harm Absent a Preliminary Injunction

Absent preliminary injunctive relief, plaintiffs will suffer substantial irreparable harm. The "single most important prerequisite for the issuance of a preliminary injunction is irreparable harm." *Faiveley Transp. Malmo AB* v. *Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez* v. *DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). Irreparable harm

---

[28]   *CASA de Maryland* v. *Trump*, 355 F. Supp. 3d 307, 325–26 (D. Md. 2018). Further statements and actions evidencing animus by President Trump and senior advisors responsible on immigration matters, including former DHS Secretary and Chief of Staff John Kelly and Senior Policy Advisor Stephen Miller, are set forth in paragraphs 201–34 of the Complaint.

[29]   Mica Rosenberg, *Fewer family visas approved as Trump toughens vetting of immigrants – Reuters review*, Reuters (Jan. 4, 2018), Ex. 41.

[30]   Francis Cissna, *Break the chain and lose the lottery – America deserves a better immigration system*, The Hill (Dec. 8, 2017), Ex. 42.

exists where, "absent a preliminary injunction, [the movants] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd.* v. *Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

A.     **Irreparable Harm Is Presumed When a Rule Violates Federal Law**

Irreparable harm is "presumed . . . satisfied per se when a violation of federal law is shown since, in enacting the statute, Congress declared that violations of the statute are contrary to the public interest and, therefore, cause irreparable harm." *Heublein* v. *FTC*, 539 F. Supp. 123, 138 (D. Conn. 1982). Similarly, "the alleged violation of a constitutional right triggers a finding of irreparable injury." *Conn. Dep't of Envtl. Prot.* v. *OSHA*, 356 F.3d 226, 231 (2d Cir. 2004); *see Brewer* v. *West Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000). As described above, the Rule was promulgated in violation of the APA, is inconsistent with the INA and the Rehabilitation Act, and violates the Equal Protection guarantee of the Fifth Amendment. For those reasons alone, the Court may presume irreparable harm will occur absent an injunction.

B.     **Plaintiffs Have and Will Continue to Divert Resources to Address the Impact of the Rule and Suffer Harms to Their Organizational Missions**

Non-profit organizations are deemed to suffer irreparable harm when an administrative rule or action causes "ongoing harms to their organizational missions," including diversion of resources. *Valle del Sol lnc.* v. *Whiting*, 732 F.3d 1006, 1018–19, 1029 (9th Cir. 2013); *see League of Women Voters of U.S.* v. *Newby*, 838 F.3d 1, 8–9 (D.C. Cir. 2016); *Saget*, 375 F. Supp. 3d at 376; *see also Centro de la Comunidad Hispana de Locust Valley* v. *Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing.").

35

Harms similar to those suffered by plaintiffs here have consistently been held to satisfy this standard.  In *League of Women Voters*, the court concluded that a new rule allowing states to require proof of citizenship to register to vote "unquestionably make[s] it more difficult for the [plaintiff organizations] to accomplish their primary mission of registering voters," which "provide[s] injury for purposes both of standing and irreparable harm."  838 F.3d  at 9.  In *Saget*, the court found that DHS's decision to terminate temporary protected status ("TPS") for Haitians would cause irreparable financial harms to a plaintiff non-profit organization which served low-income families, including Haitian TPS holders, because it would have to divert financial resources to provide "TPS-specific services, such as providing up-to-date information on TPS, holding bi-weekly community meetings regarding TPS, and providing psycho-social counseling for TPS holders and their children."  375 F. Supp. 3d at 376; *see E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1110, 1116 (N.D. Cal. 2018) (legal and social service immigration organizations demonstrated irreparable harm because the challenged rule would "frustrate the Organizations' core missions, require them to divert resources, and impair their funding").[31]

Here, plaintiffs have been and, absent an injunction, will continue to be harmed because the Rule forces them to expend resources to educating their clients, members, and the public— resources that are then unavailable for other purposes. Make the Road New York ("MRNY") has held 29 workshops on public charge, 10 since the Rule was published. (Oshiro Decl. ¶¶ 21, 25.) Catholic Charities Community Services (Archdiocese of New York) ("CCCS-NY") has 12 workshops scheduled for the month of September 2019 alone, and has devoted significant staff

---

[31] Even purely monetary harms are irreparable in an action under the APA, because the APA does not permit recovery of monetary damages. *See Pennsylvania* v. *President U.S.*, 930 F.3d 543, 574 (3d Cir. 2019) ("Because the States cannot collect money damages under the APA, . . . the States will suffer irreparable harm if the Rules are enforced.") (citing *California* v. *Azar*, 911 F.3d 558, 581 (9th Cir. 2018)); 5 U.S.C. § 702 (enabling claimants to obtain "relief other than money damages")).

time responding to questions about the Rule. (Russell Decl. ¶¶ 19, 21, 31, 34, 37, 41.)  African Services Committee ("ASC") has counseled staff, community partners, and clients about the Rule, and has bought airtime for public service announcements amounting to 8 percent of its annual communications budget. (Nichols Decl. ¶ 11.) Plaintiffs providing direct legal services—MRNY, CCCS-NY, ASC, and Catholic Legal Immigration Network, Inc. ("CLINIC")—will have to devote additional resources to applications for adjustment as a result of the Rule, as well as represent clients in removal proceedings and conduct additional trainings. (Oshiro Decl. ¶¶ 27, 35, 41; Russell Decl. ¶¶ 22–24 ; Nichols Decl. ¶¶ 21–26; Wheeler Decl. ¶¶ 10–16.) Further details about these and other harms are set forth in the accompanying declarations from plaintiffs.  (*See* Oshiro Decl. ¶¶ 21–35; Russell Decl. ¶¶ 16–41; Nichols Decl. ¶¶ 9–27; Wheeler Decl. ¶¶ 8–18; Yoo Decl. ¶¶ 9–20.)

The Rule also harms plaintiffs' core missions. MRNY's mission, for example, is to build the power of immigrant and working-class communities to achieve dignity and justice. (Oshiro Decl. ¶¶ 5, 36.)  The Rule impedes that mission by threatening members of those communities with denial of adjustment and the consequent separation of families, and causing them to forego important benefits.  (*Id.* ¶¶ 36–40.)  The Rule similarly undermines the missions of the other plaintiffs.  (*See* Russell Decl. ¶¶ 4, 42; Nichols Decl. ¶¶ 4, 7–8, 10, 12, 15, 18, 20, 24, 26; Wheeler Decl. ¶¶ 10, 14, 16, 18; Yoo Decl. ¶¶ 21–25.)  Plaintiffs' prompt filing of this lawsuit less than two weeks after the Rule was issued "'also weighs in their favor' for the irreparable harm analysis."  *E. Bay Sanctuary Covenant*, 354 F. Supp. 3d at 1116 (quoting *Azar*, 911 F.3d at 581).

### III.     The Balance of Equities and Public Interest Support a Preliminary Injunction

"[B]ecause the Government is a party, and 'the Government's interest *is* the public interest,' the balance of hardships and public interest merge as one factor." *Saget*, 375 F. Supp. 3d at 339–340 (quoting *Dep't of Commerce*, 351 F. Supp. 3d at 673).

### A.     There Is No Public Interest in an Unlawful Rule

"[T]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters*, 838 F.3d at 12. To the contrary, there is a substantial public interest "in having governmental agencies abide by the federal laws that govern their existence and operations." *Washington* v. *Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994). That public interest is "particularly strong where [as here] the rights to be vindicated are constitutional in nature." *V.W. by and through Williams* v. *Conway*, 236 F. Supp. 3d 554, 589 (N.D.N.Y. 2017). Here, there is no public interest in allowing the unlawful and unconstitutional Rule to take effect.

### B.     The Public Has a Strong Interest in Preventing the Enormous Harm That the Rule Will Cause

The Rule will increase the rate of poverty and suffering across the country, harm immigrant communities by disrupting nutrition, health, and housing for millions of families, and cause grave harm to the national economy and the public health. DHS concedes the Rule will cause hundreds of thousands of noncitizens to forego benefits to which they are lawfully entitled, including benefits for healthcare, nutrition, and housing, although it greatly understates the severity of those effects. DHS estimates that, as a result, these individuals will lose nearly $1.5 billion in federal benefits payments, and more than $1 billion in state benefits payments, every year.[32] Studies from the Migration Policy Institute, Fiscal Policy Institute, and Manatt Health,

---

[32]     *See* DHS, Economic Analysis Supplemental Information for Analysis of Public Benefits Programs, at 7 & Table 5, Ex. 43.; Regulatory Impact Analysis, Inadmissibility on Public Charge Grounds, at 10–11 & Table 1, Ex. 44.

among others, provide estimates of chilling effects that are many times greater than DHS's estimates. (*See* Compl. ¶ 244.) This will have disastrous public health consequences. According to the analysis conducted by Professor Leighton Ku:

> I conclude that the public charge rule will lead between 1.0 and 3.1 million members of immigrant families, many of whom are United States citizens, to disenroll from or forego Medicaid benefits each year, even though they may be eligible. Those harmed are disproportionately low-income members of racial and ethnic minority groups, especially Latino and Asian families, and many have serious health problems . . . . As a result, there could be as many as 1,300 to 4,000 excess premature deaths per year.

(Ku Decl. ¶ 9.) DHS also acknowledges the significant negative impact the Rule will have "on the economy, innovation, and growth." 84 Fed. Reg. at 41,472. (*Accord* Ku Decl. ¶¶ 63–73 & Tables 2–4; Schanzenbach Decl. ¶¶ 31–48 & Tables 4–8; Allen Decl. ¶¶ 45–63.)

The suffering these figures represent is enormous. In industries that depend heavily on immigrant labor, such as home health care, low wages are the norm. (Yoon Decl. ¶ 7.) The Rule will deter such workers from accessing benefits for fear of jeopardizing their status. (*Id.* ¶¶ 11–12.) The anxiety and confusion surrounding the Rule—as evidenced by a flood of questions to community advocates, (*see* Oshiro Decl. ¶¶ 25–30 , Nichols Decl. ¶¶ 22, 24, 26; Yoon Decl. ¶ 14)—will cause irreparable harm to immigrant communities. Further, as similar efforts directed toward visa applicants have shown (*see* Ku Decl. ¶ 29), denials of adjustment, and consequent family separation, will rise. These hardships are especially likely to fall on the working poor, people with disabilities, and the elderly. (*See* Van Hook Decl. ¶¶ 69–73, Table 9, Figure 9a).

There is no remotely comparable harm on the other side of the scale. If the Rule is enjoined, defendants can continue to apply the Field Guidance, which has governed public charge determinations for twenty years and is currently in effect. *See Airbnb, Inc.* v. *City of New York*, 373 F. Supp. 3d 467, 500 (S.D.N.Y. 2019) (government faces only a "slight hardship[]" in

being temporarily delayed from enforcing a regulation). Accordingly, the public interest weighs heavily in favor of a preliminary injunction.

## IV.    Any Injunction or Postponement Should Apply Nationwide

Any injunction or postponement of the Rule's effective date should apply nationwide. "[D]istrict courts have the authority to issue universal relief keeping in mind the principle that such relief must be no more burdensome to defendants than necessary to provide complete relief to plaintiffs." *Saget*, 375 F. Supp. 3d at 378 (citing *Leman* v. *Krentler-Arnold Hinge Last Co.*, 284 U.S. 448, 451 (1932); *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979); *Texas* v. *United States*, 809 F.3d 134, 188 (5th Cir. 2015)). Plaintiffs operate far beyond New York—for example, CLINIC's member organizations are located in 49 states and D.C. (Wheeler Decl. ¶¶ 2–3)—and their clients may move to or have affected family members in other states. *See E. Bay Sanctuary Covenant* v. *Barr*, No. 19-cv-4073, slip op. at *9–12 (N.D. Cal. Sept. 9, 2019) (Dkt. 73), Ex. 45. The Rule involves a generally applicable, "nationwide policy," not "case-by-case enforcement." *Saget*, 375 F. Supp. 3d at 379. And it would be irrational for different immigration rules to apply in different districts. *E. Bay Sanctuary Covenant*, No. 19-cv-4073, slip op. at *13. A nationwide injunction is particularly appropriate for an unlawful agency rule, because when such an action is "h[e]ld unlawful" and "set aside" under the APA, 5 U.S.C. § 706(2), "the ordinary result is that the rules are vacated—not that their application to individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).

## CONCLUSION

For the foregoing reasons, the Court should enjoin defendants from implementing the Rule or taking any actions to enforce or apply it, and postpone the effective date of the Rule until after entry of a final judgment.

Dated:    New York, New York
              September 9, 2019

By: */s/ Jonathan H. Hurwitz*

**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew J. Ehrlich
Jonathan H. Hurwitz
Robert J. O'Loughlin
Daniel S. Sinnreich
Amy K. Bowles (*admission pending*)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
roloughlin@paulweiss.com
dsinnreich@paulweiss.com
abowles@paulweiss.com

**CENTER FOR CONSTITUTIONAL RIGHTS**
Ghita Schwarz
Brittany Thomas
Baher Azmy

666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

41

**THE LEGAL AID SOCIETY**
Susan E. Welber, Staff Attorney, Law Reform Unit
Kathleen Kelleher, Staff Attorney, Law Reform Unit
Susan Cameron, Supervising Attorney, Law Reform Unit
Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit

199 Water Street, 3rd Floor
New York, New York 10038
(212) 577-3320
sewelber@legal-aid.org
kkelleher@legal-aid.org
scameron@legal-aid.org
hhshafiqullah@legal-aid.org

*Attorneys for Plaintiffs Make the Road New York, African Services Committee, Asian American Federation, Catholic Charities Community Services (Archdiocese of New York), and Catholic Legal Immigration Network, Inc.*