**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MAKE THE ROAD NEW YORK, AFRICAN SERVICES COMMITTEE, ASIAN AMERICAN FEDERATION, CATHOLIC CHARITIES COMMUNITY SERVICES (ARCHDIOCESE OF NEW YORK), and CATHOLIC LEGAL IMMIGRATION NETWORK, INC., | |
| Plaintiffs, | **1:19–cv-07993 (GBD)** |
| vs. | |
| KEN CUCCINELLI, in his official capacity as Acting Director of United States Citizenship and Immigration Services; UNITED STATES CITIZENSHIP & IMMIGRATION SERVICES; KEVIN K. McALEENAN, in his official capacity as Acting Secretary of Homeland Security; and UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | **DECLARATION OF RYAN ALLEN, Ph.D.** |
| Defendants. | |

<u>**Declaration of Ryan Allen**</u>

I, **Ryan Allen**, declare pursuant to 28 U.S.C. § 1746 that the following is true and correct:

**Background**

1.       My name is Ryan Allen, and I make this declaration in support of Plaintiffs' Request for a preliminary injunction. I am an Associate Professor of Urban and Regional Planning at the Humphrey School of Public Affairs at the University of Minnesota in Minneapolis, Minnesota. In addition to my role as a faculty member, I am also the Director of Graduate Studies for the Urban and Regional Planning Program at the Humphrey School of Public Affairs.

2.      I am a housing and community development researcher with over 12 years of experience as a faculty member. I have conducted substantial research about the experience of immigrants in U.S. housing. I have authored or co-authored over one dozen journal articles and reports about immigrants and housing, including publications in peer-reviewed journals such as *Housing Policy Debate*, *Urban Studies*, *Ethnic and Racial Studies*, and the *Journal of Planning Education and Research*. I have taught graduate courses on immigration, urban planning and policymaking for over 10 years at the University of Minnesota. I am a faculty affiliate of University of Minnesota Extension, the Minnesota Population Center, and the Department of Sociology, and have served as a visiting scholar at the University of New South Wales in Sydney, Australia. I am frequently invited to give guest lectures on topics related to immigration, housing, economic development, and urban planning, and I serve as a commentator on regional and national media outlets, including National Public Radio and the *Los Angeles Times*.

3.      I have a Ph.D. in Urban Studies and a Master's Degree in City Planning, both from the Massachusetts Institute of Technology. Training in both of these degrees emphasizes an interdisciplinary approach, drawing from geography, sociology, economics, political science, and other disciplines, and a mixed-method research approach that incorporates quantitative and qualitative methodologies. Prior to my graduate studies, I was on the staff of the Urban Institute. I have attached my Curriculum Vitae as Exhibit A to this Declaration.

## I.      Overview and Key Findings

4.      The Department of Homeland Security's recently released rule, *Inadmissibility on Public Charge Grounds*, 84 Fed. Reg. 41,292 (August 14, 2019) ("Final Rule"), which directs officials at the Department of Homeland Security (DHS) in U.S. Citizenship and Immigration Services (USCIS) to consider—for the first time—a noncitizen's use or potential use of specified federally subsidized housing programs when determining

whether an applicant for legal permanent residency in the United States (a "green card") or an individual applying to enter the United States on certain visas is subject to the "public charge" ground of inadmissibility.

5.      The specific federally-subsidized housing programs included in the Final Rule are: Section 8 Housing Choice Voucher Program, Project-Based Section 8 Rental Assistance, and Public Housing (collectively referred to herein as "Federal housing programs"). In addition to Federal housing programs, the Final Rule specifies receipt or potential receipt of SNAP and Medicaid benefits as well as other non-cash benefits that officials should consider when assessing public charge.

6.      According to the Final Rule, living in federally subsidized housing and receiving a subsidy in aggregate for more than 12 months during a 36-month period would be considered a heavily-weighted negative factor in determining whether a given applicant for adjustment is a public charge. The Final Rule contains many other features that go beyond the scope of this Declaration.

7.      The Final Rule is scheduled to go into effect on October 15, 2019. This declaration describes the following: (1) the Federal housing benefits included in the Final Rule, including supply and demand for these programs, financial eligibility, and immigrant eligibility; (2) the benefits of living in federal housing programs for individuals; and (3) the negative impact the Final Rule will have on noncitizens if it is not enjoined by the Court.

8.      It is my opinion that if the Final Rule goes into effect, a certain number of noncitizens who reside in federally-assisted housing will choose to disenroll from the Federal housing programs encompassed by the Final Rule. Using the estimates of disenrollment from DHS (2.5 percent), the result would be substantial harm. As explained herein, given the well-

documented positive impact living in federally-assisted housing has on residents, especially children, even a minimal amount of disenrollment can be expected to result in substantial harm. Individuals who disenroll will lose an affordable source of housing and other benefits in the areas of health, educational attainment, and earnings.

## II.     Background

### A.     Characteristics of Federal Housing Programs Included in the Final Rule

9.     I have been asked by counsel to describe the key features and eligibility criteria of the Federal housing programs included in the Final Rule, including the income households can receive while maintaining eligibility for public housing.

*Section 8 Housing Choice Vouchers*

10.     The Section 8 Housing Choice Voucher Program ("HCV" program) is the largest federally subsidized housing program in the United States, serving approximately 2.5 million households and 5.3 million residents in 2018. First established by the Housing and Community Development Act of 1974, Section 8 Housing Choice Vouchers are used by low-income families to rent housing in the private market. A low-income family that uses a voucher pays 30 percent of its income for rent and utilities (or $50, whichever is larger), and the voucher pays the balance of the rent and utility costs, up to a limit. Local public housing authorities set these limits as a proportion of Fair Market Rents (FMRs), which are adjusted by apartment size and calculated annually by HUD for over 2,600 housing markets across the U.S.[1] FMRs vary considerably in municipalities across the United States and sometimes within municipalities, depending upon rental housing costs in each area.

---

[1] Schwartz, Alex F. 2015. *Housing Policy in the United States (Third Edition)*. New York: Routledge.

11.     *Initial Eligibility*. To participate in the program, an apartment must be inspected and certified to meet minimum standards related to space and physical quality. In terms of financial eligibility, vouchers tend to be targeted to very needy families, with 75 percent of new families receiving a voucher each year classified as "extremely low income" (generally, household incomes not exceeding 30 percent of the area median income ("AMI") or the federal poverty line, whichever is higher).[2] The balance of new families receiving a voucher must have household incomes no more than 80 percent of the AMI.

**Project-Based Section 8 Rental Assistance**

12.     The Project-Based Section 8 Rental Assistance program ("PBRA") creates multi-year rental assistance agreements with owners of private multi-family properties to make all or some of the units available to low-income families. The PBRA program includes about 1.3 million housing units and approximately 2 million residents nationwide.

13.     Similar to the HCV Program, families renting housing in the PBRA program pay 30 percent of their household income (or $25, whichever is greater) each month. A monthly payment to the owner of the building and the PBRA program supplies the balance of the costs associated with maintaining and operating the apartment. In addition, about two-thirds of households living in PBRA housing are headed by seniors (i.e., individuals over age 65) or people with disabilities.

14.     *Financial eligibility*. At least 40 percent of units in each building that become vacant are allocated for "extremely low income" families (defined as households earning

---

[2] "Policy Basics: The Housing Choice Voucher Program." Center on Budget and Policy Priorities, Washington, DC (https://www.cbpp.org/research/housing/policy-basics-the-housing-choice-voucher-program, last accessed on August 21, 2019).

30 percent or less of the AMI) and most of the remainder of units are allocated to very low-income families (household incomes of no more than 50 percent of AMI).[3]

***Public Housing***

15.      In contrast to the HCV and PBRA programs described above, public housing is housing that is owned and operated by the federal government under the auspices of local public housing authorities. Families living in public housing contribute 30 percent of their income each month toward rent or a minimum rent set by the housing authority. Nationwide the public housing program includes about 1 million units and serves nearly 2 million residents.

16.      *Financial eligibility*. At least 40 percent of families newly admitted to the program each year must be "extremely low-income" households, with the balance of households earning no more than 80 percent of the AMI.[4]

***Continued eligibility for HCV, PBRA and Public Housing.***

17.      In order to maintain eligibility for each of the Federal housing benefits, the household's income may not exceed household income limits determined by HUD, generally no greater than 80 percent of the AMI. The below chart lists 50 percent and 80 percent AMI income limits for four-person households in each of the key jurisdictions encompassed by the cases in which I am serving as an expert for fiscal year 2019:

---

[3] *Ibid.*
[4] *Ibid.*

| Geographic Area | 50% AMI Family Income Limit ($) | 80% AMI Family Income Limit ($) |
|---|---|---|
| Connecticut | 50,450 | 75,500 |
| New York | 41,100 | 65,750 |
| New York City (Metro Area) | 53,350 | 85,350 |
| Vermont | 39,750 | 63,600 |

Note: Income limit data are from HUD's FY 2019 Income Limits Documentation System (https://www.huduser.gov/portal/datasets/il/il2019/select_Geography.odn, accessed on September 5, 2019).

18.     Note that each of these income limits exceeds 125 percent of the Federal Poverty Guideline for a family four which is $32,187.50. As discussed below, and as these numbers show, many families who use federal housing benefits start out with low income, but having the stability that comes with subsidized rent, they are able to achieve greater economic stability while maintaining eligibility for the Federal housing programs.

**B**.   **Volume of Federal Housing Program Units and Demand**

19.     As Table 1 in Exhibit B describes, in 2018 these programs in aggregate represented 4,827,662 housing units, or 96 percent of the federally subsidized units of housing available in the United States. The supply of these subsidized housing units has shrunk in recent years. In 2015, the available number of housing units in these three programs numbered 4,798,257, about 29,000 more units than in 2018. In addition to representing the vast majority of the federally subsidized housing units, these programs also represent nearly all of the residents living in federally subsidized housing. In 2018, the programs accommodated 9,308,020

individual residents, or about 98 percent of the total residents living in federally subsidized housing units.[5]

      20.      The current demand for federally subsidized housing units is substantial. Most public housing authorities maintain a wait list for families that are eligible to live in federally subsidized housing, but are unable to move into a unit because none are available. Recent estimates indicate that nationally there are 1.5 families waiting for every Housing Choice Voucher program unit under contract and 1.7 families waiting for every public housing unit.[6]

      21.      However, these are underestimates because so many public housing authorities ("PHAs") have closed their wait lists. In 2012, about 60 percent of HCV wait lists and 17 percent of public housing wait lists were closed, effectively limiting the number of families that appear on wait lists. If wait lists remained open for all PHAs then presumably the number of eligible families waiting for federally subsidized housing would be significantly larger. After correcting for closed wait lists, nationally there are about 4 families waiting for each HCV unit and 1.8 families for each public housing unit.[7] This translates into a wait of 1.5 years for the median family on the waitlist for HCV and nine months for the median family on the waitlist for public housing.[8] These median values obscure significant variation in wait times, particularly at the high end of the distribution. For example, 25 percent of HCV waitlists had a wait time of 3 years or longer and 25 percent of public housing waitlists had a wait time of 1.5 years or longer.[9]

---

[5] While there are a variety of other subsidized housing programs operated by HUD, the three programs described above are the largest in terms of number of housing units and number of residents.
[6] Housing Agency Waiting Lists and the Demand for Housing Assistance, 2019. https://www.housingcenter.com/wp-content/uploads/2017/11/waiting-list-spotlight.pdf
[7] *Ibid.*
[8] These estimates come from a survey of PHAs in 2015-2016 by the National Low Income Housing Coalition (NLIHC) (https://nlihc.org/sites/default/files/HousingSpotlight_6-1.pdf, last accessed August 21, 2019).
[9] *Ibid.*

22.     In some cases, waitlists for public housing and HCV are particularly long. For example, counsel has advised me that in New York City the waits can be substantially longer due to low turn-over, high demand, and depending on the type of housing, factors like household size and the availability of the requisite size apartment and other priority factors.

### C.     Immigrant Eligibility for Federal Public Housing

23.     Counsel has advised me that under current law, the following categories of noncitizens are eligible for Federal housing benefits: (a) lawful permanent residents ("LPRs") (regardless of time in LPR status); (b) refugees; (c) asylees; (d) persons granted parole; (e) persons granted withholding of removal; (f) persons granted 1986 amnesty status (entered U.S. pre-January 1, 1982); (g) lawful U.S. residents under the Compacts of Free Association with Micronesia, the Marshall Islands, Palau, and Guam; (h) certified victims of trafficking; and (i) VAWA self-petitioners (includes VAWA cancellation of removal applicants; VAWA suspension of deportation applicants).

24.     Noncitizens who do not fall into one of the above categories can live in Federal housing program units, but are required to pay a *pro rata* share of the rent. It is important to note that the income of non-eligible members of families is included in the family income figure used to determine eligibility for living in the housing and the rent that the family owes, despite the fact that non-eligible family members cannot receive a subsidy.

25.     A new Rule introduced by HUD for notice and comment on May 10, 2019 (the "Proposed HUD Rule"), would change these rules. Under the proposed new rule, non-eligible noncitizens would not be permitted to remain in HUD-sponsored housing, including

public housing, and would not be permitted to live in a household in which HCV or PBRA subsidizes the rent.[10]

26.    Noncitizen eligibility for Federal housing programs is limited under current law, but noncitizens have always been present in such programs and have never been categorically excluded by Congress.

27.    The United States Housing Act of 1937, sponsored by Representative Henry B. Steagall (D-AL) and Senator Robert F. Wagner (D-NY), created a United States Housing Authority that worked through newly created public housing agencies at the sub-national level to create subsidized rental housing for low-income families.  This legislation specified income eligibility criteria, but was silent on other eligibility requirements such as nativity or citizenship. The historical record indicates that many PHAs awarded a substantial number of units to households with noncitizen members. Of the 101,482 residents living in public housing in 1940, a total of 11,174 (11 percent) were foreign born with 8,161 residents naturalized citizens (8 percent) and 3,013 noncitizens (3 percent).[11]  While some local PHAs limited access to public housing to citizens in the early years of the program,[12] Congress passed

---

[10] Housing and Community Development Act of 1980: Verification of Eligible Status." Federal Register 84(91), RIN 2501-AD89, Docket No. FR-6124-P-01.
[11] These figures are based on the author's analysis of a unique dataset of all public housing residents in the United States at the time of the 1940 Census. For more information about the dataset, see the following reference: Allen, Ryan and Van Riper, David. Forthcoming. "The New Deal, the Deserving Poor and the First Public Housing Residents in New York City." *Social Science History*. Of the naturalized citizens, it is unclear what percentage began residence in public housing prior to attaining citizenship, but it can be assumed that a number of them did given the noncitizens in public housing in that same year. In comparison, 8.8 percent of the U.S. population was foreign born in 1940 including 5.5 percent naturalized citizens, 2.6 percent noncitizens and 0.6 percent with unreported citizenship status. "1940 Census of Population: Volume 2. Characteristics of the Population." U.S. Census Bureau: Washington, DC. https://www2.census.gov/library/publications/decennial/1940/population-volume-2/33973538v2p1ch2.pdf
[12] Vale, Lawrence J. 2000. *From the Puritans to the Projects: Public Housing and Public Neighbors.* Cambridge, MA: Harvard University Press.

no legislation that prohibited access to public housing by immigrants regardless of citizenship status.

28.     Over the course of the next four decades, Congress modified the public housing program in the United States incrementally in terms of its budget and goals for the number of public housing units it created, while core eligibility features remained consistent. Proposed eligibility requirements for public housing residents changed starting with provisions included in Section 214 of the Housing and Community Development Act of 1980. The next year, Congress proposed wider exclusions for immigrants through a revision of Section 214 in the Omnibus Reconciliation Act of 1981, but the proposed rules for interpreting the regulatory changes were not implemented immediately because Congress did not appropriate funds necessary for implementation and the regulatory changes were challenged by various lawsuits.[13]

---

[13] In published notices in the Federal Register, the Department of Housing and Urban Development developed rules for implementation of the new regulations, but failed to specify an effective date for these rules. Dzubow, Jason. 1995. "HUD Shuts the Door: Restrictions on Housing Assistance to Noncitizens." *Georgetown Immigration Law Journal* 9:801-826. Subsequently, Congress barred HUD from implementing the rule and HUD submitted multiple revised versions of the rule to implement the regulations in Section 214 throughout 1986, and delayed implementation of the rule until October 1, 1987.

Immediate implementation of the rule was delayed for two primary reasons. First, Congress did not allocate to HUD the additional funding required to implement the rule. The failure to allocate the necessary funds is most readily explained by the fact that Congress passed the Immigration Reform and Control Act of 1986 (IRCA), which changed the process used to verify immigrant status. Dzubow, Jason. 1995. "HUD Shuts the Door: Restrictions on Housing Assistance to Noncitizens." *Georgetown Immigration Law Journal* 9:801-826. As a result, it remained unclear what protocols HUD should use to verify immigrant status before Congress issued final guidelines associated with IRCA. Second, a district court in California issued a nation-wide preliminary injunction on implementing the regulation based on arguments made in *Yolano-Donnelly Tenants' Association v. Pierce*. *Yolano-Donnelly Tenants' Association v. Pierce*, E.D. Cal. No. CIV. S-86-846-MLS (1986). In this case the court recognized that implementing the new regulation would result in the eviction of thousands of families currently residing in federally-subsidized housing because either they or some members of their households were ineligible to live in the housing due to a lack of documentation. Dzubow, Jason. 1995. "HUD Shuts the Door: Restrictions on Housing Assistance to Noncitizens." *Georgetown Immigration Law Journal* 9:801-826. The court reasoned that in some cases this would result in the eviction of citizens and properly documented aliens.

An additional lawsuit in 1986, *City of New York v. Pierce*, charged that the regulations would unduly burden the City of New York because it would increase the homeless population and the administrative

29.     In 1987 Congress amended Section 214 once again to respond to the issues raised in the lawsuits. As amended, Section 214 allowed aliens in federally-subsidized housing who had been temporarily admitted or paroled into the United States as specified in Section 245A of the Immigration and Naturalization Act or who had family members who were ineligible. In the latter case, this provision preserved the integrity of mixed-status families by letting families with some members who are ineligible noncitizens continue to live in subsidized housing. After publishing a rule in 1988 related to this version of Section 214, HUD failed to implement the rule citing a lack of authorization to collect information on citizenship or alien status from residents or applicants to federally subsidized public housing. A final rule to implement Section 214 was published in the Federal Register on March 20, 1995, about 15 years after Congress passed the original restrictions from federally subsidized housing.[14]

30.     Although the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 called for widespread changes to the eligibility criteria and structure of many parts of the U.S. welfare system, it ultimately did not have a meaningful impact on Federal housing programs.[15] Battered qualified aliens were only recognized as eligible for public housing in 2016.[16]

---

burden experienced by the City. *City of New York v. Pierce,* 86-CIV-6068, U.S. District Court, Southern District of New York (1986). Together these lawsuits resulted in delayed implementation of the original restrictions to federally subsidized housing for certain groups of immigrants contemplated and enacted by Congress.

[14] Dzubow, Jason. 1995. "HUD Shuts the Door: Restrictions on Housing Assistance to Noncitizens." *Georgetown Immigration Law Journal* 9:801-826.

[15] P.L. 104-193 §431(c) (1) (A); 8 U.S.C. §1641, as cited in McCarty, Maggie and Siskin, Alison. 2015. "Immigration: Noncitizen Eligibility for Needs-Based Housing Programs." Congressional Research Service, RL31753.

[16] https://nlihc.org/sites/default/files/Eligibility-of-VAWA-Self-Petitioners_121416.pdf (accessed on September 5, 2019).

31.     HUD anticipates that the Proposed HUD Rule, if implemented, would have a large impact on the number of noncitizens residing in Federal housing programs. HUD's Regulatory Impact Analysis estimates that 25,045 households living in federally subsidized housing would be affected by this rule change, including a total of 108,104 people.[17] HUD believes that over three-quarters of the households that would be affected by this rule change will terminate housing assistance, with the remaining households splitting apart so that members of the household eligible to receive a subsidy remain in assisted housing. Overall, HUD estimates that 76,141 of the 108,104 individuals living in households that would be affected by this proposed rule change are eligible to receive federal housing subsidies. It is difficult to determine the likely degree of overlap between the households that HUD has estimated would be affected by the Proposed HUD Rule change and the households that may be affected by the Final Rule, but it is safe to assume that there will be at least some overlap given the focus on noncitizens by each rule change. Despite this potential for overlap, in the discussion below regarding the likely effect of the Final Rule on households with foreign-born members, I do not attempt to capture any of the effects associated with the Proposed HUD Rule.

**D.      Characteristics of Households Living in Federally Subsidized Housing**

32.     Table 1 in Exhibit B describes some basic descriptive information about residents living in public housing, the Housing Choice Voucher Program, Project-Based Section 8 developments, and all HUD programs in 2018 in the U.S., Connecticut, New York, Vermont, and New York City. While households earning less than 80 percent of the AMI are eligible for living in public housing or Project Based Section 8 units, or using a Housing Choice Voucher, the majority of households in these programs are classified as very low-income (earning less than

---

[17] "Housing and Community Development Act of 1980: Verification of Eligible Status, Regulatory Impact Analysis." Docket No. FR-6124-P-01, April 15, 2019.

50 percent of AMI). In 2018, 96 percent of households living in Project Based Section 8 units earned less than 50 percent of the AMI in the United States. In the Section 8 Housing Choice Voucher program and public housing 95 percent and 91 percent of households earned less than 50 percent of the AMI in the United States in 2018, respectively. Given the geographical variation in the AMI as described above, even families with income less than 50 percent of the AMI, do not necessarily have income below 125 percent of the FPG.

33.     Compared to public housing and the Housing Choice Voucher program, the Project Based Section 8 program tends to have smaller family sizes living in its units. Nationally, the average size of a family in Project Based Section 8 in 2018 was 1.7 people, compared to 2.1 in public housing and 2.3 in Housing Choice Vouchers.

34.     I do not have data on the length of stay in Federal housing programs among noncitizens, and they may vary considerably from the length of stay statistics for tenants generally. Nationally, households living in a federally subsidized housing unit typically do not remain in these units for an extended period of time. Based on the most current and comprehensive analysis available using HUD administrative data on exits from assisted housing,[18] average households living in federally subsidized housing leave assisted housing after about six years.[19] Differences in length of stay in federally subsidized housing by household type can be substantial. For example, in New York City, given the demand for public housing and lack of availability of affordable housing, the low vacancy rate, and the relatively high income a household can have and maintain eligibility, families stay in public housing much longer.

---

[18] In this case, "assisted housing" is a general term that includes the three largest federally subsidized housing programs specified in the Final Rule, plus several smaller programs not included in the Final Rule.
[19] McClure, Kirk. 2018. "Length of Stay in Assisted Housing." *Cityscape* 20(1): 11-38. (https://www.jstor.org/stable/10.2307/26381219)

Another estimate of length of stays in public housing uses longitudinal data from the Panel Survey of Income Dynamics (1987-2011) and found that most individuals who entered public housing stayed less than five years, with only 12 percent staying longer than 10 years.[20] This evidence suggests that federally-assisted housing serves as a temporary source of support for most families that use it, but that there can be exceptions in housing markets characterized by high rents and low vacancy rates.

---

[20] Dantzler, Prentiss A. 2019. "Reconsidering Poverty Dynamics by Analyzing Housing Spells." *The Social Science Journal* (In Press, https://doi.org/10.1016/j.soscij.2019.06.004).

### III.   Benefits of Living in Federally Subsidized Housing

35.   In connection with preparing this declaration, I have undertaken a review of research conducted regarding the positive impacts of living in housing subsidized by the Federal housing programs that are included in the Final Rule because the benefits, in turn, speak to the harm caused to noncitizen families who lose access to Federal housing programs because of the Final Rule.

36.   Research on residents living in federally-assisted housing shows that residing in such housing is associated with positive health and economic outcomes.[21] Living in public housing has positive associations with (a) better health outcomes, (b) educational attainment, (c) employment earnings, and (d) other benefits.

37.   *Health outcomes.* A number of studies have found a positive association between living in assisted housing and positive health outcomes for children and adults. Relative to children in families on a waitlist for federally-assisted housing and controlling for neighborhood context, children in families living in public housing have fewer symptoms of mental health stress and experience fewer emotional difficulties.[22] Similarly, relative to adults in families on a waitlist for federally-assisted housing and after controlling for neighborhood-level characteristics, adults in families in public housing had lower odds of being in fair or poor health

---

[21] It is important to note that the most methodologically sound research on outcomes associated with living in Federal housing program appropriately controls for the selection bias inherent to applying for and obtaining a unit of assisted housing. Selection criteria for admission to Federal housing programs mean that families are low income, a characteristic that has an independent relationship with educational, employment, health, and other outcomes. It is important to distinguish the relationship between living in housing supplied by a Federal housing program with these outcomes and the relationship between living in a poor family and these outcomes.

[22] Fénelon, Andrew, Slopen, Natalie, Boudreaux, Michel, and Newman, Sandra J. 2018. "The Impact of Housing Assistance on the Mental Health of Children in the United States." *Journal of Health and Social Behavior* 59(3): 447-463.

and lower odds of psychological distress.[23] Children living in assisted housing have lower Blood Lead Levels (BLLs) than children who did not receive housing assistance.[24] Many residents of public housing have poor health, but frequently health problems exist for residents prior to becoming residents of public housing. For example, in a study of Atlanta public housing residents 19 percent were diagnosed with diabetes and 23 percent were diagnosed with asthma, but of those diagnosed with these health problems at least three-quarters received the diagnosis prior to entering public housing.[25] In general, research indicates that public housing tends to provide a safety net for residents that had existing health problems when they arrived in assisted-housing rather than cause these health problems.[26]

38.     *Educational achievement.* Much of the available evidence suggests that children living in federally-assisted housing experience comparable or better educational achievement than children who do not live in federally-assisted housing. Children living in public housing are less likely to be held back a grade than those not living in public housing[27] and those living in voucher-assisted housing experience better math achievement.[28] Research that compares educational outcomes for children living in public housing and voucher-assisted

---

[23] Fenelon, Andrew, Mayne, Patrick, Simon, Alan E., Rossen, Lauren M., Helms, Veronica, Lloyd, Patricia, Sperling, Jon, and Steffen, Barry L. 2017. "Housing Assistance Programs and Adult Health in the United States." *American Journal of Public Health* 107(4): 571-578.

[24] Ahrens, Katherine A., Haley, Barbara A., Rossen, Lauren M., Lloyd, Patricia C., and Aoki, Yutaka. 2016. "Housing Assistance and Blood Lead Levels: Children in the United States." *American Journal of Public Health* 106(11): 2049-2056; Chiofalo, Jacqueline M., Golub, Maxine, Crump, Casey, and Calman, Neil. 2019. "Pediatric Blood Lead Levels Within New York City Public Versus Private Housing, 2003-2017." *American Journal of Public Health* 109(6): 906-911.

[25] Ruel, Erin, Oakley, Deirdre, Wilson, G. Elton, and Maddox, Robert. 2010. "Is Public Housing the Cause of Poor Health or a Safety Net for the Unhealthy Poor?" *Journal of Urban Health* 87(5): 827-838.

[26] *Ibid.*

[27] Currie, Janet and Yelowitz, Aaron. 2000. "Are Public Housing Project Good for Kids?" *Journal of Public Economics* 75:99-124.

[28] Carlson, Deven, Miller, Hannah, Haveman, Robert, Kang, Sohyun, Schmidt, Alex, and Wolfe, Barbara. 2019. "The Effect of Housing Assistance on Student Achievement: Evidence from Wisconsin." *Journal of Housing Economics* 44(1): 61-73.

housing finds no differences in educational outcomes, suggesting that these housing programs have indistinguishable effects on educational outcomes.[29]

39.     *Employment outcomes and earnings.* A variety of research indicates that living in federally-assisted housing either has no effect or improves employment outcomes and earnings. Despite the frequent location of federally-assisted housing in neighborhoods with high rates of poverty, which might be associated with reduced labor force activity, analysis of employment outcomes in the Multi-City Study of Urban Inequality (MSCUI) found no relationship between living in public housing and labor force activity.[30] However, in a study that focused on the effects of living in public housing for a time between 1968 and 1982 on outcomes for young adults, researchers found that every year of residence in public housing between the ages of 10 and 16 increased the probability of working by seven percentage points when the youth was between the ages of 25 through 27.[31] The result of this increased chance of employment increased annual earnings by $1,860.[32]

40.     Based on a particularly strong longitudinal research design that compares the earnings of siblings from around the United States who lived in public housing for different lengths of time, the most recent study focused on the relationship between living in federally-assisted housing and earnings found that living in assisted housing as a teenager has a positive association with higher earnings and lower rates of incarceration as an adult. Females receive

---

[29] Jacob, Brian A. 2004. "Public Housing, Housing Vouchers, and Student Achievement: Evidence from Public Housing Demolitions in Chicago." *American Economic Review* 94(1): 233-258.

[30] Reingold, David A., Van Ryzin, Gregg G., and Ronda, Michelle. 2001. "Does Urban Public Housing Diminish the Social Capital and Labor Force Activity of Its Tenants?" *Journal of Policy Analysis and Management* 20(3): 485-504.

[31] Newman, Sandra J. and Harkness, Joseph M. 2002. "The Long-Term Effects of Public Housing on Self-Sufficiency." *Journal of Policy Analysis and Management* 21(1): 21-43.

[32] *Ibid.*

about a five percent increase in earnings for each additional year in either public housing or voucher housing, while males receive about a five percent increase in earnings for each additional year in public housing and a 2.6 percent increase in earnings for each additional year in voucher housing.[33] Each additional year of living in public housing as a teenager increased estimated total discounted lifetime pre-tax earnings by $45,400 for females and $47,300 for males.[34] For each additional year of living in voucher-assisted housing as a teenager, the estimated total discounted lifetime pre-tax earnings increased by $43,600 for females and $24,100 for males.[35] Based on assumptions about increased tax revenues due to the increased estimated total discounted lifetime pre-tax earnings attributable to living in assisted housing and the cost to the federal government of providing a subsidy for assisted housing, the study concludes that providing public housing and voucher programs are nearly cost-neutral.[36] It is important to point out that the study likely underestimates the benefit of federally-assisted housing because it only estimates the intergenerational financial benefit to the federal government from providing assisted housing to poor families. With increased lifetime earnings, individuals who lived in assisted-housing as teenagers will probably be less likely to use welfare benefits as adults.[37]

---

[33] Andersson, Fredrik, Haltiwanger, John C., Kutzbach, Mark J., Palloni, Giordano E., Pollakowski, Henry O., and Weinberg, Daniel H. 2018. "Childhood Housing and Adult Earnings: A Between-Siblings Analysis of Housing Vouchers and Public Housing." NBER Working Paper Series, Working Paper 22721 (https://www.nber.org/papers/w22721).

[34] *Ibid.*

[35] *Ibid.*

[36] *Ibid.*

[37] One concern registered about Federal housing programs is that using assisted housing discourages employment and encourages dependence on government benefits. A review of the available early scholarship on the relationship between living in assisted housing and employment found no relationship between the two. Shroder, Mark. 2002. "Does Housing Assistance Perversely Affect Self-Sufficiency? A Review Essay." *Journal of Housing Economics* 11(4): 381-417. A more recent study found a small suppressive effect of using a voucher on labor supply and earnings, though this study is limited to public housing residents in Chicago raising questions about its external validity. Jacob, Brian A. and Ludwig,

41.     *Other benefits.* Emerging evidence indicates that children growing up in assisted housing have relatively small chances of returning to assisted housing as adults[38] and living in public housing has no effect on teenage parenthood for females and may decrease the probability of teenage parenthood for males.[39] For families receiving housing assistance as well as cash assistance ("welfare") benefits, receiving federal housing assistance does not appear to have a positive relationship with remaining on welfare[40] and there is some evidence that living in public housing as a child reduces welfare use as an adult by 0.70 of a year.[41] More recent research indicates that welfare use among families living in assisted housing declined after moving into assisted housing, although the rate of welfare use still exceeded that of families not living in assisted housing.[42]

42.     At least two causal mechanisms could explain the relationship between living in assisted housing and better health outcomes, educational achievement and increased employment and earnings.

---

Jens. 2012. "The Effects of Housing Assistance on Labor Supply: Evidence from a Voucher Lottery." *American Economic Review* 102(1): 272-304. Analysis of the Panel Study of Income Dynamics, which included assisted housing residents from across the U.S., found no evidence that moving into assisted housing was associated with sustained reductions in employment, work hours, or earnings. Newman, Sandra, Holupka, C. Scott, and Harkness, Joseph. 2009. "The Long-Term Effects of Housing Assistance on Work and Welfare." *Journal of Policy Analysis and Management* 28(1): 81-101.
[38] Kucheva, Yana A. 2014. "The Receipt of Subsidized Housing across Generations." *Population Research and Policy Review* 33(6): 841-871.
[39] *Ibid.*
[40] Haley, Barbara A. and Dajani, Aref N. 2015. "Addicted to Government? The Impact of Housing Assistance on Program Participation of Welfare Recipients." *Poverty and Public Policy* 7(4): 307-335.
[41] Newman, Sandra J. and Harkness, Joseph M. 2002. "The Long-Term Effects of Public Housing on Self-Sufficiency." *Journal of Policy Analysis and Management* 21(1): 21-43.
[42] *Ibid.*

43.    *First*, evidence suggests that families living in voucher-supported housing are less prone to moving[43] and have more stable household compositions.[44] Moving, particularly when it is precipitated by economic necessity or stress, is associated with increased anxiety and depression.[45] Other measures of housing insecurity, such as doubling up, overcrowding, and frequent moves, are associated with poor health outcomes for children, including food insecurity, lower weight, and developmental risk.[46] Women experiencing eviction, a particularly dramatic form of housing insecurity, experienced difficulty obtaining necessities and were more likely to experience depression, poor health outcomes and parenting stress.[47] Finally, frequent moves that include a change in schools for children are associated with poor education outcomes for children.[48] Increased residential stability that accompanies living in assisted housing may promote better health and educational outcomes for children, and improved mental and physical health for adults, eventually leading to better economic outcomes.

---

[43] Berger, Lawrence M., Heintze, Theresa, Naidich, Wendy B., and Meyers, Marcia K. 2008. "Subsidized Housing and Household Hardship among Low-Income Single-Mother Households." *Journal of Marriage and the Family* 70:934-949; Gubits, Danile et al. 2016. "Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families." Office of Policy Development and Research: U.S. Department of Housing and Urban Development.

[44] Carlson, Deven, Haveman, Robert, Kaplan, Thomas, and Wolfe, Barbara. 2012. "Long-Term Effects of Public Low-Income Housing Vouchers on Neighborhood Quality and Household Composition." *Journal of Housing Economics* 21(2): 101-120.

[45] Burgard, Sarah A., Kristin S. Seefeldt, and Sarah Zelner. 2012. "Housing Instability and Health: Findings from the Michigan Recession and Recovery Study." *Social Science & Medicine* 75(12):2215–24.

[46] Cutts, Diana Becker, Alan F. Meyers, Maureen M. Black, Patrick H. Casey, Mariana Chilton, John T. Cook, Joni Geppert, Stephanie Ettinger de Cuba, Timothy Heeren, and Sharon Coleman. 2011. "US Housing Insecurity and the Health of Very Young Children." *American Journal of Public Health* 101(8):1508–14.

[47] Desmond, Matthew, and Rachel Tolbert Kimbro. 2015. "Eviction's Fallout: Housing, Hardship, and Health." *Social Forces* 94(1):295–324.

[48] Crowley, Sheila. 2003. "The Affordable Housing Crisis: Residential Mobility of Poor Families and School Mobility of Poor Children." *The Journal of Negro Education* 72(1): 22-38.

44.     *Second*, living in assisted housing is associated with decreased housing cost burden, allowing households to spend a larger proportion of their household incomes on other household expenses that may lead to improved educational, health and economic outcomes. For example, a family spending around 30 percent of its income on housing is associated with increased investment in enrichment activities for children, leading to higher cognitive outcomes.[49] Similarly, living in assisted housing is associated with less material hardship, including food insecurity, residential overcrowding, and postponed healthcare investments, resulting in better health and behavioral outcomes for children.[50] In turn, these outcomes are related to improved educational outcomes, which lead to better employment and earnings outcomes.

## IV.     The Effect of the Final Rule on Immigrant Use of Assisted Housing

45.     The Final Rule requires immigration officials at DHS to determine whether applicants for adjustment of status not exempt from public charge are currently enrolled in a Federal housing program that supplies them with a housing subsidy or whether they are likely to be enrolled in such a program and receive a subsidy at any point in the future.[51] Accordingly, of those persons currently eligible to adjust, or who will be eligible in the future, the Final Rule will likely have a greater impact on those noncitizens predicted to be likely to receive Federal housing benefits at any time in the future than those who are currently receiving Federal housing benefits and who are applying for adjustment. The reasoning behind this

---

[49] Newman, Sandra J. and Holupka, C. Scott. 2015. "Housing Affordability and Child Well-Being." *Housing Policy Debate* 25(1): 116-151.
[50] Harkness, Joseph and Newman, Sandra J. 2005. "Housing Affordability and Children's Well-Being: Evidence from the National Survey of America's Families." *Housing Policy Debate* 16(2): 223-255.
[51] There are only a few categories of noncitizens eligible for Federal housing programs who are subject to public charge review at the time of adjustment – specifically, citizens of Micronesia, Marshall Islands. Palau and Guam, persons granted withholding of removal and parolees.

assertion is that given supply limitations in Federal housing programs there are many more noncitizens living in families that are eligible for Federal housing programs than there are noncitizens in families that are currently living in housing that is part of a Federal housing program.

46.    Counsel has asked me for purposes of this declaration to base my projections of harm on the numbers provided by DHS in the Regulatory Impact Analysis ("RIA") accompanying the Final Rule.[52] I reserve the right to provide additional analyses using different assumptions at a later date.

47.    DHS estimates that 8,801 households will disenroll from public housing, the Section 8 Housing Choice Voucher Program, or the Project Based Section 8 Rental Assistance Program.  DHS arrives at this number using the fact that 6.97 percent of the U.S. population is a foreign-born noncitizen (based on the 2012-2016 American Community Survey (ACS) 5-year Estimates from the U.S. Census Bureau). DHS multiplies this percentage by 5,051,000, the number of households residing in federally subsidized housing, to arrive at 352,055 as the number of households residing in federally-subsidized housing that contain at least one noncitizen. DHS further assumes that noncitizens that adjust their visa status and trigger a public charge review and determination by immigration officials at USCIS will be affected by the Final Rule. They estimate that approximately 2.5 percent of the foreign-born adjust their status on an annual basis. To determine the number of households that are likely to disenroll, DHS multiplies 2.5 percent and 352,055 households with at least one noncitizen to arrive at a figure of 8,801. They do not estimate the number or citizenship status of people living

---

[52] "Regulatory Impact Analysis," Inadmissibility on Public Charge Grounds, Final Rule (8 CFR Parts 103, 212, 213, 214, 245, and 248), RIN: 1615-AA22, CIS No. 2637-19, DHS Docket No.: USCIS-2010-0012, August 2019.

in these families, nor do they attempt to estimate the costs or harm that disenrollment will create for these families or individuals.

48.     As discussed below, the harm caused by 8,801 households disenrolling from federally-assisted housing benefits is substantial. There are multiple reasons to assume that the actual harm is likely to be greater and to view the 8,801 estimate as very conservative.

49.     *First*, the Final Rule indicates that immigration officials will assess the use of benefits over a three year period when determining whether an immigrant should be designated a public charge. Using the logic DHS describes —that is, 2.5 percent of people will disenroll annually—it would be more appropriate to assume 7.5 percent of foreign born noncitizens would disenroll from a benefit at some point in a given three-year period. This would effectively triple DHS's estimate of households that would disenroll from public housing and more closely match the estimate produced by HUD of the number of households living in federally subsidized housing that include at least one non-eligible immigrant (about 25,000).[53]

50.     *Second*, DHS's use of the 6.97 percent of the foreign born population to estimate the number of noncitizen households residing in federally subsidized housing is likely to result in an underestimation of the households containing at least one noncitizen residing therein and consequently the number of individuals and households affected by the Final Rule. Using this figure to produce the estimates involves two faulty assumptions. The first mistake is to assume that the distribution of noncitizens in the U.S. population matches the distribution of noncitizens enrolled for or using one of the non-cash benefits named in the Final Rule (SNAP, Medicaid, and Federal housing programs). According to 2017 ACS data, 35 percent of households that contain at least one foreign born member are headed by noncitizens. Among

---

[53] "Housing and Community Development Act of 1980: Verification of Eligible Status, Regulatory Impact Analysis." Docket No. FR-6124-P-01, April 15, 2019.

households eligible to live in federally-assisted housing, 46 percent of households that contain at least one foreign born member are headed by noncitizens. Being eligible to live in public housing is different than actually living in public housing, but the larger proportion of noncitizens in the eligible pool suggests that DHS underestimates the households with at least one noncitizen in its analysis. The second mistake is to assume that the 6.97 percent of the population who are noncitizens are the only residents that will disenroll due to the Final Rule. Evidence suggests that noncitizens are not alone in changing their behavior because of the Final Rule. A report by researchers at the Urban Institute indicates that noncitizen legal permanent residents and naturalized citizens withdrew from public benefits named in the Final Rule or declared that they would not apply, despite the fact that their immigration status would not be affected by the Final Rule.[54]

51.    These flaws in the methodology used by DHS to estimate the chilling effect on foreign-born resident use of federally subsidized housing due to the Final Rule suggest a significant underestimate by DHS of the chilling effect related to the Final Rule.

52.    Although I adopt DHS's definition of the chilling effect as a dynamic that causes disenrollment for the purposes of this declaration, other studies have noted that the Final Rule is also likely to cause noncitizens to refrain from applying for benefits implicated by the Final Rule.[55]  DHS does not estimate the number of people who would not apply to Federal

---

[54] Bernstein, Hamutal, Gonzalez, Dulce, Karpman, Michael, and Zuckerman, Stephen. 2019. "One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018." Washington, DC: The Urban Institute. (https://www.urban.org/research/publication/one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018, accessed on August 28, 2019).
[55] Based on research results from a study by the Urban Institute that documented adults living in households with at least one foreign-born member reporting disenrolling from or choosing to not apply to federal benefit programs named in the Final Rule, individuals eligible for Federal housing programs by virtue of their family incomes will likely choose to not apply to Federal housing programs due to concerns about how the Final Rule could affect their immigration status or the immigration status of a

housing programs due to the Final Rule. Nonetheless, the omission of such an estimate from DHS's analysis is another reason the agency's estimates should be viewed as conservative. In future analyses of the chilling effect I may elect to calculate a different chilling effect, using different data and a different methodology.

53.     Using the DHS calculation of 8,801 households that would disenroll from Federal housing programs due to Final Rule, I can quantify some of the categories of harm, beyond the immediate harm to the individuals forced to move from their homes after disenrolling.

54.     ***Loss of lifetime earnings.*** Given the benefits associated with living in federal housing, discussed above in Part III, the chilling effect associated with the Final Rule will be costly for the people who, absent the implementation of the Final Rule, would have continued to live in federal housing. Recent research estimates a substantial increase in life-time earnings for each additional year that a teenager lives in either public housing or voucher-assisted housing.[56] While there are also benefits for young children and adults who live in federal housing, the estimates of increased lifetime earnings for teenagers allow me to make a conservative estimate of the future harm that will occur for people that disenroll from Federal housing programs because of the chilling effect of the Final Rule.

---

family member. Bernstein, Hamutal, Gonzalez, Dulce, Karpman, Michael, and Zuckerman, Stephen. 2019. "One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018." Washington, DC: The Urban Institute. (https://www.urban.org/research/publication/one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018, accessed on August 28, 2019).
[56] Andersson, Fredrik, Haltiwanger, John C., Kutzbach, Mark J., Palloni, Giordano E., Pollakowski, Henry O., and Weinberg, Daniel H. 2018. "Childhood Housing and Adult Earnings: A Between-Siblings Analysis of Housing Vouchers and Public Housing." NBER Working Paper Series, Working Paper 22721 (https://www.nber.org/papers/w22721).

55.     The increased lifetime earnings (discounted to 2000 U.S. dollars) for each additional year that a teenager (aged 13-18) lives in public housing is $24,700 for females and $25,700 for males, or an average of $25,200.[57] The increased lifetime earnings (discounted to 2000 U.S. dollars) for each additional year that a teenager lives in voucher-housing is $23,700 for females and $13,100 for males, or an average of $18,400.[58] According to Table 1 in Exhibit B, public housing and Project-Based Section 8 housing units together accounted for about 47.6 percent of federal housing units, while vouchers accounted for 52.4 percent of federal housing units.[59] Using these proportions, a weighted average of the life-time earnings for each additional year that a teenager lives in federal housing is $21,637.  The lifetime earnings figures in this paragraph are discounted to present value.

56.     Given that families with children live in public housing for an average of four years,[60] I assume that teenagers who are 13 and 14 live in federal housing for four years before moving out. For teenagers aged 15, 16, 17, and 18, I assume that they live in federal housing for 4, 3, 2, and 1 years respectively. Given variation in length of stay in Federal housing programs by jurisdiction, using this approach will likely underestimate the number of years that teenagers between the ages of 13 and 14 stay in housing in New York and especially the high rent, low vacancy market of New York City. As a result, this approach will likely underestimate the lifetime earnings that these teens could expect to earn if they had not disenrolled from Federal housing programs.

---

[57] *Ibid.*

[58] *Ibid.*

[59] I assume that Project-Based Section 8 are more similar to public housing than they are to HCVs, so I treat them as public housing units for the purposes of understanding what effect living in a Project-Based Section 8 unit will have on a teenagers life-time earnings.

[60] McClure, Kirk. 2018. "Length of Stay in Assisted Housing." *Cityscape* 20(1): 11-38. (https://www.jstor.org/stable/10.2307/26381219).

57.     Estimating the lifetime earnings that do not accrue to teenagers because they are chilled from living in federal housing due to the Final Rule is a simple matter of arithmetic: ((number of 13-year olds chilled from federal housing x 4 years x $21,637) + (number of 14-year olds chilled from federal housing x 4 years x $21,637) + (number of 15-year olds chilled from federal housing x 4 years x $21,637) + (number of 16-year olds chilled from federal housing x 3 years x $21,637) + (number of 17-year olds chilled from federal housing x 2 years x $21,637) + (number of 18-year olds chilled from federal housing x 1 year x $21,637)) = foregone lifetime earnings.

58.     To estimate foregone lifetime earnings it is necessary to calculate the number of people living in the 8,801 families that DHS estimates will disenroll from Federal housing programs if the Final Rule is implemented. To produce this estimate, I use the ACS 50 percent of AMI sample to calculate the average family size of families eligible to live in Federal housing programs. ACS data indicate that 18,352,744 people in the United States live in 6,400,436 families that contain at least one foreign-born member and earn less than 50 percent of AMI.[61] Therefore, the average family size among this population in the United States is 2.87 (18,352,744 / 6,400,436 = 2.867). Using this average family size estimate for the U.S., the 8,801 families estimated to disenroll from Federal housing programs by DHS contain 25,232 people (8,801 x 2.87 = 25,232).

59.     To estimate foregone earnings for the people included in the national estimate from DHS I need to calculate the number of people aged 13 to 18 in the estimated

---

[61] The population estimate comes from Table 2 in Exhibit B. The number of families is based on the author's analysis of 2017 ACS and HUD determined family income limits based on 50 percent AMI. Steven Ruggles, Sarah Flood, Ronald Goeken, Josiah Grover, Erin Meyer, Jose Pacas and Matthew Sobek. IPUMS USA: Version 9.0 [dataset]. Minneapolis, MN: IPUMS, 2019. https://doi.org/10.18128/D010.V9.0.

chilled population of 25,232 people. To achieve this I use the ACS 50 percent AMI data on the distribution of teenagers in the eligible population in Table 3 in Exhibit B. I divide the number of 13 through 18 year olds in this population by the total population amount to calculate the proportion of the total population that is each age. Next I multiply the proportion of each age group by the chilled population estimated by DHS (25,232) to determine the number of people for each age in the population. I present these results in Table 4 in Exhibit B.

60.     Once I have estimated the number of teenagers in this population it is a simple matter of arithmetic to estimate the total foregone earnings among teenagers that DHS estimates would disenroll from Federal housing programs ((number of 13 year olds x 4 years x $21,637) + ...+ (number of 18 year olds x 1 year x $21,637)). For the United States, the foregone earnings total $183,569,800.

61.     As stated earlier, it is also important to note that DHS estimates of the number of people subject to a chilling effect are likely to be an underestimate. The Urban Institute's report indicates that nearly 20 percent of adults living in low income families reported disenrolling from or choosing to not apply to federal non-cash benefits named in the Final Rule (compared to 13.7 percent in the overall sample).[62] Since families living in Federal housing programs are low income, they may disenroll at greater rates than the 2.5 rate DHS estimates.

62.     With these limitations in mind, the analysis of the chilling effect presented in this declaration has erred on the side of caution by using conservative estimates of the chilling effect. I also confine my estimates of the foregone earnings to teenagers disenrolling from Federal housing programs due to the Final Rule despite the fact that the benefits of public

---

[62] Bernstein, Hamutal, Gonzalez, Dulce, Karpman, Michael, and Zuckerman, Stephen. 2019. "One in Seven Adults in Immigrant Families Reported Avoiding Public Benefit Programs in 2018." Washington, DC: The Urban Institute. (https://www.urban.org/research/publication/one-seven-adults-immigrant-families-reported-avoiding-public-benefit-programs-2018, accessed on August 28, 2019).

housing for young children and adults are substantial and their disenrollment will presumably cause them harm as well.

63.     In this declaration I come to the conclusion that implementation of the Final Rule will result in harm to families that disenroll from Federal housing programs because they fear that remaining in these programs will affect their immigration status or the immigration status of a family member. Because living in Federal housing programs confers substantial benefits to residents, disenrolling will cause these individuals to experience substantial costs, including worse educational outcomes, lower earnings, and poorer health. Using the DHS estimate of chilling effect, I estimate that the foregone lifetime earnings of the teenagers who would disenroll due to the Final Rule would be $183,569,800.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of September, 2019.

_____

Ryan Allen