**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

MAKE THE ROAD NEW YORK, *et al.*,

                                    *Plaintiffs*,

            v.                                              **No. 19-cv-07993 (GBD)**

KEN CUCCINELLI, *et al.*,

                                    *Defendants*.

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

ARGUMENT ........................................................................................................ 5

I.      STANDARD OF REVIEW. ..........................................................................5

II.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS. .............................6

      A.     Plaintiffs Have Not Established Standing Or Ripeness. ..........................6

      B.     Plaintiffs Are Outside The Zone Of Interests Regulated By The Rule.................10

      C.     Plaintiffs' Substantive Claims Lack Merit........................................................11

              1.     The Rule Is Consistent With The Plain Meaning Of "Public Charge." .....................................................................................11

              2.     The Plain Meaning of Public Charge Does Not Require Permanent Receipt Of Government Benefits Or That Such Benefits Be Paid In Cash. ..............................................................15

              3.     The Rule Exercises Interpretive Authority That Congress Delegated To The Executive Branch, A Delegation Congress Has Maintained. ....................................................................17

              4.     The Rule Does Not Violate Section 504 Of The Rehabilitation Act. ...............................................................21

              5.     The Homeland Security Act Confers On The Secretary of Homeland Security The Authority To Promulgate The Rule. .............23

              6.     The Rule Is Not Arbitrary And Capricious..........................................24

                    a.     DHS Reasonably Concluded That The Rule Will Promote Self Sufficiency...................................................................24

                    b.     The Rule Preserves and Clarifies The Application Of The Totality of The Circumstances Test And Is Not Vague.............25

                    c.     DHS Reasonably Responded To Comments. ...........................27

                    d.     The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking. ..................................................................30

                    e.     The Rule Is Not Impermissibly Retroactive. ...........................32

                      f.     The Rule Does Not Violate Equal Protection. ..........................34

III.    PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM. ...................................36

IV.    THE REMAINING EQUITABLE FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION. ...............................................................................38

V.     THE COURT SHOULD NOT GRANT NATIONWIDE RELIEF...................................39

CONCLUSION................................................................................................. 40

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner*,
 387 U.S. 136 (1967) ................................................................................................ 9

*Agape Church, Inc. v. FCC*,
 738 F.3d 397 (D.C. Cir. 2013) .............................................................................. 29

*Am. Sec. & Tr. Co. v. Utley*,
 382 F.2d 451 (D.C. Cir. 1967) .............................................................................. 17

*Arlington Heights v. MHDC*,
 429 U.S. 252 (1977) ........................................................................................ 35, 36

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
 681 F.3d 427 (D.C. Cir. 2012) .............................................................................. 27

*Baker v. Johnston*,
 21 Mich. 319 (Mich. 1870) ................................................................................... 12

*Blunt v. Lower Merion Sch. Dist.*,
 767 F.3d 247 (3d Cir. 2014) .................................................................................. 37

*Brecker v. Queens B'Nai B'Rith Housing Dev. Fund*,
 607 F. Supp. 428 (E.D.N.Y. 1985) ....................................................................... 22

*Cachillo v. Insmed*,
 638 F.3d 401 (2d Cir. 2011) ................................................................................... 9

*California v. Azar*,
 911 F.3d 558 (9th Cir. 2018) ................................................................................ 39

*Carcano v. Cooper*,
 350 F. Supp. 3d 388 (M.D.N.C. 2018) ................................................................. 35

*Central, Ltd. v. U.S.*,
 138 S. Ct. 2067 (2018) .......................................................................................... 12

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
 868 F.3d 104 (2d Cir. 2017) ................................................................................... 8

*CFTC v. Schor*,
 478 U.S. 833 (1986) .............................................................................................. 19

*Chevron, U.S.A., Inc. v. NRDC*,
  467 U.S. 837 (1984) ................................................................................. 17, 30

*Clarke v. Sec. Indus. Ass'n*,
  479 U.S. 388 (1987) ........................................................................................ 10

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ..................................................................................... 9, 37

*Competitive Enter. Inst. v. DOT*,
  863 F.3d 911 (D.C. Cir. 2017) ......................................................................... 19

*Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor*,
  782 F.3d 102 (2d Cir. 2015) ............................................................................. 12

*Cushing v. Moore*,
  970 F.2d 1103 (2d Cir. 1992) ........................................................................... 22

*Davies v. State ex rel. Boyles*,
  17 Ohio Cir. Dec. 593 (Ohio Cir. Ct. 1905) ..................................................... 16

*Defs. of Wildlife v. Zinke*,
  856 F.3d 1248 (9th Cir. 2017) .......................................................................... 29

*East Bay Sanctuary Covenant v. Barr*,
  934 F.3d 1026 (9th Cir. 2019) ..................................................................... 39, 40

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
  733 F.3d 393 (2nd Cir. 2013) ............................................................................. 9

*Envtl. Def. Fund v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019) .......................................................................... 29

*Ex Parte Horn*,
  292 F. 455 (W.D. Wash. 1923) ......................................................................... 14

*Ex Parte Mitchell*,
  256 F. 229 (N.D.N.Y. 1919) ............................................................................. 14

*Ex Parte Pugliese*,
  209 F. 720 (W.D.N.Y. 1913) ............................................................................ 18

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ......................................................................................... 30

*Fed'n for Am. Immigration Reform, Inc. v. Reno*,
  93 F.3d 897 (D.C. Cir. 1996) ........................................................................... 11

*Food & Water Watch, Inc. v. Vilsack,*
   808 F.3d 905 (D.C. Cir. 2015) ................................................................. 7

*Freedom Holdings Inc. v. Splitzer,*
   408 F.3d 112 (2d Cir. 2005) ............................................................. 36, 37

*Gegiow v. Uhl,*
   239 U.S. 3 (1915) .......................................................................... 13, 14

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .......................................................................... 39

*Grand River Enter. Six Nations, Ltd. v. Pryor,*
   481 F.3d 60 (2nd Cir. 2007) .................................................................. 36

*Harris v. FCC,*
   776 F.3d 21 (D.C. Cir. 2015) ................................................................. 16

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ........................................................................... 7, 8

*Herrera-Molina v. Holder,*
   597 F.3d 128 (2d Cir. 2010) ................................................................. 32

*Howe v. United States,*
   247 F. 292 (2d Cir. 1917) ..................................................................... 14

*In Re: Application for Temporary Resident Status,*
   USCIS AAO, 2009 WL 4983092 (Sept. 14, 2009) ............................. 21-22

*In re Feinknopf,*
   47 F. 447 (E.D. N.Y. 1891) ................................................................... 15

*In re MTBE Prods. Liab. Litig.,*
   725 F.3d 65 (2nd Cir. 2013) ................................................................... 9

*INS v. Jong Ha Wang,*
   450 U.S. 139 (1981) ............................................................................. 17

*INS v. Legalization Assistance Proj.,*
   510 U.S. 1301 (1993) ........................................................................... 11

*Inv. Co. Inst. v. CFTC,*
   720 F.3d 370 (D.C. Cir. 2013) .............................................................. 29

*Jolly v. Coughlin,*
   76 F.3d 468 (2d Cir. 1996) ..................................................................... 6

*Knowledge Ecology Int'l v. Nat. Insts. of Health*,
No. PJM 18-1130, 2019 WL 1585285 (D. Md. Apr. 11, 2019) ............................................. 37

*Knutzen v. Eben Ezer Lutheran Hous. Ctr.*,
815 F.2d 1343 (10th Cir. 1987) ................................................................. 22

*Krasniqi v. Holder*,
316 F. App'x 7 (2d Cir. 2009) .................................................................... 26

*La. Forestry Ass'n v. U.S. Dep't of Labor*,
745 F.3d 653 (3d Cir. 2014)....................................................................... 24

*Lam Fung Yen v. Frick*,
233 F. 393 (6th Cir. 1916) ......................................................................... 13

*Landgraf v. USI Film Prod.*,
511 U.S. 244 (1994)............................................................................ 32, 33, 34

*Lewis v. Thompson*,
252 F.3d 567 (2d Cir. 2001)................................................................. 25, 34, 35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)............................................................................... 10, 11

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..................................................................................... 6

*Madden v. Kentucky*,
309 U.S. 83 (1940).................................................................................... 34

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994).................................................................................. 39

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012)............................................................................... 10, 11

*Matter of A—*,
19 I. & N. Dec. 867 (BIA 1988) .............................................................. 20, 26

*Matter of B—*,
3 I. & N. Dec. 323- (BIA 1948) ..................................................................... 20

*Matter of Harutunian*,
14 I. & N. Dec. 583 (BIA 1974) .............................................................. 18, 20

*Matter of Martinez-Lopez*,
10 I. & N. Dec. 409 (A.G. 1962) ................................................................... 20

*Matter of Perez*,
    15 I. & N. Dec. 136 (BIA 1974) ........................................................................ 19

*Matter of Vindman*,
    16 I. & N. Dec. 131 (BIA 1977) ........................................................................ 18

*McAndrews v. Fleet Bank of Massachusetts, N.A.*,
    989 F.2d 13 (1st Cir. 1993) .............................................................................. 33

*Metro. Life Ins. Co. v. Bucsek*,
    919 F.3d 184 (2nd Cir. 2019) ........................................................................... 38

*Monserrate v. New York State Senate*,
    599 F.3d 148 (2nd Cir. 2010) ............................................................................. 6

*Munaf v. Geren*,
    553 U.S. 674 (2008) ...................................................................................... 5, 6

*NAACP v. City of Kyle*,
    626 F.3d 233 (5th Cir. 2010) ............................................................................ 37

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ........................................................................................ 30

*Nat'l Org. for Marriage, Inc. v. Walsh*,
    714 F.3d 682 (2nd Cir. 2013) ............................................................................. 9

*Nat'l Taxpayers Union, Inc. v. United States*,
    68 F.3d 1428 (D.C. Cir. 1995) ........................................................................... 8

*Natofsky v. City of New York*,
    921 F.3d 337 (2d Cir. 2019) ............................................................................. 21

*New York State Psychiatric Ass'n v. UnitedHealth Grp.*,
    798 F.3d 125 (2d Cir. 2015) ......................................................................... 8, 37

*New York v. DOJ*,
    343 F. Supp. 3d 213 (S.D.N.Y. 2018) ............................................................. 28

*NRDC v. DOE*,
    362 F. Supp. 3d 126 (S.D.N.Y. 2019) ............................................................. 28

*NRDC v. FDA*,
    710 F.3d 71 (2d Cir. 2013) ........................................................................... 9, 37

*Nutritional Health All. v. FDA*,
    318 F.3d 92, 102 (2d Cir. 2003) ...................................................................... 22

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................................ 10

*Ollie v. Univ. of Conn.*,
  364 F. Supp. 3d 143 (D. Conn. 2019) ............................................................... 9

*One West Bank v. Melina*,
  827 F.3d 214 (2d Cir. 2016) ............................................................................ 12

*Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*,
  23 N.J.L. 169 (N.J. 1851) ................................................................................ 13

*People ex rel. Durfee v. Comm'rs of Emigration*,
  27 Barb. 562 (N.Y. Gen. Term 1858) ............................................................... 16

*Poor Dist. of Edenburg v. Poor Dist. of Strattanville*,
  5 Pa. Super. 516 (Pa. Super. Ct. 1897) ............................................................ 16

*Pub. Citizen, Inc. v. FAA*,
  988 F.2d 186 (D.C. Cir. 1993) ......................................................................... 27

*Rodriguez by Rodriguez v. DeBuono*,
  175 F.3d 227 (2nd Cir. 1998) ..................................................................... 36, 38

*Ross v. Bank of America, N.A.*,
  524 F.3d 217 (2nd Cir. 2008) ............................................................................ 9

*Salinger v. Colting*,
  607 F.3d 68 (2nd Cir. 2010) ............................................................................ 36

*Samuels v. Chertoff*,
  550 F.3d 252 (2d Cir. 2008) ............................................................................ 33

*Sarango v. Att'y Gen.*,
  651 F.3d 380 (3d Cir. 2011) ............................................................................ 24

*Scheerer v. U.S. Att'y Gen.*,
  513 F.3d 1244 (11th Cir. 2008) ....................................................................... 24

*Simmonds v. INS*,
  326 F.3d 351 (2nd Cir. 2003) ............................................................................ 9

*St. Johnsbury Acad. v. D.H.*,
  240 F.3d 163 (2d Cir. 2001) ............................................................................ 22

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................... 7, 9, 37

*Taniguichi v. Kan Pac. Saipan, Ltd.*,
   566 U.S. 560 (2012) ........................................................................................... 12

*Texas v. EPA*,
   829 F.3d 405 (5th Cir. 2016) ............................................................................. 39

*Texas v. United States*,
   95 F. Supp. 3d 965 (N.D. Tex. 2015) ............................................................... 6

*Thomas v. Union Carbide Agric. Prods. Co.*,
   472 U.S. 568 (1985) ............................................................................................. 9

*Toilet Goods Ass'n v. Gardner*,
   387 U.S. 158 (1967) ........................................................................................... 10

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ....................................................................................... 39

*Town of Hartford v. Town of Hartland*,
   19 Vt. 392 ( 1847) .............................................................................................. 16

*Trump v. Hawaii*,
   138 S. Ct. 2392 (2018) ................................................................................. 34, 35

*United States v. Lipkis*,
   56 F. 427 (S.D.N.Y. 1893) ................................................................................ 15

*U.S. ex rel. Mantler v. Comm'r of Immigration*,
   3 F.2d 234 (2d Cir. 1924) .................................................................................. 14

*Valle del Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ........................................................................ 7, 8

*Vidal v. Neilsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ............................................................ 38

*VIP of Berlin v. Town of Berlin*,
   593 F.3d 179 (2d Cir. 2010) ................................................................................ 6

*Wallis v. U.S. ex rel. Mannara*,
   273 F. 509 (2d Cir. 1921) .................................................................................. 18

*Washington v. Trump*,
   276 F. Supp. 3d 174 (S.D.N.Y. 2017) ......................................................... 7, 37

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ........................................................................................... 40

*Winter v. NRDC*,
   555 U.S. 7 (2008) ...................................................................... 6, 39, 41

*Yeatman v. King*,
   51 N.W. 721 (N.D. 1892) ................................................................ 16

*Yuen Jin v. Mukasey*,
   538 F.3d 143 (2d Cir. 2008) ........................................................ 26, 27

**STATUTES**

5 U.S.C. § 705 ................................................................................. 40

6 U.S.C. § 112 ................................................................................. 23

6 U.S.C. § 202(3) ............................................................................ 23

6 U.S.C. § 251 ................................................................................. 24

6 U.S.C. § 271(b) ............................................................................ 24

6 U.S.C. § 542 ................................................................................. 24

6 U.S.C. § 557 ................................................................................. 24

8 U.S.C. § 1103 ........................................................................... 18, 23

8 U.S.C. § 1182(a)(4) ............................................................. 1, 3, 17, 26

8 U.S.C. § 1252 ............................................................................... 11

8 U.S.C. § 1601 ......................................................................... *passim*

29 U.S.C. § 794(a) ...................................................................... 21, 22

42 U.S.C. § 607(e) .......................................................................... 32

Homeland Security Act of 2002,
   Pub. L. 107-296, 116 Stat. 2135 .................................................. 23, 24

Personal Responsibility and Work Opportunity Reconciliation Act,
   Pub. L. No. 104-193, 110 Stat. 2105 (1996), ....................................... 4

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
   Pub. L. No. 104-208, 110 Stat. 3009 .................................................. 1

Immigration Act of 1882, 22 Stat. 214 ................................................... 3

Immigration Act of 1891, 26 Stat. 1084 ....................................................................... 3, 13

Immigration Act of 1917, 39 Stat. 874 .............................................................................. 3

Immigration and Nationality Act of 1952, 66 Stat. 163 ...................................................... 3

**REGULATIONS**

6 C.F.R. § 15.30 .............................................................................................................. 21

8 C.F.R. § 212.22 ............................................................................................................ 27

8 C.F.R. § 221.21(b) ........................................................................................................ 27

*Inadmissibility and Deportability on Public Charge Grounds,*
    64 Fed. Reg. 28676 (May 26, 1999) ........................................................................... 4, 21

*Field Guidance on Deportability and Inadmissibility on Public Charge Grounds,*
    64 Fed. Reg. 28689 (May 26, 1999) ............................................................... *passim*

*Inadmissibility on Public Charge Grounds,*
    83 Fed. Reg. 51114 (Oct. 10, 2018) ................................................................ *passim*

*Inadmissibility on Public Charge Grounds,*
    84 Fed. Reg. 41292 (Aug. 14, 2019) ............................................................... *passim*

**LEGISLATIVE MATERIALS**

26 Cong. Rec. 657 (1894) (statement of Rep. Warner) ........................................... 14-15

H.R. Doc. No. 64-886 (1916) ...................................................................................... 13

S. Rep. No. 81-1515 (1950) ..................................................................... 14, 17, 18, 19

H.R. Rep. No. 104-829 (1996) (Conf. Rep.) ................................................................. 1

**OTHER AUTHORITIES**

Arthur Cook, et al., Immigration Laws of the U.S. (1929) .................................... 12, 14

Century Dictionary & Cyclopedia (1911) ...................................................................... 13

E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 (1981) ....... 3

Frederic Jesup Stimson, Glossary of the Common Law (1881) .................................... 12

Stewart Rapalje et al., Dict. of Am. and English Law (1888) ......................................................... 12

Merriam-Webster Dictionary Online ............................................................................................... 12

C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in
    the Law, with References to Authorities (1882) ...................................................................... 12

## INTRODUCTION

For over 135 years, Congress has restricted the admissibility of aliens who are likely, in the judgment of the Executive Branch, to become "public charges." Congress has never defined the term "public charge," but it has long been understood to mean a person who cannot provide himself with the basic needs of subsistence, and therefore imposes a burden on the public fisc to provide him with aid in obtaining the necessities of daily life. A major purpose of the public charge ground of inadmissibility is to set the expectation for immigrants that they be self-sufficient and refrain from entering the United States with the expectation of receiving public benefits, thereby ensuring that persons unable or unwilling to provide for themselves do not impose an ongoing burden on the American public. For the past two decades, the public charge ground of inadmissibility, which applies in various ways to both applications for admission to the United States and for adjustment of status to lawful permanent resident, has been governed by interim field guidance adopted without the benefit of notice-and-comment procedures.

On August 14, 2019, the Department of Homeland Security ("DHS") published *Inadmissibility on Public Charge Grounds* ("Rule") in the Federal Register. 84 Fed. Reg. 41292. This final rule is the culmination of an extensive, multi-year process to adopt regulations that prescribe how DHS will determine whether an alien applying for admission or adjustment of status is inadmissible under section 212(a)(4) of the Immigration and Nationality Act ("INA") because he is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4). This Rule is long overdue: in 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (1996), "to expand the public charge ground of inadmissibility" after concluding that "only a negligible number of aliens who become public charges have been deported in the last decade." H.R. Rep. 104-828, at 240-241 (1996); *see also* IIRIRA § 531 (enumerating "minimum" factors to be considered in every public charge determination). Congress therefore provided the INS with a list of factors to consider "at a minimum" in forming an "opinion" about whether an alien is "likely at any time to become a public charge." Yet for two decades, DHS has provided its officers, current and prospective

immigrants, and the public with nothing more than an interim guidance document to specify how the factors are being implemented.

The Rule revises the anomalous definition of "public charge" set forth for the first time in that 1999 interim guidance to better reflect Congress's legislated policy making aliens who are likely to require public support to obtain their basic needs inadmissible. The Rule also reflects Congress's delegation of broad authority to the Executive Branch concerning the meaning of "public charge" and the establishment of procedures for forming an "opinion" about whether individual aliens are "likely at any time to become a public charge." The Rule is the product of a well-reasoned process that considered the plain text of the statute, legislative intent, statistical evidence, and the substance of hundreds of thousands of comments submitted by the public. Finally, the Rule has a limited scope: it does not apply to naturalization applications filed by lawful permanent residents ("LPRs"), or lead to public charge inadmissibility determinations based on the receipt of Emergency Medicaid, disaster assistance, school lunches, or benefits received by U.S.-born children. Nor does it apply to refugees or asylum recipients.

Plaintiffs—a group of five nonprofit organizations providing services to aliens and others—nevertheless seek a nationwide preliminary injunction against the Rule. This Court should deny the motion. Plaintiffs, who are organizations rather than aliens actually governed by the Rule, cannot meet basic jurisdictional requirements, and their claims in any event are meritless. The Rule accords with the longstanding meaning of "public charge" and complies with the APA and other relevant statutes. In short, Plaintiffs provide no basis for turning their abstract policy disagreement with the Executive Branch into a stay of the effective date of the Rule or a nationwide injunction.

## BACKGROUND

"Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes." 8 U.S.C. § 1601(1). "[T]he immigration policy of the United States [is] that aliens within the Nation's borders not depend on public resources to meet their needs." *Id.* § 1601(2)(A). Rather, aliens must "rely on their own capabilities and the resources of their families, their sponsors, and private organizations." *Id.* Relatedly, "the availability of

2

public benefits [is] not [to] constitute an incentive for immigration to the United States." *Id.* 1601(2)(B).

These statutorily enumerated policies are effectuated in part through the public charge ground of inadmissibility in the INA. With certain exceptions, the INA provides that "[a]ny alien who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission or adjustment of status, is likely at any time to become a public charge is inadmissible." *Id.* § 1182(a)(4)(A). An unbroken line of predecessor statutes going back to 1882 has contained a similar inadmissibility ground for public charges, and those statutes have, without exception, delegated to the Executive Branch the authority to determine who constitutes a public charge for purposes of that provision. *See* Immigration Act of 1882, 47th Cong. ch. 376, §§ 1-2, 22 Stat. 214 ("1882 Act"); 1891 Immigration Act, 51st Cong. ch. 551, 26 Stat. 1084 ("1891 Act"); Immigration Act of 1907, 59th Cong. ch. 1134, 34 Stat. 898 ("1907 Act"); Immigration Act of 1917, 64th Cong. ch. 29 § 3, 39 Stat. 874, 876 ("1917 Act"); INA of 1952, 82nd Cong. ch. 477, 66 Stat. 163. In IIRIRA, Congress added to these predecessor statutes by instructing that, in making public charge determinations, "the consular officer or the Attorney General shall at a minimum consider the alien's: (1) age; (2) health; (3) family status; (4) assets, resources, and financial status; and (5) education and skills," 8 U.S.C. § 1182(a)(4)(B) (Arabic numerals substituted), but otherwise left in place the broad delegation of authority to the Executive Branch to determine who constitutes a public charge.

The longstanding denial of admission of aliens believed likely to become public charges dates from the colonial era, when a principal "concern [in] provincial and state regulation of immigration was with the coming of persons who might become a burden to the community," and "colonies and states sought to protect themselves by [the] exclusion of potential public charges." E. P. Hutchinson, Legislative History of American Immigration Policy, 1798-1965 at 410 (1981). Provisions requiring the exclusion and deportation of public charges emerged in federal law in the late 19th century. *See, e.g.*, 1882 Act at 214 (excluding any immigrant "unable to take care of himself or herself without becoming a public charge"); 1891 Act § 11 (providing for deportation

of "any alien who becomes a public charge within one year after his arrival in the United States from causes existing prior to his landing").

In 1996, Congress enacted immigration and welfare reform statutes that bear on the public charge inadmissibility determination. IIRIRA strengthened the enforcement of the public charge inadmissibility ground in several ways. Besides codifying mandatory factors for immigration officers to consider, *see supra*, it raised the standards and responsibilities for persons who must "sponsor" an alien by pledging to bear financial responsibility for that immigrant and requiring that sponsors demonstrate sufficient means to support the alien. Contemporaneously, the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. No. 104-193, 110 Stat. 2105 (1996), restricted most aliens from accessing many public support programs, including Supplemental Security Income ("SSI") and nutrition programs. PRWORA also made the sponsorship requirements in IIRIRA legally enforceable against sponsors.

In light of the 1996 legislative developments, the INS attempted in 1999 to engage in notice and comment rulemaking to guide immigration officers, aliens, and the public in understanding public charge determinations. *See Inadmissibility and Deportability on Public Charge Grounds*, 64 Fed. Reg. 28676 (May 26, 1999) ("1999 NPRM"). No final rule was ever issued, however. Instead, the agency adopted the 1999 NPRM interpretation on an interim basis by publishing *Field Guidance on Deportability and Inadmissibility on Public Charge Grounds*, 64 Fed. Reg. 28689 (May 26, 1999) ("1999 Interim Field Guidance"). The Interim Field Guidance dramatically narrowed the public charge inadmissibility ground by defining "public charge" as a person "primarily dependent on the government for subsistence," *id.*, and by barring immigration officers from considering any non-cash public benefits, regardless of the value or length of receipt, as part of the public charge determination. *See* 1999 NPRM at 28678. Under that standard, an alien receiving Medicaid, food stamps, and public housing, but no cash assistance, would have been treated as no more likely at any time in the future to become a public charge than an alien who was entirely self-sufficient.

The Rule revises this approach and adopts, through notice-and-comment rulemaking, a

well-reasoned definition of public charge providing practical guidance to Executive Branch officials making public charge inadmissibility determinations. DHS began by publishing a Notice of Proposed Rulemaking, comprising 182 pages of description, evidence, and analysis. *See Inadmissibility on Public Charge Grounds*, 83 Fed. Reg. 51114 (Oct. 10, 2018) ("NPRM"). The NPRM provided a 60-day public comment period, during which 266,077 comments were collected. *See* Rule at 41297. After considering these comments, DHS published the Rule, addressing comments, making several revisions to the proposed rule, and providing over 200 pages of analysis in support of the Rule. Among the Rule's major components are provisions defining "public charge" and "public benefit" (neither of which are defined in the statute), an enumeration of factors to be considered in the totality of the circumstances when making a public charge inadmissibility determination, and a requirement that aliens seeking an extension of stay or a change of status show that they have not received public support in excess of the Rule's threshold since obtaining the nonimmigrant status they seek to extend or change. The Rule supersedes the Interim Field Guidance in its entirety, establishing a new definition of "public charge" based on a minimum duration threshold for the receipt of public benefits. Under this "12/36 standard," a public charge is an alien who receives designated public benefits for more than 12 months in the aggregate within any 36-month period. *Id*. at 41297. Such "public benefits" are extended by the Rule to include many non-cash benefits: with some exceptions, an alien's participation in the Supplemental Nutrition Assistance Program ("SNAP"), Section 8 Housing Programs, Medicaid, and Public Housing may now be considered as part of the public charge inadmissibility determination. *Id*. at 41501-02. The Rule also enumerates a non-exclusive list of factors for assessing whether an alien is likely at any time to become a public charge and explains how DHS officers should apply these factors as part of a totality-of-the-circumstances decision. *Id.* at 41295.

## ARGUMENT

### I.   STANDARD OF REVIEW.

Preliminary injunctions are "extraordinary and drastic remed[ies]" that are "never . . . awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotations omitted). A party

seeking to enjoin "government action taken in the public interest pursuant to a statutory or regulatory scheme" in a way that would "alter, rather than maintain, the status quo . . . must demonstrate irreparable harm and a clear or substantial likelihood of success on the merits," *VIP of Berlin v. Town of Berlin*, 593 F.3d 179, 185-86 (2d Cir. 2010) (quotation omitted),[1] and must also show that the balance of equities tips in their favor and that an injunction is in the public interest. *Winter v. NRDC*, 557 U.S. 7, 20 (2008). Where, as here, there are serious questions as to the Court's jurisdiction, it is "more *unlikely*" that the plaintiff can establish a "likelihood of success on the merits." *Munaf*, 553 U.S. at 690.

In the alternative, Plaintiffs seek a stay of the effective date of the Rule under Section 705 of the APA. *See* Mem. of Law in Support of Pls. Mot. for Prelim. Inj. (Mot.) at 16, ECF No. 39. As they correctly observe, the Court should "appl[y] the same test" to determine whether relief is available under Section 705. Mot. at 16 (citing *Texas v. United States*, 95 F. Supp. 3d 965, 973 (N.D. Tex. 2015)). Plaintiffs have not met this standard.

## II.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

### A.  Plaintiffs Have Not Established Standing Or Ripeness.

As the party invoking federal jurisdiction, Plaintiff bears the burden of establishing standing, "an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "To seek injunctive relief, a plaintiff must show that [it] is under threat of suffering 'injury in fact' that is concrete and particularized; the

---

[1] Plaintiffs allege that their proposed injunction would maintain the status quo, and that they therefore they need not demonstrate a "substantial" likelihood of success on the merits. Mot. at 16 & n. 20. This assertion is belied, however, by their effort to demonstrate irreparable harm by describing the activities they have already engaged in. *See* Mot. at 36 (explaining the dozens of workshops two of the plaintiffs have held describing the effects of the Rule). As Plaintiffs make clear, the expectations on the part of aliens (and, for that matter, Plaintiffs) have already adjusted to the Rule, and entry of a preliminary injunction would thereby *disrupt*, rather than *maintain*, the status quo. DHS is likewise well along the road to preparing the agency for the October 15, 2019 effective date. As the Second Circuit has explained, where an order "would require a dramatic shift" in current agency policy, such injunction should be characterized as mandatory and subject to the "substantial likelihood" standard. *Jolly v. Coughlin*, 76 F.3d 468, 474 (2d Cir. 1996). Nor can the Second Circuit's lesser "serious questions" test be relied upon here where Plaintiffs challenge a "governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Monserrate v. New York State Senate*, 599 F.3d 148, 154 (2nd Cir. 2010).

threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

Plaintiffs rely on an "organizational" standing theory. Mot. at 35-37. Generally, for an organization to have standing, the challenged conduct must "perceptibly impair[]" the "organization's activities," with a "consequent drain on the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). It is insufficient to allege only "a setback to the organization's abstract social interests." *Id.* In addition, an organization must show that "defendant's conduct or policy interferes with or burdens [its] ability to carry out its usual activities." *Citizens for Responsibility & Ethics in Washington ("CREW") v. Trump*, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017), vacated and remanded on other grounds, No. 18-474, 2019 WL 4383205 (2d Cir. Sept. 13, 2019). An organization must show that it was compelled to direct resources towards activities it would not have performed "in the ordinary course." *Id.* at 191-92; *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015) ("an organization does not suffer an injury in fact where it expend[s] resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended") (cleaned up).

Here, Plaintiffs do not allege they were forced to direct resources towards activities that they do not perform in the ordinary course. Instead, Plaintiffs allege that they will have to direct resources into education and legal services for their clients, *see* Mot. 36-37, precisely the services they regularly provide. *See*, *e.g.*, Oshiro Decl. ¶ 6 (Make the Road New York is in the business of providing "legal and survival services," and "transformative education"); Russell Decl. ¶¶ 4, 6-7 (Catholic Charities Community Services regularly provides education and advocacy services to immigrant populations). Plaintiffs are "not wasting resources by educating the public" and providing legal services. *CREW*, 276 F. Supp. 3d at 191. "This is exactly how" organizations like Plaintiffs "spend[] [their] resources in the ordinary course," and thus they have suffered no "concrete or particularized injury." *Id.* at 191-92.

This case is thus distinguishable from the cases on which Plaintiffs rely. In *Valle del Sol*

7

*Inc. v. Whiting*, certain organizations challenged an Arizona law criminalizing, under certain circumstances, the transportation or harboring of unauthorized aliens. 732 F.3d 1006, 1012-13 (9th Cir. 2013). The plaintiff organizations—whose volunteers helped transport and shelter aliens—submitted declarations stating that they had to divert resources into educating their volunteers over the law, lest they "be deterred from conducting these functions." *Id.* at 1018. These organizations were not in the business of providing educational services for their employees concerning new changes to the immigration laws, and thus they were forced to direct funds into an entirely new service. *See id.* Likewise, in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, the plaintiff organization was in the business of organizing day laborers, and challenged an ordinance that restricted their ability to gather in a single place to seek employment. 868 F.3d 104, 108 (2d Cir. 2017). To establish standing, the plaintiffs alleged that the ordinance would result in the "disbursement of day laborers," forcing the plaintiff to divert funds into locating them—an extraneous activity it would not undertake but for the ordinance.[2] *Id.* at 110. Plaintiffs here, by contrast, simply claim they must update the services they already provide to account for changed circumstances. If this were sufficient for standing, Plaintiffs would be authorized to challenge *any* change to the immigration laws.

Separately, Plaintiffs have asserted no coherent theory of standing for their Fifth Amendment claim, which they appear to assert on behalf of their members or constituents rather than themselves. *See* Mot. at 31-34 (citing equal protection component of the Fifth Amendment); Compl. at 115, ECF No. 1. Because Plaintiffs have not even alleged the necessary elements of associational standing, much less provided evidence in support, they cannot pursue their Fifth Amendment claim. *See New York State Psychiatric Ass'n v. UnitedHealth Grp.*, 798 F.3d 125, 130 (2d Cir. 2015) ("An association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief

---

[2] Plaintiffs also argue that the Rule harms their mission to empower certain communities by "threatening" their members with a "denial of adjustment." Mot. at 37. But any such effect would only impact the organizations' "abstract social interests," which is insufficient to support standing. *Havens*, 455 U.S. at 379.

requested requires the participation of individual members in the lawsuit.") (quotations omitted); *Summers*, 555 U.S. at 499; *NRDC v. FDA*, 710 F.3d 71, 79 (2d Cir. 2013).

Plaintiffs' claims of irreparable harm also fail to establish standing. Those claims consist of potential future harms that, if they ever came to pass, would be spurred by decisions of third parties not before the Court. Such speculative allegations are insufficient to establish Article III standing, particularly at the preliminary injunction stage. *See Cachillo v. Insmed*, 638 F.3d 401, 404 (2d Cir. 2011) ("When a preliminary injunction is sought, a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment.") (internal quotation marks omitted). Here, the Rule governs DHS personnel and certain aliens. It "neither require[s] nor forbid[s] any action on the part of" Plaintiffs, nor does it expressly interfere with any of their programs applicable to aliens. *Summers*, 555 U.S. at 493.

To be justiciable, a cause of action must also be ripe. *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2nd Cir. 2013). "Ripeness 'is peculiarly a question of timing,' and "[a] claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 472 U.S. 568, 580-81 (1985)). The constitutional "aspect of the ripeness doctrine overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 110 (2nd Cir. 2013) (quoting *Ross v. Bank of America, N.A.*, 524 F.3d 217, 226 (2nd Cir. 2008)). Thus, for the same reasons stated above regarding lack of standing, Plaintiffs' claims fail to demonstrate constitutional ripeness. *See, e.g., Ollie v. Univ. of Conn.*, 364 F. Supp. 3d 143, 153-55 (D. Conn. 2019).

Prudential ripeness also counsels against consideration of Plaintiffs' claims. This doctrine "protect[s] agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2nd Cir. 2013) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)). In resolving ripeness questions, courts examine "whether an issue is fit for judicial decision," and "whether and to what extent the parties will endure hardship if decision is withheld."

*Simmonds v. INS*, 326 F.3d 351, 359 (2nd Cir. 2003). Fitness is generally lacking where the reviewing court "would benefit from further factual development of the issues presented." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998). Here, Plaintiffs' claims are premised on speculation about the potential future effects of the Rule and disagreement with DHS's predictions based on the available evidence. Thus, "judicial appraisal of these [questions]" should await the "surer footing [of] the context of a specific application of this regulation." *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 164 (1967).

Additionally, withholding judicial consideration of Plaintiffs' claims will not cause them any significant hardship. With respect to the organizations here, the Rule "do[es] not create adverse consequences of a strictly legal kind, that is, effects of a sort that traditionally would have qualified as harm," and therefore cannot serve as the basis for a ripe claim. *Ohio Forestry Ass'n*, 523 U.S. at 733. Instead, the harms alleged are possible cumulative side effects of third party individuals' decisions to take action not required by the Rule, so they do not create a ripe facial challenge.

### B.  Plaintiffs Are Outside The Zone Of Interests Regulated By The Rule.

Even if Plaintiffs could meet their standing and ripeness burdens, Plaintiffs' claims would still fail because they are outside the zone of interests served by the limits of the "public charge" inadmissibility provision in § 1182(a)(4)(A) and related sections. The "zone-of-interests" requirement limits the plaintiffs who "may invoke [a] cause of action" to enforce a particular statutory provision or its limits. *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129-30 (2014). Under the APA, a plaintiff falls outside this zone when its "interest[s] are . . . marginally related to or inconsistent with the purposes implicit in the statute." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). This standard applies with equal force where, as here, Plaintiffs seek to challenge the government's adherence to statutory provisions in the guise of an APA claim. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012).

Plaintiffs plainly fall outside the zone of interests served by the limits of the meaning of public charge in the inadmissibility statute. At issue in this litigation is whether DHS will deny admission or adjustment of status to certain aliens deemed inadmissible on public charge grounds.

By using the term "public charge" rather than a broader term like "non-affluent," Congress ensured that only certain aliens could be determined inadmissible on the public charge ground. It is aliens improperly determined inadmissible, not organizations providing health care, advocacy, or community services, who "fall within the zone of interests protected" by any limitations implicit in §§ 1182(a)(4)(A) and 1183, because they are the "reasonable—indeed, predictable—challengers" to DHS's inadmissibility decisions. *Patchak*, 567 U.S. at 227; *see* 8 U.S.C. § 1252 (providing individuals who have a final order of removal from the United States based on a public charge determination an opportunity to file a petition for review before a federal court of appeals to contest the definition of public charge as applied to them). The interest in avoiding a purported "diversion" of "resources to educating their clients, members, and the public" asserted by the Plaintiffs, Mot. at 35-36, is not even "marginally related" to the interests of an alien seeking to demonstrate that the "public charge" inadmissibility ground has been improperly applied to his detriment. *Cf. INS v. Legalization Assistance Proj.*, 510 U.S. 1301, 1304-05 (1993) (O'Connor, J., in chambers) (concluding that relevant INA provisions were "clearly meant to protect the interests of undocumented aliens, not the interests of organizations [that provide legal help to immigrants]," and that the fact that a "regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect"); *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 904 (D.C. Cir. 1996) (dismissing under zone-of-interests test a suit challenging parole of aliens into this country, where plaintiffs relied on incidental effects of that policy on workers). Likewise, Plaintiffs' equal protection claim seeks to assert the interests of third party individuals allegedly suffering from discrimination, and it would be those individuals, not non-profit organizations providing community services, that fall within the zone of interests of the Constitution's equal protection clause. *See generally Lexmark*, 572 U.S. at 127-28.

**C. Plaintiffs' Substantive Claims Lack Merit.**

**1. The Rule Is Consistent With The Plain Meaning Of "Public Charge."**

The definition of "public charge" in the Rule is consistent with the plain meaning of the

statutory text, which "is to be determined as of the time that it became law." *One West Bank v. Melina*, 827 F.3d 214, 220 (2d Cir. 2016); *see Wisc. Central, Ltd. v. U.S.*, 138 S. Ct. 2067, 2070 (2018) (a court's "job is to interpret the words consistent with their ordinary meaning ... at the time Congress enacted the statute") (internal quotations omitted). To do so, a court begins by "consulting 'dictionaries in use when Congress enacted [the] statute in question' for ordinary meaning." *Continental Terminals, Inc. v. Waterfront Comm'n of N.Y. Harbor*, 782 F.3d 102, 109 (2d Cir. 2015) (quoting *Taniguichi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012)). Here, it is undisputed that since 1882, Congress has consistently provided for the exclusion of indigent aliens determined by the Executive Branch as likely to become "public charges," *compare* Mot. at 6-7 *with* NPRM at 51125, making that era the appropriate time for determining the plain meaning.

Contemporary dictionaries from the 1880s define "charge" as "an obligation or liability," such as "a pauper being chargeable to the parish or town." Stewart Rapalje *et al.*, Dict. of Am. and English Law (1888) ("Rapalje 1888"); *accord* Frederic Jesup Stimson, Glossary of the Common Law (1881) (defining "charge" as "[a] burden, incumbrance, or lien; as when land is charged with a debt") ("Stimson 1881"). As to the term "public," such dictionaries explain the term "public" as meaning "[t]he whole body of citizens of a nation, or of a particular district or city, [or] [a]ffecting the entire community." Rapalje 1888.[3] Together, these early definitions make clear that an alien becomes a "public charge" when his inability to achieve self-sufficiency imposes an "obligation" or "liability" on "the body of the citizens" to provide for his basic necessities, as reflected in early legal sources addressing the term "public charge." *See* Arthur Cook *et al.*, Immigration Laws of the U.S., § 285 (1929) ("Public charge means any maintenance, or financial assistance, rendered from public funds.").[4]

---

[3] *See also* C.H. Winfield, Words and Phrases, A Collection of Adjudicated Definitions of Terms Used in the Law, with References . . ., 501 (1882) ("Public" means "not any corporation like a city, town, or county but the body of the people at large." (quoting *Baker v. Johnston*, 21 Mich. 319 (Mich. 1870)).

[4] The original public meaning of "public charge," as derived from the definitions of "public" and "charge," is consistent with modern dictionary definitions of the term "public charge." For example, the online "Merriam-Webster Dictionary defines public charge simply as 'one that is supported at public expense.'" NPRM at 51158 (quoting "Public Charge", http://www. merriamwebster.com/dictionary/public%20charge (last visited Sept. 9, 2019)). Similarly, "Black's Law Dictionary (6th ed.) . . . defines public charge as 'an indigent; a person whom it is necessary

Nothing about the plain meaning of this term suggests that a person must be "destitute and unable to work," or "wholly unable to care for themselves," as Plaintiffs contend. Mot. at 1, 6. When Congress originally enacted the public charge inadmissibility ground, the distinct term "pauper" was in common use for a destitute person. *See, e.g.*, Century Dictionary & Cyclopedia (1911) (defining "pauper" as "[a] very poor person; a person entirely destitute"); *see also Overseers of Princeton Twp. v. Overseers of S. Brunswick Twp.*, 23 N.J.L. 169, 172 (N.J. 1851) (treating "a pauper" and "a person likely to become chargeable" as two separate classes). And in early versions of the statute, Congress provided a *separate* inadmissibility ground for paupers. *See, e.g.*, 1891 Act.[5] Congress thereby made "clear that the term 'persons likely to become a public charge' is *not* limited to paupers or those liable to become such; 'paupers' are mentioned as in a separate class." *Lam Fung Yen v. Frick*, 233 F. 393, 396 (6th Cir. 1916) (emphasis added).

The expansiveness of the meaning of "public charge" relative to "pauper" is underscored by the response of the Executive Branch and Congress to a 1916 Supreme Court opinion reasoning that the term "public charge" must be read as "generically similar" to terms "mentioned before and after" (such as "pauper"). *Gegiow v. Uhl*, 239 U.S. 3 (1915). Shortly after the decision, the Secretary of Labor sent a letter to Congress, requesting that the statute be amended to supersede the Supreme Court's ruling. *See* H.R. Doc. No. 64-886, at 3-4 (Mar. 11, 1916). The Secretary defined "public charge" as "a charge (an economic burden) upon the community" to which an alien is going. The Secretary then explained that the Court's opinion in *Gegiow* had highlighted a never-before recognized "defect in . . . the arrangement of the wording," which, if left uncorrected, would "materially reduce[] the effect of the clause" as the "chief measure of protection in the law . . . intended to reach economic . . . objections to the admission" of aliens. *Id.* Congress acted and explained why: "The purpose of this change [is to overcome recent decisions of the courts limiting

---

to support at public expense by reason of poverty alone or illness and poverty.'" *Id.*

[5] The 1891 Act provided "[t]hat the following classes of aliens shall be excluded from admission . . . : "All idiots, insane persons, paupers or persons likely to become a public charge, persons suffering from a loathsome . . . disease, [those] convicted of a felony or other infamous crime or misdemeanor involving moral turpitude, polygamists, and also any person whose ticket or passage is paid for with the money of another . . . unless it is affirmatively . . . shown . . . that such person does not belong to one of the forgoing excluded classes." 1891 Act at 1094.

the meaning of the description of the excluded class because of its position between other descriptions conceived to be of the same general and generical nature. (See especially Gegiow v. Uhl)." S. Rep. 64-352 at 5 (1916).[6] Subsequent authorities recognized that the 1917 Act negated the Court's interpretation in *Gegiow* by underscoring that the term "public charge" is "not associated with paupers or professional beggars." *Ex Parte Horn*, 292 F. 455, 457 (W.D. Wash. 1923) (explaining that "public charge" in the 1917 Act "is differentiated from the application in *Gegiow*"); *accord* Arthur Cook, Immigration Laws, §§ 128-34; *but see Ex Parte Mitchell*, 256 F. 229, 232 (N.D.N.Y. 1919) (declining to give effect to relocation of "public charge").[7]

Although Plaintiffs assert that the "primarily dependent" standard they urge has been applied consistently for "more than 130 years," Mot. at 5, they identify no source—and Defendants are aware of none—that defines "public charge" using those words or their cognates prior to 1999, when INS issued the nonbinding, interim field guidance.[8] In contrast, there is longstanding evidence that the term "[p]ublic charge means *any* maintenance, or financial assistance, rendered from public funds." Cook, Immigration Laws, § 285 (emphasis added); *see also* 26 Cong. Rec.

---

[6] In *Gegiow*, the Court analyzed the terms adjacent to "public charge" in the statute to conclude that the "overstocked" "state of the labor market" in plaintiffs' destination city could not serve as the basis for exclusion. 239 U.S. at 9. Although issued after enactment of the 1917 Act, the question before the Second Circuit in *Howe v. United States*, 247 F. 292, 294 (2d Cir. 1917), involved an interpretation of the 1907 Act and the court relied on a similar adjacent-terms analysis, citing *Gegiow*. In *U.S. ex rel. Mantler v. Comm'r of Immigration*, the Second Circuit quoted *Howe* without comment in a review of past interpretations of the "public charge" exclusion. 3 F.2d 234, 235 (2d Cir. 1924).

[7] The 1917 Act listed, *inter alia*, "idiots, imbeciles, feeble-minded persons, epileptics, insane persons; . . .  persons with chronic alcoholism; paupers; professional beggars; vagrants; persons afflicted with tuberculosis in any form or with a . . . disease; persons . . . certified by the examining surgeon as being mentally or physically defective . . . of a nature which may affect the ability . . . to earn a living; [felons]; polygamists . . . ; anarchists, or persons . . . who advocate . . . the unlawful destruction of property; prostitutes . . .; persons . . . induced, assisted, encouraged, or solicited to migrate . . . by offers . . . of employment [or] . . . advertisements for laborers . . . in a foreign country; persons likely to become a public charge; persons deported [within the previous year]; stowaways," and others. 1917 Act at 875-76

[8] Plaintiffs veer inconsistently between a claim that the plain meaning of public charge is limited to those "wholly unable to care for themselves," and an incompatible claim that the plain meaning of a public charge is one who is "primarily dependent on the government." *Compare* Mot. at 5 *with* Mot. at 6. As explained herein, neither of these is the plain meaning of public charge as it was understood in 1882, 1917, 1929, or most of the intervening years.

657 (1894) (statement of Rep. Warner) (explaining that under the public charge inadmissibility ground, "[i]t will not do for [an alien] [to] earn half his living or three-quarters of it, but that he shall presumably earn all his living . . . [to] not start out with the prospect of being a public charge"). Courts have also suggested that the exclusion of public charges extended to those who, although earning a modest living, might need assistance with "the ordinary liabilities to sickness, or . . . any other additional charges . . . beyond the barest needs of existence." *U.S. v. Lipkis*, 56 F. 427, 428 (S.D.N.Y. 1893) (holding that immigration officers properly required a bond from a poor family on account of poverty, even though the ultimate reliance on public aid occurred through commitment to an insane asylum); *see also In re Feinknopf*, 47 F. 447, 447 (E.D. N.Y. 1891) (determining that an alien was not likely to become a public charge after considering, as distinct evidence, whether the alien "received public aid or support" or had been an "inmate of an almshouse"). Such individuals impose a "liability" on "the body of citizens," even if they are not fully destitute. This interpretation of "public charge" conforms with Congress's explicit instruction that "the immigration policy of the United States [is] that . . . [a]liens within the Nation's borders [should] not depend on public resources to meet their needs." 8 U.S.C. § 1601(2)(A).

### 2. The Plain Meaning of Public Charge Does Not Require Permanent Receipt Of Government Benefits Or That Such Benefits Be Paid In Cash.

An alien's temporary receipt of public benefits also constitutes an obligation on the public to support the basic necessities of life, and is therefore encompassed by the plain meaning of public charge. Both administrative practice and the analysis in early cases confirm that the plain meaning of "public charge" is not limited to an alien who receives assistance on a "long-term" or "permanent" basis, as Plaintiffs briefly assert. *See* Mot. at 6, 7.

First, as the NPRM in this case explained, short-term receipt has been "a relevant factor under the [previous] guidance with respect to covered benefits." NPRM at 51165 & n.304 ("In assessing the probative value of past receipt of public benefits, 'the length of time . . . is a significant factor.'") (quoting 1999 Interim Field Guidance at 28690). In fact, the 1999 Field Guidance made no suggestion that an alien needed to receive cash benefits for an extended period for the totality of the circumstances to trigger a public charge determination and set no minimum period below which the receipt of such benefits would be less meaningful. 1999 Interim Field

Guidance at 28690. Nothing in the 1999 standard would ensure that an alien who received, in the previous 36 months, 12 months of a public benefit considered relevant under that guidance (such as Supplemental Security Income) would not be treated as a public charge. And nothing in the plain meaning of "public charge" precludes DHS from clarifying the standard by adopting a recognizable and meaningful threshold for receipt of public benefits in a given period. *Cf. Harris v. FCC*, 776 F.3d 21, 28-29 (D.C. Cir. 2015) ("An agency does not abuse its discretion by applying a bright-line rule.").

DHS's treatment of recurring, but non-permanent, receipt of public relief is also consistent with early case law. For example, a lower court in New York in the mid-nineteenth century recognized that "the modes in which the poor become chargeable upon the public" extend to "all expenses lawfully incurred," including "temporary relief." *People ex rel. Durfee v. Comm'rs of Emigration*, 27 Barb. 562, 569-70 (N.Y. Gen. Term 1858). Similarly, in *Poor Dist. of Edenburg v. Poor Dist. of Strattanville*, a Pennsylvania appellate court recognized that even a landowner with a long track record of supporting herself as a teacher, artist, and writer, could become "chargeable to" the public by temporarily receiving "some assistance" while ill, despite having "plenty of necessaries to meet her immediate wants." 5 Pa. Super. 516, 520-24 (Pa. Super. Ct. 1897).[9] Although the court ultimately rejected the landowner's classification as a pauper, it did so not because her later earnings or payment of taxes barred this conclusion, but because, under the specific facts of the case, she was "without notice or knowledge" that receipt even of limited assistance would "place[] [her] on the poor book." *Id*. at 527-28; *see also Town of Hartford v. Town of Hartland*, 19 Vt. 392, 398 (1847) (widow and children with a house, furniture, and a likely future income of $12/year from the lease of a cow were nonetheless public charges after receiving relief in "the amount of some five dollars").

---

[9] *Yeatman v. King*, 51 N.W. 721, 723 (N.D. 1892), relied on by Plaintiffs, is not to the contrary. See Mot. at 6 n.6. That case uses the phrase "temporary relief" to describe the receipt of seed grain by a farmer on two occasions, separated by one year, a far more occasional receipt of aid than the recurring receipt needed to satisfy the Rule's 12/36 standard. *Davies v. State ex rel. Boyles*, 17 Ohio Cir. Dec. 593, 595-96 (Ohio Cir. Ct. 1905), is equally inapposite, addressing aid provided to a blind person as a substitute for institutionalization. Plaintiffs themselves acknowledge that "persons who are institutionalized" for health or disability reasons form a separate class of "public charges" from those likely to become public charges for financial reasons. *See, e.g.*, Mot. at 5.

Nor does anything in the plain meaning of "public charge" suggest a distinction between benefits provided in cash and benefits provided as services, as the 1999 Interim Field Guidance required. *See* 64 Fed. Reg. at 28691. Both types of assistance create an obligation on the public and both equally relieve recipients from the conditions of poverty. For this reason, consideration of an alien's receipt of public benefits for "housing, food and medical care," as "examples of the obvious basic necessities of life," falls within the reasonable parameters of determining whether that person creates a liability on the body of the public. *Am. Sec. & Tr. Co. v. Utley*, 382 F.2d 451, 453 (D.C. Cir. 1967). Plaintiffs concede that receipt of in-kind services such as health care, food, and housing—the equivalents of modern benefits covered by the Rule such as Medicaid, SNAP, and public housing—were among the types of public support that rendered a person a public charge in the past by acknowledging that such persons included those who were provided relief through almshouses. *See* Mot. at 6. And because the fact that the modern mores governing public assistance have appropriately deinstitutionalized the poor by providing assistance through subsidies for private housing, food purchases, and the like does not in any way change the fact that receipt of such subsidies imposes an "obligation" or "burden" on the body of the public.

### 3. The Rule Exercises Interpretive Authority That Congress Delegated To The Executive Branch, A Delegation Congress Has Maintained.

The statutory term "public charge" has "never been [explicitly] defined by Congress in the over 100 years since the public charge inadmissibility ground first appeared in the immigration laws." Rule at 41308. Congress implicitly delegates interpretive authority to the Executive Branch when it omits definitions of key statutory terms, thereby "commit[ting] their definition in the first instance to" the agency, *INS v. Jong Ha Wang*, 450 U.S. 139, 144 (1981), to be exercised within the reasonable limits of the plain meaning of the statutory term. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837, 844 (1984). Congress has long recognized this implicit delegation of authority to interpret the meaning of "public charge." *See, e.g.*, S. Rep. No. 81-1515, at 349 (1950) (recognizing that because "there is no definition of the term [public charge] in the statutes, its meaning has been left to the interpretation of the administrative officials and the courts"). This delegation is reinforced by Congress's explicit directive that the determination be made "in the opinion of the Attorney General" or a "consular officer." 8 U.S.C. § 1182(a)(4)(A). This expansive delegation of

authority grants DHS wide latitude to interpret "public charge" within the reasonable limits set by the broad, plain meaning of the term itself.[10]

Congress's comprehensive delegation of interpretive authority is well-established in precedent dating back to the early public charge statutes. *See, e.g., Ex Parte Pugliese*, 209 F. 720, 720 (W.D.N.Y. 1913) (affirming the Secretary of Labor's authority "to determine [the] validity, weight, and sufficiency" of evidence going to whether an individual was "likely to become a public charge"); *Wallis v. U.S. ex rel. Mannara*, 273 F. 509, 510 (2d Cir. 1921) (deference required even if "evidence to the contrary [is] very strong"). It is also recognized in Executive Branch practice. Administrative decisions have explained that Congress's broad delegation of authority in this area was necessary because "the elements constituting likelihood of becoming a public charge are varied." *Matter of Harutunian*, 14 I. & N. Dec. 583, 588-90 (BIA 1974) (quoting S. Rep. No. 81-1515 at 349 (1950) (holding that alien's receipt of "old age assistance benefits" in California was sufficient to render the alien a "public charge")); *see also Matter of Vindman*, 16 I. & N. Dec. 131, 132 (BIA 1977) (citing regulations in the visa context, and explaining that the "elements constituting likelihood of an alien becoming a public charge are varied . . . [and] are determined administratively"). Indeed, Plaintiffs themselves seek to preserve a *prior* exercise of this delegated interpretive authority by requiring DHS to revert to the "primarily dependent" standard for public charge determinations that appeared for the first time in the 1999 Interim Field Guidance and simultaneous 1999 NPRM. *See* Mot. at 39 (seeking to require Defendants to "continu[e] to apply" the 1999 Interim Field Guidance).

The long history of congressional delegation of definitional authority over the meaning of "public charge" demonstrates the error in Plaintiffs' claim that Congress has, by choosing not to impose a definition of "public charge" when revising the statute, "endorse[d] [the] agency's interpretation" and thereby commanded DHS "to preserve" the 1999 Interim Field Guidance. Mot.

---

[10] These delegations of authority specific to the public charge ground of inadmissibility are reinforced by the explicit overall delegation of authority by Congress to the Secretary of Homeland Security the authority to "establish such regulations . . . as he deems necessary for carrying out" the INA, 8 U.S.C. § 1103(a)(3). Congress has also provided the Secretary with specific responsibility to carry out the INA and to make public charge inadmissibility decisions, as spelled out in detail in the NPRM and Rule. *See* NPRM at 51124; Rule at 41295.

at 20. By its inaction in 1996 and 2013, the occasions Plaintiffs cite, Congress left the public charge provision unchanged. This inaction cannot plausibly be read to withdraw the longstanding delegation to the Executive Branch to exercise definitional authority over the "varied" elements of the meaning of "public charge." S. Rep. No. 81-1515, at 349. Certainly the INS, when it adopted the 1999 Interim Field Guidance and proposed to issue a sweeping new definition of "public charge" through notice-and-comment rulemaking in 1999, did not understand Congress's 1996 action to have altered the statute by withdrawing the long-understood delegation. At a minimum, the likelihood that Congress intended to preserve the delegation means that, under the circumstances, "[c]ongressional inaction lacks persuasive significance" because competing "inferences may be drawn from such inaction." *Competitive Enter. Inst. v. DOT*, 863 F.3d 911, 917 (D.C. Cir. 2017). But the more plausible of the competing inferences is that Congress intended for DHS to retain the authority delegated to it to analyze the "totality of the alien's circumstances" to make "a prediction" about the likelihood that an alien will become a public charge, *Matter of Perez*, 15 I. & N. Dec. 136, 137 (BIA 1974), including the delegated authority for DHS to adopt further procedures to guide its officers, aliens, and the public at large in understanding the application of the public charge ground of inadmissibility.

Nor could Congress's 1952 or 1996 decisions not to adopt a specific definition of "public charge" have "demonstrate[d] . . . approval" of the cramped meaning of the term that Plaintiffs urge, Mot. at 19, for the simple reason that Plaintiffs misconstrue the agency's interpretations of "public charge" from these eras. Contrary to Plaintiffs' assertion in the portion of their argument mislabeled as "Facts," the administrative interpretations they cite did *not* conclude that "public charge" is limited to those "wholly unable to care for themselves." Mot. at 6. Because this was not the "longstanding administrative interpretation" of "public charge" in the inadmissibility context, congressional inaction cannot possibly make that interpretation "the one intended by Congress." Mot. at 19 (quoting *CFTC v. Schor*, 478 U.S. 833, 846 (1986)).

As a threshold matter, many of the decisions Plaintiffs cite arise in the context of *deportation*, not inadmissibility, and it is widely recognized that "administrative authorities [have] interpreted *public charge* differently for purposes of the grounds of inadmissibility than for the

19

grounds of deportability." Summary, *Public Charge Grounds of Inadmissibility and Deportability: Legal Overview*, Cong. Research Svc. (Jan. 5, 2016) ("CRS 2016"). "Public charge" deportation is a different statutory provision, 8 U.S.C. § 1227(a)(5), and, as a 1974 agency decision explained, the agency viewed it as "incorrect to interpret 'public charge" in the context of inadmissibility, "as narrowly as in the deportation section." *Matter of Harutunian*, 14 I & N Dec. 583, 589 (BIA 1974); *see id.* at 588 ("[T]he deportation statute must be strictly construed. The rule is otherwise as to exclusion"). In the deportation context only, the agency developed a test—not at issue in the inadmissibility context addressed by the Rule—that examined whether the government agency providing public benefits had demanded repayment of the benefits and whether the alien had failed to do so. *See* CRS 2016 at 3-4 (citing, *e.g.*, *Matter of B—*, 3 I & N Dec. 323, 326 (BIA 1948)).

Plaintiffs also misread the substance of these decisions as supporting their position, but they do not. In *Matter of Martinez-Lopez*, for example, then-Attorney General Robert F. Kennedy explained that a "specific circumstance," which he described as any "fact reasonably tending to show that the burden of supporting the alien is likely to be cast on the public," is the standard for demonstrating a likelihood to become a public charge. 10 I. & N. Dec. 409, 421 (A.G. 1962) (rejecting argument that an alien's misrepresentation of an offer of employment was sufficient to render the alien deportable). The receipt of public benefits—whether cash or non-cash—for an extended period such as to fall within the 12/36 standard set forth in the Rule readily qualifies as a "specific circumstance" demonstrating that a burden of support has been "cast on the public." *Id.* Similarly, although the applicant in *Matter of A—*, 19 I. & N. Dec. 867, 870 (BIA 1988), was held not to be deportable based on the past receipt of public benefits, that decision emphasized that such indicia of financial status *may* properly be considered in the totality of the circumstances analysis; the agency simply concluded that a specific type of temporary unemployment—that of "a mother to stay at home to care for her children, especially when the children have not started school"— did not outweigh the applicant's current employment in making a *prospective* determination (now that the children were six years of age or greater). *Id.*

Finally, although Plaintiffs argue that the 1999 Interim Field Guidance and the 1999 NPRM demonstrate that the exclusion of non-cash benefits in those documents "confirmed the settled

interpretation of public charge," Mot. at 11, the reverse is true. Both documents describe the exclusion of "non-cash public benefits" at that time as "reasonable," highlighting that although they did not conclude that the meaning of "public charge" required consideration of such benefits, they also did not conclude that the meaning of public charge foreclosed their consideration. 1999 NPRM at 28677-78 ("It has never been [the] policy that the receipt of any public service or benefit *must* be considered. . .") (emphasis added). Indeed, the only examples of prior exclusion of non-cash benefits from consideration that the drafters of the interim guidance could identify were: (1) broadly-available public benefits such as "public schools"; and (2) the exclusion of food stamps (i.e., "SNAP") under State Department guidance that apparently did not exclude other forms of non-cash benefits. *See, e.g.*, 1999 Interim Field Guidance at 28692. The 1999 Interim Field Guidance and 1999 NPRM thereby illustrate an exercise of the authority Congress has delegated to the Executive Branch to define "public charge" within the broad limits of its plain meaning, and do not shed light on the limits of that meaning.

### 4. The Rule Does Not Violate Section 504 Of The Rehabilitation Act.

Plaintiffs note that the Rule requires DHS to consider disability as a factor in a public charge determination, and claim, incorrectly, that the Rule "explicitly discriminates against individuals with disabilities in violation of Section 504 of the Rehabilitation Act." Mot. at 21. That section provides that "[n]o otherwise qualified individual with a disability . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under . . . any program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a) (emphasis added); *see also* 6 C.F.R. § 15.30 (DHS implementing regulation). The statute imposes a "strict[] 'solely' causation standard," *Natofsky v. City of New York*, 921 F.3d 337, 350–51 (2d Cir. 2019), and Plaintiffs cannot satisfy it.

As a threshold matter, the INA explicitly lists "health" as a factor that DHS officials "shall . . . consider" in making a public charge determination. 8 U.S.C. § 1182(a)(4)(B)(i). "Health" certainly includes an alien's disability, and it is therefore Congress, not the Rule, that requires DHS to take this factor into account. *See, e.g.*, *In Re: Application for Temporary Resident Status*, USCIS AAO, 2009 WL 4983092, at *5 (Sept. 14, 2009) (considering application for disability benefits in

public charge in case of an irreconcilable inconsistency between them the later and more specific statute usually controls the earlier and more general one inquiry). A specific, later statutory command, such as that contained in the INA, supersedes section 504's general proscription to the extent the two are in conflict (which they are not, as explained below). *See, e.g.*, *Knutzen v. Eben Ezer Lutheran Hous. Ctr.*, 815 F.2d 1343, 1353 (10th Cir. 1987) ("[A] general . . . statute, § 504" may not "revoke or repeal . . . a much more specific statute . . . absent express language by Congress." (internal quotation marks omitted)); *Nutritional Health All. v. FDA*, 318 F.3d 92, 102 (2d Cir. 2003) ("a later-enacted, more specific, comprehensive statute . . . controls the construction of a more general statute when there is a potential conflict or discrepancy").

In any event, the Rule is fully consistent with section 504 of the Rehabilitation Act. The Rule does not deny any alien admission into the United States, or adjustment of status, "solely by reason of" disability. All covered aliens, disabled or not, are subject to the same inquiry: whether they are likely to use one or more covered federal benefits for the specified period of time. Although disability is one factor (among many) that may be considered, it is not dispositive, and is relevant only to the extent that an alien's particular disability tends to show that he is "more likely than not to become a public charge" at any time. Rule at 41368. Further, any weight assigned to this factor may be counterbalanced by other factors, including "[an] affidavit of support," "employ[ment]," "income, assets, and resources," and "private health insurance." *Id.* Thus, any public charge determination cannot be based "solely" on an applicant's disability. Furthermore, to fall within the coverage of the Rehabilitation Act, an individual must be "otherwise qualified," 29 U.S.C. § 794(a), which means that the individual "must be able to meet all of a program's requirements in spite of his handicap." *St. Johnsbury Acad. v. D.H.*, 240 F.3d 163, 173 (2d Cir. 2001). An alien who is likely to become a public charge because of his or her medical condition is not otherwise qualified for admission or adjustment of status.[11] *See Cushing v. Moore*, 970 F.2d

---

[11] Plaintiffs also fail to make out a Rehabilitation Act claim by alleging the possibility that "[o]ther negative factors may also flow from a person's disability status," and so the Rule uniquely harms those with disabilities. Mot. at 22. Such factors are considered in the analysis regardless of disability, and there is no evidence that disabled persons are likely to be found to be public charges *solely* because of their disability under the totality-of-the-circumstances determination.

1103, 1109 (2d Cir. 1992) (explaining that "an institution is not required to disregard . . . disabilities . . . , provided the handicap is relevant to reasonable qualifications").

### 5.  The Homeland Security Act Confers On The Secretary of Homeland Security The Authority To Promulgate The Rule.

Plaintiffs' assertion that the Secretary of Homeland Security lacks rulemaking authority because the INA references the "Attorney General" is meritless. *See* Mot. at 22-24. In the Homeland Security Act of 2002, Congress established the Secretary of Homeland Security as the head of DHS, and provided the Secretary with "direction, authority and control" over the Department as well as "vested" in him "[a]ll functions of all officers, employees, and organizational units of the Department." Pub. L. No. 107-296, § 102(a)(3), 116 Stat. 2135 (6 U.S.C. §112(a)(3). Congress further conferred general authority to issue regulations, 6 U.S.C. § 112(e), and specific authority to promulgate regulations implementing the immigration laws, 8 U.S.C. § 1103(a)(3) (providing that the Secretary "shall establish such regulations . . . as he deems necessary for carrying out" the immigration laws).[12] *See also* 6 U.S.C. § 202(3) (Secretary is responsible for "[c]arrying out the immigration enforcement functions vested by statute in, or performed by" the INS or its Commissioner); *id.* § 202(4) (Secretary is responsible for "[e]stablishing and administering rules . . . governing the granting of visas or other forms of permission, including parole, to enter the United States to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States").

Having transferred the *functions* of INS, as overseen by the Attorney General, to DHS under the control of the Secretary of Homeland Security, Congress then provided for all assignments of specific authority to a designated official to be transferred as well:

---

[12] Because all relevant functions have been transferred away from the Attorney General, 8 U.S.C. § 1103(a)(1), relied on by Plaintiffs, does not leave rulemaking authority in the Attorney General's hands.  Rather, the Attorney General has independent authority to promulgate regulations implementing authorities and functions exercised by the Executive Office for Immigration Review ("EOIR").  8 U.S.C. § 1103(g)(2).  Plaintiffs misunderstand *Sarango v. U.S. Att'y Gen.*, which addressed a unique situation in which Congress specifically amended the INA in 2006 with the clear "intent to divest the Attorney General of authority to consider consent [to reapply for admission] requests [under 8 U.S.C. § 1182(a)(9)(C)(ii)] and to endow the Secretary . . . with this authority." 651 F.3d 380, 386 (3d Cir. 2011). *See* Mot. at 24.

> With respect to any function transferred by or under this chapter (including under a reorganization plan that becomes effective under section 542 of this title)[13] and exercised on or after the effective date of this chapter, reference in any other Federal law to any department, commission, or agency or any officer or office the functions of which are so transferred shall be deemed to refer to the Secretary, other official, or component of the Department to which such function is so transferred.

Pub. L. No. 107-296 § 1517 (codified at 6 U.S.C. § 557). Thus, any reference to the Attorney General in a provision of the INA describing functions transferred from DOJ to DHS must be read as conferring upon the Secretary—either exclusively or concurrently with the Attorney General—the authorities described therein. *See, e.g., Scheerer v. U.S. Att'y Gen.*, 513 F.3d 1244, 1251 & n.6 (11th Cir. 2008) (holding that, in light of 6 U.S.C. §§ 271(b) and 557, Congress conferred upon *both* the Secretary and the Attorney General adjustment of status authority under INA § 245(a), 8 U.S.C. § 1255(a), even though that section referred only to the "Attorney General").

Congress specifically "transferred from the Commissioner of Immigration and Naturalization to the Director of [USCIS]"—a component of DHS—all functions relating to immigrant visa petitions, naturalization petitions, asylum and refugee applications, adjudications performed at service centers, and all other adjudications performed by the INS. *Id.* § 451(b) (6 U.S.C. § 271(b)); *see La. Forestry Ass'n v. Dep't of Labor*, 745 F.3d 653, 659 (3d Cir. 2014) (explaining that "the authority to determine nonimmigrant visa petitions" no longer resides with the Attorney General); 6 U.S.C. §§ 251, 271 (transferring border-security and port-of-entry functions to Secretary of Homeland Security). As the Eleventh Circuit has explained, this transfer of authority includes, among other things, authority to grant adjustment of status to aliens who are not in removal proceedings. *Scheerer*, 513 F.3d at 1251 n.6.

### 6.   The Rule Is Not Arbitrary And Capricious.

#### a.   DHS Reasonably Concluded That The Rule Will Promote Self-Sufficiency.

Although Plaintiffs contend that the Rule is arbitrary and capricious because it provides for immigration officials to take into account benefits that Plaintiffs believe "promote rather than

---

[13] 6 U.S.C. § 542 provides for the establishment of "a reorganization plan regarding . . . [t]he transfer of agencies, personnel, assets, and obligations" to establish DHS.

impede self-sufficiency," Mot. at 25, this conflates the meaning of "self-sufficiency" in two distinct contexts. For specific purposes of the public charge inadmissibility ground, Congress's intent is "that aliens should be self-sufficient before they seek admission or adjustment of status," not that they should someday attain self-sufficiency by drawing on public resources to improve their financial condition. Rule at 41308; *see* 8 U.S.C. § 1601. This protects American citizens— who are already taxed heavily to provide public benefits for the support of American citizens and eligible qualified aliens, including LPRs—from shouldering increased burdens to support newly-eligible aliens who would be likely to become at any time public charges. The "self-sufficiency" purpose of public benefits programs is similar, but separate: to encourage the termination of receipt of public benefits (when recipients attain self-sufficiency) so as to limit the cost to taxpayers of those currently in need of public support. Nothing about the existence of public benefit programs intended to serve (and assist in attaining self-sufficiency) some categories of persons obligates Congress or DHS to admit to the United States or adjust to LPR status every "working-poor famil[y]" who has not achieved self-sufficiency, as Plaintiffs seek to require. Mot. at 25.

In this context, DHS's explanation regarding how the Rule will advance self-sufficiency meets the standards of the APA. Although aliens may face a five-year waiting period prior to eligibility for public benefits, they can be expected to base their present decisions on the availability of those future benefits. *Cf. Lewis v. Thompson*, 252 F.3d 567, 583-84 (2d Cir. 2001) (Congress could reasonably "believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits"). By making clear that receipt of such benefits will be considered as part of the totality of the circumstances determination of the public charge ground of inadmissibility, the Rule helps "ensure that aliens coming to or opting to stay in the United States permanently are self-sufficient." Rule at 41317.

### b. The Rule Preserves and Clarifies The Application Of The Totality of the Circumstances Test And Is Not Vague.

In a brief subsection with a paucity of explanation, Plaintiffs allege that the Rule is vague because it provides insufficient guidance about how the "totality of the circumstances"

determination of the public charge ground of inadmissibility is to be applied. Mot. at 25-26. Plaintiffs' objection lacks logic because, under past administrative practice (including the 1999 Interim Field Guidance), DHS officers were required to apply an identical "totality of the circumstances" analysis but in a far more "vague, broad, and standardless" context. Mot. at 25.

As the Rule makes clear, the statute itself requires that DHS make public charge determinations by considering, "at a minimum," eight elements: age, health, family status, assets, resources, financial status, education, and skills. 8 U.S.C. § 1182(a)(4). The statute provides no further guidance about these elements. The totality of the circumstances test, in turn, has been applied by the agency for decades, including in administrative decisions relied on in Plaintiffs' brief. *See, e.g.*, Mot. at 8 (citing *Matter of A—*, 19 I. & N. Dec. 867). Since 1996, DHS has been employing this analysis with respect to the eight elements, as required by IIRIRA, and the 1999 Interim Field Guidance confirmed that this approach is correct. By providing *additional* information to DHS officers to guide their consideration, including by enumerating specific benefits to consider and providing relative weightings of how DHS officers should account for various elements, DHS has *clarified* the application of this test, contrary to Plaintiffs' claim.[14]

Plaintiffs' specific arguments regarding particular factors are similarly meritless. Mot. at 25-26. The Rule properly includes proficiency in English and other languages as a factor to be considered as part of the totality of the circumstances, particularly given the statutory requirement to consider an applicant's "education and skills." 8 U.S.C. § 1182(a)(4)(B)(i). By including language proficiency, the Rule is providing *more* specificity than offered by the statute, and there

---

[14] Plaintiffs have failed to offer more than passing references to explain their claims that specific factors, such as proficiency in a language, are vague. As an initial matter, Plaintiffs cannot challenge the Rule as vague under the Fifth Amendment, because the Constitution's protections extend only to the deprivation "of life, liberty, or property" and it is well-established that aliens do not "have a constitutionally protected liberty or property interest in a grant of adjustment of status because it is a discretionary form of relief." *Krasniqi v. Holder*, 316 F. App'x 7, 8 (2d Cir. 2009); *see Yuen Jin v. Mukasey*, 538 F.3d 143, 156-57 (2d Cir. 2008). As to language proficiency, the term "proficiency," as part of the totality of the circumstances determination, is not at all vague because "proficiency" means "the degree of competence attained," a spectrum which can appropriately be accounted for as part of an analysis weighing the many different mandatory and other factors. "Proficiency," Oxford Eng. Dict. (3d ed. 2007).

is no requirement that DHS also define a more specific "level of proficiency" in the Rule, as Plaintiffs argue. Mot. at 26. Next, the Rule is clear that DHS will not consider noncash public benefits received before the Rule's effective date, Rule at 41504 (8 C.F.R. § 212.22(d)), and the fact that a non-final draft immigration form asks if applicants have "ever" received certain public benefits does not change the Rule or suggest it is arbitrary or capricious. Plaintiffs also believe two provisions relating to health coverage for medical conditions are inconsistent, Mot. at 26, but Plaintiffs ignore that the Rule does not count a severe medical condition as a heavily weighted negative factor if the alien has "the financial resources to pay for reasonably foreseeable medical costs related to such medical condition." Rule at 41504. Such "financial resources" can include "health insurance not designated as a public benefit." *See id.* (8 C.F.R. § 212.22(b)(4)(ii)(H) provides that "resources . . . to pay for reasonably foreseeable medical costs" includes "health insurance not designated as a public benefit under 8 C.F.R. § 221.21(b)"). Lastly, the fact that the Rule considers some Medicaid benefits but not state public health insurance benefits does not render it arbitrary or capricious. DHS excluded such state benefits "because of the number of public benefits that exist and the administrative burden such a rule would have imposed on DHS and the state and local public benefit granting agencies." *Id.* at 41390. "In addition, including all state and local benefits would add vagueness and confusion as to what public benefits would be considered." *Id.*

### c. DHS Reasonably Responded To Comments.

An agency's obligation to respond to comments on a proposed rulemaking is "not particularly demanding." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441–42 (D.C. Cir. 2012). "[T]he agency's response to public comments need only 'enable [courts] to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did.'" *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Plaintiffs claim that DHS did not adequately respond to certain comments about the potential that the Rule could cause individuals to disenroll from public benefits or forgo enrollment, but under these standards, cannot plausibly show any deficiency in the agency's responses. Mot. at 27.

The Rule provided a detailed discussion of the comments raising concerns regarding the disenrollment impact and offered a lengthy, reasoned discussion explaining precisely why DHS believed the Rule was justified notwithstanding this potential harm. Rule at 41310-14. As DHS stated, notwithstanding the disenrollment impact, the "rule's overriding consideration, *i.e.*, the Government's interest" in (1) minimizing the incentive of aliens to immigrate or adjust status to obtain public benefits and (2) promoting self-sufficiency of aliens in the United States "is a sufficient basis to move forward." *Id*. at 41312. DHS explained that it is not "sound policy to ignore the longstanding self-sufficiency goals set forth by Congress" because of the potential for disenrollment. *Id*. at 41314. Thus, DHS did not "abdicate" the responsibility to consider potential harms, Mot. at 27; rather, it found those harms insufficient to override the legitimate policy goals of the Rule. This case is therefore distinguishable from *New York v. DOJ*, 343 F. Supp. 3d 213, 240 (S.D.N.Y. 2018), in which there was not "any discussion of the negative impacts" from the agency's decision and which did not involve a rulemaking. Likewise, in *NRDC v. DOE*, 362 F. Supp. 3d 126, 148 (S.D.N.Y. 2019), another case cited by Plaintiffs, the agency "refused even to look at the arguments against" its intended course of action. Plaintiffs show nothing similar here.

Plaintiffs fault DHS for noting the difficulty of accurately predicting the disenrollment impact, Mot. at 27, but their own cited studies and comments agree with that conclusion. For instance, one cited comment observed that "a precise single estimate of the impact of the proposed rule on Medicaid participation is challenging to calculate" and that only "reasonable ranges can be explored." Pls' Ex. 20 at 63, ECF No. 50-20. A study cited by Plaintiffs likewise noted that "it is difficult to predict the effect of the policy change," and therefore the authors "applied disenrollment rates of 15%, 25%, and 35%," which merely "illustrate a range of potential impacts[.]"[15] DHS proceeded similarly. In its Regulatory Impact Analysis that accompanies the

---

[15] *See* Samantha Artiga, Rachel Garfield, Anthony Damico "Estimated Impacts of the Proposed Public Charge Rule on Immigrants and Medicaid" (October 2018), http://files.kff.org/attachment/Issue-Brief-Estimated-Impacts-of-the-Proposed-Public-Charge-Rule-on-Immigrants-and-Medicaid, cited at Pls' Ex. 37 at 5 n.9, ECF No. 50-37.

Rule, DHS attempted to calculate the disenrollment impact and, like the study cited by Plaintiffs, applied a range of disenrollment rates (up to 54%) based on DHS's recognition that the rate could be higher than predicted. Ex. A at 99-100.

As for Plaintiffs' argument that DHS did not "quantify" other costs such as lost productivity, adverse health effects, and medical expenses, Plaintiffs cite no cases holding that, to comply with the APA, an agency must "quantify" all potential effects of a rule. Nor could they. S*ee Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 379 (D.C. Cir. 2013) (the "law does not require agencies to measure the immeasurable"); *Defs. of Wildlife v. Zinke*, 856 F.3d 1248, 1263 (9th Cir. 2017) (finding agency action was not arbitrary and capricious notwithstanding agency's "failure to quantify" effects). Plaintiffs fail to identify any methodology DHS could have followed to reliably measure these costs. DHS reasonably considered these potential costs qualitatively, Rule at 41488, and the APA requires nothing more.

Plaintiffs acknowledge that DHS addressed comments about the English proficiency factor but argue that DHS failed to respond to the specific point that the factor lacks adequate standards. *See* Mot. at 28. But the Rule includes a lengthy response to comments claiming the totality of the circumstances test generally lacks sufficient standards. Rule at 41321-22. Thus, DHS met its obligation to respond to comments. *Envtl. Def. Fund v. EPA*, 922 F.3d 446, 458 (D.C. Cir. 2019) ("an agency need not discuss every item of fact or opinion included in comments . . . [n]othing in the APA saddles agencies with the crushing task of responding to every single example cited in every single comment").

Finally, there is no merit to Plaintiffs' argument that they were deprived of an opportunity to comment on the provision making private health insurance a heavily weighted positive factor but excluding plans subsidized via tax credits. Mot. at 28. An "agency's final rule need only be a logical outgrowth of its notice." *Agape Church, Inc. v. FCC*, 738 F.3d 397, 411 (D.C. Cir. 2013). A final rule qualifies as the logical outgrowth of the proposed rule if interested parties should have anticipated that the change was possible. *Id*. Here, the NPRM expressly stated that it "would consider whether the alien has private health insurance" and explained that "[h]aving private health

insurance would be a positive factor in the totality of the circumstances." NPRM at 51182, 51189. Thus, there should be no surprise that DHS decided to treat private health insurance as a heavily weighted positive factor, nor any surprise that DHS decided not to treat insurance purchased using tax subsidies as such a factor. Rule at 41448-49.

### d. The Rule Meets The Standards Required For An Agency To Change Its Position Through Notice-and-Comment Rulemaking.

There is "no basis in the Administrative Procedure Act . . . for a requirement . . . [of] more searching review" when an agency changes its position. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009). This is particularly true here, where the "prior policy" to which the Plaintiffs seek to revert is nonbinding guidance that could not possibly foreclose DHS from adopting a different reasonable interpretation through notice-and-comment rulemaking. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982-83 (2005).[16] As the Supreme Court explained in *Fox*, all that DHS was required to do to permissibly change course from the 1999 Interim Field Guidance was to acknowledge that the Rule sets forth a policy change, provide a reasoned explanation for the change, and explain how it believes the new interpretation is reasonable. *See Fox*, 556 U.S. 514-16. The Rule readily meets these standards, and so DHS is entitled to full deference to its changed interpretations, consistent with its obligation to "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863-64 (recognizing agencies receive deference to a "changed . . . interpretation of [a] term").

First, the NPRM and Rule acknowledged that DHS was changing course. In the former, DHS announced it was proposing "major changes," *see, e.g.*, NPRM at 51116, and that these changes included "a new definition of public charge." *Id.* at 51158; *see also id.* at 51163 (describing DHS's intent to make "a change from the standard" of "primary dependence" set forth in the 1999 Interim Field Guidance). DHS also stated that it would change and "improve upon the 1999 Interim Field Guidance" by changing the treatment of non-cash benefits. *Id.* at 51123. In the Rule, DHS "agree[d] with commenters that the public charge inadmissibility rule constitutes a

---

[16] As explained *supra*, the standards of "primary dependency" (or "primarily dependent") and exclusion of non-cash benefits were newly-adopted by the 1999 Interim Field Guidance.

change in interpretation from the 1999 Interim Field Guidance," Rule at 41319, and repeatedly explained that it was "redefin[ing]" public charge and adopting a "new definition" of "public benefit" that would be "broader" than before. *Id.* at 41295, 41297, 41334; *see also id.* at 41347 (explaining that the agency may justifiably change course).

Second, DHS explained the reasons for the change in course. DHS described how the "focus on cash benefits" in the 1999 Interim Field Guidance had proved "to be insufficiently protective of the public budget, particularly in light of significant public expenditures on non-cash benefits." NPRM at 51164. DHS quantified the "significant federal expenditure on low-income individuals" specifically associated with "benefits directed toward food, housing and healthcare." NPRM at 51160; *see id.* at Table 10. Recognizing that these benefits are provided to citizens and aliens alike, DHS also examined the substantial participation rate among foreign-born aliens for these programs. *See id.* at 51161 & Table 11. In this analysis, DHS found that public benefits programs provide, on average, thousands of dollars of "assistance to those who are not self-sufficient" and who are aliens, *id.* at 51163, and that millions of aliens receive such benefits: 3.1 million receive Medicaid alone. *Id.* at 51161-62 & Table 12. These statistics reasonably support DHS's conclusion that, under the 1999 Interim Field Guidance, the agency was failing to carry out the principles mandated by Congress that "aliens . . . not depend on public resources to meet their needs," and instead "rely on their own capabilities" and support from families, sponsors, and private organizations. 8 U.S.C. § 1601; *see also* Rule at 41308, 41319 (explaining that the prior guidance "failed to offer meaningful guidance for purposes of considering the mandatory factors and was therefore ineffective"). This amply demonstrates the reasonableness of DHS's decision to adopt a new definition and approach in exercise of the delegated authority to make public charge inadmissibility determinations.

Relevantly, Plaintiffs misread 8 U.S.C. § 1601 and PRWORA when they suggest that DHS has acted contrary to law or arbitrarily and capriciously by interpreting "public charge" in light of the principles of self-sufficiency set forth in PRWORA. Mot. at 21, 29. The statutory provision describes these principles as the "continu[ing] . . . *immigration policy* of the United States," 8

U.S.C. § 1601(2) (emphasis added), and *not* the continuing "public benefits policy." And rather than locate these provisions in Title 42 with other provisions governing public benefits, *see, e.g.*, 42 U.S.C. § 607(e) (codifying PRWORA's work requirement for receipt of benefits), Congress located this language in Title 8, "Aliens and Nationality," thereby choosing to require that these principles guide immigration policy, not just public benefits policy. Further, as explained above, DHS looked to specific evidence regarding the extensive receipt of public benefits by millions of aliens and reasonably relied on that evidence to conclude that the 1999 Interim Field Guidance was "overly permissive," "disserved the goal of furthering immigrant self-sufficiency," and should be revised to better achieve that goal, thereby preempting the summary allegations Plaintiffs raise. *See* Mot. at 29. Indeed, the need for a change in course is underscored by Plaintiffs' claim that the Rule will interfere with the efforts of "generations of immigrant families to build lives." In short, DHS has reasonably justified the changes made from the 1999 Interim Field Guidance, consistent with the standards of the APA.

### e.  The Rule Is Not Impermissibly Retroactive.

A regulation has retroactive effect if "it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 280 (1994). Courts must exercise "commonsense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment." *Herrera-Molina v. Holder*, 597 F.3d 128, 134 (2d Cir. 2010). "[D]eciding when a statute operates 'retroactively' is not always a simple or mechanical task." *Landgraf*, 511 U.S. at 268.

Here, the Rule was carefully crafted to avoid any material retroactive effect. In particular, when administering the Rule, DHS personnel will only consider benefits received prior to the Rule's effective date if those benefits would have been considered under the prior public charge standard. *See* Rule at 41321 ("[A]ny benefits received before that date will only be considered to the extent they would have been covered by the 1999 Interim Field Guidance"). Thus, for example, since TANF benefits were covered by the prior standard, immigration personnel may consider any

receipt of these benefits prior to the Rule since aliens were aware that use of these benefits may support a public charge determination. *See* Rule at 41459. By contrast, SNAP benefits were not covered by the prior standard, and so immigration personnel may only consider SNAP benefits received after the Rule's effective date. *See id.* [17]

Plaintiffs argue that the Rule is retroactive since it considers an applicant's credit score for the first time, thus penalizing prior financial decisions. But "a statute is not made retroactive merely because it draws upon antecedent facts for its operation." *Landgraf*, 511 U.S. at 270 n.24. After the Rule takes effect, immigration personnel will consider an alien's operative credit scores at the time of the public charge inquiry. The Rule is not unlawfully "retroactive" simply because an alien's current credit score will reflect prior financial decisions. *See McAndrews v. Fleet Bank of Massachusetts, N.A.*, 989 F.2d 13, 16 (1st Cir. 1993) ("Even when the later-occurring circumstance depends upon the existence of a prior fact, that interdependence, without more, will not transform an otherwise prospective application into a retroactive one" and so a regulation "may modify the legal effect of a present status . . . without running up against the retroactivity hurdle").[18]

Plaintiffs then argue that the Rule unsettles prior expectations since affidavits of support are now only one non-dispositive factor to be considered. Mot. at 31. But this is not a departure from the 1999 Field Guidance, which states that "an alien may be found to be inadmissible" on public charge grounds "[n]otwithstanding the filing of a sufficient affidavit of support." *See* 64

---

[17] Plaintiffs note that a non-final draft of the I-944 form requires aliens to disclose whether they have ever received benefits covered by the Rule. *See* Mot. at 30. But this does not mean immigration personnel may consider all of these benefits when rendering a public charge determination. *See* Rule at 41470 ("Adjudicators will be appropriately trained on Form I–944.").

[18] Plaintiffs relatedly argue that the Rule penalizes prior receipt of cash assistance. Plaintiffs argue that any amount of cash assistance may be considered as a factor under the Rule, whereas under the prior standard aliens would be considered public charges only if they were likely to be "primarily dependent" on cash benefits. Plaintiffs, however, conflate the public charge definition with the evidence immigration personnel consider when determining if that definition is met in a particular case. Even under the prior public charge standard, immigration personnel could generally consider prior receipt of cash assistance as evidence. *See* Rule at 41459. Thus, aliens have had "fair notice" that receipt of these benefits may lend support to a public charge determination. *Samuels v. Chertoff*, 550 F.3d 252, 260 (2d Cir. 2008).

Fed. Reg. at 28690 (1999 Field Guidance stating that an affidavit of support is one factor "taken into account under the totality of the circumstances test," quoting 8 C.F.R. § 213a.2(C)(2)(iv)). In any event, a "statute does not operate 'retrospectively' merely because" it "upsets expectations based in prior law." *Landgraf*, 511 U.S. at 269. This aspect of the Rule does not impose a unique legal consequence for any past conduct.

### f.   The Rule Does Not Violate Equal Protection.

Plaintiffs' claim alleging a violation of the equal protection component of the Fifth Amendment is not likely to succeed under any conceivable standard, but particularly not under the highly deferential standard applicable to immigration cases such as this. It is well-established that the government has "broad power over naturalization and immigration" and therefore "rational basis scrutiny applies to immigration and naturalization regulation." *Lewis*, 252 F.3d at 582 ("We have recently recognized that a 'highly deferential' standard is appropriate in matters of immigration."). The Supreme Court's recent decision in *Trump v. Hawaii* reaffirms these principles and makes clear that, at most, rational basis would be the appropriate standard of review in this case for the same reasons as in *Hawaii*: the deference accorded the political branches in this arena. 138 S. Ct. 2392, 2418-19 (2018) ("Because decisions [in the admission and exclusion of foreign nationals] may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" (citation omitted)).

Plaintiffs fall far short of satisfying their heavy burden under rational basis review. Under that standard, courts "will uphold the policy so long as it can reasonably be understood to result from a justification independent of unconstitutional grounds." *Hawaii* at 2420 (noting that "the Court hardly ever strikes down a policy as illegitimate under rational basis scrutiny"). "Any reasonably conceivable state of facts" will suffice to satisfy rational basis scrutiny. *Lewis*, 252 F.3d at 582. "The burden falls to the party attacking the statute as unconstitutional to 'negative every conceivable basis which might support it.'" *Id.* (quoting *Madden v. Kentucky*, 309 U.S. 83, 88

34

(1940)). Here, the Rule easily falls within DHS's broad authority to regulate immigration matters and is indeed rationally related to the government's compelling, statutorily-codified interest in minimizing the incentive of aliens to immigrate to the United States due to the availability of public benefits and promoting the self-sufficiency of aliens within the United States. *See* 8 U.S.C. § 1601; *see also* Rule at 41323. It is certainly "reasonably conceivable" that the Rule will promote these governmental interests. *See Lewis*, 252 F.3d at 583 ("[I]t is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival[.]"). Indeed, not even Plaintiffs contend that the Rule will fail to achieve the desired ends. The Rule is "expressly premised on legitimate purposes," *Hawaii*, 138 S. Ct. at 2421, and it cannot be said that the Rule is "inexplicable by anything but animus." *id*. at 2420.

Rather than address the applicable legal standard, Plaintiffs discuss some of the factors specified in *Arlington Heights v. MHDC*, 429 U.S. 252 (1977), for identifying a discriminatory purpose. Mot. at 31-32. But the *Arlington Hts.* factors are not relevant under the highly deferential rational basis standard of review. And even were the Court to apply those factors, they still would not show a likelihood of success. Plaintiffs assert that the Rule will have a disparate impact on immigrants of color, Mot. at 32-33, but *Arlington Hts.* itself reaffirmed that "official action will not be held unconstitutional solely because it results in a racially disproportionate impact" and that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 264-65. Plaintiffs fail to provide such proof. In particular, although Plaintiffs point to alleged statements by various administration officials, those statements are not part of the "legislative or administrative history" that might be relevant under *Arlington Hts.*. 429 U.S. at 268; *see also Carcano v. Cooper*, 350 F. Supp. 3d 388, 419-20 (M.D.N.C. 2018) (statements made by legislators "in the press and through their social media" about the "purpose and effect" of the challenged statute "are not 'legislative history'" under *Arlington Hts.* and therefore not relevant). Moreover, the statements are disconnected from the Rule; none suggests that a purpose of the Rule is to discriminate against immigrants of color. Plaintiffs' claim is

ultimately based on speculation that animus may have motivated the Rule, but that speculation does not establish a likelihood of success. Moreover, Plaintiffs ignore the other *Arlington Hts.* factors and do not even argue that they show any discriminatory animus, nor could they. *See* 429 U.S. at 267. For instance, Plaintiffs fail to allege any "[d]epartures from the normal procedural sequence" in the promulgation of the Rule that could suggest discriminatory intent. *Id.*

## III.    PLAINTIFFS FAIL TO ESTABLISH IRREPARABLE HARM.

"[I]rreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, and . . . accordingly, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66-67 (2nd Cir. 2007) (citation omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2nd Cir. 2005) (quoting *Rodriguez by Rodriguez v. DeBuono*, 175 F.3d 227, 234-35 (2nd Cir. 1998)). Plaintiffs have failed to carry this burden because they have not alleged any diversion of resources from their core activities or any concrete harms to their core missions.

Plaintiffs are incorrect that irreparable harm can be presumed in this case. First, presuming irreparable harm on the basis of a violation of federal law is not the binding law of this Circuit, and indeed the Court of Appeals for the Second Circuit has rejected such presumptions in other contexts. *See, e.g., Salinger v. Colting*, 607 F.3d 68, 79-80 (2nd Cir. 2010) (rejecting presumption of irreparable harm in copyright cases as "inconsistent with principles of equity" and *Winter*). Moreover, the Rule does not violate any statutes, as discussed *supra*, and there has been no finding to the contrary on which to base a presumption of harm. Second, although Plaintiffs have not articulated a coherent theory of standing, it appears that they are asserting their Equal Protection claims on behalf of their members or constituents rather than themselves. Mot. 31-33; Compl. at 115. Because Plaintiffs have not even alleged the necessary elements of associational standing,

much less provided evidence to support that standing, their Equal Protection allegations cannot serve as the basis of a presumption of irreparable harm. *See New York State Psychiatric Ass'n,* 798 F.3d at 130 ("An association has standing to bring suit on behalf of its members when (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.") (citation omitted); *Summers*, 555 U.S. at 499 ("[T]he Court has required plaintiffs claiming an organizational standing to identify members who have suffered the requisite harm."); *NRDC, Inc. v. FDA*, 710 F.3d at 79 ("A membership organization . . . may assert the standing of its members if . . . it establishes that at least one of its members has standing to sue individually.").

Neither do Plaintiffs' allegations concerning diversion of resources and frustration of their missions satisfy the irreparable harm standard. Irreparable harm is a more demanding standard than standing, *see, e.g. Freedom Holdings*, 408 F.3d at 114, which itself Plaintiffs' claims do not satisfy, *see supra*. In the same breath Plaintiffs assert their organizational purposes are to educate clients and provide legal services, primarily in the realm of immigration law, they complain that they are being harmed by doing so. *See* Mot. at 36-37. Plaintiffs are "not wasting resources by educating the public" and providing legal services because "this is exactly how" organizations like Plaintiffs "spend[] [their] resources in the ordinary course." *CREW*, 276 F. Supp. 3d. at 191-92. Thus they have suffered no "concrete or particularized injury" that can satisfy the irreparable injury standard. *Id*; *see also, e.g.*, *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 285-86 (3d Cir. 2014) ("additional expenditures . . . consistent with [an organization's] typical activities" are not an injury); *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010) (actions that did not "differ from the [organization]'s routine . . . activities" did not confer standing); *Knowledge Ecology Int'l v. Nat. Insts. of Health*, No. PJM 18-1130, 2019 WL 1585285, at *6 (D. Md. Apr. 11, 2019) (finding no standing because providing advice about the challenged policies was "very much in line with [the organization's] core mission."). Nor have Plaintiffs even alleged that these ephemeral purported harms are either irreparable or "so imminent as to be irreparable if a court waits until

37

the end of trial to resolve the harm." *Rodriguez*, 175 F.3d at 235.

## IV. THE REMAINING EQUITABLE FACTORS REQUIRE DENIAL OF PLAINTIFFS' MOTION.

Even if Plaintiffs had made a sufficient showing on either likelihood of success on the merits or likelihood of irreparable injury, and they have not, they would still be obligated to make a satisfactory showing both that the balance of equities tips in their favor and that the public interest favors injunction. *See Metro. Life Ins. Co. v. Bucsek*, 919 F.3d 184, 188 n.2 (2nd Cir. 2019). These two factors merge when the government is a party, *Vidal v. Neilsen*, 279 F. Supp. 3d 401, 435 (E.D.N.Y. 2018), but Plaintiffs have not made a sufficient showing to meet the standard for either factor. Plaintiffs assert that the balance of equities and public interest favor an injunction because they have alleged economic and public health harms, Mot. at 39, and that Defendants will not suffer comparable harm because an injunction allegedly maintains Defendants' existing practice. *Id*.[19]

This analysis is facially incorrect and self-serving. The economic and public health harms alleged by Plaintiffs are wholly speculative, premised on the cumulative effects of the independent decisions of thousands of individual third parties. Moreover, there is no support for their assertions that these harms would be realized during the pendency of this case. Conversely, there can be no doubt that the Defendants have a substantial interest in administering the national immigration system, a *solely federal* prerogative, according to the expert guidance of the responsible agencies as contained in their regulations, and that the Defendants will be harmed by an impediment to doing so. Quite obviously, Defendants have made the assessment in their expertise that the existing Field Guidance referred to by Plaintiffs is insufficient or inappropriate to serve the purposes of proper immigration enforcement. Therefore, imposing the extraordinary remedy of a preliminary injunction and requiring the prior practice to continue before a determination on the merits would

---

[19] Plaintiffs also contend that the balance favors an injunction because there is a public interest in lawful agency action and no public interest in unlawful agency action. However, the interests of the Defendants, as federal regulators, are also served by proper compliance with the law, which was undertaken in this case. *See supra*. Thus, this factor is merely neutral in the balance.

significantly harm Defendants.

Plaintiffs' speculative harms have no weight in the balance of hardships compared to the Defendants' interest in avoiding roadblocks to administering the national immigration system. Consequently, Plaintiffs have failed to demonstrate that the balance of hardships tips in their favor or that the public interest favors injunction. On this ground alone, their motion for a preliminary injunction must fail. *See Winter*, 555 U.S. at 26.

## V.      THE COURT SHOULD NOT GRANT NATIONWIDE RELIEF.

Were the Court to order a preliminary injunction or a stay of the effective date of the Rule, it should be limited to redressing only any established injuries to the individual Plaintiffs who establish standing and irreparable harm. Under Article III, a plaintiff must "demonstrate standing . . . for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930, 1933 (2018) ("The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it."). Plaintiffs have requested either a stay of the effective date of the regulation or a preliminary injunction, but have neither established nor alleged any facts in support of a nationwide injunction or a stay with that effect. Equitable principles require that an injunction "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Accordingly, Courts of Appeals have repeatedly vacated or stayed the nationwide scope of injunctions, including in a challenge to a federal immigration rule. *See, e.g., E. Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029 (9th Cir. 2019) ("Under our case law . . . all injunctions—even ones involving national policies—must be 'narrowly tailored to remedy the specific harm shown.'"); *see also California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) (collecting cases).

Relief under 5 U.S.C. § 705 is similarly limited, as that provision permits a court to stay the effective date of an agency action only "to the extent necessary to prevent irreparable injury." *Id*. Although Plaintiffs have requested a stay of the effective date of the Rule without limitation, narrower relief is both available under § 705 and required by equitable principles applicable to

extraordinary forms of relief. *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (indicating that courts should consider any "brief[ing] [regarding] how [to] craft a limited stay"); 5 U.S.C. § 705 (Courts "may issue all necessary and appropriate process to postpone the effective date of an agency action *or* to preserve status or rights pending conclusion of the review process." (emphasis added)). Plaintiffs acknowledge that relief under § 705 is governed by equitable principles under the "same" standards as govern preliminary injunctions, Mot. at 40, and nothing in § 705 speaks clearly enough to work "a major departure from the long tradition of equity practice." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982).

Here, Plaintiffs have not established that nationwide relief is necessary to remedy their alleged harms. Only one Plaintiff—CLINIC—alleges any connection between its operations and individuals outside New York State, and CLINIC does not serve such individuals directly and instead has only "affiliate organizations" undertaking activities in those locations. Mot. at 40. Plaintiffs identify no case in which an attenuated harm via the client of a Plaintiff organization's client organization was held to justify a finding of irreparable harm to the Plaintiff, let alone to require nationwide relief. Nor can the mere possibility that the Plaintiff organizations' clients may choose to voluntarily move out-of-state, Mot. at 40, during the pendency of a preliminary injunction justify extending an injunction to every alien in the nation. Any injunction should be limited to clients of the Plaintiffs, and only to those clients and patients for whom Plaintiffs have demonstrated injury, and even then, only after the Court has conducted the required balancing of any demonstrated harm against the other equitable considerations. *Winter*, 555 U.S. at 26. A nationwide injunction that applies to countless individuals lacking any non-speculative, irreparable harm tied to their specific relationships with these plaintiff organizations is not "narrowly tailored to remedy the specific harm shown." *East Bay*, 934 F.3d at 1029.

## CONCLUSION

Defendant respectfully requests that the Court deny Plaintiffs' motion for a preliminary injunction or stay of the effective date of the Rule.

Dated:  September 27, 2019                   Respectfully submitted,

  GEOFFREY S. BERMAN                     JOSEPH H. HUNT
  United States Attorney                 Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director, Federal Programs Branch

                                         /s/ *Joshua M. Kolsky*
                                         ERIC J. SOSKIN
                                         Senior Trial Counsel
                                         KERI L. BERMAN
                                         KUNTAL V. CHOLERA
                                         JOSHUA M. KOLSKY, DC Bar No. 993430
                                         U.S. Dept. of Justice, Civil Division,
                                         Federal Programs Branch
                                         1100 L Street, N.W., Rm. 12002
                                         Washington, DC 20001
                                         Phone: (202) 305-7664
                                         Fax: (202) 616-8470
                                         Email: joshua.kolsky@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 27, 2019 I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

_/s/ Joshua M. Kolsky_
JOSHUA M. KOLSKY