UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MAKE THE ROAD NEW YORK, AFRICAN SERVICES
COMMITTEE, ASIAN AMERICAN FEDERATION,
CATHOLIC CHARITIES COMMUNITY SERVICES,
and CATHOLIC LEGAL IMMIGRATION NETWORK,
INC.,

Plaintiffs,

- against -

KEN CUCCINELLI, in his official capacity as Acting
Director of United States Citizenship  and Immigration
Services; UNITED STATES CITIZENSHIP &
IMMIGRATION SERVICES; KEVIN K. McALEENAN,
in his official capacity as Acting Secretary of Homeland
Security; and UNITED STATES DEPARTMENT OF
HOMELAND SECURITY,

Defendants.

1:19-cv-07993  (GBD)

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................... 1

ARGUMENT .............................................................................................. 1

I.      Plaintiffs Have Standing and Their Claims Are Ripe and in the Zone of Interests  1

II.     Plaintiffs Are Likely To Succeed on the Merits ................................... 4

        A.      The Rule is Contrary to the INA .............................................. 4

        B.      The Rule Violates the Rehabilitation Act ................................. 8

        C.      DHS Lacks Authority to Promulgate the Rule ......................... 8

        D.      The Rule Is Arbitrary and Capricious ...................................... 9

                1.      The Evidence Before the Agency Does Not Justify the Rule, or Its Departure from the Field Guidance ............................... 9

                2.      Defendants Fail to Show Adequate Responses to Significant Comments or to Counter Arguments that Specific Provisions are Vague ................................................................................ 10

        E.      The Rule Is Not Designed to Avoid Retroactive Effect ........... 11

        F.      The Rule Is Motivated by Animus Against Immigrants of Color and Is Subject to Strict Scrutiny ............................................. 12

III.    The Evidence of Irreparable Harm Is Overwhelming ........................ 13

IV.     The Public Interest and Balance of the Equities Favor an Injunction ................. 14

V.      The Rule Should Be Enjoined or Postponed Nationwide ................... 15

CONCLUSION .......................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Al Otro Lado* v. *Neilsen*,
 327 F. Supp. 3d 1284 (S.D. Cal. 2018) ...............................................................4

*Arlington Heights* v. *Metro. Hous. Dev. Corp.*,
 429 U.S. 252 (1977)...........................................................................................12

*Bank of Am.* v. *City of Miami*,
 137 S. Ct. 1296 (2017) .........................................................................................4

*Batalla Vidal* v. *Nielsen*,
 291 F. Supp. 3d 260 (E.D.N.Y. 2018) ....................................................... 4, 12, 15

*Blunt* v. *Lower Merion Sch. Dist*,
 767 F.3d 247 (3d Cir. 2014) ...............................................................................13

*FDA* v. *Brown & Williamson Tobacco Corp.*,
 529 U.S. 120 (2000).............................................................................................4

*Centro de la Comunidad Hispana de Locust Valley* v. *Oyster Bay*,
 868 F.3d 104 (2d Cir. 2017) .............................................................................1, 2

*Centro Presente* v. *Dep't of Homeland Security*,
 332 F. Supp. 3d 393 (D. Mass. 2018)............................................................ 12, 13

*Citizens for Responsibility & Ethics in Wash.* v. *Trump*,
 276 F. Supp. 3d 174 (S.D.N.Y. 2017) ....................................................... passim

*Citizens for Responsibility & Ethics in Wash.* v. *Trump*,
 2019 WL 4383205 (2d Cir. Sept. 13, 2019)............................................... passim

*Doe* v. *Trump*,
 288 F. Supp. 3d 1045 (W.D. Wash. 2017)...........................................................4

*E. Bay Sanctuary Covenant* v. *Trump*,
 909 F.3d 1219 (9th Cir. 2018) .............................................................................4

*Ex Parte Horn*,
 292 F. 455 (W.D. Wash. 1923) ...........................................................................6

*Ex Parte Mitchell*,
 256 F. 229 (N.D.N.Y. 1919) ...............................................................................7

*In re Feinknopf,*
  47 F. 447 (E.D.N.Y. 1891) ......................................................................6

*Getty Petroleum Corp.* v. *Bartco Petroleum Corp.,*
  858 F.2d 103 (2d Cir. 1988) ...................................................................9

*Henrietta D.* v. *Bloomberg,*
  331 F.3d 261 (2d Cir. 2003) ...................................................................8

*INS* v. *Legalization Assistance Project,*
  510 U.S. 1301 (1993) (O'Connor, J., in chambers)................................4

*Matter of A-,*
  19 I. & N. Dec. 867 (B.I.A. 1988) ..........................................................6

*Matter of Martinez-Lopez,*
  10 I. & N. Dec. 409 (B.I.A. 1962; A.G. 1964)........................................5

*Matter of Perez,*
  15 I. & N. Dec. 136 (B.I.A. 1974) ..........................................................6

*Mayor & City Council of Baltimore* v. *Trump,*
  2019 WL 4598011 (D. Md. Sept. 20, 2019) ......................................3, 13

*Michigan* v. *EPA,*
  135 S. Ct. 2699 (2015) ............................................................................5

*Nat'l Mining Ass'n* v. *Dep't of Interior,*
  177 F.3d 1 (D.C. Cir. 1999)...................................................................12

*Nat'l Mining Ass'n* v. *U.S. Army Corps. of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998)............................................................15

*Natofsky* v. *City of New York,*
  921 F.3d 337 (2d Cir. 2019) ...................................................................8

*Nnebe* v. *Daus,*
  644 F.3d 147 (2d Cir. 2011) ...........................................................1, 2, 4

*Pennsylvania* v. *President United States,*
  930 F.3d 543 (3d Cir. 2019) .................................................................15

*Public Citizen, Inc.* v. *FAA,*
  988 F.2d 186 (D.C. Cir. 1993) ..............................................................10

*Ramos* v. *Nielsen,*
  336 F. Supp. 3d 1075 (N.D. Cal. 2018) ...........................................12, 13

*Romer* v. *Evans,*
    517 U.S. 620 (1996)...................................................................................12

*Saget* v. *Trump,*
    375 F. Supp. 3d 280 (E.D.N.Y. 2019) ..................................................12, 13, 15

*Scheerer* v. *U.S. Att'y Gen.,*
    513 F.3d 1244 (11th Cir. 2008) ...................................................................9

*Sessions* v. *Morales-Santana,*
    137 S. Ct. 1678 (2017) ..............................................................................12

*Toyota Motor Mfg., Ky., Inc.* v. *Williams,*
    534 U.S. 184 (2002) ...................................................................................5

*Trump* v. *Hawaii,*
    138 S. Ct. 2393 (2018) .........................................................................12, 13

*Texas* v. *United States,*
    809 F.3d 134 (5th Cir. 2015) ......................................................................15

*Utility Air Reg. Grp.* v. *EPA,*
    573 U.S. 302 (2014) ...................................................................................5

*United States* v. *Lipkis,*
    56 F. 427 (S.D.N.Y. 1893) .........................................................................6

*United States ex rel. Mantler* v. *Comm'r of Immigration,*
    3 F.2d 234 (2d Cir. 1924) ...........................................................................7

### STATUTES

6 U.S.C. § 202(4) ............................................................................................9

6 U.S.C. § 236(b) ............................................................................................9

8 U.S.C. § 1159(b) ...........................................................................................9

29 U.S.C. § 794(a) ...........................................................................................8

Immigration Act of 1882, 47th Cong. Ch. 376, 22 Stat. 214 ......................................6

Pub. L. No. 109-13, div. B, title I, § 101(g)(1), 119 Stat. 231, 305 (2005) ....................9

Pub. L. No. 110-325, 122 Stat. 3553 (2008) ..........................................................8

### OTHER AUTHORITIES

6 C.F.R. § 15.30(a) ..........................................................................................8

64 Fed. Reg. 28,689..........................................................................................................................6

83 Fed. Reg. 51,160........................................................................................................................10

84 Fed. Reg. 52,357........................................................................................................................11

## PRELIMINARY STATEMENT[1]

For more than 130 years, courts and administrative agencies, with Congress's approval, have meant by "public charge" only an individual who is institutionalized at public expense, or who otherwise primarily relies on the government for subsistence. Defendants now plan to abolish that definition. In its place, they seek to deny lawful permanent residence to millions of low-income immigrants who are predicted to show any financial vulnerability in the future, and to do so in reliance on a set of factors that are confusing, vague, and discriminatory. The Rule thus converts the public charge inadmissibility provision into a scale weighted to favor the wealthy and high-income—those who can absorb, without assistance, such ordinary vagaries of life as temporary unemployment or illness. If permitted to take effect, this radical departure from settled law will cause immeasurable and irreparable harm to plaintiffs and the communities they serve. The Rule should be enjoined.

## ARGUMENT

### I.    Plaintiffs Have Standing and Their Claims Are Ripe and in the Zone of Interests

An organization has standing when it is forced "to divert money from its other current activities to advance its established organizational interests[.]" *Centro de la Comunidad Hispana de Locust Valley* v. *Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017); *Citizens for Responsibility & Ethics in Wash.* v. *Trump*, 276 F. Supp. 3d 174, 190 (S.D.N.Y. 2017) ("*CREW*") ("[A]n organization has standing where it is forced to expend resources to prevent some adverse or harmful consequence on a well-defined and particularized class of individuals."), *rev'd on other grounds*, 2019 WL 4383205 (2d Cir. Sept. 13, 2019). "[O]nly a perceptible impairment of an organization's activities is necessary for there to be injury-in-fact." *Nnebe* v. *Daus*, 644 F.3d

---

[1] All capitalized and abbreviated terms used in this Reply are the same as defined in the plaintiffs' opening brief (Dkt. 35), cited herein as "Mot." References to defendants' opposition brief (Dkt. 129) are cited herein as "Opp'n."

147, 157 (2d Cir. 2011) (quotation marks omitted) (taxi drivers' advocacy group had standing to challenge defendants' procedures for suspending licenses when it "expended resources to assist its members" in license suspension proceedings). "[S]omewhat relaxed standing rules apply" in cases like this, where "a party seeks review of a prohibition prior to its being enforced." *Oyster Bay*, 868 F.3d at 110. Where "multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Id.* at 109 (quoting *Rumsfeld* v. *Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

Plaintiffs satisfy these standards. Defendants do not dispute that each plaintiff has already devoted substantial resources to mitigating the Rule's impact on its clients (*see* Opp'n at 7), to the detriment of their other activities, and that the need to do so will only increase if the Rule becomes effective.[2] (Mot. at 36–37.) These and similar harms affect more than plaintiffs' "abstract social interests." (Opp'n at 7 & n.2.) They hinder plaintiffs' ability to deliver critical services to the real human beings they are mission-bound to serve.[3]

Defendants' reliance on this Court's decision in *CREW* is misplaced. This Court emphasized in *CREW* that the "common thread" in Second Circuit organizational standing cases is that the "organization was compelled to act, with a consequent drain on [its] resource[s], to remedy and counter the adverse consequences flowing from the defendant's conduct or policy." 276 F. Supp. 3d at 190 (citation omitted). The organizational plaintiff in *CREW* lacked standing

---

[2] For example, ASC's clients have already refused to apply for public cash assistance and are instead relying on ASC's housing-assistance programs, jeopardizing its sustainability. (Nichols Decl. ¶ 17.) The same goes for CCCS-NY, which expects the Rule to "caus[e] an increased strain on already limited resources, thereby reducing the number of individuals we serve, [and] limiting the scope of services rendered." (Russell Decl. ¶ 32.) Instead of engaging in policy advocacy, MRNY's health staff spend time addressing members' public charge fears. (Oshiro Decl. ¶ 40). And plaintiffs that provide direct legal services—MRNY, CCCS-NY, ASC, and CLINIC—must spend additional time and resources on applications for adjustment of status and related proceedings. (*See* Mot. at 37.)

[3] Defendants argue that plaintiffs have not established standing for their Fifth Amendment claim because plaintiffs "appear to" have asserted the claim on behalf of their members. (Opp'n at 8.) But, "nothing prevents an organization from bringing a [discrimination] suit on its own behalf so long as it can independently satisfy the requirements of Article III standing[.]" *Nnebe*, 644 F.3d at 156 (citation omitted).

because it failed to allege that defendants' actions impeded its performance of mission-related activities, or that it used resources to remedy the consequences of defendants' conduct. *Id*. Plaintiffs here, by contrast, show that defendants' actions will require them to "expend resources they would not have otherwise spent to avert or remedy some harm."[4] *See id*.

Defendants contend that plaintiffs' claims are not ripe because their allegations of irreparable harm "consist of potential future harms that . . . would be spurred by decisions of third parties."[5] (Opp'n at 9.) The Supreme Court rejected this argument in *Dep't of Commerce* v. *New York*, when it held that New York had standing because its claims rested "on the predictable effect of Government action on the decisions of third parties." 139 S. Ct. 2551, 2566 (2019); *accord CREW*, 2019 WL 4383205, at *11 (That "[p]laintiffs' theory of harm results from decisions of third parties does not preclude finding the cognizable link between the challenged action and the alleged harm that Article III requires."); *Mayor & City Council of Baltimore* v. *Trump*, 2019 WL 4598011, at *17 (D. Md. Sept. 20, 2019) (rejecting similar challenge to State Department's modification of "public charge" definition for visa applications). Here, too, the harm to plaintiffs is not speculative, and indeed was anticipated by defendants. (Mot. at 35–40.)[6]

Finally, defendants contend that only a noncitizen wrongly deemed inadmissible as a public charge falls within the zone of interests of section 212(a)(4) of the INA. (Opp'n at 11.) But the zone of interests inquiry is "not meant to be especially demanding" and "does not require the plaintiff to be an intended beneficiary of the law in question." *CREW*, 2019 WL 4383205, at

---

[4] Defendants' assertion that an organizational plaintiff must "show that it was compelled to direct resources towards activities it would not have performed 'in the ordinary course'" (Opp'n at 7) is contrary to the law of this Circuit. The organizational plaintiff in *Nnebe* had standing because it devoted resources to assisting members in defending against legal claims, although doing so was part of its ordinary activities. 644 F.3d at 157–58.

[5] Defendants argue that plaintiffs' claims are not constitutionally ripe "for the same reasons" that plaintiffs "lack . . . standing." (Opp'n at 9.) Because plaintiffs have standing, this argument should be rejected.

[6] Defendants contend that withholding judicial consideration now will not cause plaintiffs "significant hardship." (Opp'n at 10.) But plaintiffs have already suffered injury and will continue to do so it the Rule is not enjoined. (*See* Mot. at 37.) Defendants do not identify further factual development that would assist the court and justify delay.

3

*13, 16. Courts have found that immigrant advocacy organizations such as plaintiffs have standing to challenge immigration regulations in light of INA provisions that "give [immigrant advocacy organizations] a role in helping immigrants navigate the immigration process." *E. Bay Sanctuary Covenant* v. *Trump*, 909 F.3d 1219, 1245 (9th Cir. 2018).[7] And the zone of interests test is satisfied by an "economic injury" that makes the plaintiff "a reliable private attorney general to litigate the issues of the public interest." *CREW*, 2019 WL 4383205, at *15; *see Bank of Am.* v. *City of Miami*, 137 S. Ct. 1296, 1303–04 (2017) (city's discriminatory lending claims within zone of interests of the Fair Housing Act, despite any indication Act was intended to protect municipal budgets).[8] Plaintiffs here satisfy this test. (*See* Mot. at 37.)[9]

## II.   Plaintiffs Are Likely To Succeed on the Merits

### A.   The Rule is Contrary to the INA

Defendants invoke "Congress's delegation of broad authority to the Executive Branch" to justify the Rule.[10] (*E.g.*, Opp'n at 2–3, 17–21.) But evidence of Congress's intent when it reenacted the public charge provision in 1996—including the language of the provision, its longstanding judicial and administrative interpretation, Congress's express rejection of a broader definition of "public charge," and Congress's decision then and later to allow noncitizens to have access to public benefits—shows that Congress spoke to the issue, and precludes the Rule's

---

[7] *E.g.*, *Batalla Vidal* v. *Nielsen*, 291 F. Supp. 3d. 260, 269 n.3 (E.D.N.Y. 2018) (challenge to termination of DACA program); *Al Otro Lado* v. *Nielsen*, 327 F. Supp. 3d 1284, 1299–1302 (S.D. Cal. 2018) (challenge to DHS asylum policy); *Doe* v. *Trump*, 288 F. Supp. 3d 1045, 1067–68 (W.D. Wash. 2017) (challenge to agency refugee policy).
[8] Defendants rely on *INS* v. *Legalization Assistance Project*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers), but that 26-year old decision—which was issued by a single Justice interpreting a different statute—is inconsistent with the modern zone of interests doctrine set forth in *City of Miami*. Defendants also rely on *Fed'n for Am. Imm'gn Reform, Inc.* v. *Reno*, but that case simply held that an anti-immigration group lacked standing to challenge an immigration decision based on its objections to immigration generally. 93 F.3d 897, 900–04 (D.C. Cir. 1996).
[9] Plaintiffs' economic injury similarly places them squarely within the zone of interests of the Fifth Amendment. *See CREW*, 2019 WL 4383205, at *15 n.13 (rejecting argument that the zone of interests test is more strictly applied to constitutional claims than APA claims); *cf. Nnebe*, 644 F.3d at 156 (finding that advocacy organization had standing to assert Due Process claim based on alleged economic injury sustained by virtue of diverted resources).
[10] Defendants do not dispute that the Rule is a "major question" not subject to *Chevron* deference. (*See* Mot. at 17.)

4

inconsistent interpretation. *See FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125–26 (2000) (rejecting administrative interpretation as inconsistent with expressed intent of Congress in light of statute's structure and purpose, legislative history, content of related statutes, and rejections of efforts to amend statute); *Toyota Motor Mfg., Ky., Inc.* v. *Williams*, 534 U.S. 184, 193–94 (2002) ("Congress's repetition of a well-established term generally implies that Congress intended the term to be construed in accordance with pre-existing regulatory interpretations."). In any event, defendants' definition is outside any permissible bounds. *See Michigan* v. *EPA*, 135 S. Ct. 2699, 2708 (2015); *Utility Air Reg. Grp.* v. *EPA*, 573 U.S. 302, 321 (2014). The Rule's transformational nature is evident from parallel changes to the Department of State's Foreign Affairs Manual, which increased the rate of immigrants being denied visas on public charge grounds twelvefold in a period of two years, with the most dramatic increases falling on prospective immigrants from Mexico, South Asia, Haiti, and the Dominican Republic. (Mot. at 32.) The dramatic impact of the Rule is also illustrated by the fact that while historically less than one percent of immigrants have been excluded on public charge grounds, approximately *half* of all citizens use benefits identified in the Rule. (*See* Mot. at 7, 14.) There is no evidence that Congress intended to exclude as a public charge anyone who might ultimately be entitled to use the same benefits that are also used by such a broad range of citizens.

Defendants do not cite a single case or administrative decision interpreting "public charge" in the INA as the Rule does. In fact, the leading administrative decisions show that receipt or likely future receipt of benefits does not render a person a public charge absent other circumstances such as age or illness showing that she is unlikely to be able to support herself.

- *Matter of Martinez-Lopez*, 10 I. & N. Dec. 409 (B.I.A. 1962; A.G. 1964): Petitioner not likely to become a public charge, despite his falsifying an offer of employment, complete lack of English fluency, and only $50 in assets, when he was young, had work experience in the U.S., and had family in U.S. that was willing to assist him.

5

- *Matter of Perez*, 15 I. & N. Dec. 136 (B.I.A. 1974): Petitioner not likely to become a public charge despite past receipt of welfare because having been "on welfare does not, by itself, establish that he or she is likely to become a public charge," and she was 28, healthy, capable of finding employment, and supported by family.

- *Matter of A-*, 19 I. & N. Dec. 867 (B.I.A. 1988): Petitioner not likely to become a public charge although neither she nor her spouse had worked during the past four years and her family received cash assistance, as she was "young," employed, and able to earn a living.

Defendants' assertion that INS's Field Guidance "dramatically narrowed the public charge inadmissibility ground" (Opp'n at 4) is unsupported. The Field Guidance "summarize[d] longstanding law," 64 Fed. Reg. 28,689, at 28,689 (1999), Ex. 26, and is consistent with decades of prior administrative decisions. (Mot. at 11–12.) Defendants nowhere dispute that the Field Guidance's 1999 interpretation is better evidence of Congress's intent in 1996 than the Rule's inconsistent interpretation issued two decades later. (*See* Mot. at 18–19.) Nor do they cite evidence that Congress believed the Field Guidance was inconsistent with the intent of the Act.

Defendants rely on a handful of archaic cases that supposedly show that "public charge" meant something other than being destitute, but those cases do not support their position.[11] The 1882 Act itself, which created the public charge provision, simultaneously established an "immigrant fund" to provide "for the care of immigrants arriving in the United States, [and] for the relief of such as are in distress." Immigration Act of 1882, 47th Cong. Ch. 376, 22 Stat. 214, Ex. 6. The Congressional debate makes clear that the "immigrant fund" was "to be used for protecting and caring for [immigrants] when they arrive in the ports of this country, until they can proceed to other places or obtain occupation for their support." 13 Cong. 5106 (June 19,

---

[11] *In re Feinknopf*, 47 F. 447 (E.D.N.Y. 1891) (Immigrant found *not* excludable as likely to be a public charge because he was skilled and employable, "ha[d] not been an inmate of an almshouse, and ha[d] not received public aid or support," although he had only $20 worth of baggage and 50 cents in cash on hand.); *United States* v. *Lipkis*, 56 F. 427 (S.D.N.Y. 1893) (Woman "became a public charge" when she "was sent to the public insane asylum . . . where only poor persons unable to pay for treatment are received."); *Ex Parte Horn*, 292 F. 455 (W.D. Wash. 1923) (Petitioner "not likely to become a public charge, in the sense that he would be a 'pauper' or an occupant of an almshouse for want of means of support, or likely to be sent to an almshouse for support at public expense.").

1882) (statement of Rep. Reagan), Ex. 9. Defendants also cite dictionary definitions of the terms "public" and "charge," (Opp'n at 12), but even these dictionaries use as examples "pauper[s]," not persons receiving supplemental assistance. And courts have rejected defendants' argument that Congress's revision of the INA in 1917 to separate "public charge" from terms such as "pauper" changed the meaning of "public charge." *E.g.*, *Ex Parte Mitchell*, 256 F. 229, 230–32 (N.D.N.Y. 1919) (citing *Howe* v. *United States ex rel. Savitsky*, 247 F. 292, 294 (2d Cir. 1917)); *see also United States ex rel. Mantler* v. *Comm'r of Immigration*, 3 F.2d 234 (2d Cir. 1924).

Defendants' assertion that IIRIRA was intended to "expand" the definition of "public charge" is based on misleading snippets from the bill's Conference Report. (Opp'n at 1 (quoting H.R. Rep. 104-828, at 241 (1996) (Conf. Rep.), Ex. 46).) In fact, the Report makes clear that IIRIRA's only "expan[sion]" was to the affidavit of support requirement, not to the definition of "public charge" itself; in fact, IIRIRA codified the existing definition. (*See* Mot. at 10.) Likewise, defendants wrongly assert that this purported "expan[sion]" followed a finding that "only a negligible number of aliens who become public charges have been deported in the last decade" (*see* Opp'n at 1 (quoting Conf. Rep. at 241)), ignoring that days later Congress *rejected* a proposed expansion of the "public charge" removal provision.[12] (*See* Mot. at 10–11.)

Against all this evidence of Congress's intent in the INA, defendants point to a general statement of policy in the PRWORA that "aliens within the Nation's borders not depend on public resources to meet their needs." (*E.g.*, Opp'n at 2–3, 15 (citing 8 U.S.C. § 1601(2)(A)).) But "[w]here the enacting or operative parts of a statute are unambiguous, the meaning of the statute cannot be controlled by language in the preamble." *Ass'n of Am. R.R.s* v. *Costle*, 562 F.2d

---

[12] Defendants mention only in passing Sen. Sessions's failed attempt in 2013 to amend the public charge provision in the same way as the Rule, which they say constitutes congressional inaction indicating an intent to continue delegating interpretive authority. (*See* Opp'n at 19.) But the affirmative act of rejecting Sen. Sessions's amendment is significant evidence that Congress approved of the existing agency policy. (Mot. at 20–21.)

1310, 1316 (D.C. Cir. 1977). And defendants do not dispute that Congress determined this policy statement was consistent with making benefits available to immigrants. (*See* Mot. at 21.)

### B.       The Rule Violates the Rehabilitation Act

Defendants argue that the Rule does not violate the Rehabilitation Act because applicants will not be denied adjustment "solely" because of disability, citing *Natofsky* v. *City of New York*, 921 F.3d 337, 350–51 (2d Cir. 2019). (Opp'n at 21–23.) But *Natofsky* addressed employment discrimination; its causation standard does not apply to claims regarding the government's provision of services or programs, where plaintiffs need show only that disability was a "substantial cause of the exclusion or denial." *Henrietta D.* v. *Bloomberg*, 331 F.3d 261, 291 (2d Cir. 2003); *see Natofsky*, 921 F.3d at 346 (distinguishing *Henrietta D.*).

Here, plaintiffs' claims easily satisfy the standard set forth by the Rehabilitation Act and DHS's implementing regulations. 29 U.S.C. § 794(a); 6 C.F.R. § 15.30(a). Defendants concede that an immigrant's "disability is one [negative] factor" in the public charge analysis (Opp'n at 22), so that disabled applicants begin the public charge inquiry with a strike against them. And defendants do not contest that "other negative factors may flow from a person's disabled status." (Opp'n at 22 & n.11.) Defendants' suggestion that disabled applicants "counterbalance" their disabilities with other factors (Opp'n at 22) simply highlights that disabled individuals are "subjected to discrimination" under the Rule.[13]

### C.       DHS Lacks Authority to Promulgate the Rule

Defendants argue that the HSA transferred rulemaking authority from the Attorney General to the Secretary because section 451(b) of the HSA transferred adjudicatory functions

---

[13] The argument that IIRIRA's inclusion of "health" as a public charge factor "supersedes" Section 504's proscription against discrimination because it is a "specific, later statutory command" (Opp'n at 21–22) is specious. Section 504's disability discrimination prohibition is more specific than a single word: "health." And Section 504 was amended—and its definitions of disability were expanded—twelve years after the "health" factor was added to the public charge provision. *See* Pub. L. No. 110-325, 122 Stat. 3553 (2008).

from the Commissioner of INS to the Director of USCIS. (Opp'n at 24 (citing 6 U.S.C. § 271(b)).) But Congress did not intend a transfer of adjudicatory functions to automatically transfer rulemaking authority. For example, although the HSA transferred adjudicatory authority over "immigrant visa petitions" to USCIS, Congress separately transferred authority for "establishing and administering rules . . . governing the granting of visas." *See* 6 U.S.C. §§ 202(4), 236(b). Similarly, although the HSA transferred to USCIS adjudicatory authority over "asylum and refugee applications," Congress did not grant the Secretary rulemaking authority over such applications until 2005. *See* Pub. L. No. 109-13, div. B, title I, § 101(g)(1), 119 Stat. 231, 305 (2005), codified at 8 U.S.C. § 1159(b), Ex. 47.[14]

Defendants' argument that a catchall provision in the HSA transferred "all relevant functions" away from the Attorney General (Opp'n at 23 & n.12) is belied by subsequent acts of Congress and court decisions. For example, the Third Circuit in *Sarango* v. *Attorney General* held that a 2006 statute that replaced the term "Attorney General" with "Secretary of Homeland Security" in a different inadmissibility provision of the INA "indicate[d] Congress's intent to divest the Attorney General of authority" in favor of the Secretary. 651 F.3d 380, 385 (3d Cir. 2011).[15] By contrast, Congress never provided the Secretary with rulemaking authority over adjustment of status or public charge, and accordingly, he has none.

### D. The Rule Is Arbitrary and Capricious

#### 1. *The Evidence Before the Agency Does Not Justify the Rule, or Its Departure from the Field Guidance*

---

[14] Defendants offer no response to the fact that Congress specifically considered and rejected legislation that would have replaced the term "Attorney General" with "Secretary of Homeland Security" in several provisions of the INA—but *not* the public charge provision—after the enactment of the HSA. (*See* Mot. at 24 n.21.)

[15] *Scheerer* v. *U.S. Att'y Gen.*, 513 F.3d 1244 (11th Cir. 2008), cited by defendants, upheld a regulation concerning eligibility to apply for adjustment of status promulgated by the *Attorney General* in 2006. *Id.* at 1250–51. To the extent the court suggested in a footnote that the Attorney General and Secretary share *adjudicatory* authority over adjustment of status applications, *id.* at 1251 n.6, that statement has no precedential weight because the issue was neither briefed nor argued. *See Getty Petroleum Corp.* v. *Bartco Petroleum Corp.*, 858 F.2d 103, 113 (2d Cir. 1988).

Defendants largely ignore plaintiffs' showing that the Rule's failure to grapple with relevant evidence renders it arbitrary and capricious. *First*, plaintiffs showed that the agency ignored evidence that supplemental benefits promote rather than impede self-sufficiency. (Mot. at 25.) Defendants point to no contrary evidence and do not dispute that benefits programs are widely used by working families. (*See* Opp'n at 24–25.) Nor do they explain why these families are not "self-sufficient" merely because they use benefits that Congress has made available.

*Second*, in response to plaintiffs' showing that DHS failed to justify departing from the Field Guidance (*see* Mot. at 28–30), defendants respond that the Field Guidance is purportedly "insufficiently protective of the public budget" and is inconsistent with the policy statement in PRWORA (Opp'n at 31). This justification fails to acknowledge the low percentage of noncitizens who receive public benefits or account for the fact that DHS's figures "include refugees, asylees, and other populations that may access public benefits but are not subject to the public charge ground of inadmissibility." NPRM, 83 Fed. Reg. 51,160 (proposed Oct. 10, 2018), Ex. 5. Nor does it explain why these budgetary concerns should overcome the Field Guidance's findings that widespread disenrollment from public benefits programs would harm immigrant communities and the public. (Mot. at 29.) Defendants do not even mention the reliance interests engendered by the existing policy, or explain why they should be disregarded. (Mot. at 29–30.)

## 2. *Defendants Fail to Show Adequate Responses to Significant Comments or to Counter Arguments that Specific Provisions are Vague*

Defendants cannot show that they responded reasonably to the "major issues of policy that were ventilated" by significant public comments. *Public Citizen, Inc.* v. *FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993). Mere citation to the Rule's repeated claim that it is honoring a goal of "self-sufficiency" (*e.g.*, Opp'n at 28) does not substitute for a reasoned response to the thousands of comments warning of the grave harm the Rule poses to immigrants, their families, and their

10

communities.[16] Mentioning a preference for private health insurance (Opp'n at 29–30) does not alert commenters that DHS would disregard as a positive factor insurance supported by tax credits in the Affordable Care Act. Pointing to the Rule's generalized totality of circumstances test (Opp'n at 29) does not relieve DHS of its obligation to respond specifically to commenters' concerns regarding the Rule's lack of guidelines for evaluating English language proficiency, particularly given this factor's role in disproportionately impacting immigrants of color.[17]

Defendants' claim that their lengthy and complex discussion of weighted circumstances "clarifies" the totality of circumstances test (Opp'n at 26) is simply wrong. The failure to set forth clear standards for the English language proficiency factor—in contrast, for example, to those set forth in the naturalization regulations (*see* Mot. at 28 n.24)—is emblematic of the Rule's vagueness. The Rule's introduction of a confusing array of negative factors and a small number of positive factors, each with different "weights," along with new standards for credit, income, and health insurance, transforms what should be a clear test into a complex puzzle that does not give fair notice to applicants and invites arbitrary adjudications.

### E.    The Rule Is Not Designed to Avoid Retroactive Effect

Defendants' assertion that the Rule is "carefully crafted to avoid any material retroactive effect" (Opp'n at 32) ignores how the Rule works. Defendants justify the Rule's requirement that applicants disclose every benefit "**EVER** received" on the new I-944 Form,[18] stating that USCIS officers simply will not consider information regarding benefits received before the Rule's

---

[16] Defendants' disregard for significant comments is evident from its rush to publish the Rule under intense pressure from the White House (*see* Mot. at 14–15, 33–34), which resulted in 7 pages of corrections published on October 2, 2019. *See Inadmissibility on Public Charge Grounds; Corrections*, 84 Fed. Reg. 52,357, Ex. 48.

[17] The English language proficiency factor disproportionately impacts immigrants of Latino and Asian origin even where applicants for adjustment have had no history at all of public benefits use. *See* Mot. at 32; Br. of Amici Asian Am. Advancing Justice *et al.*, ECF No. 62-1, at 14–15 (English proficiency factor functions as a "proxy for race")

[18] The Rule counts as a negative factor *any* amount of cash assistance ever received or applied for. In contrast, under the Field Guidance past receipt of cash assistance—for example, if in the distant past—did not trigger a public charge finding unless the applicant was "primarily dependent on the government for subsistence." (*See* Mot. at 30.)

effective date. (Opp'n at 32–33 & n.17.) If that were true, defendants could create a form that would not seek all such information. And defendants admit that consideration of credit scores can penalize past financial decisions made in reliance on the Field Guidance. (*See* Opp'n at 33.) Lastly, despite defendants' claim that they are not departing from the Field Guidance by diminishing the importance of an affidavit of support for immigrants who have already acquired one, the consistent practice since 1999 has been that an affidavit of support is sufficient to avoid public charge status. (Opp'n at 33–34; Mot. at 31.) These changes penalize noncitizens for actions that did not have negative immigration consequences at the time they were taken, and are impermissibly retroactive. *Nat'l Mining Ass'n* v. *Dep't of Interior,* 177 F.3d 1, 8 (D.C. Cir. 1999).

## F.     The Rule Is Motivated by Animus Against Immigrants of Color and Is Subject to Strict Scrutiny

Defendants argue that plaintiffs' Equal Protection claims are subject only to rational basis review.[19] But government actions driven by racial animus are subject to heightened scrutiny under *Arlington Heights* v. *Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977),[20] including racial discrimination against immigrants within the United States.[21] The Rule is not entitled to any deference as was the travel ban at issue in *Trump* v. *Hawaii*, 138 S. Ct. 2393, 2408 (2018). (*See* Opp'n at 34.) The Supreme Court's application of rational basis review in that case "was based on two considerations not at issue here: . . . the limited due process rights afforded to foreign nationals seeking entry into the United States and the particular deference accorded to the

---

[19] *Lewis* v. *Thompson*, which defendants cite in support of rational basis scrutiny, did not address racial or national origin discrimination, but discrimination based on immigration status. 252 F.3d 567, 582–83 (2d Cir. 2001).

[20] Recent Supreme Court precedent makes clear that rules based on suspect classifications are subject to heightened scrutiny when applied to immigrants in the United States. *Sessions* v. *Morales-Santana*, 137 S. Ct. 1678, 1689–90 (2017) (applying heightened scrutiny to gender-based classifications in INA's citizenship provisions). Moreover, a policy enacted out of animus against a particular group fails even rational basis scrutiny, as it "lacks a rational relationship to legitimate state interests." *Romer* v. *Evans*, 517 U.S. 620, 632 (1996).

[21] *E.g.*, *Batalla Vidal*, 291 F. Supp. 3d at 274–77; *Saget* v. *Trump*, 375 F. Supp. 3d 280, 366–67 (E.D.N.Y. 2019); *Centro Presente* v. *Dep't of Homeland Security*, 332 F. Supp. 3d 393, 409–12 (D. Mass. 2018); *Ramos* v. *Nielsen*, 336 F. Supp. 3d 1075, 1098 (N.D. Cal. 2018).

executive in making national security determinations." *Centro Presente*, 332 F. Supp. 3d at 411. These concerns do not apply to immigrants who "are living and have lived in the United States for lengthy periods with established ties to the community." *Ramos*, 336 F. Supp. 3d at 1107.

Defendants barely respond to plaintiffs' showing of improper purpose under *Arlington Heights*. They do not contest that there will be a disparate impact. (Opp'n at 35; Mot. at 31–33.) Nor do they address policy-makers' voluminous discriminatory statements directly linked to the Rule. (Mot. at 3, 14–15, 33–34). Defendants also ignore the unusual circumstances surrounding the creation of the Rule, including its origins in a nativist think tank, the pressure from the White House to speed publication, and the sudden resignations or replacements of agency heads. (*Id.*)

Defendants assert that the Court should confine its review to the administrative record. (*See* Opp'n at 35–36.) But numerous cases, including *Trump* v. *Hawaii*, have considered "extrinsic evidence" such as policy-makers' statements when evaluating the constitutionality of immigration rules. 138 S.Ct. at 2420; *Mayor and City of Baltimore*, 2019 WL 4598011, at *39; *Ramos*, 336 F. Supp. 3d at 1108; *Saget*, 375 F. Supp. 3d at 368. Defendants' position would "constrain judicial review" and evade "the Court's responsibility to 'smoke out' unconstitutional government conduct under the [equal protection] doctrine." *Saget*, 375 F Supp. 3d at 368.

## III.    The Evidence of Irreparable Harm Is Overwhelming

Defendants cite no authority for the suggestion that the diversion of resources and frustration of organizational mission cannot amount to irreparable harm, instead conflating the issue with standing.[22] (Opp'n at 37.) But such diversion of resources has routinely been held to

---

[22] Defendants characterize plaintiffs' harm as resources expended in the "ordinary course" of business. (Opp'n at 37.) But unlike the organizational plaintiffs cited in the defendants' brief, plaintiffs here engage in a broad range of activities on a wide array of issues, not limited to public charge inadmissibility, or even to family-based adjustment. *Cf., e.g., CREW*, 276 F. Supp. 3d at 191–92 (in challenge to corruption, describing plaintiff CREW's "entire reason for being" as combatting corruption and the influence of money in politics through education, advocacy, and litigation); *Blunt* v. *Lower Merion Sch. Dist*, 767 F.3d 247, 285-86 (3d Cir. 2014) (organizational plaintiff's "very purpose was to expend resources to educate the public regarding the [defendant school district's] behavior").

support granting preliminary injunctive relief. (Mot. at 35–36.) And defendants do not dispute that monetary harms are irreparable in an APA action (*see* Mot. at 36 n.31), or contest plaintiffs' testimony as to their monetary damages. (*E.g.*, Nichols Decl. ¶¶ 11, 16, 19, 25, 26; Wheeler Decl. ¶ 16.) Under the Rule, many of plaintiffs' clients—immigrants who are low-income, limited English proficient, disabled, or have low credit scores—will lose their path to a green card, even if they have never used benefits, and will face the real risk of removal and family separation. Plaintiffs are compelled to address these crises, and in so doing, suffer irreparable harm.

Additionally, defendants claim irreparable harm cannot be presumed on the basis of a statutory violation, citing *Salinger* v. *Colting*, 607 F.3d 68, 79–80 (2d Cir. 2010). (Opp'n at 36.) But *Colting* was limited to copyright cases and did not abrogate decisions presuming irreparable harm for other statutory or constitutional violations. (*See* Mot. at 35.)

## IV.   The Public Interest and Balance of the Equities Favor an Injunction

As explained above, defendants are wrong to argue that the "economic and public health harms alleged by Plaintiffs are wholly speculative." (Opp'n at 38.) To the contrary, the NPRM acknowledged the Rule would cause "[w]orse health outcomes," "[i]ncreased use of emergency rooms," "[i]ncreased prevalence of communicable diseases," "[i]ncreased rates of poverty and housing instability," and "[r]educed productivity and educational attainment." (*See* Mot. at 4–5.) Defendants further concede that noncitizens will forego $1.5 billion in federal benefits, and more than $1 billion in state benefits, every year, because of the Rule. (Opp'n at 38.) The uncontested declarations of plaintiffs' experts show that the harms will be substantially more severe than defendants' estimates (*see* Mot. at 38–39), and amici have provided further support.[23] State and

---

[23] *See, e.g.*, Amicus Br. of Public Health, Health Policy, Medicine, and Nursing Deans, Chairs and Scholars, et al., ECF No. 54 at 4 ("The Rule's chilling effect will cause a substantial drop in enrollment in [SNAP], Medicaid and other essential health care programs ... resulting in worse health outcomes and a spike in premature deaths."); Amicus Br. of Fiscal Policy Institute, ECF No. 107 at 11 ("[T]here is likely to be a 25 percent decline in enrollment

City administrators of these benefits have also attested to similar harm in the related case, *State of New York* v. *DHS*, No. 19-Civ-07777 (GBD) (S.D.N.Y.). While defendants claim an "interest in avoiding roadblocks to administering the national immigration system" (Opp'n at 39), they nowhere identify problems administering or implementing the Field Guidance. Defendants' policy preference does not overcome the demonstrable harm to the public.

## V.   The Rule Should Be Enjoined or Postponed Nationwide

Courts routinely hold that nationwide relief is "necessary to provide complete relief to plaintiffs" where, as here, an agency promulgates an unlawful rule with nationwide applicability. *Saget*, 375 F. Supp. 3d at 378; *Nat'l Mining Ass'n* v. *U.S. Army Corps. of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (when "regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioner is proscribed").[24] Defendants' proposal that any injunction be limited to plaintiffs' clients for whom "the Court has conducted the required balancing of any demonstrated harm against the other equitable considerations" (Opp'n at 40) is unprecedented and unworkable. The court in *Make the Road N.Y.* v. *McAleenan* recently rejected a similar proposal by DHS to limit an injunction's scope to the organizational plaintiffs in that case—including MRNY—because the proposed remedy did not "work in practice," was a "terrible proposal that is patently inconsistent with the dictates of the law," and would deprive plaintiffs "of the full measure of the remedy to which they are entitled." 2019 WL 4738070, at *44, 47 (D.D.C. Sept. 27, 2019). The Court should reach the same conclusion here.

### CONCLUSION

The Court should enter a preliminary injunction and postpone the Rule's effective date.

---

in SNAP and Medicaid among people who have at least one non-citizen family member [as a result of the Rule].").
[24] *See also, e.g.*, *Batalla Vidal*, 279 F. Supp. 3d at 438 ("Because the decision to rescind the DACA program had a 'systemwide impact,' the court will preliminarily impose a 'systemwide remedy.'"); *Pennsylvania* v. *President United States*, 930 F.3d 543, 575–76 (3d Cir. 2019); *Texas* v. *United States*, 809 F.3d 134, 187–88 (5th Cir. 2015).

Dated:   New York, New York
         October 4, 2019


By: */s/ Jonathan H. Hurwitz* _____


**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**
Andrew J. Ehrlich
Jonathan H. Hurwitz
Elana R. Beale
Robert J. O'Loughlin
Daniel S. Sinnreich
Amy K. Bowles (*admission pending*)

1285 Avenue of the Americas
New York, New York 10019-6064
(212) 373-3000
aehrlich@paulweiss.com
jhurwitz@paulweiss.com
ebeale@paulweiss.com
roloughlin@paulweiss.com
dsinnreich@paulweiss.com
abowles@paulweiss.com


**CENTER FOR CONSTITUTIONAL RIGHTS**
Ghita Schwarz
Brittany Thomas
Baher Azmy

666 Broadway
7th Floor
New York, New York 10012
(212) 614-6445
gschwarz@ccrjustice.org
bthomas@ccrjustice.org
bazmy@ccrjustice.org

16

**THE LEGAL AID SOCIETY**
Susan E. Welber, Staff Attorney, Law Reform Unit
Kathleen Kelleher, Staff Attorney, Law Reform Unit
Susan Cameron, Supervising Attorney, Law Reform Unit
Hasan Shafiqullah, Attorney-in-Charge, Immigration Law Unit

199 Water Street, 3rd Floor
New York, New York 10038
(212) 577-3320
sewelber@legal-aid.org
kkelleher@legal-aid.org
scameron@legal-aid.org
hhshafiqullah@legal-aid.org

*Attorneys for Plaintiffs Make the Road New York, African Services Committee, Asian American Federation, Catholic Charities Community Services (Archdiocese of New York), and Catholic Legal Immigration Network, Inc.*