**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**



- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MAKE THE ROAD NEW YORK, AFRICAN
SERVICES COMMITTEE, ASIAN AMERICAN
FEDERATION, CATHOLIC CHARITIES
COMMUNITY SERVICES (ARCHDIOCESE OF NEW
YORK), and CATHOLIC LEGAL IMMIGRATION
NETWORK, INC.,

                    Plaintiffs,

       -against-

KEN CUCCINELLI, *in his official capacity as Acting*
*Director of United States Citizenship and Immigration*
*Services*; UNITED STATES CITIZENSHIP &
IMMIGRATION SERVICES; KEVIN K.
MCALEENAN, *in his official capacity as Acting*
*Secretary of Homeland Security*; and UNITED STATES
DEPARTMENT OF HOMELAND SECURITY,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

             :
             :

**MEMORANDUM DECISION**
**AND ORDER**

19 Civ. 7993 (GBD)

GEORGE B. DANIELS, United States District Judge:

     Plaintiffs Make the Road New York, African Services Committee, Asian American

Federation, Catholic Charities Community Services (Archdiocese of New York), and Catholic

Legal Immigration Network, Inc. bring this action against Defendants Kenneth T. Cuccinelli II, in

his official capacity as Acting Director of the United States Citizenship and Immigration Services

("USCIS"); Kevin K. McAleenan, in his official capacity as Acting Secretary of the United States

Department of Homeland Security ("DHS"); USCIS; and DHS.  (Compl., ECF No. 1.)  Plaintiffs

challenge Defendants' promulgation, implementation, and enforcement of a rule, Inadmissibility

on Public Charge Grounds, 84 Fed. Reg. 41,292 (Aug. 14, 2019) (to be codified at 8 C.F.R. pts.

103, 212, 213, 214, 245, 248) (the "Rule"), which redefines the term "public charge" and

establishes new criteria for determining whether a noncitizen applying for admission into the

United States or for adjustment of status is ineligible because he or she is likely to become a "public charge." (*See id.* ¶¶ 1–3.)  Plaintiffs seek, *inter alia*, (1) a judgment declaring that the Rule is unauthorized and contrary to law, (2) a vacatur of the Rule, and (3) an injunction enjoining Defendants from implementing the Rule. (*Id.* at 115.)

Plaintiffs now move pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction enjoining Defendants from implementing or enforcing the Rule, which is scheduled to take effect on October 15, 2019. (*See* Notice of Mot., ECF No. 38.)  Plaintiffs' motion for a preliminary injunction is GRANTED.[1]

## I.    FACTUAL BACKGROUND

### A.  Current Framework for Public Charge Determination.

The Immigration and Nationality Act (the "INA") provides that the federal government may deny admission or adjustment of status to any noncitizen who it determines is "likely at any time to become a public charge." 8 U.S.C. § 1182(a)(4)(A).  In 1996, Congress enacted two pieces of legislation focusing on noncitizens' eligibility for public benefits and on public charge determinations.  It first passed the Personal Responsibility and Work Opportunity Reconciliation Act, Pub. L. No. 104-193, § 403, 110 Stat. 2105, 2265–67 (1996) (the "Welfare Reform Act"), which established a detailed—and restrictive—scheme governing noncitizens' access to benefits.  It also passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, § 531, 110 Stat. 3009, 3674–75 (1996) ("IIRIRA"), which amended the INA by codifying five factors relevant to a public charge determination.  Specifically, IIRIRA provides that in assessing whether an applicant is likely to fall within the definition of public charge, DHS

---

[1] This Court also grants, under separate order, the same preliminary injunction and stay in a related action, *State of New York v. United States Department of Homeland Security*, 19 Civ. 7777 (GBD).

should, "at a minimum," take into account the applicant's age; health; family status; assets, resources, and financial status; and education and skills. 8 U.S.C. § 1182(a)(4)(B)(i).

In 1999, DHS's predecessor, the Immigration and Naturalization Service ("INS"), issued its Field Guidance on Deportability and Inadmissibility on Public Charge Grounds, 64 Fed. Reg. 28,689 (May 26, 1999) (the "Field Guidance"), as well as a parallel proposed rule, 64 Fed. Reg. 28,676, which "summarize[d] longstanding law with respect to public charge and provide[d] new guidance on public charge determinations" in light of IIRIRA, the Welfare Reform Act, and other recent legislation. 64 Fed. Reg. at 28,689. Both the Field Guidance and proposed rule defined "public charge" as a noncitizen who has become or is likely to become "primarily dependent on the government for subsistence, as demonstrated by either (i) the receipt of public cash assistance for income maintenance or (ii) institutionalization for long-term care at government expense." *Id.* (internal quotation marks omitted). Consistent with the INA, INS regulations, and several INS, Board of Immigration Appeals, and Attorney General decisions, they instructed INS officials to evaluate a noncitizen's likelihood of becoming a public charge by examining the totality of the noncitizen's circumstances at the time of his or her application. *Id.* at 28,690. The Field Guidance noted that "[t]he existence or absence of a particular factor should never be the sole criterion for determining if an alien is likely to become a public charge." *Id.* (emphasis omitted). Although the parallel proposed rule was never finalized, the Field Guidance sets forth the current framework for public charge determinations.

**B. The 2018 Proposed Rulemaking and Rule.**

On October 10, 2018, DHS published a notice of proposed rulemaking, Inadmissibility on Public Charge Grounds, 83 Fed. Reg. 51,114 (Oct. 10, 2018), which withdrew the 1999 proposed rule that INS had issued with the Field Guidance. *Id.* at 51,114. This newly proposed rule sought,

among other things, to redefine "public charge," and to amend the totality-of-the-circumstances standard that is currently used in public charge determinations. *See id.* The notice provided a 60-day period for public comments on the proposed rule. *Id.* DHS collected 266,077 comments, "the vast majority of which opposed the rule." 84 Fed. Reg. at 41,297; *see also id.* at 41,304–484 (describing and responding to public comments).

Subsequently, on August 14, 2019, DHS issued the Rule. It was finalized, with several changes, as the proposed rule described in the October 2018 notice. *Id.* at 41,292; *see also id.* at 41,297–303 (summarizing changes in Rule).

Under the Rule, "public charge" is to be defined as any noncitizen "who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period." *Id.* at 41,501. The Rule defines "public benefit," in turn, as both cash benefits and noncash benefits such as Supplemental Nutrition Assistance Program, Medicaid, and public housing and Section 8 housing assistance. *Id.* Each benefit is to be counted separately in calculating the duration of use, such that, for example, receipt of two benefits in one month would count as two months. *Id.*

The Rule also provides a new framework for assessing whether a noncitizen is likely at any time to become a public charge. Specifically, the Rule enumerates an expanded non-exclusive list of factors relevant to analyzing whether a person is likely to receive 12 months of public benefits within 36 months. *See id.* 41,502–04. It includes, for example, family size, English-language proficiency, credit score, and any application for the enumerated public benefits, regardless of the actual receipt or use of such benefits. *Id.* The Rule designates the factors as "positive," "negative," "heavily weighted positive," or "heavily weighted negative," and instructs the DHS officer to "weigh" all such factors "individually and cumulatively." *Id.* at 41,397; *see also id.* 41,502–

04. Under this framework, if the negative factors outweigh the positive factors, the applicant would be found likely to receive 12 months of public benefits in the future. The applicant would then be found inadmissible as likely to become a public charge. Conversely, if the positive factors outweigh the negative factors, the applicant would not be found inadmissible as likely to receive 12 months of public benefits and thereby become a public charge. *Id.* at 41,397.

DHS published various corrections to the Rule as recently as October 2, 2019. Inadmissibility on Public Charge Grounds; Correction, 84 Fed. Reg. 52,357 (Oct. 2, 2019). None of these corrections materially alter the new public charge determination framework as outlined above. The Rule, as corrected, is set to go into effect on October 15, 2019.

### C. Plaintiffs' Services.

Plaintiffs are nonprofit organizations that work with and for immigrants. (Compl. ¶¶ 21–46.) They provide direct services, including legal, educational, and health-related. (*Id.* ¶¶ 21–22, 26, 31, 34–36, 40–42.) Make the Road New York, for instance, conducts educational workshops on issues affecting immigrants, represents immigrants in removal proceedings, and assists immigrants in applying for benefits and accessing health services. (*Id.* ¶ 22.) Similarly, African Services Committee provides legal representation in immigration proceedings, including those for adjustment of status; health-related services; emergency financial support; and food pantry and nutrition services. (*Id.* ¶ 26.) Plaintiffs also administer community outreach programs that, for example, disseminate information on immigration policies, (*id.* ¶¶ 21, 26), make referrals to social service providers, (*id.* ¶ 36), and host in-person trainings on immigration-related matters, (*id.* ¶ 40).

## II.   LEGAL STANDARD

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (citation omitted).   To obtain a preliminary injunction, the moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## III.   PLAINTIFFS HAVE DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS

The Administrative Procedure Act ("APA") authorizes judicial review of agency rules. Under the APA, a reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations"; is "not in accordance with law"; or is "arbitrary, capricious, [or] an abuse of discretion."   5 U.S.C § 706(2)(A), (C).   Here, Plaintiffs are likely to succeed on the merits of their claim that the Rule conflicts with the APA in all of these respects.

### A. Plaintiffs Satisfy the Threshold Justiciability Requirements.

As a preliminary matter, Defendants raise several arguments that Plaintiffs' claims are not justiciable.   Specifically, they assert that Plaintiffs lack standing, the claims are not ripe for judicial review, and Plaintiffs fall outside the zone of interests regulated by the Rule.

### 1.   Plaintiffs Have Standing.

Article III of the U.S. Constitution limits the judicial power of federal courts to "Cases" or "Controversies."   U.S. Const. art. III, § 2, cl. 1.   To invoke this power, a plaintiff must have standing to sue. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (citation omitted).   The plaintiff bears the burden of establishing standing, *Rajamin v. Deutsche Bank Nat'l Tr. Co.*, 757

F.3d 79, 84 (2d Cir. 2014) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009)), and such burden applies to each claim and form of relief sought, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  To demonstrate Article III standing, the plaintiff must show that (1) "it has suffered a concrete and particularized injury that is either actual or imminent," (2) "the injury is fairly traceable to the defendant," and (3) "it is likely that a favorable decision will redress that injury."  *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan*, 504 U.S. at 560–61).  "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (citation omitted).

Defendants argue, on several grounds, that Plaintiffs lack standing.  First, they challenge Plaintiffs' reliance on an "organizational" standing theory.  An organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."  *Warth v. Seldin*, 422 U.S. 490, 511 (1975).  "Under this theory of "organizational" standing, the organization is just another person—albeit a legal person—seeking to vindicate a right."  *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012).  Therefore, "[t]o qualify, the organization itself 'must 'meet[ ] the same standing test that applies to individuals.'"  *Id.* (second alteration in original) (citations omitted).

The Second Circuit has found that an organization has standing where the defendant's conduct interferes with or burdens the organization's ability to carry out its usual activities, or where the organization is forced to expend resources to prevent some adverse consequence on a well-defined and particularized class of individuals.  *See, e.g.*, *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (finding concrete and cognizable injury where local ordinance regulating ability of day laborers to solicit employment

would "force" organization to expend greater resources since "if the laborers are dispersed, it will be more costly to reach them"); *N.Y. Civil Liberties Union*, 684 F.3d at 295 (finding standing where organization's ability to represent its clients in administrative hearings was "impeded" and "will continue to [be] impede[d]" by defendant's policy barring public access to such hearings). "Only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe v. Davis*, 644 F.3d 147 (2d Cir. 2011) (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993)). Moreover, "'somewhat relaxed standing' rules apply" where "a party seeks review of a prohibition prior to its being enforced." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017).

Courts have distinguished between cases where a defendant's conduct forced a plaintiff to divert its resources and provide *new* services, therefore giving rise to organizational standing, and cases where a plaintiff was *already* providing the services at issue and therefore failed to allege any injury. *Compare Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 230 (S.D.N.Y. 2019) (finding no injury where organization failed to allege that it "diverted any other resources from its activities (specific or otherwise)" because of directive at issue), *and Lowell v. Lyft, Inc.*, 352 F. Supp. 3d 248, 259 (S.D.N.Y. 2018) (finding no injury where no allegations that defendant's conduct caused organization "to expend any resources separate from this litigation or that it was otherwise impeded in its ability to pursue its mission"), *with Oyster Bay*, 868 F.3d at 110 (finding standing where ordinance would force organization to divert resources from its other activities in order to combat negative effects of ordinance), *and Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (finding standing where organization devoted new resources to investigate its clients' housing discrimination claims and advocate on their behalf), *and Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x. 714, 716–17 (2d Cir. 2013) (finding standing

where organization expended resources to challenge state mental health agency's policy of asserting counterclaims for outstanding treatment charges against patients who sued agency and thereby discouraged patients from bringing such suits), *and Nnebe*, 644 F.3d at 157–58 (finding standing where organization "allocated resources to assist drivers only when another party—the City—ha[d] initiated proceedings against one of its members").

This case falls squarely in the category of those where the plaintiff was forced to divert its resources from its usual mission-related activities because of the defendant's conduct. As Plaintiffs adequately demonstrate, the Rule forces them to devote substantial resources to mitigate its potentially harmful effects—resources that Plaintiffs could and would have used for other purposes. Plaintiffs allege, for example, that they will have to divert resources to educate their clients, members, and the public about the Rule. (Mem. of Law in Supp. of Pls.' Mot. for Prelim. Inj. ("Pls.' Mem."), ECF No. 39, at 36–37.) Those Plaintiffs that provide direct legal services will also have to expend additional resources helping clients prepare applications for adjustments, representing clients in removal proceedings, and conducting additional trainings. (*Id.* at 37.) In fact, Plaintiffs allege that they have *already* had to dedicate significant resources addressing the Rule since the announcement of the Rule last year. They have, for example, already conducted dozens of workshops. (Decl. of Theo Oshiro, ECF No. 43, ¶¶ 21, 25). They have also developed new materials for legal information sessions that previously could be held on a groupwide basis but now require individualized consultation due to the Rule's complexity. (Decl. of C. Mario Russell, ECF No. 44, ¶ 19). These are entirely new services that, but for the Rule, Plaintiffs would not have had to provide.

Defendants additionally argue that Plaintiffs' claims of irreparable injury "consist of potential future harms that, if they ever came to pass, would be spurred by decisions of third parties

9

not before the Court," and that these injuries are therefore too speculative. (Mem. of Law in Opp'n to Pls.' Mot. for a Prelim. Inj. ("Defs.' Opp'n"), ECF No. 129, at 9). In Defendants' view, the Rule governs only DHS personnel and certain noncitizens, but does not directly affect Plaintiffs, either by requiring or forbidding any action on Plaintiffs' part or by expressly interfering with any of Plaintiffs' programs. (*Id.*) This argument fails. As set forth above, Plaintiffs sufficiently allege "concrete and particularized" injuries that they themselves will suffer and, in fact, have *already* begun to suffer. Plaintiffs therefore have standing to bring this action on their own behalf.

### 2. Plaintiffs' Claims Are Ripe for Judicial Review.

To be justiciable, Plaintiffs' claims must also be ripe—that is, they "must present 'a real, substantial controversy, not a mere hypothetical question.'" *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (quoting *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir.1993)). "Ripeness 'is peculiarly a question of timing,'" and "[a] claim is not ripe if it depends upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.* (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)).

"Ripeness encompasses two overlapping doctrines concerning the exercise of federal court jurisdiction." *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 733 F.3d 393, 429 (2d Cir. 2013) (citing *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993)) (internal quotation marks omitted). The first, constitutional ripeness, "overlaps with the standing doctrine, 'most notably in the shared requirement that the plaintiff's injury be imminent rather than conjectural or hypothetical.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 110 (2d Cir. 2013) (quoting *Ross v. Bank of Am., N.A.*, 524 F.3d 217, 226 (2nd Cir. 2008)). Prudential ripeness, meanwhile, is "'an important exception to the usual rule that where jurisdiction exists a

federal court must exercise it,' and allows a court to determine 'that the case will be better decided later.'" *Id.* (quoting *Simmonds v. Immigration Naturalization Serv.*, 326 F.3d 351, 357 (2d Cir. 2003)).  In determining whether a case is prudentially ripe, courts examine "(1) whether [the case] is fit for judicial decision and (2) whether and to what extent the parties will endure hardship if decision is withheld." *Simmonds*, 326 F.3d at 359 (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967)).

One can conceive of no issue of greater ripeness than that presented here.  The Rule is scheduled to go into effect in a matter of *days*, at which point hundreds of thousands of individuals who were previously eligible for admission and permanent residence in the United States will no longer be eligible because of this change of law.  Adverse consequences and determinations will soon begin to have their effect.  The Rule is intended to immediately cause the immigrant population to avoid public benefits.  Plaintiffs must be prepared to immediately adjust to the results of this change in policy.

No further factual predicate is necessary for purposes of determining ripeness, where there is clearly a legal question about whether the Rule exceeds Defendants' delegated authority, violates the law, and is arbitrary and capricious.  Moreover, for the same reasons that Plaintiffs sufficiently allege an injury under the standing inquiry, they have shown that they will endure significant hardship with any delay.  Accordingly, Plaintiffs' claims are ripe for review, both constitutionally and prudentially.

### 3.  Plaintiffs Are Within the Zone of Interests Regulated By the Rule.

The final threshold question raised by Defendants is whether Plaintiffs have concerns that "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (citation and internal quotation marks

omitted).  The zone-of-interests test is "not 'especially demanding,'" particularly with respect to the APA and its "generous review provisions." *Id.* at 130 (citation and internal quotation marks omitted).  Indeed, in the APA context, the Supreme Court has "often 'conspicuously included the word "arguably" in the test to indicate that the benefit of any doubt goes to the plaintiff.'" *Id.* (citation omitted).  "The test forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'"  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation omitted).

Plaintiffs plainly fall within the INA's zone of interests.  The interests of immigrants and immigrant advocacy organizations such as Plaintiffs are inextricably intertwined.  In fact, the court in *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260 (E.D.N.Y. 2018), found that Make the Road New York, one of the Plaintiffs in this very action, fall within the zone of interests of the INA.  *Id.* at 269 n.3.  Furthermore, the zone-of-interests test "does not require the plaintiff to be an intended beneficiary of the law in question," but instead allows parties simply "who are injured" to seek redress.  *Citizens for Responsibility & Ethics in Wash. v. Trump*, No. 18-474, 2019 WL 4383205, at *16 (2d Cir. Sept. 13, 2019).  The Supreme Court has consistently found that economic injuries like those alleged here satisfy the test.  *See, e.g., Bank of Am. Corp. v. City of Miami*, 137 S.Ct. 1296, 1304–05 (2017) (finding city's discriminatory lending claims within zone of interests of Fair Housing Act, despite economic nature of harms alleged and absence of any indication that Act was intended to protect municipal budgets).

## B.  Plaintiffs Sufficiently Allege That the Rule Exceeds Statutory Authority and Is Contrary to Law.

Turning to the merits of Plaintiffs' claims, Plaintiffs argue that the Rule violates the APA because it exceeds DHS's delegated authority under the INA and is contrary to law.  *See* 5 U.S.C

§ 706(2)(A), (C).   In analyzing an agency's interpretation of a statute and whether the agency's action exceeds statutory authority, courts often apply the two-step framework articulated in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).   "[T]he question . . . is always whether the agency has gone beyond what Congress has permitted it to do[.]"   *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013).   Under *Chevron*, courts first ask whether the statute is clear.   *Chevron*, 467 U.S. at 842.   If so, "that is the end of the matter[,] for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."   *Id.* at 842–43.   Where there is ambiguity, however, courts then ask whether the agency's interpretation of the statute is reasonable.   *Id.* at 843–44.   Such deference "is premised on the theory that a statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps."   *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159 (2000).   Notwithstanding this implicit delegation, "agencies must operate 'within the bounds of reasonable interpretation,'" and "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'"   *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citations omitted).

## 1.   Long-Standing Definition of "Public Charge."

Plaintiffs argue that the Rule's definition of "public charge" is a drastic deviation from the unambiguous and well-established meaning of the term that has existed for over 130 years.   (Pls.' Mem. at 5, 18–19.)   They assert that the term has been interpreted narrowly to refer to an individual who is "institutionalized or [is] otherwise primarily dependent on the government for subsistence."   (*Id.* at 5.)   Going as far back as 1882, when Congress passed the first federal immigration statute, Plaintiffs note that the statute rendered excludable "any person unable to take care of himself or herself without becoming a public charge," (*id.* at 6 (quoting Immigration Act

of 1882, ch. 376, 22 Stat. 214, 47th Cong. (1882))), and that its legislative history showed that Congress intended "public charge" to refer to "those likely to become long-term residents of 'poor-houses and alms-houses,'" (*id.* (quoting 13 Cong. Rec. 5109 (June 19, 1882) (statement of Rep. Davis)).) Plaintiffs point to court decisions in the years that followed, which confirmed this definition of "public charge." (*Id.* at 6–7.) According to Plaintiffs, federal agencies have also affirmed this narrow interpretation, as evidenced by INS's 1999 Field Guidance. (*Id.* at 12.)

In opposition, Defendants assert that the definition of "public charge" in the Rule "is consistent with the plain meaning of the statutory text, which 'is to be determined as of the time that it became law.'" (Defs.' Opp'n at 11–12 (quoting *One West Bank v. Melina*, 827 F.3d 214, 220 (2d Cir. 2016)).) They direct this Court to dictionaries used in the 1880s, when the Immigration Act of 1882 was passed, which allegedly "make clear" that a noncitizen becomes a "public charge" "when his inability to achieve self-sufficiency imposes an 'obligation' or 'liability' on 'the body of the citizens' to provide for his basic necessities." (*Id.* at 12–13.)

Upon review of the plain language of the INA, the history and common-law meaning of "public charge," agency interpretation, and Congress's repeated reenactment of the INA's public charge provision without material change, one thing is abundantly clear—"public charge" has *never* been understood to mean receipt of 12 months of benefits within a 36-month period. Defendants admit that this is a "new definition" under the Rule. (*Id.* at 5.) And at oral argument, they did not dispute that this definition has *never* been referenced in the history of U.S. immigration law or that there is *zero* precedent supporting this particular definition. (*See, e.g.*, Tr. of Oral Arg. dated Oct. 7, 2019 at 51:8–11, 52:1–3.) No ordinary or legal dictionary definition of "public charge" references Defendants' proposed meaning of that term. As such, Plaintiffs raise a compelling argument that Defendants lack the authority to redefine "public charge" as they have.

## 2. Congress's Intent.

Nor is there any evidence that Congress intended for a redefinition of "public charge," and certainly not in the manner set forth in the Rule. No legislative intent or historical precedent alludes to this new definition. Defendants have made no showing that Congress was anything but content with the current definition set forth in the Field Guidance, which defines public charge as someone who has become or is likely to become primarily dependent on the government for cash assistance. Indeed, Congress has repeatedly endorsed this definition and rejected efforts to expand it. For example, during the 1996 debate over IIRIRA, several members of Congress tried and failed to extend the meaning of public charge to include the use of non-cash benefits. *See* 142 Cong. Rec. S11612, at S11712 (daily ed. Sept. 16, 1996). Congress rejected similar efforts in 2013 because of its "strict benefit restrictions and requirements." S. Rep. 113-40, at 42 (2013).

In addition, if Congress wanted to deny immigrants any of the public benefits enumerated in the Rule, it could have done so, as it similarly has in the past. The Welfare Reform Act, for example, restricted certain noncitizens' eligibility for certain benefits. Specifically, it provided that only "qualified" noncitizens—which, in most cases, meant those who had remained in the United States for five years—could have access to most federal means-tested public benefits. 8 U.S.C §§ 1612, 1613. Therefore, the absence of any Congressional intent to redefine public charge also counsels in favor of a preliminary injunction.

## C. Plaintiffs Sufficiently Demonstrate That the Rule Is Arbitrary and Capricious.

Plaintiffs additionally argue that the Rule is arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). "The scope of review under the 'arbitrary and capricious' standard is narrow[.]" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Nevertheless, the APA requires an agency to "engage in 'reasoned decisionmaking,'" *Michigan v.*

*EPA*, 135 S. Ct. 2699, 2706 (2015) (citation omitted), and to "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43 (citation omitted).   An agency rule is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.*   Where an agency action changes prior policy, the agency need not demonstrate "that the reasons for the new policy are *better* than the reasons for the old one."   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2008).   It must, however, "show that there are good reasons for the new policy."   *Id.*   This requirement is heightened where the "new policy rests upon factual findings that contradict those which underlay its prior policy," *id.* (citation omitted), as "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *id.* at 516.

## 1.   Defendants' Justification of Rule.

Here, Defendants fail to provide any reasonable explanation for changing the definition of "public charge" or the framework for evaluating whether a noncitizen is likely to become a public charge.   As noted above, "public charge" has never been interpreted as someone "who receives one or more public benefits . . . for more than 12 months in the aggregate within any 36-month period."   84 Fed. Reg. at 41,501.   This new definition essentially changes the public charge assessment into a *benefits* issue, rather than an inquiry about *self-subsistence*, such that any individual who is deemed likely to accept a benefit is considered a public charge.   Receipt of a benefit, however, does not necessarily indicate that the individual is unable to support herself.   One could envision, for example, a scenario where an individual is fully capable of supporting herself without government assistance but elects to accept a benefit, such as public housing, simply

because she is entitled to it.  Under the Rule, although this individual is legally entitled to public housing, if she takes advantage of this right, she may be penalized with denial of adjustment of status.  There is no logic to this framework.  Moreover, considering that the federal welfare program was not established in the United States until the 1930s, whereas the concept of public charge existed at least as early as 1882, there *must* be some definition of public charge separate and apart from mere receipt of benefits.

At oral argument, Defendants were afforded numerous opportunities to articulate a rational basis for equating public charge with receipt of benefits for 12 months within a 36-month period, particularly when this has never been the rule.  Defendants failed each and every time.  When asked, for example, why the standard was 12 months and 36 months as opposed to any other number of months, Defendants merely responded that they do not need to "show a case from 100 years ago that also adopted this precise 12[/]36 standard."  (Tr. of Oral Arg. dated Oct. 7, 2019 at 53:14–20.)  Defendants were asked to explain how the new framework would operate and to provide an example of the "typical person" that Defendants could predict is going to receive 12 months of benefits in a 36-month period.  (*Id.* 68:11–80:123.)  Defendants again stumbled along and were unable to adequately explain what the determinative factor is under the Rule, what individual would fall across the line and be considered a public charge, and what evaluation of the factors enumerated in the Rule would make the DHS officer confident that she could make an appropriate prediction.  (*Id.*)  And yet, according to Defendants, the Rule is intended to "provide[] a number of concrete guidelines to assist in making [the public charge] determination" and is "designed . . . to make it more predictable for people on both sides of the adjudicatory process."  (*Id.* at 80:20–23.)  Quite the opposite appears to be the case.

Defendants suggest that the totality-of-circumstances test remains and that receipt of benefits for 12 months out of a 36-month period is only one of several factors to be considered. (*Id.* at 52:17–22.) This characterization of the Rule is plainly incorrect. Under the Rule, receipt of such benefits is not *one* of the factors considered; it is *the* factor. That is, if a DHS officer believes that an individual is likely to have benefits for 12 months out of a 36-month period, the inquiry ends there, and the individual is *automatically* considered a public charge. As such, Defendants are not simply expanding or elaborating on the list of factors to consider in the totality of the circumstances. Rather, they are entirely reworking the framework, and with no rational basis.

Defendants also fail to demonstrate rational relationships between many of the additional factors enumerated in the Rule and a finding of benefits use. One illustrative example is the addition of English-language proficiency as a factor. Defendants do not dispute that there has never been an English-language requirement in the public charge analysis. They argue, however, that the Rule "properly" adds English proficiency as a factor, given the requirement in the INA to consider an applicant's "education and skills." (Defs.' Opp'n at 26.) Defendants' suggestion that an individual is likely to become a public charge simply by virtue of her limited English proficiency is baseless, as one can certainly be a productive and self-sufficient citizen without knowing *any* English. The United States of America has no official language. Many, if not most, immigrants who arrived at these shores did not speak English. It is simply offensive to contend that English proficiency is a valid predictor of self-sufficiency.[2]

---

[2] Similarly, it is unclear how the credit score of a new immigrant—who, for example, may have only recently opened her first credit account and therefore has a short credit history, which would negatively impact her credit score—is indicative of her likelihood to receive 12 months of public benefits. Defendants blithely argue that a low credit score "is an indication that someone has made financial decisions that are not necessarily entirely responsible" and that "those irresponsible financial decisions may be the product

In short, Defendants do not articulate why they are changing the public charge definition, why this new definition is needed now, or why the definition set forth in the Rule—which has absolutely no support in the history of U.S. immigration law—is reasonable. The Rule is simply a new agency policy of exclusion in search of a justification. It is repugnant to the American Dream of the opportunity for prosperity and success through hard work and upward mobility. Immigrants have always come to this country seeking a better life for themselves and their posterity. With or without help, most succeed.

### 2. Rehabilitation Act.

Plaintiffs further argue that the Rule discriminates against individuals with disabilities, in contravention of Section 504 of the Rehabilitation Act, Pub. L. No. 93-112, 87 Stat. 394 (1973) (codified at 29 U.S.C. § 794). Section 504 provides that no individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination . . . under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). DHS, in particular, is prohibited from denying access to benefits and services on the basis of disability, 6 C.F.R. § 15.30(b)(1), and from using discriminatory criteria or methods of administration, *id.* § 15.30(b)(4). *See also id.* § 15.49. "Exclusion or discrimination [under Section 504] may take the form of disparate treatment, disparate impact, or failure to make reasonable accommodation." *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016).

The Rule clearly considers disability as a negative factor in the public charge assessment. Defendants acknowledge that disability is "one factor . . . that may be considered" and that it is "relevant . . . to the extent that an alien's particular disability tends to show that he is 'more likely

---

of someone who doesn't have very much money to work with." (Tr. of Oral Arg. dated Oct. 7, 2019 at 86:16–20).

than not to become a public charge' at any time." (Defs.' Opp'n at 22 (quoting 84 Fed. Reg. at 41,368).) Defendants do not explain how disability alone is itself a negative factor indicative of being more likely to become a public charge. In fact, it is inconsistent with the reality that many individuals with disabilities live independent and productive lives. As such, Plaintiffs have raised at least a colorable argument that the Rule as to be applied may violate the Rehabilitation Act, and further discovery and development of the record is warranted prior to its implementation.

### 3. Fifth Amendment Equal Protection Guarantee.

According to Plaintiffs, the Rule violates the equal protection guarantee of the Fifth Amendment to the U.S. Constitution because it disproportionately harms noncitizens of color. Plaintiffs and Defendants disagree about the appropriate level of scrutiny under which to assess the Rule's constitutionality. Plaintiffs argue that the Rule was motivated by discriminatory animus towards noncitizens of color and is therefore subject to strict scrutiny under *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). (Pls.' Mem. at 31–32.) Defendants, on the other hand, contend that because the government has "broad power over naturalization and immigration," (Defs.' Opp'n at 34 (quoting *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001))), the Rule is subject only to rational basis review, (*id.* at 34–35).

Under either standard, the conclusion remains the same: Plaintiffs have sufficiently demonstrated a likelihood of success on the merits of their equal protection claim. Indeed, even under the highly deferential standard advanced by Defendants, Defendants have yet to articulate a "rational relationship between the disparity of treatment and some legitimate government purpose." *Lewis*, 252 F.3d at 582 (citations and internal quotation marks omitted). Defendants do not dispute that the Rule will disparately impact noncitizens of color. At oral argument, when asked whether the Rule "will have a greater impact on people of Hispanic and African descent,"

for example, Defendants' response was that they "don't know" and that "that's the same issue that would have applied under the [Field Guidance], which [Defendants] assume also would have had a disproportionate impact." (Tr. of Oral Arg. dated Oct. 7, 2019 at 81:10–16.) Defendants instead challenge Plaintiffs' equal protection claim by arguing that the Rule is "rationally related to the government's compelling, statutorily-codified interest in minimizing the incentive of aliens to immigrate to the United States due to the availability of public benefits and promoting the self-sufficiency of aliens within the United States." (Defs.' Opp'n at 35.) But, as discussed above, this is no reasonable basis for Defendants' sharp departure from the current public charge determination framework. *See supra* Part III.C.1. As such, "Plaintiffs have, at the very least, raised serious questions going to the merits of their Equal Protection Claim." *Saget v. Trump*, 375 F. Supp. 3d 280, 374 (E.D.N.Y. 2019).

## IV.    PLAINTIFFS HAVE DEMONSTRATED THAT THEY WILL SUFFER IRREPARABLE HARM ABSENT A PRELIMINARY INJUNCTION

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer 'an injury that is neither remote nor speculative, but actual and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve the harm.'" *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted). However, Plaintiffs need only show "a *threat* of irreparable harm, not that irreparable harm already ha[s] occurred." *Mullins v. City of New York*, 626 F.3d 47, 55 (2d Cir. 2010).

The irreparable injury to Plaintiffs by forcing them to divert resources and by shifting the burden of providing services to those who can no longer obtain federal benefits without

jeopardizing their status in the United States, and the immediate response that is necessary by this shift of burden to Plaintiffs, is a direct and inevitable consequence of the impending implementation of the Rule.  As discussed above, Plaintiffs allege that the Rule will hinder their ability to carry out their missions and force them to expend substantial resources to mitigate the potentially adverse effects of the Rule.  *See supra* Parts III.A.1–2.  Plaintiffs provide declarations extensively describing and calculating such injuries.  (*See, e.g.*, Decl. of Diane Schanzenbach, Ph.D., ECF No. 40; Decl. of Ryan Allen, Ph.D., ECF No. 41; Decl. of Leighton Ku, Ph.D., M.P.H., ECF No. 42.)

No less important is the immediate and significant impact that the implementation of the Rule will have on law-abiding residents who have come to this country to seek a better life.  The consequences that Plaintiffs must address, and America must endure, will be personal and public disruption, much of which cannot be undone.  Overnight, the Rule will expose individuals to economic insecurity, health instability, denial of their path to citizenship, and potential deportation—none of which is the result of any conduct by those such injuries will affect.  It is a rule that will punish individuals for their receipt of benefits provided by our government, and discourages them from lawfully receiving available assistance intended to aid them in becoming contributing members of our society.  It is impossible to argue that there is no irreparable harm for these individuals, Plaintiffs, and the public at large.

## V.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST TIP IN PLAINTIFFS' FAVOR

Finally, Plaintiffs must demonstrate that "the balance of equities tips in [their] favor" and that "an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  "These factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  In assessing these factors, the court must "balance the competing claims of injury and must consider the effect

22

on each party of the granting or withholding of the requested relief," as well as "the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citations omitted).

Here, preventing the alleged economic and public health harms provides a significant public benefit. As discussed above, these harms are not speculative or insufficiently immediate. In fact, the notice of proposed rulemaking itself acknowledged that the Rule could cause "[w]orse health outcomes"; "[i]ncreased use of emergency rooms and emergent care as a method of primary health care due to delayed treatment"; "[i]ncreased prevalence of communicable diseases, including among members of the U.S. citizen population who are not vaccinated"; "[i]ncreases in uncompensated care in which a treatment or service is not paid for by an insurer or patient"; "[i]ncreased rates of poverty and housing instability"; "[r]educed productivity and educational attainment"; and other "unanticipated consequences and indirect costs." 83 Fed. Reg. at 51,270.

Moreover, there is no public interest in allowing Defendants to proceed with an unlawful, arbitrary, and capricious rule that exceeds their statutory authority. *See Planned Parenthood of N.Y.C., Inc. v. U.S. Dep't of Health & Human Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) ("It is evident that '[t]here is generally no public interest in the perpetuation of unlawful agency action.' . . . The inverse is also true: 'there is a substantial public interest in 'having governmental agencies abide by the federal laws that govern their existence and operations.'" (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)).)

To be sure, Defendants have a legitimate interest in administering the national immigration system. However, that interest is not paramount in this instance, particularly where Defendants fail to demonstrate why or how the current public charge framework is inadequate. Defendants have applied their current rules for decades, and the current concept of "public charge" has been

accepted for over a century.  Aside from conclusory allegations that they will "be harmed by an impediment" to administering the immigration system, (Defs.' Opp'n at 38), Defendants do not—and cannot—articulate what actual hardship they will suffer by maintaining the status quo.

Accordingly, because Plaintiffs are likely to succeed on the merits and to suffer irreparable harm absent preliminary relief, and the balance of hardships and public interest tip in their favor, Plaintiffs are entitled to a preliminary injunction.

## VI.    THE INJUNCTION SHOULD APPLY NATIONWIDE

As to the scope of the relief, a nationwide injunction is necessary.  The scope of preliminary injunctive relief generally should be "no broader than necessary to cure the effects of the harm caused by the violation" and "not impose unnecessary burdens on lawful activity."  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 72 (2d Cir. 2016) (citations omitted).  However, there is no requirement that an injunction affect only the parties in the suit. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.")

Here, a nationwide injunction is appropriate.  First, national immigration policies, such as the Rule, require uniformity.  *Hawaii v. Trump*, 878 F.3d 662, 701 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018); *see also Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 438 (E.D.N.Y. 2018) (granting nationwide injunction preventing rescission of Deferred Action for Childhood Arrivals program in part because "there is a strong federal interest in the uniformity of federal immigration law"); U.S. Const. art. I, § 8, cl. 4 ("The Congress shall have Power . . . To establish a[] uniform Rule of Naturalization.").  A geographically limited injunction that would

result in inconsistent applications of the Rule, and different public charge determinations based upon similar factors, is inimical to this need for uniformity in immigration enforcement.

Indeed, at least nine lawsuits have already been filed challenging the Rule, including *State of California v. U.S. Department of Homeland Security*, 19 Civ. 4975 (PJH) (N.D. Cal.) and *State of Washington v. United States Department of Homeland Security*, 19 Civ. 5210 (RMP) (E.D. Wash.).[3]  In just these two actions alone, Plaintiffs include the State of California, District of Columbia, State of Maine, Commonwealth of Pennsylvania, State of Oregon, State of Washington, Commonwealth of Virginia, State of Colorado, State of Delaware, State of Illinois, State of Maryland, Commonwealth of Massachusetts, Attorney General Dana Nessel on behalf of the People of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico, and State of Rhode Island.  Combined with the instant action, that means that nearly *two dozen jurisdictions* have already brought suit.  It would clearly wreak havoc on the immigration system if limited injunctions were issued, resulting in different public charge frameworks spread across the country, based solely on geography.  *Batalla*, 279 F. Supp. at 438 (granting nationwide injunction where more limited injunction "would likely create administrative problems for the Defendants").

There is no reasonable basis to apply one public charge framework to one set of individuals and a different public charge framework to a second set of individuals merely because they live in different states.  It would be illogical, for example, if a New York resident was eligible for adjustment of status but a resident of a sister state with the *same exact* background was not eligible,

---

[3] In addition to the instant action and the related action both before this Court, these other actions include *Mayor and City Council of Baltimore v. United States Department of Homeland Security*, 19 Civ. 2851 (PJM) (D. Md.); *Casa De Maryland, Inc. v. Trump*, 19 Civ. 2715 (PWG) (D. Md.); *City and County of San Francisco v. U.S. Citizenship and Immigration Services*, 19 Civ. 4717 (PJH) (N.D. Cal.); *La Clinica De La Raza v. Trump*, 19 Civ. 4980 (PJH) (N.D. Cal.); and *Cook County, Illinois v. McAleenan*, 19 Civ. 6334 (GF) (N.D. Ill.).

only because the second resident had the misfortune of living somewhere not covered by a limited injunction.

Relatedly, a nationwide injunction is necessary to accord Plaintiffs and other interested parties with complete redress. In particular, an individual should not have to fear that moving from one state to another could result in a denial of adjustment of status. For example, if the injunction were limited to New York, Connecticut, and Vermont, and a New York resident moved to New Jersey where the injunction would not apply, this individual could there be considered a public charge and face serious repercussions simply for crossing state borders. "[F]reedom to travel throughout the United States has long been recognized as a basic right under the Constitution." *United States v. Guest*, 383 U.S. 745, 758 (1966) (citations omitted). It has been considered a "right so elementary [that it] was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created." *Id.*; *see also Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971) ("Our cases have firmly established that the right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private as well as governmental interference.") The Supreme Court's recognition of the preeminence of this right lends further support for a nationwide injunction that would not interfere with individuals' ability to move from one place to another. *See, e.g., Batalla*, 279 F. Supp. 3d at 438 (finding nationwide injunction appropriate "partly in light of the simple fact that people move from state to state and job to job").

Accordingly, this Court grants a nationwide injunction, as well as a stay postponing the effective date of the Rule pending a final ruling on the merits, or further order of the Court.[4]

---

[4] The standard for a stay under 5 U.S.C. § 705 is the same as the standard for a preliminary injunction. *Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 149 (S.D.N.Y. 2019). Accordingly, this Court grants the stay for the same reasons it grants the injunction.

## VII.   CONCLUSION

Plaintiffs' motion for issuance of a preliminary injunction, (ECF No. 38), is GRANTED.

Dated: New York, New York
      October 11, 2019

SO ORDERED.

GEORGE B. DANIELS
United States District Judge